```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   IP INNOVATION, L.L.C.    )
     and TECHNOLOGY LICENSING )
 4   CORP.,                   )
                              )
 5   Plaintiffs               )
                              ) Civil Docket No.
 6   VS.                      ) 2:07-CV-447-RRR
                              ) April 26, 2010
 7   RED HAT, INC. and        )
     NOVELL, INC.,            )
 8                            )
     Defendants               ) 9:00 A.M.
 9
             TRANSCRIPT OF VOIR DIRE PROCEEDINGS
10         BEFORE THE HONORABLE RANDALL R. RADER
                UNITED STATES CIRCUIT JUDGE
11
     APPEARANCES:
12   FOR THE PLAINTIFF:       MR. JOSEPH A. CULIG
                              MR. ARTHUR A. GASEY
13                            MR. PAUL C. GIBBONS
                              MR. PAUL K. VICKREY
14                            Niro Scavone Haller & Niro
                              181 West Madison, Suite 4600
15                            Chicago, Illinois 60602

16                            MR. JACK WESLEY HILL
                              Ward & Smith Law Firm
17                            111 West Tyler Street
                              Longview, Texas 75601

18

19   APPEARANCES CONTINUED ON NEXT PAGE:

20   COURT REPORTERS:         MS. DONNA COLLINS
                              MS. GLENDA FULLER
21                            Deputy Official Court Reporters
                              100 East Houston, Suite 125
22                            Marshall, TX 75670
                              903/935-3868
23
     (Proceedings recorded by mechanical stenography,
24   transcript produced on CAT system.)

25
```

```
 1  APPEARANCES CONTINUED:
    FOR THE DEFENDANT:          MR. JOSH A. KREVITT
 2                              Gibson, Dunn & Crutcher
                                200 Park Avenue
 3                              New York, New York 10016

 4                              MR. MARK N. REITER
                                MS. AMY E. LaVALLE
 5                              Gibson, Dunn & Crutcher
                                2100 McKinney Avenue
 6                              Suite 1100
                                Dallas, Texas 75201
 7
                                MR. H. MARK LYON
 8                              Gibson, Dunn & Crutcher
                                1881 Page Mill Road
 9                              Palo Alto, California 94304

10             *    *    *    *    *    *

11                   P R O C E E D I N G S

12            (Jury in.)

13            THE COURT:  Thank you.  Please be seated.

14            Ladies and Gentlemen, we're here to

15   discuss a patent matter.  I understand you've had a

16   little instructions in patent law and what that might

17   entail, but I think what we ought to do this morning, as

18   we get started, is make sure you know all these

19   wonderful people here in front of you.  So let's start

20   with the Plaintiffs.

21            And, Mr. Gasey, would you be kind enough

22   to introduce yourself and your colleagues and who you

23   represent a little bit.

24            MR. GASEY:  Actually, with me here is

25   Mr. Wesley Hill, and since he's the local counsel, we're
```

09:33 1   going to have him go ahead and introduce everybody.

09:33 2                   THE COURT:  Mr. Hill, please take over.

09:33 3                   MR. HILL:  Thank you, Your Honor.  Good

09:33 4   morning, Your Honor.  It's a pleasure to see you.

09:33 5                   Ladies and Gentlemen, good morning.  Thank

09:33 6   you for being here today.  My name is Wesley Hill.  I

09:33 7   represent the Plaintiff in this lawsuit.  The Plaintiff

09:33 8   is IP Innovation, LLC and Technology Licensing

09:33 9   Corporation.  Those are my clients.

09:33 10                  With me here at the table is Mr. Gasey,

09:33 11  who you just met, Mr. Art Gasey.

09:33 12                  Art, will you stand up?

09:33 13                  Mr. Gasey will be an attorney you'll be

09:33 14  hearing from in this case extensively.  He'll be our

09:33 15  lead lawyer.

09:33 16                  Also, here at the table is Ms. Katie

09:33 17  Dickman.  Ms. Dickman is an assistant with us.  She's

09:33 18  going to keep us straight during the course of the

09:33 19  trial.

09:33 20                  We also have Mr. Paul Gibbons, who's an

09:33 21  attorney with Mr. Gasey.  They're law partners in

09:33 22  Chicago, Illinois.  Also, partners with them, Mr. Paul

09:33 23  Vickrey, who you'll also be hearing from during the

09:33 24  case.

09:33 25                  We appreciate you folks being here.  We

09:34  1    know it's always a hardship and an imposition to show up

09:34  2    for jury service.  We know we're taking your time.  I

09:34  3    appreciate you being here, and I look forward to those

09:34  4    of you, who are selected for the jury, giving us an

09:34  5    opportunity to present our case to you.

09:34  6                    Thank you.

09:34  7                    Thank you, Your Honor.

09:34  8                    THE COURT:  Thank you, Mr. Hill.

09:34  9                    Mr. Krevitt, do I get to ask you to do the

09:34 10    same for the Defendants or not?

09:34 11                    MR. KREVITT:  Good morning, Your Honor.

09:34 12    I'm going to ask Mr. Reiter --

09:34 13                    THE COURT:  Okay.

09:34 14                    MR. KREVITT:  -- who will be conducting

09:34 15    this process.

09:34 16                    THE COURT:  I'm 0 for 2 getting the right

09:34 17    person.

09:34 18                    MR. REITER:  Good morning, Ladies and

09:34 19    Gentlemen.  My name is Mark Reiter.  I'm an attorney

09:34 20    from Dallas.  I am from Texas.  My accent is not quite

09:34 21    as thick as Mr. Hill's, but I'm not too far from here.

09:34 22                    With me today is my partner, Josh Krevitt.

09:34 23                    MR. KREVITT:  Good morning.

09:34 24                    MR. REITER:  You'll be seeing a bunch of

09:34 25    him.

09:34 1                    And also some colleagues, Robert Vincent,

09:34 2 who works with me in Dallas, and Amy LaValle, who works

09:34 3 with me in Dallas.

09:35 4                    And I want to echo Mr. Hill's thanks for

09:35 5 y'all coming out here today, your time.  We know it is

09:35 6 an imposition.  We know it takes valuable time away from

09:35 7 your children, your job, but it is an important task.

09:35 8 And we do appreciate very much you showing up, and we

09:35 9 appreciate very much those of you who will serve on the

09:35 10 jury.

09:35 11                    Thank you, Your Honor.

09:35 12                    THE COURT:  Thank you, Mr. Reiter.

09:35 13                    I also have an accent, but I'm afraid it's

09:35 14 not from Texas.  I don't suppose I could hide that from

09:35 15 you anyway, but the Court welcomes you and appreciates

09:35 16 your service.

09:35 17                    What we're going to do now is I'm going to

09:35 18 pose some questions to you, and I'm going to ask you to

09:35 19 raise your hand if your answer to the question is yes.

09:35 20                    For instance, I'll ask you in a minute if

09:35 21 you know any of these people you see seated in front of

09:36 22 you, either in the witness box or at the counsel tables.

09:36 23 And if you know any of them or recognize them or think

09:36 24 you know them, then you'll raise your hand.  And I might

09:36 25 then inquire further of you how you know them or why you

09:36  1  think you've seen them or was it on TV or what; you

09:36  2  know, just what your connection is.

09:36  3            If there's some -- I'm going to ask you at

09:36  4  some point, by the way, if you've ever been in a lawsuit

09:36  5  or sued someone, and if there's anything embarrassing or

09:36  6  that you'd like to just mention to me alone, that's easy

09:36  7  to do, too.  We can just arrange for you to come up here

09:37  8  and whisper in my ear.

09:37  9            And we want to make this process very easy

09:37 10  for you, and we want to make sure that we have an

09:37 11  opportunity to get to know you a bit before we select 12

09:37 12  of you who will sit here and perform the absolutely

09:37 13  essential function of a juror in our governmental

09:37 14  system.

09:37 15            It's a great honor for us to serve with

09:37 16  you in this capacity, and it's one of -- really, the

09:37 17  highest honors you can receive as a citizen of the

09:37 18  United States, to be entrusted with helping the United

09:37 19  States resolve important disputes like this.

09:37 20            Well, let's not spend too much more time.

09:38 21  Let's just dive right in and let me ask some questions.

09:38 22            There's one other thing I want to tell

09:38 23  you.  I sometimes refer to myself as the Court.  Well,

09:38 24  the Court had knee surgery last Thursday, so every now

09:38 25  and then the Court is going to get up and stand behind

09:38 1  this chair.  I'm not -- you shouldn't think I'm

09:38 2  objecting to anything that the jury -- that the

09:38 3  witnesses are saying or that the attorneys are saying.

09:38 4  It's just me stretching my leg, all right?

09:38 5          So don't be alarmed if I get up and walk

09:38 6  around back here a little bit; I'm just accommodating a

09:38 7  sore knee.

09:38 8          Well, let's start with our first question.

09:38 9  Remember, if the answer is yes, you'll just raise your

09:38 10 hand.  And then I might ask each of you who raised your

09:38 11 hand to respond further.

09:39 12          Let me ask that question I suggested.  Do

09:39 13 any of you recognize any of the -- start with the

09:39 14 attorneys.  You had them introduced to you before, but

09:39 15 there's Mr. Gasey, Mr. Gibbons, Mr. Vickrey, Mr. Hill,

09:39 16 Mr. Culig, Mr. Haynes.  Some of these are corporate

09:39 17 representatives as well.

09:39 18          Mr. Haynes, Mr. Cooper, Mr. Henderson,

09:39 19 Ms. Dickman, Ms. Harper, Ms. Martin, Mr. Zimmerman,

09:39 20 Mr. Gemini on the one side.

09:39 21          On the other side, Mr. Krevitt,

09:39 22 Mr. Reiter, Mr. Lyon, Ms. LaValle, Ms. Jalali,

09:39 23 Mr. Vincent, Mr. Barns, Mr. Stewart, Ms. Wilkins.

09:40 24          Do you recognize any of those persons or

09:40 25 names?  If so, please raise your hand.

09:40 1          There's one -- there's a person right
09:40 2   here.  Excuse me, ma'am.  Could you stand so we could
09:40 3   hear you?
09:40 4          Do you recognize someone?
09:40 5          JUROR HEBERT:  She (indicates) looks
09:40 6   familiar, but I'm not positive.  If so, I just think
09:40 7   that I might have saw her the last time I was here.
09:40 8          THE COURT:  Okay.  While you're on that
09:40 9   subject, why were you here last time?
09:40 10         JUROR HEBERT:  I don't really remember.  I
09:40 11  didn't get picked.
09:40 12         THE COURT:  Were you in a jury pool?
09:40 13         JUROR HEBERT:  Yes.
09:40 14         THE COURT:  Did you get selected for the
09:40 15  jury?
09:40 16         JUROR HEBERT:  I made it to the box.
09:40 17         THE COURT:  You made it to the -- were
09:40 18  you -- did you -- I will ask all of you this question
09:40 19  later, but let's deal with you.
09:40 20         Have you -- did you participate in the
09:40 21  jury then?
09:41 22         JUROR HEBERT:  No.
09:41 23         THE COURT:  Did you -- so you did not
09:41 24  serve on the jury; you were just in the box and then
09:41 25  excused?

09:41 1                    JUROR HEBERT:  Yes.

09:41 2                    THE COURT:  Your name again?

09:41 3                    JUROR HEBERT:  Sharon Hebert.

09:41 4                    THE COURT:  Nice to meet you, Ms. Hebert.

09:41 5            So I can assume that none of the rest of

09:41 6  you recognize anyone.

09:41 7                    Thank you.

09:41 8            Have you heard anything about this case?

09:41 9            Once again, this is the case of IP

09:41 10  Innovation versus Red Hat.  Have you heard anything

09:41 11  about this case, read anything about it, have any

09:41 12  association with it in any way?

09:41 13                    I see no hands.

09:41 14            Let's go on to the next and rather

09:41 15  important question.  This case will go a week, meaning

09:42 16  we'll be here through Friday maybe.  It's a possibility

09:42 17  we could even go a day next week, but that would require

09:42 18  you to be here from 8:30 to 5:30 each of those days.

09:42 19            Is there any reason that you could not

09:42 20  serve for that period of time?  If there is a reason,

09:42 21  please raise your hand.

09:42 22            Okay.  No. 5, could you stand and give us

09:42 23  your name?

09:42 24                    JUROR WALKER:  Clarence Walker.

09:42 25                    THE COURT:  Yes, Mr. Walker?

09:42 1          JUROR WALKER:  I'm currently in school in

09:42 2 a graduate program.  It's online, so the timing is

09:42 3 varied, but quite a bit of work and discussions we have

09:42 4 to participate in regularly, so...

09:42 5          THE COURT:  I understand.  Is there a way

09:42 6 for you to tape or otherwise deal with any classes that

09:43 7 may occur?

09:43 8          JUROR WALKER:  That's not a problem, sir.

09:43 9 The problem is just the amount of work.  The assignments

09:43 10 that are due next week --

09:43 11          THE COURT:  You'd have to catch up?

09:43 12          JUROR WALKER:  Well, there's no catching

09:43 13 up.  They're due at a certain time, and if they're not

09:43 14 in, they're --

09:43 15          THE COURT:  If you get a note from me, do

09:43 16 they -- does that help or does it hurt maybe?

09:43 17          JUROR WALKER:  I don't know.

09:43 18          THE COURT:  You don't know.

09:43 19          I have on occasion reminded employers, and

09:43 20 in this case educators, that they have a duty to help us

09:43 21 as well as your duty.  So I would give you that note, if

09:43 22 necessary.

09:43 23          JUROR WALKER:  Yes, sir.  I believe my

09:43 24 professor would be understanding.  I'm not sure he has

09:43 25 the parameters under the school to.

09:43  1                     THE COURT:  Okay.  Well, I think schools

09:43  2  usually listen to courts, but not always.  But thank you

09:44  3  very much, sir, for your answer.

09:44  4                     Now, I saw another hand or two.

09:44  5                     JUROR HEBERT:  Me, again.

09:44  6                     THE COURT:  Okay.  Yes, let's hear from

09:44  7  you.

09:44  8                     JUROR HEBERT:  You're going to laugh at

09:44  9  me, too.

09:44 10                     THE COURT:  No, we never laugh.

09:44 11                     JUROR HEBERT:  Oh, thank you.

09:44 12                     This sounds ridiculous, but before God,

09:44 13  I'm the only one that can do my job.

09:44 14                     THE COURT:  What's your job again, ma'am?

09:44 15                     JUROR HEBERT:  I work for a radio station,

09:44 16  KJTX, and do the programming of the -- the inputting of

09:44 17  the data into the computer that goes on the air.  And

09:44 18  our -- the problem was that we've changed -- the owners

09:44 19  are the managers, and we've changed one set of owners to

09:44 20  another set.  And the new set don't know how to do

09:44 21  anything, haven't learned.  And I tried to do as much as

09:44 22  I could last week.

09:44 23                     THE COURT:  These attorneys think the same

09:44 24  thing about me.  They don't think I know how to do

09:45 25  anything.

09:45 1                    JUROR HEBERT:  But that's --

09:45 2                    THE COURT:  Okay.  Thank you, ma'am.

09:45 3  Thank you very much.

09:45 4                    There was another hand.  Yes, ma'am?

09:45 5                    JUROR SNOWDEN:  This is work-related in a

09:45 6  way, and I'm a dental hygienist, and I have patients

09:45 7  that will have to be rescheduled.  So it just

09:45 8  inconveniences more than me for the rest of the week.

09:45 9  My employers will let me off, but it's a major

09:45 10  inconvenience for the people that I'm supposed to be

09:45 11  seeing this week.

09:45 12                    THE COURT:  Helping, okay.  Thank you,

09:45 13  ma'am, very much.

09:45 14                    I assume those could be rescheduled, but

09:45 15  it's an inconvenience; is that correct?

09:45 16                    You can just nod your head.  I notice

09:45 17  you're saying yes.  Thank you.

09:45 18                    Our next question:  Do you or anyone in

09:45 19  your family have any education or background in computer

09:46 20  science?  If so, raise your hand.  Computers, computer

09:46 21  science, anything where you feel particular familiarity

09:46 22  with the computer environment.

09:46 23                    There's a hand here and one in the back --

09:46 24  three hands.  Let's start in front.

09:46 25                    JUROR RYAN:  I took a few computer classes

09:46 1   in college.  I would hardly say I'm proficient, but --

09:46 2   and probably the language is even outdated now, but just

09:46 3   in programming.  And it was in engineering classes.

09:46 4             THE COURT:  Thank you very much, ma'am.

09:46 5   Thank you.  And your name again was?

09:46 6             JUROR RYAN:  Misty Ryan.

09:46 7             THE COURT:  Misty Ryan.  Thank you.

09:46 8             And there was a gentleman behind

09:46 9   Ms. De-Ron there.

09:46 10            JUROR STEPHENSON:  My name is David

09:47 11  Stephenson, and I have had courses in computers and

09:47 12  programming.  And my wife is a -- I call her a technical

09:47 13  guru, so -- her job is in technology for the school

09:47 14  district.

09:47 15            THE COURT:  Now, you say you had

09:47 16  courses --

09:47 17            JUROR STEPHENSON:  Yes, sir.  The line of

09:47 18  work I was in before I retired, I had computer

09:47 19  programming courses that would -- right now, they would

09:47 20  be out of date, because that was back in the '80s, early

09:47 21  '80s.  So I have some knowledge but not that much.  And

09:47 22  my wife has quite a bit of knowledge about...

09:47 23            THE COURT:  Okay.  We'll get to this

09:47 24  later, but you would understand that you wouldn't

09:47 25  discuss the case with your wife at all?

09:47 1              JUROR STEPHENSON:  Yes, sir, I wouldn't.

09:47 2              THE COURT:  Thank you, sir.

09:47 3              JUROR STEPHENSON:  Yes, sir.

09:47 4              THE COURT:  And I see there's a lady with

09:47 5    her hand up here on the far side.

09:48 6              JUROR BRASHER:  Mine is the same as

09:48 7    theirs.  I took computer science in college, but it's

09:48 8    been many, many years ago.  And those languages are now

09:48 9    outdated.

09:48 10             THE COURT:  What is your name again,

09:48 11   ma'am?

09:48 12             JUROR BRASHER:  Gina Brasher.

09:48 13             THE COURT:  Ms. Brasher, thank you very

09:48 14   much.

09:48 15             Okay.  Let me ask if you -- no?  You did

09:48 16   mention that you had computers at your radio station.

09:48 17             JUROR HEBERT:  Right.  I took a course in

09:48 18   college, but like them, it was so long ago I don't

09:48 19   really consider that.  I remember it.  But my job,

09:48 20   that's what I do.  I deal with a lot of computers, but I

09:48 21   only know enough to do what I need to do.

09:48 22             THE COURT:  Thank you very much, ma'am.

09:48 23             I need to ask if you or your family has

09:48 24   any education or work experience in legal matters or

09:49 25   particularly patent law issues.

09:49  1                    Hands that go up on legal matters --

09:49  2   maybe -- yes, I see a lady in the third row there.

09:49  3                    I'll get you next, sir.

09:49  4                    Yes, ma'am?

09:49  5                    JUROR BOLT:  I am Linda Bolt.  I was

09:49  6   prelaw several years ago, multiple years ago in my

09:49  7   degree, but I switched to business finance and

09:49  8   accounting.  And I also attended a two-day seminar with

09:49  9   a patent attorney in Dallas along with some other

09:49 10   inventors.

09:49 11                    THE COURT:  Oh.  Tell me about the seminar

09:49 12   just a little bit.

09:49 13                    JUROR BOLT:  Well, he basically just told

09:49 14   us how to -- the process for getting a patent on our

09:49 15   invention that we had.  One of the interesting gentlemen

09:49 16   that I was in there with had previously invented the

09:49 17   artificial heart, and he was there with another

09:49 18   invention, and he told about that.

09:49 19                    It's a very, very lengthy and timely

09:50 20   process, based on what all he was telling us.  And there

09:50 21   was a lot of research that we had to do before we

09:50 22   actually acquired an attorney.

09:50 23                    THE COURT:  So did you feel like the

09:50 24   things you saw on the film today were kind of old hat to

09:50 25   you?

09:50   1                        JUROR BOLT:  Right, a little bit.  I'm not

09:50   2   an expert by any means.

09:50   3                        THE COURT:  But you have a little

09:50   4   background.  Thank you, ma'am.

09:50   5                        There was a gentleman in front of you who

09:50   6   raised his hand as well.

09:50   7                        JUROR WHATLEY:  My name is Reggie Whatley,

09:50   8   and just by profession, my wife is currently a

09:50   9   paralegal.

09:50  10                        THE COURT:  Oh, okay.  What is your

09:50  11   profession, sir?

09:50  12                        JUROR WHATLEY:  I'm a school teacher.

09:50  13                        THE COURT:  Great.  What do you teach?

09:50  14                        JUROR WHATLEY:  Music.

09:50  15                        THE COURT:  Oh, my -- let's talk.  I need

09:50  16   some help.  My rock band has trouble keeping the rhythm.

09:50  17   Thank you.

09:51  18                        Let me see.  Let's go on to my next

09:51  19   question.  I want to ask if any of you have ever served

09:51  20   on a jury before.

09:51  21                        Now, I'll need to see hands.  Oh, good, we

09:51  22   have lots of questions here.  Let's start right up here

09:51  23   in front, and I'm going to ask you what kind of case and

09:51  24   what was the verdict and how long ago.

09:51  25                        JUROR C. WILSON:  I'm Carol Wilson, and

09:51 1   I've been on two or three juries; one when I lived in

09:51 2   Dallas and a couple since I've been in Cass County.

09:51 3   They were civil court, property disputes.

09:51 4               THE COURT:  Do you remember the verdict?

09:51 5               JUROR C. WILSON:  One very emotional and

09:51 6   one was not guilty.

09:51 7               THE COURT:  Okay.  That was -- was it a

09:51 8   criminal-type case?

09:51 9               JUROR C. WILSON:  No, it was a property

09:52 10  dispute.

09:52 11              THE COURT:  It was a property dispute.

09:52 12              JUROR C. WILSON:  He said/she said.  It

09:52 13  was a not guilty.

09:52 14              THE COURT:  And your jury said there was

09:52 15  no damages?

09:52 16              JUROR C. WILSON:  Exactly.

09:52 17              THE COURT:  Okay.  Do you remember -- you

09:52 18  said there were more than one.

09:52 19              JUROR C. WILSON:  As I say, they're all

09:52 20  civil.  I've not been on a criminal case.  But they were

09:52 21  all property disputes.

09:52 22              THE COURT:  Do you remember the outcomes

09:52 23  of any of the others?

09:52 24              JUROR C. WILSON:  No.

09:52 25              THE COURT:  Okay.  Thank you very much.

09:52  1   That was very helpful.

09:52  2              I think the lady next to you had a --

09:52  3   seeing her hand up.

09:52  4              JUROR ROBERTSON:  I'm Linda Robertson, and

09:52  5   it was a wreck, a car wreck.  The man said he was

09:52  6   guilty, but then we did the damages.  And some damages,

09:52  7   we rewarded and some we didn't.

09:52  8              THE COURT:  So you kind of gave some

09:52  9   relief but not everything?

09:52 10              JUROR ROBERTSON:  Yeah.  We thought some

09:52 11   were right and some were wrong.

09:52 12              THE COURT:  It was a car wreck case?

09:52 13              JUROR ROBERTSON:  Yes, sir.

09:52 14              THE COURT:  Thank you.

09:52 15              How long ago was that?

09:52 16              JUROR ROBERTSON:  About two years ago.

09:52 17              THE COURT:  Okay.  Thank you.

09:53 18              I think the gentleman next to you was one

09:53 19   as well.

09:53 20              JUROR ORR:  Yes.  My name is Ricky Orr,

09:53 21   and it's been about nine months ago.  It was a criminal

09:53 22   case and found the man guilty.  He had crack cocaine in

09:53 23   his hat.

09:53 24              THE COURT:  Okay.  Thank you very much.

09:53 25              I need the hands again to see who else is

09:53 1    in -- okay.  Let's come right along the border here.

09:53 2                    JUROR WOLFE:  My name is Jan Wolfe.  I

09:53 3    think it was about ten years ago, I served on a criminal

09:53 4    case.  It was a murder trial.  And he was guilty.  We

09:53 5    convicted him.

09:53 6                    THE COURT:  Okay.  Thank you for your

09:53 7    service then.

09:53 8                    And the next lady, I think, is also --

09:53 9                    JUROR MILLER:  My name is Beverly Miller.

09:53 10   I served on a juror (sic) right here within the last two

09:53 11   years.  It was a patent dispute, and we found that the

09:53 12   patent was not good.

09:54 13                   THE COURT:  You invalidated the patent?

09:54 14                   JUROR MILLER:  Invalidated, yes.

09:54 15                   THE COURT:  Thank you.  That's a help,

09:54 16   too, as well.

09:54 17                   Were there other -- yes, the lady on

09:54 18   the -- we finally missed you.

09:54 19                   Excuse me.  I shouldn't...

09:54 20                   JUROR HILL:  Willie Dean Hill.  I served

09:54 21   on a criminal jury where we found the guy guilty.

09:54 22                   THE COURT:  What kind of case?

09:54 23                   JUROR HILL:  Two drunks got in a fight,

09:54 24   and one hit the other up side of the head, and he later

09:54 25   died.

09:54  1                THE COURT:  Thank you very much.  Thank

09:54  2  you.

09:54  3                JUROR HEBERT:  You didn't miss me.

09:54  4                THE COURT:  Oh, we didn't miss you.

09:54  5                JUROR HEBERT:  It was about 20 years ago

09:54  6  maybe.  I don't know what kind of case it was, but a man

09:54  7  was accused of child abuse, a 17-year-old and a man, but

09:54  8  they settled, so we didn't have to make a decision.

09:54  9                THE COURT:  Okay.  Good.  Thank you.

09:54 10                And I need the hands again, and we'll go

09:54 11  over on this side.

09:55 12                JUROR POWER:  James Power.  I served on

09:55 13  the county -- in Morris County for a dispute over a

09:55 14  Rolex watch.  And we found that -- I don't know how it

09:55 15  really turned out.  He wasn't -- it was over if it was a

09:55 16  real Rolex watch or not, and the guy didn't know that

09:55 17  what he sold was not a genuine Rolex.

09:55 18                THE COURT:  Okay.

09:55 19                JUROR POWER:  So no damages awarded.

09:55 20                THE COURT:  No damages awarded.  Thank you

09:55 21  very much, sir.

09:55 22                Next, ma'am?

09:55 23                JUROR NASH:  I'm Beth Nash from Linden,

09:55 24  Texas.  And it's probably been 12 years I was on a civil

09:55 25  case, and it was also a property dispute.  And I believe

09:55  1    the judge actually finally came up with the actual

09:55  2    decision.

09:55  3                    THE COURT:  Do you remember what that was?

09:56  4                    JUROR NASH:  Just a property dispute like

09:56  5    over property lines.

09:56  6                    THE COURT:  Oh, okay.  And they redrew the

09:56  7    line appropriately?

09:56  8                    JUROR NASH:  Yes, sir.

09:56  9                    THE COURT:  Thank you very much, ma'am.

09:56 10                    JUROR COLLINS:  Ron Collins.  I was on a

09:56 11    criminal case.  A guy had stolen some checks and thought

09:56 12    they were his, I guess, and we found him guilty.

09:56 13                    THE COURT:  All right.  Thank you very

09:56 14    much, sir.

09:56 15                    Let's see.  Across the aisle.

09:56 16                    JUROR STEPHENSON:  Again, David

09:56 17    Stephenson.  And I've served on a jury here in this

09:56 18    court building about three or four years ago, and it was

09:56 19    civil.  A young man was suing a -- suing about his

09:56 20    credit and so -- but we found against the young man.

09:57 21                    THE COURT:  Okay.  Thank you.

09:57 22                    Others who have been on a jury?  Let's go

09:57 23    back on this side.

09:57 24                    Thank you.

09:57 25                    JUROR BRASHER:  Gina Brasher.  And I live

09:57 1   in Ore City, Texas, which is in Upshur County.  I've

09:57 2   served on many juries, county, and I was on a grand

09:57 3   jury, and I've served here once.  It's probably been

09:57 4   about 15 years ago, I guess.

09:57 5            It was a personal injury-type case, and we

09:57 6   found -- we didn't award any damages in that case.  The

09:57 7   others have been -- I think there was one civil and

09:57 8   several criminal, too, in Upshur County.

09:57 9            THE COURT:  Okay.  Thank you, ma'am.

09:57 10            JUROR LIGHTFOOT:  My name is Judy

09:57 11   Lightfoot.  I have served on a criminal jury in Cass

09:57 12   County.  I believe it was aggravated assault about 15

09:57 13   years ago, and we found him guilty.

09:58 14            And over 20 years ago, I served here as a

09:58 15   juror.  I believe it was an inmate suing the state, but

09:58 16   after a day of testimony, he settled out.  So we didn't

09:58 17   serve any longer.

09:58 18            THE COURT:  Thank you, ma'am.

09:58 19            JUROR BOLT:  Linda Bolt.  I was on a

09:58 20   case -- a civil case in 1993.  It was an auto accident.

09:58 21   There were three insurance companies involved.  The case

09:58 22   trial lasted about a week and a half.

09:58 23            Halfway through, two of the insurance

09:58 24   companies settled out of court, and we ended up awarding

09:58 25   more than was asked for damages for the third insurance

09:58  1  company that saw the trial all the way through.

09:58  2            THE COURT:  Okay.  Thank you, ma'am.

09:58  3            JUROR M. WILSON:  Mary Teresa Wilson.

09:58  4  I've served on three juries.  One was two boys that had

09:58  5  gotten into a fight; one was a car wreck; and the other

09:58  6  was a theft charge hearing here in Marshall.

09:58  7            THE COURT:  Okay.  Do you remember any of

09:58  8  the verdicts?

09:59  9            JUROR M. WILSON:  The fight was not

09:59 10  guilty; the car wreck was not guilty; and the theft was

09:59 11  guilty.

09:59 12            THE COURT:  Okay.  Thank you very much.

09:59 13  You remember quite well.

09:59 14            Others who -- there's several here.  Thank

09:59 15  you.

09:59 16            JUROR SNOWDEN:  Katherine Snowden.  I was

09:59 17  picked.  It was -- I believe we were just supposed to

09:59 18  decide the sentence.  I believe it was a forgery case in

09:59 19  Cass County, probably around 20 years ago.  We did not

09:59 20  ever get to decide.  It was settled.

09:59 21            We were waiting and it got settled before

09:59 22  we had to do anything.  And I don't remember what they

09:59 23  settled for.  He pled guilty.

09:59 24            THE COURT:  Okay.  Thank you, ma'am.

09:59 25            JUROR MCCANT:  Maude McCant.  I served on

09:59  1    jury duty in Cass County.  It was a drug conviction.  We

09:59  2    did find the young lady guilty.

10:00  3                    THE COURT:  Thank you, ma'am.

10:00  4                    JUROR IRVING:  My name is Bloyce Irving.

10:00  5    I served on a personal injury case, and I served on one

10:00  6    that was dismissed on a personal injury case.  The guy

10:00  7    got half of what he asked for.

10:00  8                    THE COURT:  Okay.  Thank you.

10:00  9                    Have we gotten everyone on that question

10:00 10    now?  Anyone who did not get a chance to talk about

10:00 11    prior jury service?

10:00 12                    My next question:  Has you or anyone in

10:00 13    your family ever been sued or sued someone else in state

10:00 14    or federal court?

10:00 15                    Now, once again, this is one of those

10:00 16    questions that if you'd prefer to come up and talk to me

10:00 17    quietly, we can arrange that.  But if you prefer just to

10:00 18    mention it, we can -- openly, that will be fine, too.

10:01 19                    There's one hand I see.  Let's see some

10:01 20    hands.  I see one, two, three hands.

10:01 21                    JUROR DRENNEN:  My name is Frances

10:01 22    Drennen, and I was in an auto accident.  I was in an

10:01 23    auto accident twice.  It settled out of court.

10:01 24                    And one time our family, we did go -- in

10:01 25    the accident, we went to court, but they settled before

10:01 1    it got started.

10:01 2                    THE COURT:  Now, did they hit you or

10:01 3    did --

10:01 4                    JUROR DRENNEN:  Yes, sir.

10:01 5                    THE COURT:  So in each case, you were the

10:01 6    victim?

10:01 7                    JUROR DRENNEN:  Yes, sir.

10:01 8                    THE COURT:  And so you had sued them to

10:01 9    recover your damages?

10:01 10                   JUROR DRENNEN:  Yes, sir.

10:01 11                   THE COURT:  Okay.  Thank you.  And that

10:01 12   settled.

10:01 13                   I think there's a gentleman here and a

10:01 14   lady here (indicates).  Let's start with the gentleman.

10:01 15   Excuse me.  We should do ladies first, but in this case,

10:01 16   we'll start with the gentleman.

10:01 17                   JUROR STABENO:  William Stabeno.  I was

10:01 18   sued for an auto accident, and they ended up -- the

10:01 19   insurance company paid them a couple thousand dollars

10:01 20   and they dropped the suit.

10:02 21                   THE COURT:  Okay.  It sounds like it was a

10:02 22   pretty minor affair.  Okay.  Thank you.

10:02 23                   And the lady here?

10:02 24                   JUROR BRASHER:  Gina Brasher.  And I guess

10:02 25   my suit is still pending.  It has not gone to court yet.

10:02 1  My daughter was killed in an automobile accident 15

10:02 2  months ago, and so all of this is still pending.

10:02 3         THE COURT:  Oh, I'm very sorry to hear

10:02 4  about that.

10:02 5         JUROR BRASHER:  Thank you.

10:02 6         THE COURT:  Okay.  Thank you.

10:02 7         Anybody else who's sued or been sued?

10:02 8  Again, we can do this in private, if you prefer.

10:02 9         There's a lady in front.

10:02 10         JUROR MILLER:  I had to think about this a

10:02 11  minute.  Beverly Miller.

10:02 12         When I was 17 years old, I had a car

10:02 13  wreck.  We didn't go to court or anything, but I know

10:02 14  there was a lawyer who got our hospital bills and stuff

10:02 15  like that paid for.  And my sister had to have plastic

10:02 16  surgery on her forehead, and they paid for that.  But I

10:03 17  can't tell you how many years ago that was.  I was 17; I

10:03 18  know that.

10:03 19         THE COURT:  Well, we're not going to

10:03 20  inquire about the Court's record.  This is one of those

10:03 21  instances where I could maybe top some of you.  But

10:03 22  thank you, ma'am, very much.

10:03 23         Oh, good, the radio station.

10:03 24         JUROR HEBERT:  I wasn't sure if this

10:03 25  counted.  One of my family members was part of a class

10:03  1   action pharmaceutical suit.

10:03  2                   THE COURT:  That counts.

10:03  3                   JUROR HEBERT:  You know, they ruled in

10:03  4   favor of the -- whatever you call them, the Defendants.

10:03  5   So she got a settlement.

10:03  6                   THE COURT:  Do you remember how much?

10:03  7                   JUROR HEBERT:  Maybe 20,000.  It was a

10:03  8   whole --

10:03  9                   THE COURT:  Okay.  That gives us an idea.

10:03 10   Thank you very much.

10:03 11                   Anybody else?  Did we get it all?

10:03 12                   Thank you.

10:03 13                   Now, it's typical sometimes that there are

10:04 14   mock trials or jury focus groups.  Attorneys can invite

10:04 15   people to come to their office or to go to some place

10:04 16   where they participate in a kind of a mock trial so that

10:04 17   the attorneys can learn how to present their cases

10:04 18   better, or they can study how jurors react to certain

10:04 19   arguments.

10:04 20                   Have any of you ever done this, been part

10:04 21   of a mock jury sort of a situation?

10:04 22                   Yes, ma'am?

10:04 23                   JUROR HEBERT:  Yes.  It was a case where a

10:04 24   gentleman that worked for a railroad had gotten injured

10:04 25   on the job, and they didn't give him any benefits or

10:04  1  anything, so he sued them.  And we ruled in favor of

10:04  2  him.

10:04  3             THE COURT:  That was kind of a mock --

10:05  4             JUROR HEBERT:  Yes, sir.  It was a mock

10:05  5  trial.

10:05  6             THE COURT:  -- mock trial.  Thank you.

10:05  7             Anyone else participated in anything like

10:05  8  that?

10:05  9             Okay.  Good.  You know, let me just ask

10:05 10  you two very general questions, but they're really my

10:05 11  most important two questions.  So I'd like you to listen

10:05 12  very carefully and really -- this is one of those times

10:05 13  I ask you to kind of search your insights a little bit.

10:05 14             Is there any reason that you could not

10:05 15  follow my instructions on the law of this case?  If you

10:05 16  have any apprehensions, maybe you disagree with the law

10:05 17  that I would give to you and tell you to follow or

10:05 18  something, could you raise your hand on that?

10:05 19             All right.  And this is another question.

10:05 20  It's general, but I really need you to take it quite

10:06 21  seriously.

10:06 22             Is there any reason at all that any of you

10:06 23  could not render an unbiased verdict here?  Is there any

10:06 24  reason that you would feel you couldn't really do the

10:06 25  job your government expects you to do in reaching a fair

10:06  1    verdict?  If you could raise your hand on any

10:06  2    apprehensions you might have about that role.

10:06  3                    Thank you.

10:06  4                    What I'm going to do now is I'm going to

10:06  5    allow counsel to go through maybe some of the same

10:06  6    areas.  I want to just make sure they get a chance to

10:06  7    get to know you a little bit as well and ask you a few

10:06  8    questions.

10:06  9                    So we'll start -- I think we'll start with

10:06 10    you, Mr. Hill.  Would you like to take a little time and

10:07 11    talk to the ladies and gentlemen?

10:07 12                    MR. HILL:  Thank you for the opportunity,

10:07 13    Your Honor.

10:07 14                    Ladies and Gentlemen, thank you again for

10:07 15    being here this morning.  My name is Wesley Hill.  As I

10:07 16    told you earlier, I represent the Plaintiffs in this

10:07 17    lawsuit.

10:07 18                    Let me ask first off, I want to -- you

10:07 19    folks are out there and I hate to stay way over here.

10:07 20    If I step away from the podium, can you hear me okay?

10:07 21                    Okay.  My clients in this case, as I told

10:07 22    you earlier, are two companies.  The first company is

10:07 23    called IP Innovation.  The second is a company called

10:07 24    Technology Licensing Corporation.

10:07 25                    There's a couple people earlier that I

10:07 1  didn't introduce to you that I want to introduce to you

10:07 2  now. The first Mr. Carl Cooper. Mr. Cooper is the

10:07 3  General Manager of Technology Licensing Corporation.

10:07 4  He's here as a corporate representative on behalf of the

10:07 5  company.

10:07 6           The other person I want to introduce to

10:07 7  you is Mr. Clayton Haynes. Mr. Haynes is a corporate

10:08 8  representative with IP Innovation. He'll be with us

10:08 9  here through the trial as well.

10:08 10           I wanted to give you folks a chance to

10:08 11  meet them. They're the representatives for the

10:08 12  Plaintiffs in this lawsuit.

10:08 13           Now, as I told you earlier, we've got

10:08 14  other lawyers that are working on the case. We

10:08 15  introduced to you Mr. Gasey, Mr. Gibbons, Mr. Vickrey.

10:08 16  They're from Chicago, Illinois, and a firm up there

10:08 17  called Niro Haller & Niro. And they were kind enough to

10:08 18  ask me to be their local guy on the thing since they

10:08 19  came down to Marshall, Texas, to work on this case.

10:08 20           Now, this is a significant part of the

10:08 21  process, jury selection. This is our only opportunity

10:08 22  to talk to you folks and you can talk back to us. We

10:08 23  can have a discussion. The rest of the time, for those

10:08 24  of you who get selected, it will be you listening to us,

10:08 25  and we won't be able to listen to you at that point.

10:09  1          The only wrong answer in a jury selection

10:09  2  is the answer you don't give.  So all we're doing is

10:09  3  trying to get to know you folks a little bit so we can

10:09  4  represent our clients fairly when we try to make sure we

10:09  5  get a jury in this case that's going to be fair and

10:09  6  impartial and to fairly hear the case.

10:09  7          If I ask some questions and it's something

10:09  8  you think pertains to you as you've already done for

10:09  9  Judge Rader, let me know, and we'll talk about it.  And

10:09 10  I appreciate it.

10:09 11          Now, this is a patent case, and we -- my

10:09 12  clients, IP Innovation and Technology Licensing

10:09 13  Corporation, are the owners of three United States

10:09 14  patents.  That's them right here (indicates), three

10:09 15  United States patents.

10:09 16          And what our companies do is we are in the

10:09 17  business of helping inventors and small business owners,

10:09 18  small patent owners realize value from their inventions.

10:10 19  We provide them with the time and the investment and the

10:10 20  expertise that small inventors may not have to make sure

10:10 21  their property rights are respected.

10:10 22          What we do is we help patent rights owners

10:10 23  to get paid royalties by companies that want to use

10:10 24  their technology.

10:10 25          Let me ask a question.  How many of you

10:10 1  have ever heard of either of these companies, either IP

10:10 2  Innovation or Technology Licensing Corporation.

10:10 3            It's not likely that you would.

10:10 4            Let me ask this question:  Is there

10:10 5  anybody -- oh, I'm sorry.  Yes, ma'am; is that

10:10 6  Ms. McFarland?

10:10 7            JUROR MCFARLAND:  Gayle McFarland.  I've

10:10 8  just heard of IP Innovation.  I don't know really

10:10 9  anything about them.  I just have heard about them.

10:10 10           MR. HILL:  You've heard the name.  Nothing

10:10 11  about that makes you lean one way or the other?

10:10 12           JUROR MCFARLAND:  No, sir.

10:10 13           MR. HILL:  Thank you, ma'am.

10:11 14           Now, is there anybody -- I mentioned

10:11 15  earlier royalties.  Anybody here receive oil and gas

10:11 16  royalties?

10:11 17           We have a couple over here.

10:11 18           Mr. Orr, you're in the oil and gas

10:11 19  business, aren't you?

10:11 20           JUROR ORR:  Yes, I am.

10:11 21           MR. HILL:  And you're familiar with oil

10:11 22  and gas royalties?

10:11 23           JUROR ORR:  Yes, I am.

10:11 24           MR. HILL:  So if an oil company pays you

10:11 25  royalties, they're paying you that royalty because

10:11 1  they're using your property, right?

10:11 2                JUROR ORR:  Yes.

10:11 3                MR. HILL:  They're using your mineral

10:11 4  rights --

10:11 5                JUROR ORR:  Right.

10:11 6                MR. HILL:  -- to produce oil and gas, and

10:11 7  they pay you a royalty based off it?

10:11 8                JUROR ORR:  Right.

10:11 9                MR. HILL:  Well, that's not unlike our

10:11 10 situation.  We own inventions, patents, and people who

10:11 11 want to use our property pay us royalties to use them.

10:11 12 So it's a similar circumstance.

10:11 13                Anybody else familiar with oil and gas

10:11 14 royalties?

10:11 15                That's where it comes up.  We have a

10:11 16 couple hands here.

10:11 17                You're just generally familiar with how

10:11 18 that works?

10:11 19                JUROR NASH:  My husband inherited

10:11 20 generation generation from a grandmother to his mother's

10:12 21 portion of oil and gas rights up in Oklahoma but very

10:12 22 small.  So the only thing we really know is an

10:12 23 occasional very small check.

10:12 24                MR. HILL:  Okay.  Ms. Nash, you understand

10:12 25 how that concept works then, receiving a royalty from

10:12  1   somebody using the property?

10:12  2              JUROR NASH:  Yes.

10:12  3              MR. HILL:  Everybody else is familiar with

10:12  4   royalties and understands that concept?

10:12  5              Now, let me ask you about the Defendants

10:12  6   in this lawsuit.  The Defendants in this lawsuit, who we

10:12  7   say are infringing our patents, are two companies.  The

10:12  8   first one is called Red Hat.

10:12  9              Anybody in here heard of Red Hat?

10:12 10              The second is Novell.

10:12 11              Anybody heard of Novell?

10:12 12              We've got a couple hands here.

10:12 13              Let me just ask, is there anybody that

10:12 14   knows anything more than Novell is a software company?

10:12 15              Had a lot of dealings with Novell.

10:12 16              Let's start right here.  Mr. Walker; is

10:13 17   that right?

10:13 18              JUROR WALKER:  It's been a few years and

10:13 19   my memory is not that good.  I might be getting it mixed

10:13 20   up with another company.  But I believe it was a

10:13 21   Canadian company that had office suite-type software.

10:13 22   WordPerfect, I think, was one of them, I believe.

10:13 23              MR. HILL:  I think you're talking about

10:13 24   Corel.

10:13 25              JUROR WALKER:  Corel.  I'm sorry.  See, it

10:13  1  rhymes.  I told you my memory is not that good.

10:13  2              MR. HILL:  While I've got you there,

10:13  3  Mr. Walker, let me ask you something.  You mentioned

10:13  4  that you're a student right now, a graduate student.

10:13  5              JUROR WALKER:  Yes, sir.

10:13  6              MR. HILL:  What are you studying?

10:13  7              JUROR WALKER:  Military history.

10:13  8              MR. HILL:  Okay.  What school?

10:13  9              JUROR WALKER:  It's Norwood University in

10:13 10  Northfield, Vermont.

10:13 11              MR. HILL:  Are you a full-time student.

10:13 12              JUROR WALKER:  Yes.

10:13 13              MR. HILL:  Thank you, sir.

10:13 14              THE COURT:  Why did Napoleon win the

10:13 15  battle of Austerlitz?

10:13 16              Because he abandoned the high ground.  You

10:13 17  can use that for --

10:14 18              JUROR WALKER:  That was three weeks ago,

10:14 19  sir.

10:14 20              THE COURT:  He applied all expectations.

10:14 21              Excuse me.  Go ahead.

10:14 22              MR. HILL:  Now -- yes, ma'am, right over

10:14 23  here.  And that is Ms. -- let's see if I can get it.  Is

10:14 24  that Ms. Whatley?

10:14 25              I'm sorry.  19, is that your number?

10:14 1                     That is Ms. Corley.  I'm sorry.

10:14 2                     JUROR CORLEY:  I currently work for a

10:14 3  company that uses Novell.

10:14 4                     MR. HILL:  You use their software.  You're

10:14 5  familiar that they make operating systems and that sort

10:14 6  of thing?

10:14 7                     JUROR CORLEY:  Uh-huh.  Kind of/sort of.

10:14 8  I just use the system.  I log into it and process off it

10:14 9  every day.

10:14 10                    MR. HILL:  Is there anything about the use

10:14 11 of their software that makes you feel you couldn't be

10:14 12 fair to one side or the other?

10:14 13                    JUROR CORLEY:  No.

10:14 14                    MR. HILL:  Anybody else?  Anybody know

10:14 15 something about Red Hat or Novell that makes you think

10:14 16 you couldn't be fair to the parties in this case?

10:14 17                    Thank you.

10:14 18                    Now, earlier you saw the lawyers for the

10:14 19 Defendants and you also saw the lawyers for the

10:15 20 Plaintiffs, and you had a chance to look at us a little

10:15 21 longer now.

10:15 22                    I want to ask you again, does anybody

10:15 23 recognize any of the lawyers?

10:15 24                    No?

10:15 25                    Okay.  Well, as I mentioned when we got

10:15 1   started, this is a case about patent infringement, and

10:15 2   we are the owners of three U.S. patents that were issued

10:15 3   in 1991, '95, and '96.  Those are the patents I showed

10:15 4   you earlier.

10:15 5          And in broad form, our patents relate to a

10:15 6   technology called computer workspace switching or

10:15 7   computer workspace switcher.  Let me tell you, that's no

10:15 8   more complicated than it sounds.  You're looking at a

10:15 9   computer screen and you've got Windows and things open

10:15 10  on that computer screen and you want to do something

10:15 11  else, but you don't want to close everything down.

10:15 12         There's a switch and you pick it and it

10:15 13  gives you a new, fresh desktop.  Your other one is still

10:15 14  there, but you have a new one pop up.  You can use it.

10:15 15  When you get ready, you can push it back, or you can

10:16 16  create a third one and switch to it.  That's, in a

10:16 17  nutshell, what these patents relate to.

10:16 18         We say that the Defendants in this lawsuit

10:16 19  are infringing our patents, because they sell operating

10:16 20  systems that provide that same functionality.  They're

10:16 21  using our property and they're not paying us for it.

10:16 22  And that brings me to talking about questions about

10:16 23  patents and patent rights or rights that a patent gives

10:16 24  you.

10:16 25         Is there anyone who, either you or a

10:16 1    family member, a close family member, have ever invented

10:16 2    anything and sought a patent on it?  Anybody?

10:16 3             Now, Ms. -- right back here, Ms. Bolt?  I

10:16 4    noticed earlier you said you went to this seminar a

10:16 5    couple days.

10:16 6             Were you look at getting a patent?

10:16 7             JUROR BOLT:  Right.

10:16 8             MR. HILL:  Was it an invention of your

10:17 9    own?

10:17 10            JUROR BOLT:  Yes.

10:17 11            MR. HILL:  Can you tell me -- I don't want

10:17 12   to get into your business, but can you tell me anything

10:17 13   about it?

10:17 14            JUROR BOLT:  It's still pending.  I have

10:17 15   not done anything further on it.  It has to do with --

10:17 16   it's kind of funny.  It has to do with our raising seat

10:17 17   lids on the toilet.

10:17 18            MR. HILL:  Okay.  Well, that's something

10:17 19   that's got to be done.

10:17 20            JUROR BOLT:  And it's putting it back

10:17 21   down.  That was the big issue.

10:17 22            MR. HILL:  That's important, too.  Do you

10:17 23   have a patent pending?

10:17 24            JUROR BOLT:  No.  I'm still in the process

10:17 25   of working things out.

10:17  1              MR. HILL:  Is there something that would

10:17  2  make you a better or worse juror in this case?

10:17  3              JUROR BOLT:  Probably neither one.

10:17  4              MR. HILL:  Neither one?

10:17  5              Okay.  Anybody else?

10:17  6              Right up here on the front row.

10:17  7              JUROR WOLFE:  It's insignificant.

10:17  8              MR. HILL:  Listen, there's nothing

10:17  9  insignificant here today.

10:17 10              Ms. Wolfe?

10:17 11              JUROR WOLFE:  Yes, Jan Wolfe.  My son is

10:18 12  an engineer.  Truthfully, I really don't know that much

10:18 13  about it, but I know he has invented something.  He

10:18 14  designs blowout preventers for Gulf rigs.

10:18 15              MR. HILL:  That's important right now.

10:18 16  Have you seen --

10:18 17              JUROR WOLFE:  It's scarily important.  But

10:18 18  I'm not even sure what the product does.  It's some kind

10:18 19  of device or valve or something on those blowout

10:18 20  preventers.  And it has been applied for.  That's all

10:18 21  that I know.

10:18 22              MR. HILL:  Okay.  Thank you.

10:18 23              I saw on the news this morning where they

10:18 24  were trying to get a robot submarine to pull the blowout

10:18 25  preventer on the well in the Gulf that's leaking.

10:18 1                    Now, patents are issued by the United

10:18 2     States Patent & Trademark Office of the United States

10:18 3     government.  And they're authorized by our Constitution.

10:18 4     Patent protection is embodied in our United States

10:18 5     Constitution.

10:18 6                    Is there anybody that objects to the

10:18 7     government being the one who decides who owns important

10:19 8     intellectual property?

10:19 9                    That's a 3-dollar word.  Let me talk about

10:19 10    that.

10:19 11                   Intellectual property is what patent

10:19 12    lawyers use to talk about patents or trademarks or

10:19 13    copyrights or those kind of things.

10:19 14                   Is there anybody that has a problem with

10:19 15    the fact that it's the government ultimately, the Patent

10:19 16    Office, that decides who's the inventor and who owns

10:19 17    that?  Does that bother anybody?

10:19 18                   Now, it's often said a patent is like a

10:19 19    deed to land.  And what it does is for a period of time,

10:19 20    it gives the person a right to use that invention.

10:19 21                   Is there anybody who has a problem with

10:19 22    the idea that a patent owner is the person with the

10:19 23    right to give permission for whether somebody else can

10:19 24    use their invention?

10:19 25                   Does everybody agree with me they think

10:19  1   that's the way it ought to be?

10:19  2              Is there anybody that feels it's wrong to

10:19  3   require a company to pay for somebody else's technology

10:20  4   if they want to use it?  If you want to use the property

10:20  5   of somebody else, is it wrong to require them to pay for

10:20  6   it?

10:20  7              Now, as the Judge told you earlier, when a

10:20  8   company like our companies -- we'll call them IPI and

10:20  9   TLC for short.  You'll hear us say that throughout the

10:20 10   trial.

10:20 11              When companies like IPI or TLC believe

10:20 12   somebody is infringing their patents, there's no patent

10:20 13   police out there.  There's nobody that enforces this.

10:20 14   The remedy is you have to come to court and file a

10:20 15   lawsuit for patent infringement.  And that's what we've

10:20 16   done in this case.

10:20 17              Now, the reason I bring that up is a lot

10:20 18   of people are of the opinion -- and I'm not going to say

10:20 19   it's the wrong opinion -- of the opinion there's too

10:20 20   many lawsuits in this world.  But patent lawsuits are

10:20 21   something you have to file if you want to check facts.

10:20 22              Is there anybody that thinks patent

10:21 23   lawsuits aren't the kind of lawsuits you want to see at

10:21 24   the courthouse?

10:21 25              Do you think that these are abusive-type

10:21  1   lawsuits, or you have a problem with people coming to

10:21  2   court and filing a lawsuit to enforce their intellectual

10:21  3   property rights?

10:21  4                    Does that bother anybody?

10:21  5                    Mr. Walker, does that give you any

10:21  6   concern?

10:21  7                    JUROR WALKER:  Not particularly.

       8                    MR. HILL:  Anybody else?  Is there anybody

10:21  9   that's different than Mr. Walker that it does give you

10:21 10   some concern.

10:21 11                    Mr. Stabeno, I may have misread you back

10:21 12   there.  Is there anything crossing your mind about that?

10:21 13                    JUROR STABENO:  (Shakes head.)

10:21 14                    MR. HILL:  No?  Okay.

10:21 15                    Now, it's important to ask in these cases,

10:21 16   because some people feel this way.  Some people have

10:21 17   moral or religious convictions that they think prevent

10:22 18   them from sitting in judgment of somebody else's

10:22 19   situation.

10:22 20                    There's nothing wrong with that, but if

10:22 21   you feel that way and think that will be a problem in

10:22 22   your jury service, just let us know that.

10:22 23                    Anybody have those kind of feelings, moral

10:22 24   or religious reasons you think jury service isn't for

10:22 25   you?

10:22  1          Well, let me talk to you a little bit

10:22  2     about something called burdens of proof.  And those of

10:22  3     you who have been on a jury before will know what

10:22  4     burdens of proof are all about.

10:22  5          But we're the Plaintiffs in this case, and

10:22  6     we have to prove that the Defendants who we've sued are

10:22  7     infringing our patents.  And we're going to do that.

10:22  8     And we have to prove that by what's called a

10:22  9     preponderance of the evidence.

10:22 10          Preponderance of the evidence means more

10:22 11     likely true than not true.  That means if we look at the

10:22 12     scales of justice up here, that means enough to tip the

10:22 13     scale, just in one direction or another.

10:22 14          We use a football analogy, getting it

10:23 15     across the 50-yard line.  That's the preponderance of

10:23 16     evidence standard.  That's the standard that applies in

10:23 17     most cases and applies to us in proving our case of

10:23 18     infringement.

10:23 19          Let me ask, is there anybody who thinks

10:23 20     that seems like too light a burden?

10:23 21          We're here suing for money, and we're

10:23 22     going to be asking for several million dollars at the

10:23 23     end of the day, because these companies have made tens

10:23 24     of millions of dollars off the backs of our technology.

10:23 25          Is there anybody who thinks that if you're

10:23 1    going to sue for millions of dollars, you ought to have

10:23 2    a higher burden than that?

10:23 3            If the Judge tells you that's the law,

10:23 4    everybody agree they can apply that and follow it?

10:23 5            Now, Red Hat and Novell, they're not going

10:23 6    to admit their infringement.  They're going to come up

10:23 7    in here and they're going to put up defenses.  One of

10:23 8    the defenses they're going to put up is they're going to

10:24 9    tell you our patents are no good, that they're invalid.

10:24 10           And to prove the defense of invalidity,

10:24 11   they have to meet a higher burden of proof.  It's a

10:24 12   burden called clear and convincing evidence.  And that

10:24 13   means something highly probable.  It means if we look at

10:24 14   these scales of justice again, they don't just have to

10:24 15   tip ever so slightly, like the preponderance of the

10:24 16   evidence standard.  They would have to tip

10:24 17   significantly.  Highly probable.

10:24 18           And the reason for that is, because a

10:24 19   patent, once it's issued by the Patent Office, is

10:24 20   presumed to be valid.  You presume the Patent Office did

10:24 21   their job right, and that's a valid patent.

10:24 22           Is there anybody that thinks that's

10:24 23   unfair, that they have a higher burden of proof to prove

10:24 24   their defenses of invalidity than we have to prove our

10:24 25   case of infringement?

10:24 1          Does that notion strike anybody as just

10:24 2 not the way it should be?

10:25 3          Mr. Orr, does that bother you?

10:25 4          JUROR ORR:  I know nothing about computers

10:25 5 and software.

10:25 6          MR. HILL:  Okay.  But just the idea that

10:25 7 they would have to go further to invalidate our patent

10:25 8 than we have to go to prove that they're infringing on

10:25 9 them, does that bother you?

10:25 10         JUROR ORR:  No.

10:25 11         MR. HILL:  Okay.  If the Judge tells you

10:25 12 that's the law, you can accept it and follow it?

10:25 13         JUROR ORR:  Yes.

10:25 14         MR. HILL:  Everybody agree with Mr. Orr?

10:25 15         Anybody disagree with him?

10:25 16         Now, some of you mentioned prior jury

10:25 17 service.  One place you may have heard of the clear and

10:25 18 convincing evidence standard is in family law cases.  If

10:25 19 the State is going to terminate somebody's parental

10:25 20 rights, they have to prove abuse or neglect by a clear

10:25 21 and convincing evidence.  Highly probable evidence.

10:25 22         Is there anybody that's ever been on a

10:25 23 jury before where you had to apply the heightened clear

10:25 24 and convincing evidence burden?  Anybody?

10:25 25         Yes, ma'am, I thought I would hear from

10:25  1   you.  Ms. -- let me get your name right -- Ms. Miller?

10:25  2              JUROR MILLER:  Yes, sir.

10:26  3              MR. HILL:  Now, you've served on a patent

10:26  4   jury before?

10:26  5              JUROR MILLER:  Yes, sir.

10:26  6              MR. HILL:  And that was a case where

10:26  7   validity was at issue?

10:26  8              JUROR MILLER:  Yes, sir.

10:26  9              MR. HILL:  And you said that the jury in

10:26 10   your case found that the patents were, in fact, invalid;

10:26 11   is that right?

10:26 12              JUROR MILLER:  Yes, sir.

10:26 13              MR. HILL:  Let me ask you about that.  Did

10:26 14   the Judge instruct you on the clear and convincing

10:26 15   evidence burden?

10:26 16              JUROR MILLER:  Yes, sir.

10:26 17              MR. HILL:  Did you understand that that

10:26 18   was pretty serious evidence to get there?

10:26 19              JUROR MILLER:  Yes, sir.

10:26 20              MR. HILL:  And in that case, you held the

10:26 21   Defendant to their burden, didn't you?

10:26 22              JUROR MILLER:  Yes, sir.  It was based

10:26 23   on -- like there was already all that knowledge in the

10:26 24   field years before their patent.

10:26 25              MR. HILL:  Somebody else had come up with

10:26  1  it first?

10:26  2                   JUROR MILLER:  It had been in use a period

10:26  3  of time.

10:26  4                   MR. HILL:  Okay.  So someone had used the

10:26  5  invention out in the public before the patent

10:26  6  application?

10:26  7                   JUROR MILLER:  Yes.

10:26  8                   MR. HILL:  Okay.  Well, if you're a juror

10:26  9  in this case, will you again impose that high burden and

10:27 10  hold the Defendants to their clear and convincing

10:27 11  standard?

10:27 12                   JUROR MILLER:  Yes, sir.

10:27 13                   MR. HILL:  Does everybody think they can

10:27 14  do what Ms. Miller has done before and would do again

10:27 15  and hold the Defendants to a higher standard of clear

10:27 16  and convincing evidence, if the Judge tells you that's

10:27 17  the law?

10:27 18                   Thank you, Ms. Miller.

10:27 19                   Now, folks, this is an important case to

10:27 20  my clients, and it's important case, because they think

10:27 21  the technology that they own or these patents they own

10:27 22  are very valuable.

10:27 23                   And once you've heard the evidence in this

10:27 24  case -- it's a civil case.  And civil cases are about

10:27 25  money damages.  We're going to ask you for money damages

10:27 1  to compensate us for the Defendants' use of our

10:27 2  technology without having to pay for it.

10:27 3           And you're going to hear that that amount

10:27 4  of money to compensate us for that use that they made

10:28 5  off our patents is going to be in the millions of

10:28 6  dollars, several million dollars.

10:28 7           Is there anybody that is uncomfortable

10:28 8  with that, that that just bothers you; that you think,

10:28 9  you know, there's a certain amount of money that just no

10:28 10 lawsuit is worth, and they're asking for millions of

10:28 11 dollars?  I don't know.  Anybody?  Just gives you a

10:28 12 little bit of unease?

10:28 13          Because let me tell you, it's not going to

10:28 14 be that we're going to ask for it without presenting

10:28 15 evidence to you.

10:28 16          Let me ask a couple people this.

10:28 17 Ms. Wolfe, does it give you any heartburn?

10:28 18          JUROR WOLFE:  No.

10:28 19          MR. HILL:  If the evidence is presented

10:28 20 that shows that burden of proof?

10:28 21          JUROR WOLFE:  No, because there's so much

10:28 22 time and several --

10:28 23          MR. HILL:  You would agree with me that

10:28 24 patents can be very valuable things?

10:28 25          Anybody disagrees with Ms. Wolfe?

10:29 1         Now, I want to ask a couple specific

10:29 2  questions of some of you.  Some things about your

10:29 3  history that -- I know some of you completed a

10:29 4  questionnaire for us, and I appreciate you doing that.

10:29 5  It helps us simplify and save you time in the courtroom.

10:29 6         But I want to ask a couple of specific

10:29 7  questions and just get a show of hands.  How many of you

10:29 8  have ever held the same job for more than 20 years?

10:29 9         Let's get a couple of hands.

10:29 10         I'll call out your numbers.  We've got

10:29 11  Mr. Orr here, No. 4, 6, 7, 15, 17, 18, 21, 24, 29, and

10:29 12  30.

10:29 13         Okay.  How many of you have ever worked at

10:30 14  a job where it was a union-type environment?

10:30 15         My dad grew up working for

10:30 16  Kelly-Springfield over in Tyler, the Rubber Workers

10:30 17  Union and Steelworkers Union over there.

10:30 18         Anybody ever worked in a union job?  Let's

10:30 19  see your hands.

10:30 20         Okay.  Of those who have worked in those

10:30 21  kinds of environments, have any of you ever been

10:30 22  somewhere where they had a union and you could join and

10:30 23  you chose not to?

10:30 24         Anybody said -- right here, No. 25.  That

10:30 25  is Mr. Knight?

| | | |
|---|---|---|
| 10:30 | 1 | Mr. Knight, where was that at? |
| 10:30 | 2 | JUROR KNIGHT:  Beeville, Texas. |
| 10:30 | 3 | MR. HILL:  Beeville? |
| 10:30 | 4 | JUROR KNIGHT:  Beeville and Kingsville. |
| 10:30 | 5 | MR. HILL:  Okay.  What kind of company was |
| 10:30 | 6 | it? |
| 10:30 | 7 | JUROR KNIGHT:  We were contractors for the |
| 10:30 | 8 | government. |
| 10:30 | 9 | MR. HILL:  Okay.  Anybody else in similar |
| 10:31 | 10 | circumstances as Mr. Knight at some point where you were |
| 10:31 | 11 | in a job and the union was an option, but you chose not |
| 10:31 | 12 | to? |
| 10:31 | 13 | Ms. Bolt, yes, ma'am? |
| 10:31 | 14 | JUROR BOLT:  Yes.  I worked as the payroll |
| 10:31 | 15 | administrator in the Accounting Department for a company |
| 10:31 | 16 | here in Marshall, and we also had a location in |
| 10:31 | 17 | Oklahoma, and the employees were unionized. |
| 10:31 | 18 | MR. HILL:  And you were not? |
| 10:31 | 19 | JUROR BOLT:  I was not. |
| 10:31 | 20 | MR. HILL:  All right.  Is there anybody |
| 10:31 | 21 | here that works for a government job, government entity? |
| 10:31 | 22 | It can be county, city, state, federal.  Work in a |
| 10:31 | 23 | government job? |
| 10:31 | 24 | Yes, sir, right over here.  Mr. Power? |
| | 25 | JUROR POWER:  Yes, sir. |

```
 1                    MR. HILL:  Mr. Power, where did you work?
 2                    JUROR POWER:  Corrections.
 3                    MR. HILL:  Over at TDC?
 4                    JUROR POWER:  Yes, sir.
10:31  5             MR. HILL:  TDCJ, isn't it?
10:31  6             JUROR POWER:  TDCJ-ID, Institutional
10:31  7   Division.
10:31  8             MR. HILL:  What unit?
10:32  9             JUROR POWER:  I was at Telford and New
10:32 10   Boston for five years, and then got transferred to
10:32 11   Winnsboro, which is a SAFPF rehab, state rehab.
10:32 12             MR. HILL:  Anybody else?
10:32 13             Yes, sir, right here next to you, yes,
10:32 14   sir?
10:32 15             JUROR WHATLEY:  I just work for the public
10:32 16   school system.
10:32 17             MR. HILL:  What school district was that?
10:32 18             JUROR WHATLEY:  Hughes Springs.
10:32 19             MR. HILL:  Hughes Springs.  And are you
10:32 20   the band director?
10:32 21             JUROR WHATLEY:  Yes, I am.
10:32 22             MR. HILL:  All right.  Who else?
10:32 23             Mr. Walker has got his hand up here, right
10:32 24   on the front row as well.
10:32 25             JUROR WALKER:  I just recently -- well,
```

10:32  1   within the last year retired from the Army Reserves

10:32  2   after 32 years.  But also in the past, I worked for the

10:32  3   State of Louisiana and the State of Texas, also.

10:32  4                    MR. HILL:  What was your position in the

10:32  5   Army?

10:32  6                    JUROR WALKER:  Chaplain.

10:32  7                    MR. HILL:  Very good.

10:32  8                    All right.  Who else?  We had a couple

10:32  9   other hands.

10:33  10                    Ms. Wolfe?

10:33  11                    JUROR WOLFE:  I work for the school

10:33  12   district.

10:33  13                    MR. HILL:  The school district.

10:33  14                    Okay.  Right there behind you, Mr. Roach?

10:33  15                    JUROR ROACH:  Kenneth Roach.  I work for

10:33  16   the City of Marshall.

10:33  17                    MR. HILL:  City of Marshall.  What do you

10:33  18   do for the City?

10:33  19                    JUROR ROACH:  Operator 2.

10:33  20                    MR. HILL:  Okay.  Thank you.

10:33  21                    Right over here we've got a couple of

10:33  22   others, whichever you want to do.

10:33  23                    JUROR BARBER:  I'm Amy Barber, and I work

10:33  24   for Atlanta Independent School District.

10:33  25                    MR. HILL:  What do you do for them?

| | | |
|---|---|---|
| 10:33 | 1 | JUROR BARBER:  I'm a teacher. |
| 10:33 | 2 | MR. HILL:  What grade? |
| 10:33 | 3 | JUROR BARBER:  Seventh and eighth. |
| 10:33 | 4 | MR. HILL:  Specific subject? |
| 10:33 | 5 | JUROR BARBER:  It's called AVID; it's an |
| 10:33 | 6 | elective course. |
| 10:33 | 7 | MR. HILL:  Okay. |
| 10:33 | 8 | THE COURT:  Do you get hazard pay for |
| 10:33 | 9 | that? |
| 10:33 | 10 | [Laughter.] |
| 10:33 | 11 | JUROR STEPHENSON:  I'm Mr. Stephenson.  I |
| 10:33 | 12 | work for Harmony Independent School District.  I'm a |
| 10:33 | 13 | retired electrician, but decided to go to work for a |
| 10:33 | 14 | school district to have something to do.  But I'm a |
| 10:33 | 15 | teacher's aide in the sixth, seventh, and eighth grade. |
| 10:33 | 16 | MR. HILL:  Thank you, sir. |
| 10:34 | 17 | Let me ask you one quick question.  Where |
| 10:34 | 18 | did you retire from? |
| 10:34 | 19 | JUROR STEPHENSON:  TU Electric. |
| 10:34 | 20 | MR. HILL:  What did you do? |
| 10:34 | 21 | JUROR STEPHENSON:  Maintenance |
| 10:34 | 22 | electrician. |
| 10:34 | 23 | MR. HILL:  All right.  Right next door to |
| 10:34 | 24 | Mr. Stephenson? |
| 10:34 | 25 | JUROR BATES:  Ann Bates.  I teach school |

10:34  1    at Gilmer ISD.  I'm the homebound teacher.  I go out to

10:34  2    all grades.

10:34  3                    MR. HILL:  Thank you, Ms. Bates.

10:34  4                    Also, on the front row, Ms. Miller?

10:34  5                    JUROR MILLER:  I'm not sure if this is

10:34  6    considered county or what, but I work for Titus County

10:34  7    Regional Medical Center.  It is a hospital, but it's

10:34  8    Titus County.

10:34  9                    MR. HILL:  Now, you're a nurse,

10:34 10    Ms. Miller; is that right?

10:34 11                    JUROR MILLER:  Yes.

10:34 12                    MR. HILL:  How long have you done that?

10:34 13                    JUROR MILLER:  21 years.

10:34 14                    MR. HILL:  Are you in any particular

10:34 15    specialty or department of the hospital?

10:34 16                    JUROR MILLER:  I work Surgical Services.

10:34 17    Right now, I just do paperwork, preop interviews and

10:34 18    things like that.

10:34 19                    MR. HILL:  Okay.  Well, Ladies and

10:35 20    Gentlemen, I have used the time that Judge Rader was

10:35 21    kind enough to allot for me, so I'm going to sit down.

10:35 22                    Before I do, I want to ask you one last

10:35 23    question.  As a lawyer representing a client, all you

10:35 24    ever hope to do is give them a fair shake at minimum.

10:35 25    That's what you're looking for; that's what the court

10:35 1   system is for.

10:35 2                   And you can't always think of every

10:35 3   question you ought to ask a group of people in 30

10:35 4   minutes, and so I have to depend on you.  And so the

10:35 5   last thing I want to ask you is, if you were in my shoes

10:35 6   and you were having to represent a client and talk to

10:35 7   folks about jury service, is there anything about

10:35 8   yourself that you'd want to know, if you were the person

10:35 9   standing up here asking the questions?

10:35 10                  Anything about your prior experience in

10:35 11  life, experience with the courts, just general feelings

10:35 12  about the world that you think we ought to know about

10:35 13  that could impact your service on this jury?  Anybody?

10:36 14                  All right.  I appreciate your time.  I

10:36 15  appreciate your openness with me.  I know this isn't a

10:36 16  comfortable environment, and I know I've taken up time

10:36 17  in your life.  You'd rather do other things.

10:36 18                  So thank you.

10:36 19                  And thank you, Judge Rader, for the

10:36 20  opportunity.

10:36 21                  THE COURT:  Mr. Hill, I think we'll hear

10:36 22  now -- Mr. Reiter, is it you we're going to hear from?

10:36 23                  MR. REITER:  Yes, Your Honor.  Thank you.

10:36 24                  THE COURT:  You may proceed.

10:36 25                  MR. REITER:  Good morning, everybody.

10:36   1          My name, as I said, is Mark Reiter.  I'm

10:36   2   an attorney for Defendants Red Hat and Novell.

10:36   3          You've heard a little bit about them from

10:36   4   my friend, Mr. Hill, and I want to tell you a little bit

10:36   5   more about them, a little bit about what they do, and

10:36   6   see if what they do maybe familiarizes yourself with

10:36   7   those companies such that it might ring a bell and y'all

10:36   8   might remember something from before.

10:36   9          Before I do, there's a couple of people

10:36  10   that I want to introduce, people from my clients, from

10:36  11   Red Hat and Novell, who are here, who are going to be

10:36  12   spending their time, because this is an important case.

10:36  13   This is very important to my clients.  They've been

10:37  14   accused of something that's very, very significant, and

10:37  15   they take that seriously.

10:37  16          So for Red Hat, we have Mr. Michael

10:37  17   Tiemann who's up on the back row.  And for Novell,

10:37  18   Markus Rex.  Both Mr. Tiemann and Mr. Rex are going to

10:37  19   talk to those of you who are selected as jurors.

10:37  20   They're going to explain what their companies do and

10:37  21   what the products are all about.

10:37  22          Now, one of the things that y'all have

10:37  23   seen so far this morning is I get to go last.  And I

10:37  24   have to sit and we have to sit and we have to wait and

10:37  25   listen to what everybody else has to say and ask

10:37  1  questions, and then we get our turn.

10:37  2              That's the way the system works.  We all

10:37  3  know that.  Somebody gets to go first and somebody gets

10:37  4  to go second.  That's alright.

10:37  5              But what that requires of y'all sitting on

10:37  6  the jury is to keep an open mind.  You have to wait and

10:38  7  listen to the whole story.  You can't just make up your

10:38  8  mind and hear what's happened and then say, well, I've

10:38  9  heard enough and I can shut down now.

10:38 10              It's very important to us, because we are

10:38 11  asking for a fair trial, and we do think that we don't

10:38 12  infringe.  In fact, we know we don't infringe.

10:38 13              So I want to ask all y'all, is there

10:38 14  anybody here who is going to have a problem keeping an

10:38 15  open mind, waiting to let us tell our side of the story

10:38 16  before they make up their mind or make a decision?

10:38 17              Anybody, a show of hands, that's just

10:38 18  going to have a hard time with that?

10:38 19              Now, several of you filled out a

10:38 20  questionnaire, and one of those questions was make up my

10:38 21  mind quick or I'm kind of a little bit slower to make up

10:38 22  my mind.  And I want to ask a couple of y'all some

10:38 23  questions.

10:38 24              So, Mr. Orr, I think you indicated that

10:38 25  you're a quick learner.  Is there anything about what

10:38  1   you've heard or the process and the fact that you know

10:39  2   you're a quick learner that's going to prevent you from

10:39  3   keeping an open mind and waiting to hear all the

10:39  4   evidence.

10:39  5              JUROR ORR:   (Shakes head.)

10:39  6              MR. REITER:  Ms. Ryan, you also said you

10:39  7   were a quick learner.  Anything about what you've heard

10:39  8   today and the process and the way that things are going

10:39  9   to go, the burdens of proof, the evidence that Mr. Hill

10:39 10   talked about?  Are you going to be able to wait before

10:39 11   you make up your mind and listen to everything?

10:39 12              JUROR RYAN:  Yes.  That's a bit of an

10:39 13   unfair question.  I think it should be stated, if

10:39 14   presented with enough information, how would you make up

10:39 15   your mind quickly, or something.  So if presented with

10:39 16   everything, I can make up my mind quickly.

10:39 17              MR. REITER:  That's a very fair point, and

10:39 18   we'll have to put that down on the way we ask that

10:39 19   question.

10:39 20              What we're trying to do with those

10:39 21   questionnaires is get as much information as we can from

10:39 22   you-all so that when we come in here, we can ask

10:39 23   intelligent questions, like you're saying, Ms. Ryan, and

10:40 24   learn a little bit about who you-all are so that we can

10:40 25   explain things in a way that might be interesting to

10:40 1    you.

10:40 2                    Mr. Stabeno, I think you also said you

10:40 3    were a quick learner.  Anything about the process that

10:40 4    gives you trouble or thoughts?

10:40 5                    JUROR STABENO:  No.

10:40 6                    MR. REITER:  Now, as Mr. Hill said and as

10:40 7    Judge Rader said, this is a patent dispute.  There are

10:40 8    three patents that are involved in this case.  You heard

10:40 9    a little bit about what the Plaintiffs do, the

10:40 10   Technology Licensing Corp. and IPI.

10:40 11                   Mr. Hill talked about how they help small

10:40 12   inventors, small people monetize or enforce the rights

10:40 13   associated with their patents.  This case is a little

10:40 14   bit different.

10:41 15                   These patents came from a company called

10:41 16   Xerox.  Now, how many of y'all, by a show of hands, has

10:41 17   heard of a company called Xerox?

10:41 18                   That's not a small company.  These patents

10:41 19   came from Xerox, and Xerox gave these patents to the

10:41 20   Plaintiffs.  And the Plaintiffs are now, as you heard,

10:41 21   claiming that my clients infringe.

10:41 22                   Now, does the fact that the patents came

10:41 23   from Xerox, a big company, and that these -- the

10:41 24   Plaintiffs, IPI and TLC, are enforcing it, does that

10:41 25   create any problems for anybody?  Does that create any

10:41 1   questions?

10:41 2              Now, my clients, Red Hat and Novell, they

10:41 3   are software companies.  They make software.  And,

10:41 4   again, it's about going second, so I get to tell you a

10:41 5   little bit more from what Mr. Hill said.

10:41 6              They make software for operating systems

10:41 7   for computers.  A lot of y'all have probably heard of

10:42 8   Windows and you know what Windows is.  And you can move

10:42 9   your -- or control your computer and put programs on,

10:42 10  and it does things like that.

10:42 11             Well, my clients make a similar type

10:42 12  product, but they're not like Windows.  They're not like

10:42 13  Microsoft.  They have a different type of a system.

10:42 14  Rather than having a bunch of engineers or computer

10:42 15  programmers in their building that only work for them,

10:42 16  they are part of a system called open source.

10:42 17             And that means they give away their

10:42 18  software for free.  They don't charge anything for their

10:42 19  software.  And the way they're able to do that is

10:42 20  because people all over the world contribute to the

10:42 21  software for free.

10:42 22             Now, have any of y'all heard of

10:42 23  open-source software?  Anybody familiar with that?

10:42 24             Colonel Walker, what do you know about

10:42 25  open source?

10:42  1                    JUROR WALKER:  Basically what you said,

10:42  2   something that's available.  For example, a system like

10:43  3   Microsoft or something that, things like that you pay

10:43  4   the licensing fee or whatever for however many computers

10:43  5   and put it on something like probably Linux, Firefox,

10:43  6   web browser, things like that, other things like that,

10:43  7   download from the web at no cost.

10:43  8                    MR. REITER:  Do you use any of those open

10:43  9   source-type products.

10:43 10                    JUROR WALKER:  Recently I've been using

10:43 11   Firefox some.

10:43 12                    MR. REITER:  Do you ever use Linux?

10:43 13                    JUROR WALKER:  To my knowledge -- I know

10:43 14   some companies use different things that I may not be

10:43 15   aware of.  To my knowledge, I haven't ever used Linux.

10:43 16                    MR. REITER:  Does Firefox work okay for

10:43 17   you?

10:43 18                    JUROR WALKER:  It's okay.  It does the

10:43 19   job.

10:43 20                    MR. REITER:  It does the job.  I

10:43 21   understand.

10:43 22                    Anybody else heard of open-source software

10:44 23   or any open-source products?

10:44 24                    Anybody heard of Linux that you heard me

10:44 25   talking about with Colonel Walker?

10:44  1              Now, this open-source software philosophy

10:44  2    where you give your product away for free and you have

10:44  3    people all over the world contributing to it for free,

10:44  4    it's kind of a business philosophy.  There are people

10:44  5    that are really very attuned to that and feel that it's

10:44  6    a very important way of doing business, because it

10:44  7    allows for a better product and a quicker set of

10:44  8    products.

10:44  9              You don't have just one company focusing

10:44 10    on one thing.  You have people all over the place

10:44 11    focusing on many things.

10:44 12              Now, as I said, that's a business

10:44 13    philosophy.  Does anybody here have any problem with

10:44 14    that type of philosophy, allowing people from all over

10:44 15    the world to work on your product, do it for free, and

10:45 16    then give it away for free?

10:45 17              Anybody, by a show of hands, have a

10:45 18    problem with that philosophy?

10:45 19              Anybody have any kind of experience with a

10:45 20    similar business model where you have kind of a group

10:45 21    effort, a collective effort, and the product belongs to

10:45 22    the group?  Anybody have a similar type experience like

10:45 23    that, a project from college, a project in high school?

10:45 24              Now -- oh, Colonel Walker?

10:45 25              JUROR WALKER:  A couple years ago, I was

10:45  1    at Fort Stewart, Georgia, and we built a new chapel, the

10:45  2    largest chapel in the Army.  And we had all sorts of

10:45  3    scheduling issues.

10:45  4                So my chaplain and assistant and I worked

10:45  5    with IT folks to develop some scheduling software, and

10:45  6    our hope was that our computer gurus at Fort Stewart

10:45  7    would -- when we had all the bugs worked out, would

10:45  8    share that with other installations.

10:46  9                For example, Fort Bliss right now is in

10:46  10   the process of building a similar chapel.  They're going

10:46  11   to have the headaches we had.  But the way we looked at

10:46  12   it, it's not exactly the open source in a sense that we

10:46  13   looked at it as we were developing that at Fort Stewart,

10:46  14   and it belonged to the Army, and we wanted to share that

10:46  15   with as many Army installations as possible.

10:46  16                MR. REITER:  Did that work out well?

10:46  17                JUROR WALKER:  Well, I left about a year

10:46  18   ago, and my NCO is now a chaplain himself, and I really

10:46  19   don't -- I mean, it was working well.  I don't know how

10:46  20   much of it we've been able to share with other

10:46  21   installations.  It was working great for us.

10:46  22                MR. REITER:  I'm sorry, Colonel Walker.

10:46  23   Did you help do the programming on that?  Were you part

10:46  24   of the programming effort?

10:46  25                JUROR WALKER:  I had input.  I didn't do

10:46  1   any of the code or anything, but we worked with our

10:46  2   coders who took our input.  We told them what we wanted,

10:46  3   what we needed, and to be able to schedule.  And I had

10:46  4   control over the data that was input, but someone else

10:47  5   was doing all the code.

10:47  6               MR. REITER:  Thank you.

10:47  7               Anybody else have a similar experience?

10:47  8               Now, a number of y'all talked about some

10:47  9   of the computer classes you took and some old languages.

10:47 10   I'm going to get to that in just a second, but these

10:47 11   three patents that came out of Xerox, they were filed

10:47 12   back in 1987 and came out of work in the '80s.  The

10:47 13   first patent issued in the 1991.  And it deals with

10:47 14   technology.

10:47 15               Now, is that going to be a problem for

10:47 16   anybody that we're talking about technology that came

10:47 17   from the '80s, but is being applied to a product that's

10:47 18   around today?  Is that an issue for anybody?

10:47 19               Now, as I said, some of y'all talked about

10:47 20   taking computer classes.

10:47 21               I think, Ms. Ryan, you said you took a

10:47 22   computer class.  Do you remember what language?

10:48 23               JUROR RYAN:  Paschal.

10:48 24               MR. REITER:  Paschal?  I took a Paschal

10:48 25   class a while back.

10:48  1              Let's see.  No. 16, Mr. Stephenson, you

10:48  2  took some computer classes?

10:48  3              JUROR STEPHENSON:  Yes, sir.  When I was

10:48  4  working for TU Electric, and it was just -- it was

10:48  5  computer logic-type programs that we use for -- to

10:48  6  replace our relay logic that we had.  But this is what

10:48  7  they call ladder logic and a controlling-type system for

10:48  8  the making of electricity.

10:48  9              MR. REITER:  I'm familiar with ladder

10:48 10  logic.  I programmed some of that myself.

10:48 11              JUROR STEPHENSON:  It's pretty good stuff.

10:48 12              MR. REITER:  It was.  It takes the

10:48 13  hardwire stuff and puts it into the computer.

10:48 14              JUROR STEPHENSON:  Yes, sir.

10:49 15              MR. REITER:  Anybody else have experience

10:49 16  with computer programming?

10:49 17              Now, on the other end, is there anybody

10:49 18  that is just not real happy with computers; they don't

10:49 19  like to deal with them; they don't want to mess with

10:49 20  them?

10:49 21              Mr. Orr, you don't like computers?

10:49 22              JUROR ORR:  I don't like computers at all.

10:49 23  I refuse to even try to attempt to turn one on.  Years

10:49 24  ago when my wife got her first computer, in our

10:49 25  business, we had to have one.  And some kind of program,

10:49  1   you know, but I didn't know anything about it.

10:49  2              Well, one night I decided I was going to

10:49  3   learn a little bit.  So I turned the computer on about

10:49  4   1:00 o'clock in the evening; I couldn't sleep.  And I

10:49  5   messed it all up.  And it was back during the old DOS

10:50  6   programs, I think is what she told me.  I promised her I

10:50  7   would never fool with her computers again.  And I

10:50  8   absolutely hate computers.

10:50  9              MR. REITER:  And you kept your promise?

10:50 10              JUROR ORR:  I still keep my promise.

10:50 11              MR. REITER:  Is there anything about that

10:50 12   you don't like computers a whole, whole lot that will

10:50 13   prevent you from being fair in this case or keep you

10:50 14   from listening to the evidence?

10:50 15              JUROR ORR:  I know computers are a very

10:50 16   necessary part of our society, and I know that we

10:50 17   have -- I mean, we use them in our business.  I don't,

10:50 18   but they do.  So I don't think it would affect my

10:50 19   judgment.

10:50 20              MR. REITER:  I think there were a few

10:50 21   other people.

10:50 22              Ms. Robertson?

10:50 23              JUROR ROBERTSON:  I just feel

10:50 24   uncomfortable with them.  I don't have a lot of

10:50 25   knowledge.  Both my daughters are very into them.  One

10:50 1   is Assistant County Auditor, so she is with computers.

10:51 2   And the other one is a nurse at the jail.

10:51 3           And so I just feel inept to mess with

10:51 4   them.  But I like to send e-mails.  I do use it for

10:51 5   e-mails and a little bit of research on subjects every

10:51 6   once in a while.

10:51 7           MR. REITER:  On the internet?

10:51 8           JUROR ROBERTSON:  Yes.  I just don't enjoy

10:51 9   it.

10:51 10          MR. REITER:  I understand that.  The fact

10:51 11  that you don't really enjoy computers, is that going to

10:51 12  be a problem for you?

10:51 13          JUROR ROBERTSON:  No.

10:51 14          MR. REITER:  Anybody else who would just

10:51 15  feel so uncomfortable with computers that you might not

10:51 16  just feel comfortable listening to a case about

10:51 17  computers and computer software?

10:51 18          In the back, Ms. Lightfoot, is it?

10:51 19          JUROR LIGHTFOOT:  Yes.  I'm a retired

10:51 20  middle school secretary from Queen City ISD, and we

10:51 21  started that DOS program years ago, and I didn't have a

10:51 22  choice.  I had to learn that for my job.  And I did it

10:51 23  and did it well, but I just learned to click on an icon.

10:52 24          And my technology person had to do

10:52 25  everything else for me.  I've been out ten years now,

10:52 1  and I very seldom touch a computer.  It's nothing I want

10:52 2  to do.

10:52 3                  MR. REITER:  I understand.  There's

10:52 4  nothing about your dislike of computers that will affect

10:52 5  you?

10:52 6                  JUROR LIGHTFOOT:  (Shakes head.)

10:52 7                  MR. REITER:  Now, as I said -- switching

10:52 8  subjects a little bit -- we do not -- we believe, and I

10:52 9  think we'll be able to show that we don't infringe these

10:52 10  patents.  We think that the Plaintiffs are taking the

10:52 11  words in the patent, and they're reading them a little

10:52 12  bit differently than they were meant to be read and

10:52 13  really what they say.

10:52 14                  You heard Mr. Hill talk about the

10:52 15  technology very generally; that there are workspaces and

10:52 16  the patents talk about being able to switch from one

10:52 17  workspace to another workspace.

10:52 18                  And we're going to have experts and we're

10:53 19  going to have witnesses explain that our system is

10:53 20  different.  And we've already talked about all of y'all

10:53 21  are going to keep an open mind on that.

10:53 22                  But having heard and we were talking about

10:53 23  computers, having heard about workspaces and switching

10:53 24  back and forth in the patents, does that give anybody

10:53 25  any pause or any concern?

10:53 1          Now, a few of y'all in the questionnaires

10:53 2  answered some questions about you thought people had

10:53 3  taken your idea or may have taken your idea in the past.

10:53 4  If it's something you don't want to talk in the open

10:53 5  group, we can talk with Judge Rader.  We do want to

10:53 6  follow up on that a little bit.

10:53 7          Ms. Bates, I think you indicated that you

10:53 8  thought somebody might have taken your idea in the past.

10:53 9  Is that something you can talk about?

10:54 10          JUROR BATES:  Not me.

10:54 11          MR. REITER:  Ms. Bates is over there.  Did

10:54 12  you answer that you thought that somebody may have taken

10:54 13  your idea in the past on the questionnaire?

10:54 14          JUROR BATES:  No.

10:54 15          MR. REITER:  Well, I apologize for that.

10:54 16          Mr. Knight, can you answer that?  Did I

10:54 17  get that right this time?

10:54 18          JUROR KNIGHT:  Yes.  We did come up with

10:54 19  some solutions several years ago that our company

10:54 20  actually took away from us and used.  But it doesn't

10:54 21  affect the way I would judge anything.

10:54 22          MR. REITER:  Do you know if there was a

10:54 23  lawsuit filed or lawyers involved?

10:54 24          JUROR KNIGHT:  No, sir.

10:54 25          MR. REITER:  You just thought somebody

10:54  1    took your ideas?

10:54  2                    JUROR KNIGHT:  Yes.

10:54  3                    MR. REITER:  Colonel Walker, I think you

10:54  4    answered that question.

10:54  5                    JUROR WALKER:  I wasn't thinking anything

10:54  6    specific, just in general, you know, people exchange

10:54  7    ideas.  Sometimes we use things that we don't always

10:55  8    give other people credit for, but nothing that would

10:55  9    rise to this level.

10:55 10                    MR. REITER:  And, Ms. Wilson, there's two

10:55 11    Ms. Wilsons in the pool.  You answered that question.

10:55 12                    JUROR C. WILSON:  (Shakes head.)

10:55 13                    MR. REITER:  No?

10:55 14                    JUROR M. WILSON:  I think it was group

10:55 15    discussions, and all of a sudden it will come back out

10:55 16    as somebody else's idea.  Nothing I'm going to lose

10:55 17    sleep over.

10:55 18                    MR. REITER:  No lawsuits?

10:55 19                    JUROR M. WILSON:  No.  More work for

10:55 20    somebody else, usually.

10:55 21                    MR. REITER:  Now, Ms. Bolt, I think you

10:55 22    applied for a patent.  Did you apply for a patent

10:55 23    because you thought somebody had taken your idea or you

10:55 24    were just trying to patent it?

10:55 25                    JUROR BOLT:  Back in 1974 and '75, my

10:55 1  father put a patent on three different machines for the

10:56 2  company he worked for.  So, of course, it was for the

10:56 3  company because he worked for them.  And so he and I

10:56 4  sort of tinkered with a little project, and I went to

10:56 5  the seminar just to check it out and see if it would be

10:56 6  something we wanted to pursue.  And we just sort of put

10:56 7  it on the back burner for a while.

10:56 8          MR. REITER:  Now you're pursuing it or at

10:56 9  least a patent is pending?

10:56 10         JUROR BOLT:  No, we do not have a pending

10:56 11 patent.  We're still deliberating.

10:56 12         MR. REITER:  Okay.  You had said that to

10:56 13 Mr. Hill.

10:56 14         Now, with respect to taking ideas and

10:56 15 asking y'all if people have taken your idea, we don't

10:56 16 have that situation here.  We don't have the person or

10:56 17 the company that owned the patents that developed the

10:56 18 technology sitting here saying that we took the idea.

10:56 19         Plaintiffs got the patents from Xerox, as

10:56 20 I said before.  Now, is that going to be a problem for

10:57 21 anybody, that Xerox is not here, but the Plaintiffs are

10:57 22 here saying that we took their idea?  Is that a problem

10:57 23 for anybody?

10:57 24         Now, a number of y'all also indicated you

10:57 25 thought corporations rely too heavily on the courts.  I

10:57 1  want to go around a little bit and talk to some of

10:57 2  y'all.

10:57 3              Now, Mr. Collins -- Mr. Collins, do you

10:57 4  think too many lawsuits or corporations are in court too

10:57 5  often?

10:57 6              JUROR COLLINS:  Yeah, I think that a lot

10:57 7  of people think they're going to hit the lottery by

10:57 8  going to court and suing somebody.  That's just the way

10:57 9  I feel.

10:57 10             MR. REITER:  Is that going to affect your

10:57 11 ability as a juror, if you're called?

10:57 12             JUROR COLLINS:  I wouldn't think so.

10:57 13             MR. REITER:  You couldn't fairly judge

10:58 14 what you hear?

10:58 15             JUROR COLLINS:  I don't think so.

10:58 16             MR. REITER:  Ms. Nash, now do you have a

10:58 17 problem or do you feel that corporations are in court

10:58 18 too much?

10:58 19             JUROR NASH:  Not necessarily corporations.

10:58 20 I just think there's a lot of things that people used to

10:58 21 would talk things out and shake hands over that, things

10:58 22 that could be handled out of court instead of taking up

10:58 23 a lot of people's time.

10:58 24             MR. REITER:  People like y'all?

10:58 25             JUROR NASH:  Yeah.

10:58  1            MR. REITER:  Is that going to affect your

10:58  2  ability to listen to the evidence and judge fairly?

10:58  3            JUROR NASH:  Not in this case, no.

10:58  4            MR. REITER:  Ms. Snowden?

10:58  5            JUROR SNOWDEN:  You hear on the news and

10:58  6  TV about somebody going after somebody all the time, but

10:58  7  I am not familiar with laws.  And until I heard the law

10:58  8  about the patents this morning, I wasn't familiar that

10:59  9  with patent law, that's the only way to pursue things.

10:59 10  I don't know details.  But it seems like the courts are

10:59 11  clogged with things all the time.

10:59 12            MR. REITER:  That perception that the

10:59 13  courts are clogged, is that going to affect your ability

10:59 14  to fairly listen to the evidence?

10:59 15            JUROR SNOWDEN:  No.

10:59 16            MR. REITER:  Now, we talked a little bit

10:59 17  about infringement, and Mr. Hill talked about validity.

10:59 18  And we also heard from, I think, Ms. Miller who sat on a

10:59 19  patent case before where the jury found the patent

10:59 20  invalid.  And you saw the video when y'all came in this

10:59 21  morning about how you are part of the patent process.

10:59 22            The Patent Office is a very busy place.

10:59 23  They look at a lot of applications and have a lot of

10:59 24  papers to look at.  Even though they have a lot of

10:59 25  papers to look at, they don't get to see everything.

10:59 1              And the law does presume the patents to be

10:59 2  valid.  Congress kind of gives the Patent Office the

11:00 3  benefit of the doubt.  But as I said, we believe these

11:00 4  patents are invalid, and we're going to have -- just

11:00 5  like we have evidence that we do not infringe, we're

11:00 6  going to have evidence that the patents are invalid,

11:00 7  that people had this idea and had this invention first.

11:00 8              And it's based on information the Patent

11:00 9  Office did not see or did not completely see.

11:00 10             Now, do any of y'all have a problem with

11:00 11 judging what the Patent Office did?  Because that's what

11:00 12 y'all are going to have to do, whether they did a good

11:00 13 job and issued a patent that really shouldn't have been

11:00 14 issued, or if they did it right.

11:00 15             Is anybody going to have a problem with

11:00 16 listening to the evidence and second-guessing or

11:00 17 correcting something the Patent Office did?

11:00 18             Now, Mr. Hill also talked about the

11:00 19 different burdens of proof, and he referred to the

11:00 20 scales of justice over here and how a preponderance of

11:01 21 the evidence it has to tip just slightly.  But on clear

11:01 22 and convincing, it has to tip more.

11:01 23             We have the clear and convincing

11:01 24 evidentiary burden on the validity issue.  That's

11:01 25 something we're happy to accept.  We're going to show

11:01 1　prior art, and I think that's the term you were thinking

11:01 2　of, Ms. Miller, that by a preponderance of -- or by

11:01 3　clear and convincing, the patents are invalid.

11:01 4　　　　　　Now, that's no different than -- I lost my

11:01 5　train of thought.  That is a burden, as I said, we are

11:01 6　able to deal with.  And I just want to assure myself

11:01 7　that you all are comfortable, that even with that clear

11:01 8　and convincing burden, you'll be able to listen to the

11:01 9　evidence and judge fairly.

11:01 10　　　　　　Everybody okay with that?

11:01 11　　　　　　Now, the last issue that will be in the

11:02 12　case or that I'll talk about is the issue of damages.

11:02 13　Mr. Hill talked about that a little bit, talked about

11:02 14　royalty.

11:02 15　　　　　　Mr. Orr, you got picked on a little bit

11:02 16　this morning.  In fact, I had you written down to talk

11:02 17　about that, too.  Now, can you explain a little bit how

11:02 18　the royalties work in the oil field, in your business?

11:02 19　　　　　　JUROR ORR:  Well, I'm kind of on both

11:02 20　sides, because I own mineral rights under property that

11:02 21　I draw royalties on from other companies.  Then I'm also

11:02 22　on the side that I've leased property from people and

11:02 23　produced wells that's on that property.  So I pay

11:02 24　royalties or my company pays royalties to the people.

11:02 25　　　　　　MR. REITER:  How is the price of royalties

11:02  1    decided?

11:02  2                    JUROR ORR:  In oil and gas, it depends on

11:02  3    whatever oil or natural gas it's bringing at the time,

11:02  4    and they get their percentage, whatever their percentage

11:03  5    is.

11:03  6                    MR. REITER:  The market value, what others

11:03  7    are paying for the price of oil at the time?

11:03  8                    JUROR ORR:  Right.

11:03  9                    MR. REITER:  That's somewhat similar to

11:03 10    what happens in a patent case.  Royalties are determined

11:03 11    based on what the value of the technology is and what

11:03 12    others have paid and looking at a number of different

11:03 13    things.

11:03 14                    And is that something, Mr. Orr, that

11:03 15    sounds familiar to you.

11:03 16                    JUROR ORR:  Well, I mean, like what we do,

11:03 17    whatever we get paid for the oil and gas, we have to pay

11:03 18    the royalty interest owners their percentage, whatever

11:03 19    their percentage is.  And it varies.  But that's what we

11:03 20    have to pay them.

11:03 21                    MR. REITER:  There's some leases where

11:03 22    there's no oil and no gas, and you don't have to pay

11:03 23    anything, right?

11:03 24                    JUROR ORR:  Well, on any producing well,

11:03 25    you have to pay somebody some royalty somewhere.

11:03 1                    MR. REITER:  Right, right.  So if there's

11:03 2  not a producing well --

11:03 3                    JUROR ORR:  If there's not a producing

11:03 4  well, you don't have to pay anybody.

11:03 5                    MR. REITER:  Thank you, Mr. Orr.

11:03 6                    So I see I'm drawing to the end of my

11:03 7  time, and I did have a question -- two questions I

11:04 8  wanted to ask all y'all.

11:04 9                    And that is, any of you served as a

11:04 10 chairperson of a committee; served on a committee and

11:04 11 been the chairperson or been the president of a club,

11:04 12 society.

11:04 13                   Mr. Orr?

11:04 14                   JUROR ORR:  I was president of the school

11:04 15 board for five years.

11:04 16                   MR. REITER:  When was that?

11:04 17                   JUROR ORR:  Up to last year.  My term is

11:04 18 up in May.  I'm getting off the board.  I'm retiring

11:04 19 from that.

11:04 20                   MR. REITER:  Ms. McFarland, I think you

11:04 21 put up your hand.

11:04 22                   JUROR MCFARLAND:  I was actually president

11:04 23 of PTO when my oldest children were in school, and that

11:04 24 was many moons ago.  And then recently, I've been

11:04 25 president of the Daingerfield band boosters for about

11:04 1   six years at the end of last year.

11:04 2                   MR. REITER:  So you're retired, too?

11:05 3                   JUROR MCFARLAND:  No, actually I'm not.

11:05 4   I'm currently serving as treasurer and I will end that

11:05 5   this August.

11:05 6                   THE COURT:  We found a couple of people to

11:05 7   talk to you about your hazard pay.

11:05 8                   JUROR BATES:  Ann Bates.  I've been

11:05 9   president of the PTO and president of the Friends of the

11:05 10  Library when we built the new library in Gilmer in

11:05 11  Upshur County.  And I've been president of the

11:05 12  Bluebonnet Club, which is the Federated Women's Club

11:05 13  group in Gilmer.

11:05 14                  MR. REITER:  You keep yourself busy.

11:05 15                  JUROR BATES:  Doesn't pay.

11:05 16                  JUROR SNOWDEN:  Katherine Snowden.

11:05 17  Several years ago, probably 10 or 12 or so, I was

11:05 18  Council Chairman at the local Women's Methodist Church

11:05 19  and then I served as ad hoc president but secretary and

11:05 20  concession chairman with band boosters.

11:06 21                  MR. REITER:  Anybody else?  Colonel

11:06 22  Walker?

11:06 23                  JUROR WALKER:  I'm trying to remember

11:06 24  these things over the years.  I think that's why we put

11:06 25  our resumes on paper.

11:06 1          Several years ago, I was -- I don't

11:06 2    remember the time -- probably Chairman of the Pastor

11:06 3    Association in DeSoto Baptist Association, Mansfield,

11:06 4    Louisiana.  And also for a year was moderator of that

11:06 5    association.  So those are just two examples.  If I go

11:06 6    back over 30 years, probably a lot more.

11:06 7          MR. REITER:  Yes, sir.

11:06 8          Ms. Robertson?

11:06 9          JUROR ROBERTSON:  I was president of the

11:06 10   Girl's Softball Association in Pittsburg about, oh, 20

11:06 11   years ago.  My girls were young.

11:06 12         MR. REITER:  When your girls were in

11:06 13   softball.

11:06 14         Well, I think I have run out of my time

11:06 15   this morning, and like Mr. Hill and on behalf of my

11:07 16   colleagues and also on behalf of the Plaintiffs, I'd

11:07 17   like to thank all of y'all for spending the time with us

11:07 18   this morning.

11:07 19         I know it's not a voluntary thing, but

11:07 20   it's a very important thing.  Our country is unique.  In

11:07 21   disputes like this, the Seventh Amendment to the

11:07 22   Constitution allows parties who have a dispute come to

11:07 23   court and have the community to decide who's right and

11:07 24   who's wrong and resolve that in a peaceful way.  That's

11:07 25   part of our Constitution.

| | | |
|---|---|---|
| 11:07 | 1 | And we thank you for your time, and we |
| 11:07 | 2 | appreciate your patience. |
| 11:07 | 3 | THE COURT:  Ladies and Gentlemen, I think |
| 11:07 | 4 | we're ready to move to our next phase. |
| 11:07 | 5 | Is that correct, Mr. Hill, are we ready? |
| 11:07 | 6 | MR. HILL:  I believe we are. |
| 11:07 | 7 | THE COURT:  Mr. Reiter, do you agree? |
| 11:07 | 8 | MR. REITER:  Yes. |
| 11:07 | 9 | THE COURT:  This would be a good time, I |
| 11:07 | 10 | think, to take a break.  So I'm going to let you ladies |
| 11:08 | 11 | and gentlemen take a quick break, and then we'll invite |
| 11:08 | 12 | you back in 10 or 15 minutes, and we'll let you know who |
| 11:08 | 13 | gets to stay with us for a week. |
| 11:08 | 14 | Thank you very much. |
| 11:08 | 15 | (Jury out.) |
| 11:08 | 16 | THE COURT:  If you'll give me two minutes, |
| 11:08 | 17 | I'll be right black. |
| 11:08 | 18 | (Recess.) |
| 11:11 | 19 | THE COURT:  All right.  Gentlemen, I wish |
| 11:11 | 20 | I had stood up a little bit more, so I'm going to stand |
| 11:11 | 21 | here for a minute. |
| 11:11 | 22 | Please be seated.  You're all fine. |
| 11:11 | 23 | I'm ready to receive motions to strike for |
| 11:11 | 24 | cause. |
| 11:11 | 25 | MR. HILL:  Thank you, Your Honor. |

11:11  1                    THE COURT:  Let me get my jurors in front

11:11  2  of me.

11:11  3                    And, Mr. Hill, I'll accept your motions

11:11  4  first.

11:11  5                    MR. HILL:  Thank you, Your Honor.

11:11  6                    The first, Your Honor, was Juror No. 5.

11:11  7  That's Mr. Walker.  And I've got two concerns there,

11:11  8  Your Honor.  There were some answers in his

11:11  9  questionnaire that we believe upon further inquiry with

11:12 10  individual voir dire will reveal --

11:12 11                    THE COURT:  Mr. Walker is the chaplain,

11:12 12  right?

11:12 13                    MR. HILL:  That's correct, Your Honor.

11:12 14  There's an exemption issue, I think, to be addressed

11:12 15  with him.  He said he's a full time student, and a

11:12 16  full-time student -- I don't know that he's aware of it,

11:12 17  whether Ms. Anderson with the clerk's office has made

11:12 18  him aware, a full-time student can be exempt from jury

11:12 19  service if they so elect.  It doesn't sound like he's

11:12 20  been made aware of his opportunity to elect.

11:12 21                    THE COURT:  I did not get the impression

11:12 22  he was a full-time student.  I got the impression that

11:12 23  he is a -- he's taking an elective course over the

11:12 24  Internet.

11:12 25                    MR. HILL:  I asked him specifically, Your

11:12 1   Honor, if he was a full-time student, and he responded,

11:12 2   yes.  We can explore it with him.

11:12 3              THE COURT:  My impression is very

11:12 4   different.  This is not a full-time student in the sense

11:12 5   of college student.  This is someone who is retired and

11:12 6   is pursuing a post-career life enhancement study rather

11:13 7   than, I think, the purpose of the exemption that you're

11:13 8   talking about.  Would you agree with me, Mr. Hill?

11:13 9              MR. HILL:  I don't know that I would

11:13 10  agree, Your Honor.  The exemption speaks to whether you

11:13 11  are a full-time status college student.  When I asked

11:13 12  him if he was a full-time student, his answer was, yes.

11:13 13  If he's taking graduate course study, nine hours' credit

11:13 14  is typically considered full-time status.  I don't know

11:13 15  what his current enrollment is, but that is something we

11:13 16  can pursue and find out whether he is simply unaware of

11:13 17  his exemption -- we get the impression he doesn't want

11:13 18  to be here because of that, and so we want to --

11:13 19             THE COURT:  He did give that impression;

11:13 20  that is true.  Let me consult here with --

11:14 21             (Discussion off the record.)

11:14 22             THE COURT:  Mr. Hill, let's go on to the

11:14 23  next one and come back to that one, okay?

11:14 24             MR. HILL:  Okay.  Your Honor, he is my

11:14 25  only, I think, realistic challenge for cause in that my

11:14  1   other one is No. 30 in the panel.  I don't know

11:14  2   mathematically that we will reach --

11:14  3                  THE COURT:  Let's treat it as if we might.

11:14  4   That's --

11:14  5                  MR. HILL:  That's Ms. Snowden.

11:14  6                  THE COURT:  -- Ms. Snowden, and she's a

11:14  7   dental hygienist with convenience issues with some of

11:14  8   her clients, right?

11:14  9                  MR. HILL:  That's correct, Your Honor.  My

11:14 10   concern regarding the cause challenge is that she has

11:14 11   some written answers in her questionnaire where she

11:14 12   indicated that she could not judge the case fairly

11:14 13   because of preconceived notions she has.

11:14 14                  THE COURT:  Give me one second.

11:14 15                  MR. HILL:  I've got those questionnaires

11:14 16   handy, Your Honor.

11:14 17                  THE COURT:  I do too.  I did not catch

11:14 18   that one.  I looked over them quickly, though.  Snowden.

11:15 19   Okay, I have it.  One second.  Point me to the place.

11:15 20                  MR. HILL:  Yes, Your Honor.  It's on the

11:15 21   last page.  If you'll just give me a moment to catch up

11:15 22   with you.

11:15 23                  THE COURT:  Yes, I see.  Too many people

11:15 24   file lawsuits for no good reason.

11:15 25                  MR. HILL:  The concern, Your Honor, is not

11:15  1    just the written statement that she has there, but it's

11:15  2    the, yes/no indication.

11:15  3                    THE COURT :  I see the yes/no.

11:15  4                    MR. HILL:  It's indicating that she can't

11:15  5    be fair.

11:15  6                    THE COURT:  I asked her, though, several

11:15  7    times if she had any apprehensions about fairness or

11:15  8    bias, and she didn't respond.  I'm going to deny your

11:15  9    motion.

11:15 10                    MR. HILL:  Your Honor, if I can ask the

11:15 11    Court's indulgence.

11:15 12                    THE COURT:  You may.

11:15 13                    MR. HILL:  Before we deny it, can we have

11:16 14    an opportunity to speak with her individually with the

11:16 15    Court just to explore that sensitivity of hers a little

11:16 16    further to see if there is some true bias in that answer

11:16 17    we need to discuss?

11:16 18                    THE COURT:  Once again, I did ask her

11:16 19    repeatedly, and she indicates here her reason.  She's

11:16 20    worried that too many lawsuits are filed, and she's open

11:16 21    about her reason, and I don't find that's a reason that

11:16 22    precludes her from reaching a fair and unbiased verdict.

11:16 23                    MR. HILL:  Thank you, Your Honor.

11:16 24                    THE COURT:  So she's denied.

11:16 25                    We're going to return -- I can tell you

11:16 1   specifically I'm checking the rule on full-time student,

11:16 2   and so if you -- if we can hold on that one until I have

11:16 3   a little more information.

11:16 4                   MR. HILL:  We certainly can.

11:16 5                   THE COURT:  We'll try and get it right.

11:16 6                   MR. HILL:  I also have a substantive cause

11:17 7   challenge to Mr. Walker apart from the exemption issue.

11:17 8                   THE COURT:  Okay.  Give me that at the

11:17 9   same time.

11:17 10                  MR. HILL:  Specifically with regard to his

11:17 11  answers to the questionnaire, he also indicated that he

11:17 12  has opinions about the patent monopoly that prevent him

11:17 13  from being fair.

11:17 14                  THE COURT:  Okay.  Just a second.  That's

11:17 15  Mr. Walker.  Let me look at that with you.  Mr. Walker.

11:17 16  Can you point me to the place?

11:17 17                  MR. HILL:  Yes, Your Honor.  It's on the

11:17 18  last page again.

11:17 19                  THE COURT:  Last page again.

11:17 20                  MR. HILL:  Towards the top of the page.

11:17 21  Let me find his questionnaire myself.  He has indicated,

11:17 22  yes, in response to that question.

11:17 23                  THE COURT:  Let me see.  Do you think

11:17 24  corporations rely too heavily on the courts?

11:17 25                  MR. HILL:  The question before that, Your

11:17 1   Honor.

11:17 2                   THE COURT:  Do you have any opinions about

11:17 3   the 7 to 21-year monopoly that prevents you from being a

11:18 4   fair juror?

11:18 5                   We repeatedly asked Mr. Walker questions

11:18 6   and inquired of him.  I did not sense that he had any

11:18 7   strong biases.  My guess is that he reacted to that

11:18 8   question very honestly and fairly as we might expect

11:18 9   from a chaplain.  And I think he's a little bit more

11:18 10  sensitive than -- to his fairness, than this Court is.

11:18 11  I'm denying, at least on that ground, your motion and

11:18 12  keeping him in the pool.

11:18 13                  Did you find out -- what did you find out?

11:18 14                  (Discussion off the record.)

11:18 15                  THE COURT:  A full-time student is someone

11:19 16  who is taking 12 to 15 hours a semester.

11:19 17                  MR. HILL:  There's no distinction between

11:19 18  graduate and undergraduate credit, Your Honor?  I don't

11:19 19  ask that to quibble, but I just -- I remember from

11:19 20  college days there being a distinction is the only

11:19 21  reason I ask.

11:19 22                  THE COURT:  I don't think there's a -- no

11:19 23  distinction was given to me, but once again, based on my

11:19 24  understanding and information, I'm going to deny the

11:19 25  motion.  I think he's in a little different category

11:19 1   than what that rule is trying to satisfy.  I think we're

11:19 2   trying to protect students whose careers might be

11:19 3   jeopardized by their service if they were taken out of

11:20 4   school for a month or two, and I don't think that

11:20 5   applies to a retired chaplain.

11:20 6               MR. HILL:  Your Honor, with regard to Mr.

11:20 7   Walker, based on the denial of the challenge for cause,

11:20 8   I would like to -- because I think I'm required to

11:20 9   complete my record for appellate purposes --

11:20 10               THE COURT:  Sure.  Absolutely.

11:20 11               MR. HILL:  We believe based on his written

11:20 12   answers and then also based on the question of his

11:20 13   exemption status and his preoccupation with the fact

11:20 14   that he wants to be somewhere else completing this

11:20 15   course study that he should be stricken for cause.  And

11:20 16   as a result, we're going to have to exercise a

11:20 17   preemptory challenge and then select a juror later in

11:20 18   the panel who we also may find unacceptable.

11:20 19               And because of that, Your Honor, we would

11:20 20   request of the Court at this time an additional

11:20 21   preemptory challenge to atone for that prejudice that's

11:20 22   caused by the denial for cause.

11:20 23               THE COURT:  Thank you, Mr. Hill.  That's

11:20 24   denied.  I'm particularly impressed with Mr. Walker.  I

11:21 25   think he's -- boy, if we could get 12 chaplains, we

11:21  1  might do really well in our jury system, wouldn't we?

11:21  2  And I think he's somebody who's going to do his best,

11:21  3  and that's what we want.

11:21  4          MR. HILL:  Thank you, Your Honor.

11:21  5          THE COURT:  Thank you.  Your motion,

11:21  6  though denied, is noted for the record.

11:21  7          Now, I think, Mr. Reiter, is your chance

11:21  8  to make any motions for cause.

11:21  9          MR. REITER:  Your Honor, having listened

11:21 10  to everybody in the thorough questioning from the Court

11:21 11  as well as Mr. Hill, we have no motions for cause.

11:21 12          THE COURT:  All right.  Then we are now, I

11:21 13  think, proceeding to our preemptory challenges.  Just so

11:21 14  we're all clear, after your preemptory challenges are

11:21 15  through, what I will do is go with anyone left.  I will

11:21 16  start one, two, three, four, five, in the order that

11:21 17  they have appeared on my list here and seat the

11:22 18  remaining jurors in the box until we have 12 and excuse

11:22 19  the rest.

11:22 20          Is that clear, Mr. Hill?

11:22 21          MR. HILL:  Yes, Your Honor, it is.

11:22 22          And my only question, Your Honor, is in

11:22 23  regard to exercising our cause challenges -- or, excuse

11:22 24  me, our preemptory challenges.  At this time or in a few

11:22 25  moments, we wanted to note --

11:22 1                    THE COURT:  Yes --

11:22 2                    MR. HILL:  -- who was in and who was out.

11:22 3  And as we have an opportunity to --

11:22 4                    THE COURT:  You certainly can have --

11:22 5  shall we take -- how much time would be convenient for

11:22 6  you?  This is your time to kind of think it through all

11:22 7  together.

11:22 8                    MR. HILL:  Your Honor, if we could get 15

11:22 9  minutes, we still could get the jury seated before noon

11:22 10 and release them for lunch with that much to break.

11:22 11                   THE COURT:  Does that sound okay to you,

11:22 12 Mr. --

11:22 13                   MR. REITER:  Yeah, sounds fine with me.

11:22 14                   THE COURT:  Okay.  Let's go ahead and take

11:22 15 15 minutes.

11:22 16                   (Recess.)

      17                   THE COURT:  Are you ready to proceed,

11:45 18 Mr. Hill, Mr. Reiter.

11:45 19                   MR. HILL:  Yes.  I think we had a little

11:45 20 bit of confusion about the process, but you tell us how

11:45 21 to proceed, we'll do it.

11:45 22                   THE COURT:  I'm the source of the

11:45 23 confusion.  I'm not following the way it's usually done

11:45 24 here in the Eastern District.  I have to apologize to

11:46 25 the people who know the system better than I do.  We'll

11:46  1    do it the way I discussed.  We'll alternate picks, but

11:46  2    then if you would submit a written copy signed of your

11:46  3    preemptory strikes so we could have the proper paperwork

11:46  4    in order as well.

11:46  5                MR. HILL:  We'll do it.

11:46  6                THE COURT:  Let's start as we discussed

11:46  7    earlier with strikes coming first from Mr. Hill.

11:46  8                MR. REITER:  Your Honor, we did have, as

11:46  9    we were conferring, a question.  Mr. Whatley, No. 14,

11:46 10    did not fill out a questionnaire.

11:46 11                THE COURT:  Mr. Whatley, No. 14.  I didn't

11:46 12    notice that.

11:46 13                MR. REITER:  It was an oversight.  He did

11:46 14    say his wife was a paralegal.  The question asked for

11:46 15    the employer.  We were wondering if we could ask him or

11:46 16    have somebody ask him that one question, what kind of

11:46 17    paralegal and who his wife works for.

11:47 18                THE COURT:  My clerk thinks we have it.

11:47 19                MR. REITER:  For Mr. Whatley?

11:47 20                THE COURT:  She saw someone come in late,

11:47 21    and she's thinking it might be him.  We're not sure.

11:47 22    We'll check.  No.  You seem to be correct.

11:47 23                Mr. Hill?

11:47 24                MR. HILL:  Your Honor, he disclosed that

11:47 25    his wife was a paralegal on the questioning.  No one

11:47  1    followed up.  I hate to drag him in here individualized

11:47  2    to ask one question, but we can if the Court wants to,

11:47  3    obviously.

11:47  4                    THE COURT:  How important is this, Mr.

11:47  5    Reiter?

11:47  6                    MR. REITER:  Well, Judge, it is important

11:47  7    to us, Your Honor, and was a piece of information that I

11:47  8    thought was on the questionnaire.  As I said, I didn't

11:48  9    realize that he did not fill one out --

11:48 10                    THE COURT:  That seems to be kind of a

11:48 11    fair point that --

11:48 12                    MR. REITER:  I can tell the Court that we

11:48 13    don't know who he is.  Nobody on my team knows him.

11:48 14    He's not affiliated with -- his wife at least wouldn't

11:48 15    be affiliated with any of the firms in this case.

11:48 16                    THE COURT:  Well, it's probably a -- just

11:48 17    an abundance of caution, but let's just make sure it's

11:48 18    not a firm that would somehow be affiliated somewhere.

11:48 19                    Can we invite Mr. Whatley in just for one

11:48 20    quick question?

11:48 21                    COURT ROOM DEPUTY:  Sure.

11:48 22                    (Juror enters courtroom.)

11:48 23                    THE COURT:  Explain that it's the Court's

11:48 24    oversight or something.

11:48 25                    MR. REITER:  Your Honor, if you wouldn't

| | | |
|---|---|---|
| 11:48 | 1 | mind asking the question. |
| 11:48 | 2 | THE COURT:  I will ask. |
| 11:48 | 3 | MR. REITER:  Okay.  Thank you. |
| 11:49 | 4 | THE COURT:  Mr. Whatley, you can stand |
| 11:49 | 5 | right there.  I kind of made a mistake in not following |
| 11:49 | 6 | up on one question.  I wondered if we could ask you, you |
| 11:49 | 7 | mentioned that your wife -- where does she work? |
| 11:49 | 8 | JUROR WHATLEY:  She works for the Nix Law |
| 11:49 | 9 | Firm in Dangerfield. |
| 11:49 | 10 | THE COURT:  Nix Law Firm.  What does she |
| 11:49 | 11 | do there? |
| 11:49 | 12 | JUROR WHATLEY:  She's a paralegal/legal |
| 11:49 | 13 | assistant. |
| 11:49 | 14 | THE COURT:  What sort of work is that?  I |
| 11:49 | 15 | don't mean to embarrass you.  She does kind of research |
| 11:49 | 16 | and things for them? |
| 11:49 | 17 | JUROR WHATLEY:  Yes, sir, she does. |
| 11:49 | 18 | THE COURT:  And is there any -- Mr. Hill |
| 11:49 | 19 | or Mr. Reiter, do you have anything else you'd like to |
| 11:49 | 20 | ask about his wife's employment? |
| 11:49 | 21 | MR. HILL:  No, Your Honor. |
| 11:50 | 22 | MR. REITER:  No, Your Honor. |
| 11:50 | 23 | THE COURT:  Thank you very much.  We |
| 11:50 | 24 | appreciate it.  That was my mistake.  I should have |
| 11:50 | 25 | followed up earlier and didn't. |

11:50  1                    (Juror exits courtroom.)

11:50  2                    THE COURT:  Okay.  Are we set, Mr. Reiter?

11:50  3                    MR. REITER:  Yes, Your Honor.  Thank you

11:50  4   very much.

11:50  5                    THE COURT:  Okay.  Then I believe we're

11:50  6   ready for your first preemptory challenge, Mr. Hill.

11:50  7                    MR. HILL:  Thank you, Your Honor.  Our

11:50  8   first preemptory challenge is Juror No. 15, Herbert

11:50  9   Ronald Collins.

11:50 10                    THE COURT:  Herbert Ronald Collins.  Okay.

11:50 11   That's noted.

11:50 12                    Mr. Reiter, we're to you.

11:50 13                    MR. REITER:  Yes, Your Honor.

11:50 14                    THE COURT:  This is like the NFL draft.

11:50 15   Reiter, what position did he play for Texas?  Go ahead,

11:51 16   Mr. Reiter.

11:51 17                    MR. REITER:  Your Honor, our first strike

11:51 18   is No. 7, Janet Wolfe.

11:51 19                    THE COURT:  No. 7, Janet Wolfe, is struck.

11:51 20                    We're back to you, Mr. Hill.

11:51 21                    MR. REITER:  Your Honor, our strike is

11:51 22   Juror No. 8, Beverly Miller.

11:51 23                    THE COURT:  No. 8, Beverly Miller.  Okay.

11:51 24                    To you, Mr. Reiter.

11:51 25                    MR. REITER:  Your Honor, our next strike

11:51  1  is No. 14, Mr. Whatley.

11:51  2              THE COURT:  14, Mr. Whatley.  All right.

11:51  3  I don't get to enhance my music skills, I guess.

11:51  4              MR. REITER:  I apologize, Your Honor.

11:52  5              THE COURT:  Mr. Hill?

11:52  6              MR. HILL:  Your Honor, our strike is Juror

11:52  7  No. 5, Clarence Michael Walker.

11:52  8              THE COURT:  No. 5, Clarence Michael

11:52  9  Walker.

11:52 10              Mr. Reiter?

11:52 11              MR. REITER:  Our last strike, Your Honor,

11:52 12  is No. 4, Ricky Dean Orr.

11:52 13              THE COURT:  Mr. Orr is struck.

11:52 14              By my count, we're done.

11:52 15              Are you in agreement, Mr. Hill?

11:52 16              MR. HILL:  Yes.

11:52 17              THE COURT:  Mr. Reiter, are you in

11:52 18  agreement?

11:52 19              MR. REITER:  Yes, Your Honor.

11:52 20              THE COURT:  Then what I think we need to

11:52 21  do is sign your papers and supply them here to the Court

11:52 22  official.

11:54 23              Can we invite the jury pool back in the

11:54 24  room?  And we'll all rise for their entrance.

11:56 25                  (Jury pool present.)

11:56  1              THE COURT:  May I invite you to seat our

11:56  2  jury.

11:56  3              THE CLERK:  As I call your name, could you

11:56  4  please come forward and take a seat in the jury box.

11:56  5  Juror No. 1, the first name I will call will come up and

11:56  6  go all the way down to the first seat on the first row.

11:56  7  We'll seat six people on the first row, six people on

11:56  8  the second row.

11:56  9              Gayle Anne McFarland, Carol Marie Wilson,

11:56 10  Linda Sue Robertson, Misty Ryan, Sharon Kay Hebert or

11:57 11  Hebert (Pronouncing), Willie Dean Hill.

11:57 12              The No. 7 juror, you go all the way down

11:57 13  to the end on the second row.  James L. Power, Jr.,

11:57 14  Rhena Beth Nash, Frances Marie Drennen, L. David

11:58 15  Stephenson, Ann Carol Bates, William C. Stabeno.

11:58 16              THE COURT:  Mr. Power, Mr. Stephenson, Mr.

11:58 17  Stabeno, the women have you outnumbered there.

11:58 18              You folks will have the honor to serve as

11:58 19  our jury, and I need to take a moment and tell the

11:58 20  entire jury pool that if it were up to me, I'd keep all

11:59 21  of you.  I've tried a lot of cases, and I've tried them

11:59 22  all around the country because of the nature of my

11:59 23  position, California, Michigan, New York, everywhere,

11:59 24  and I've never had a jury pool that's been as exemplary

11:59 25  as this one.  I was very impressed with all of you.  And

11:59 1   by the way, on the way out, you be sure to talk to him

11:59 2   about your hazard pay, will you.

11:59 3            But I do want to thank all of you for

11:59 4   being here, for being willing to serve, and you have

11:59 5   served by your presence here and by your willingness to

11:59 6   serve the citizens, and you're now excused with my great

12:00 7   appreciation.  Thank you.

12:00 8            (Remaining jury panel leaves courtroom.)

12:00 9            THE COURT:  Now, ladies and gentlemen,

12:00 10  we'll have a chance to get better acquainted over the

12:00 11  next week, but you have very significant

12:00 12  responsibilities.  At this point, I'd like to ask our

12:00 13  official to give you your oath.

12:01 14           COURT ROOM DEPUTY:  Would you stand,

12:01 15  please, and raise your right hand.

12:01 16           (Jurors sworn.)

12:01 17           THE COURT:  Thank you, all of you.  We're

12:01 18  going to excuse you now.  We're going to have lunch.

12:01 19  You'll have an hour.  Please be back promptly.  You're

12:01 20  the most important people in this room, and we can't

12:01 21  start without all of you here.  So you need to all be

12:01 22  back, or we'll all wait until you get back.

12:01 23           Let me just -- I know you've had

12:01 24  instructions, but let me remind you that there will be a

12:01 25  time when you'll talk with each other at length about

12:02 1  the case, but that time isn't yet.  You're not talking

12:02 2  about anything that happens in this room yet, so just

12:02 3  remember that as you go out together or alone or however

12:02 4  you go to get you a little lunch.  We'll see you then in

12:02 5  an hour.

12:02 6                    All rise for the jury.

12:03 7                    Does counsel need me before lunch?

12:03 8                    MR. HILL:  I don't believe so, Your Honor.

12:03 9                    MR. REITER:  No, Your Honor.

12:03 10                   THE COURT:  Okay.  I'll see you in an

12:03 11  hour.

12       12                   (Lunch recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      CERTIFICATION.

2

3

4            I HEREBY CERTIFY that the foregoing is a

5  true and correct transcript from the stenographic notes

6  of the proceedings in the above-entitled matter to the

7  best of my ability.

8

9

10 _____            _____

11 DONNA COLLINS, CSR                Date
   Deputy Official Court Reporter
12 State of Texas No. 1086
   Expiration Date:  12/31/10
13

14

15 _____            _____
   GLENDA FULLER, CSR                Date
16 Deputy Official Court Reporter
   State of Texas No. 1042
17 Expiration Date:  12/31/10

18

19

20

21

22

23

24

25