IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

IP INNOVATION, L.L.C.     )
and TECHNOLOGY LICENSING )
CORP.,                    )
                          )
Plaintiffs                )
                          ) Civil Docket No.
VS.                       ) 2:07-CV-447-RRR
                          ) April 30, 2010
RED HAT, INC. and         )
NOVELL, INC.              )
                          )
Defendants                ) 8:00 A.M.

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDALL R. RADER
UNITED STATES CIRCUIT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:        MR. JOSEPH A. CULIG
                          MR. ARTHUR A. GASEY
                          MR. PAUL C. GIBBONS
                          MR. PAUL K. VICKREY
                          Niro Scavone Haller & Niro
                          181 West Madison, Suite 4600
                          Chicago, Illinois 60602

                          MR. JACK WESLEY HILL
                          Ward & Smith Law Firm
                          111 West Tyler Street
                          Longview, Texas 75601

APPEARANCES CONTINUED ON NEXT PAGE:

COURT REPORTERS:          MS. DONNA COLLINS
                          MS. GLENDA FULLER
                          Deputy Official Court Reporters
                          100 East Houston, Suite 125
                          Marshall, TX 75670
                          903/935-3868

(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

```
 1    APPEARANCES CONTINUED:
      FOR THE DEFENDANT:         MR. JOSH A. KREVITT
 2                               Gibson, Dunn & Crutcher
                                 200 Park Avenue
 3                               New York, New York 10016

 4                               MR. MARK N. REITER
                                 MS. AMY E. LaVALLE
 5                               Gibson, Dunn & Crutcher
                                 2100 McKinney Avenue
 6                               Suite 1100
                                 Dallas, Texas 75201
 7
                                 MR. H. MARK LYON
 8                               Gibson, Dunn & Crutcher
                                 1881 Page Mill Road
 9                               Palo Alto, California 94304

10              *    *    *    *    *    *

11              P R O C E E D I N G S

12              (Jury out.)
```

08:09 13              THE COURT:  Good morning.

08:09 14              Are you holding down the fort,

08:09 15  Mr. Gibbons?

08:09 16              MR. GIBBONS:  They sent me as the advance

08:10 17  scout, I think, because I had a suit coat on.  They said

08:10 18  head on over.

08:10 19              THE COURT:  Okay.  Do we have any issues

08:10 20  or needs this morning?

08:10 21              MR. REITER:  I think we need to do the

08:10 22  formal charge conference and lodge our objections to the

08:10 23  jury instructions.

08:10 24              THE COURT:  That would be very appropriate

08:10 25  at this time.  So we met last night.  I have given you

08:10  1   my final versions of the instructions.

08:10  2              Mr. Gibbons?

08:10  3              MR. GIBBONS:  The Plaintiffs have a few

08:10  4   objections, Your Honor, to the final set of jury

08:10  5   instructions.

08:10  6              We have an objection to the final

08:10  7   instruction with respect to the Inventorship

08:10  8   instruction, Your Honor --

08:10  9              THE COURT:  All right.

08:10 10              MR. GIBBONS:  -- specifically Part B.  And

08:10 11   it's the requirement that each of the inventors work on

08:11 12   the same subject matter.

08:11 13              Further down in that section, it's the

08:11 14   requirement that they must have directly collaborated.

08:11 15              Is it alright if I read it in the record?

08:11 16              THE COURT:  This is fine.  I think you

08:11 17   need to make at least some kind of record of what your

08:11 18   objections are so that you're protected.

08:11 19              MR. GIBBONS:  In the final sentence, the

08:11 20   term regarding each co-inventor engaged with the other

08:11 21   co-inventors.

08:11 22              And then we have objections with respect

08:11 23   to damage instructions, specifically, Part A at the

08:11 24   bottom with respect to burden.  Some of the language

08:11 25   that we had wanted inserted had been struck by the

08:12  1   Court, and that deals with the accuracy of the records

08:12  2   and the --

08:12  3              THE COURT:  Why don't you read me just a

08:12  4   sentence or two of what you wanted so that it's clear.

08:12  5              MR. GIBBONS:  Sure.  What was taken out

08:12  6   was where the amount of damages cannot be determined

08:12  7   with precision.  Any doubts regarding the amount of

08:12  8   damages must be resolved against Defendants.

08:12  9   Specifically, if absolute damages cannot be determined

08:12 10   with precision from the evidence available from

08:12 11   Defendants is inadequate, such as where a calculation of

08:12 12   damages is impeded by Defendants' incomplete or

08:12 13   inaccurate records, damages may be estimated on the best

08:12 14   available evidence, resulting in uncertainties and

08:12 15   doubts against the Defendants.

08:12 16              And we also have an objection in Section C

08:12 17   with regard to reasonable royalty, specifically the

08:12 18   paragraph regarding Apple, Apple Computer, and the --

08:13 19   specifically the language that -- regarding at least

08:13 20   Apple's internal use.

08:13 21              Is that clear enough, sir?

08:13 22              THE COURT:  If I recall right, you wanted

08:13 23   that to say and not sales, or something like that?

08:13 24              MR. GIBBONS:  I believe so, Your Honor.

08:13 25   Let me check that.

08:13 1                   THE COURT:  I think I recall that.

08:13 2                   MR. GIBBONS:  I'm not sure if we had it in

08:13 3     our version.  I think that was proposed by the

08:13 4     Defendants and was part of the discussions, Your Honor.

08:13 5     I had left to go prepare the closing.

08:13 6                   THE COURT:  I think you've covered pretty

08:13 7     well what I recall as your concerns.

08:13 8                   MR. GIBBONS:  Fair enough.  Thank you,

08:13 9     Your Honor.

08:13 10                  THE COURT:  Just a comment:  I think on

08:13 11    the Inventorship, the Court took most of this language

08:13 12    right from federal circuit opinions.  On the damages

08:14 13    portion, the language you refer to came from cases where

08:14 14    there were errors in the records of the Defendants, and

08:14 15    the Defendants were responsible for some inadequacy of

08:14 16    records, which this record doesn't support that, in the

08:14 17    Court's view.  It just doesn't seem to be available

08:14 18    records of any kind.

08:14 19                  And the final point on the Apple, I think

08:14 20    is dealt with pretty well by the language the Court did

08:14 21    select.  But your objections are noted, and I think

08:14 22    preserved.

08:14 23                  MR. GIBBONS:  Thank you, Your Honor.

08:14 24                  THE COURT:  Now, Ms. LaValle.

08:14 25                  MS. LAVALLE:  Good morning, Your Honor.

08:14  1          We have just a few objections to the final

08:14  2  jury charge and the verdict form.

08:14  3          THE COURT:  Okay.

08:14  4          MS. LAVALLE:  First, we have some

08:14  5  objections to the Court's claim construction.  We object

08:14  6  to several of the terms.

08:14  7          THE COURT:  Could I for just one

08:15  8  second interrupt you.  Did you have claim construction

08:15  9  concerns, Mr. Gibbons?

08:15 10          MR. GIBBONS:  I don't believe so.  I can

08:15 11  check on that.

08:15 12          THE COURT:  Check on that in the interim,

08:15 13  so that we make sure that we have you on record on that,

08:15 14  too.

08:15 15          Please, Ms. LaValle, continue.

08:15 16          MS. LAVALLE:  The first term that

08:15 17  Defendants object to the Court's claim construction on

08:15 18  is perceptible as the same tool.  The Court's

08:15 19  construction is recognized as the same tool, even if the

08:15 20  objects have some different display characteristics,

08:15 21  including different positions, sizes, and contexts.

08:15 22          Defendants proposed a construction that

08:15 23  reads:  Generated to achieve object constancy such that

08:15 24  changes made to shared features of a tool appearing in

08:15 25  one workspace, for example, content, data, et cetera,

08:15  1    are reflected in features of tools in other workspaces.

08:15  2              Defendants believe that the Court's

08:15  3    construction is inconsistent with the intrinsic record

08:15  4    of the patents.  And that was perceptible as the same

08:16  5    tool.

08:16  6              The second term that we have objection to

08:16  7    the Court's construction of is workspace data structure.

08:16  8    The Court actually did not construe that term.  The

08:16  9    Court said that no construction is necessary.

08:16 10              The Defendants proposed a construction of

08:16 11    body -- the Defendants' construction was stated as body

08:16 12    of interrelated items of data corresponding to a

08:16 13    particular workspace.  The Defendants believe that the

08:16 14    Court's failure to construe this term is incorrect as a

08:16 15    matter of law, as it is necessary to construe this term

08:16 16    in order to assist the jury and resolve the parties'

08:16 17    dispute regarding the meaning of this claim term.

08:16 18              The next term that Defendants have an

08:16 19    objection to the construction of is workspace data

08:16 20    similar to the term workspace data structure.  Again,

08:16 21    the Court ruled that no construction was necessary, and

08:17 22    Defendants proposed a definition of interrelated items

08:17 23    of data corresponding to a particular workspace.

08:17 24              Again, the Defendants believe that a

08:17 25    construction was necessary to assist the jury and to

08:17 1     resolve the parties' dispute regarding the meaning of

08:17 2     this term.

08:17 3             The Defendants also object to the Court's

08:17 4     construction of two means plus function terms; that is,

08:17 5     control means and display object means.  The Court

08:17 6     construed the corresponding structure of control means

08:17 7     to be executable computer code implementing selectable

08:17 8     graphical user interface pop-up menus and icons and

08:17 9     their equivalents.

08:17 10             Defendants believe that under federal

08:17 11     circuit law, it's clear that if you have a computer

08:17 12     implemented means plus function claim, the corresponding

08:18 13     structure should be an algorithm.  And in this case,

08:18 14     there was an algorithm disclosed in the specification.

08:18 15     So Defendants proposed corresponding structure to this

08:18 16     means plus function term control means that we presented

08:18 17     was:  Procedures and algorithm specified in flowcharts

08:18 18     of exit and enter workspace procedures disclosed in

08:18 19     Figures 13, 18A, and 18B as well as Figure 10 and the

08:18 20     accompanying pseudocode disclosed in Table 1 that was in

08:18 21     Column 21 of the specification representing workspace

08:18 22     data structures and their equivalents.

08:18 23             Defendants' objection to the means plus

08:18 24     function term display object means a similar --

08:18 25     Defendants believe that under federal circuit law, the

08:19 1   corresponding structure of a computer implemented means

08:19 2   plus function claim would be the disclosed algorithm.

08:19 3          But in this case, there was no disclosed

08:19 4   algorithm in the specification, so in this case,

08:19 5   Defendants argue that this claim term was indefinite as

08:19 6   a matter of law.  There was no algorithm disclosed as

08:19 7   the corresponding structure for display object means.

08:19 8          The Court construed the structure to be

08:19 9   display system object and its equivalents, and

08:19 10  Defendants believe that that definition is indefinite.

08:19 11         That's all of our objections to the

08:19 12  Court's claim construction.

08:19 13         THE COURT:  As you understand, we've

08:19 14  played the game under those rules, so it's little hard

08:19 15  for the Court to reconsider them at this point, but your

08:19 16  objections are noted.

08:19 17         MS. LAVALLE:  Thank you, Your Honor.

08:19 18         MR. GIBBONS:  Your Honor --

08:19 19         THE COURT:  Excuse me.  Mr. Gibbons?

08:20 20         MR. GIBBONS:  I was going to say that

08:20 21  Plaintiffs' have no objection to the Court's claim

08:20 22  construction.

08:20 23         THE COURT:  Okay.  Fine.

08:20 24         MS. LAVALLE:  We have a few other

08:20 25  objections to --

08:20 1                    THE COURT:  On the instructions, please

08:20 2 proceed.

08:20 3                    MS. LAVALLE:  With respect to the

08:20 4 Inventorship instruction, Defendants object to the last

08:20 5 sentence of that instruction.  Specifically, Defendants

08:20 6 object to the inclusion of the phrase, in some cases,

08:20 7 before the last sentence that states:  In some cases,

08:20 8 the interplay between conception and collaboration

08:20 9 requires that each co-inventor engage with the other

08:20 10 co-inventors to contribute to a joint conception.

08:20 11                    Defendants believe that this instruction

08:20 12 is contrary to the federal circuit's recent opinion in

08:20 13 Vanderbilt versus ICOS Corporation, which indicates that

08:20 14 in all cases, the interplay between conception and

08:20 15 collaboration requires that each co-inventor engage with

08:20 16 the other co-inventors to contribute to a joint

08:20 17 conception.

08:20 18                    THE COURT:  Ouch.  You're going to fault

08:21 19 me for not following the federal circuit?

08:21 20                    MS. LAVALLE:  We think you got it close,

08:21 21 Your Honor.

08:21 22                    THE COURT:  You're very delicate, but you

08:21 23 continue with the objection you need to make.

08:21 24                    MS. LAVALLE:  Thank you, Your Honor.

08:21 25                    We have several objections to the damages

08:21 1    instruction, and that will be our last objection.

08:21 2                     THE COURT:  Okay.

08:21 3                     MS. LAVALLE:  First, we have an objection

08:21 4    to the damages instruction regarding a reasonable

08:21 5    royalty.  Specifically, the parties and the Court met

08:21 6    last night and agreed to include a -- or the Court, at

08:21 7    least, allowed us to include a sentence that had to do

08:21 8    with the Apple license and Plaintiffs.

08:21 9                     THE COURT:  Yes.

08:21 10                    MS. LAVALLE:  And Defendants agree with

08:21 11   this instruction, except that we disagree with the

08:21 12   inclusion of the phrase, at least.  And I'll read the

08:22 13   sentence.  It says:  With respect to the license

08:22 14   agreement entered into between Apple and Plaintiffs, you

08:22 15   should keep in mind that when Plaintiffs sued Apple, the

08:22 16   law allowed Plaintiffs to receive damages for at least

08:22 17   Apple's internal use.

08:22 18                    (Discussion off the record.)

08:22 19                    MS. LAVALLE:  If Your Honor will --

08:22 20                    MR. REITER:  I'm sorry, Your Honor.  I

08:22 21   didn't mean to interrupt.

08:22 22                    The objection is the inclusion of the

08:22 23   phrase, at least Apple's use.  So it should be:  To

08:22 24   receive damages that predated the filing.  So the

08:22 25   reference to Apple's use exclusively, we object to that.

08:22 1  I just wanted that to be clear.

08:22 2        THE COURT:  Thank you.  I think that the

08:22 3  jury is going to understand that we're talking about the

08:22 4  use that predated.  But please continue.

08:22 5        MS. LAVALLE:  I'll move on to the next

08:23 6  objection that we have to the damages instruction.

08:23 7        We object to the omission of an

08:23 8  instruction regarding the entire market value rule in

08:23 9  this case.  It's our belief that the jury should

08:23 10 consider the questions relating to the entire market

08:23 11 value rule in this case, because Plaintiffs' expert is

08:23 12 presenting an opinion on damages, which applies a

08:23 13 royalty rate to a royalty base.

08:23 14        And Plaintiffs' expert included 100

08:23 15 percent of units that were distributed during the

08:23 16 applicable damages period and did not offer an opinion

08:23 17 that would discount either the royalty base or the

08:23 18 royalty rate for the fact that the majority of

08:23 19 Defendants' products are not used in an infringing

08:23 20 manner.

08:23 21        Finally, we have an objection to -- I'm

08:24 22 sorry -- we have a couple more objections to the damages

08:24 23 instructions.  One is, we have an objection to having an

08:24 24 inclusion of a running royalty instruction at all in the

08:24 25 instructions and in the verdict form, because there's no

08:24  1    reliable evidence of royalty base based on a number of

08:24  2    units in this case.

08:24  3                 Defendants believe that a reasonable jury

08:24  4    would not be able to apply a royalty rate to a royalty

08:24  5    base in this case and come to a reasonable decision.

08:24  6    The evidence is just too unreliable in this case.

08:24  7                 Our last objection to the damages

08:24  8    instruction is that we have an objection to the sentence

08:24  9    in the instruction that states:  While Plaintiffs may

08:24 10    not establish the amount of damages by mere speculation

08:24 11    or guess, Plaintiffs satisfy their burden by showing the

08:24 12    extent of damages as a matter of just and reasonable

08:24 13    inference, even if the damages established are an

08:25 14    approximation.

08:25 15                 I'm sorry.  I think I stated incorrectly

08:25 16    that this was Defendants' proposed instruction, but I

08:25 17    meant that this was Plaintiffs' proposed sentence in the

08:25 18    damages.

08:25 19                 THE COURT:  Thank you.  I understood it

08:25 20    that way.

08:25 21                 MS. LAVALLE:  Right.  We object to this

08:25 22    sentence, because we believe it's contrary to the law,

08:25 23    it's vague, and it may cause confusion for the jury.

08:25 24    And as a consequence, it would be prejudicial to the

08:25 25    Defendants.

08:25  1                      Thank you, Your Honor.

08:25  2                      THE COURT:  Thank you, Ms. LaValle.

08:25  3                      Mr. Gibbons, anything else?

08:25  4                      MR. GIBBONS:  I don't believe we have

08:25  5  anything further.

08:25  6                      THE COURT:  Okay.  We've preserved our

08:25  7  objections.

08:25  8                      Mr. Gibbons.

08:25  9                      MR. GIBBONS:  Other than objections, we do

08:25 10  have a small housekeeping matter.

08:25 11                      THE COURT:  Sure.

08:25 12                      MR. GIBBONS:  We're going to buy the jury

08:25 13  lunch.  I brought a menu, and we didn't know if they

08:25 14  would like to select items or just order sandwiches.

08:26 15                      THE COURT:  Can you handle that with

08:26 16  Peggy?  Peggy can coordinate that.  She works right with

08:26 17  the jury.

08:26 18                      MR. GIBBONS:  Fair enough.  Thank you,

08:26 19  Your Honor.

08:26 20                      MR. REITER:  I just want to make sure

08:26 21  that's not a PX exhibit, Your Honor.

08:26 22                      THE COURT:  I think I understood both

08:26 23  parties were -- Mr. Gibbons said that.  Mr. Gibbons, I

08:26 24  think, was clear that he had worked with Mr. Lyon on

08:26 25  that.

08:26  1              MR. GIBBONS:  We're going to send him the

08:26  2   bill and go from there.

08:26  3              [Laughter.]

08:26  4              THE COURT:  Good attorney.  You get the

08:26  5   credit; he gets the bill.

08:26  6              MR. HILL:  Your Honor, will the Court make

08:26  7   available to us a final written version of the Charge

08:26  8   that you're actually going to read?

08:26  9              THE COURT:  Yes.  I thought you had that.

08:26 10   Did you have it --

08:26 11              MR. REITER:  It was e-mailed out last

08:26 12   night.

08:26 13              THE COURT:  It was e-mailed, but we can

08:26 14   get you written copies as well.

08:26 15              MR. HILL:  I just wasn't sure if the Court

08:26 16   was making any last-minute changes.  So the extent

08:26 17   that --

08:26 18              THE COURT:  The Court does not have any

08:26 19   changes.

08:26 20              MR. HILL:  Okay.  I just wanted to make

08:27 21   sure what I put in front of the jury in terms of either

08:27 22   on a document camera or otherwise to emphasize an

08:27 23   instruction would be the final version so that I didn't

08:27 24   have a boo-boo in that regard.

08:27 25              THE COURT:  You should follow along,

08:27 1    because I'm a little notorious for ad libbing here and

08:27 2    there.  But I will not depart from the substance as much

08:27 3    as I can.  But you should follow along carefully.

08:27 4               If you have any question, what I would

08:27 5    request you to do is request a sidebar right after I --

08:27 6    let me finish -- out of respect, you let me finish, but

08:27 7    then request a sidebar and we'll talk about it.  If I

08:27 8    think I misspoke in some way, I will correct it on the

08:27 9    spot.

08:27 10              MR. REITER:  You mean finish the whole

08:28 11   thing?

08:28 12              THE COURT:  Yes.  I'll finish the whole

08:28 13   thing, but -- I will go through the whole thing, and

08:28 14   then if you have a place where you think I slipped or

08:28 15   did something you didn't expect, request a sidebar and

08:28 16   I'll go back and correct that point right before you

08:28 17   give your closing arguments.

08:28 18              MR. HILL:  Thank you, Your Honor.

08:28 19              THE COURT:  Are we just about ready?

08:28 20              MR. GASEY:  Yes, Your Honor.

08:28 21              THE COURT:  Give me just one second, and I

08:28 22   actually need to check and see -- we had one juror who

08:28 23   was calling in a little late, and I need to go and check

08:28 24   and see if that juror arrived.

08:28 25              So I'll be right back.

08:28  1              (Recess.)

08:28  2              (Jury in.)

       3              THE COURT:  Good morning.  Please be

08:32  4  seated.

08:32  5              Mr. Reiter.

08:32  6              MR. REITER:  With the Court's permission,

08:33  7  I'd like to have Dr. Putnam, Defendants' damages expert,

08:33  8  resume his testimony.

08:33  9              THE COURT:  Please.

02:33 10      JONATHAN D. PUTNAM, Ph.D., DEFENDANTS' WITNESS,

02:33 11                  PREVIOUSLY SWORN

02:33 12              DIRECT EXAMINATION (CONTINUED)

02:33 13  BY MR. REITER:

02:33 14      Q.   Good morning, Dr. Putnam.

08:33 15      A.   Good morning.

08:33 16      Q.   How are you?

08:33 17      A.   Fine.  Thanks.

08:33 18      Q.   So I'd like to kind of give everybody a chance

08:33 19  to remember where we were before we broke for the

08:33 20  evening yesterday.  I believe we were talking about the

08:33 21  structure of the license that might be executed in the

08:33 22  hypothetical negotiation.

08:33 23              Do you recall that?

08:33 24      A.   Yes.

08:33 25      Q.   Okay.  And I think you said that the license

08:33  1   would be a lump-sum license; is that right?

08:33  2        A.   That's right.

08:33  3        Q.   Okay.  And we were reviewing licenses that had

08:34  4   been executed in the past to look and see what kind of

08:34  5   structure those licenses had; is that right?

08:34  6        A.   Yes; that's right.

08:34  7        Q.   Okay.  And so there were four licenses that had

08:34  8   been executed to these patents.

08:34  9                Did I get that right?

08:34 10        A.   Yes.

08:34 11        Q.   Hewlett-Packard, Central Point, SGI, and Apple?

08:34 12        A.   That's right.

08:34 13        Q.   And I think we were in the middle of our

08:34 14   discussion about the HP license.

08:34 15                Does that sound right to you?

08:34 16        A.   Sure.

08:34 17        Q.   Okay.  Now, just to refresh everybody's memory

08:34 18   after the evening, could you tell us what the terms of

08:34 19   the HP license were, generally?

08:34 20        A.   Sure.  Remember, in the HP case, this is for an

08:34 21   add-on product, and HP was selling this product to

08:34 22   another company called Borland.  As part of the sale,

08:34 23   they entered into this license with Xerox.  The Xerox

08:34 24   license with HP said that HP was licensed for all the

08:34 25   sales that it made in the past, and we calculated that

08:35 1  to be about $12 million.

08:35 2                    And then going forward, Borland would be

08:35 3  licensed for another $10 million of sales.  So there was

08:35 4  a total of about $22 million worth of sales that were

08:35 5  licensed.

08:35 6                    For that license, HP paid $110,000.  There

08:35 7  was one additional provision that Mr. Gemini used that

08:35 8  if they got past 10 million, there would be a 1-percent

08:35 9  royalty, but as far as we know, that never happened.  So

08:35 10 the basic terms were a 110,000-dollar payment, $22

08:35 11 million in sales.

08:35 12    Q.   Now, was there anything in the license --

08:35 13                   MR. REITER:  Maybe we could put up DX770

08:35 14 and go to Exhibit B.

08:35 15    Q.   (By Mr. Reiter) Was there anything in the

08:35 16 license that indicated that the license was being

08:35 17 transferred to Borland?

08:35 18    A.   Yes.  There's an amendment at the end or an

08:35 19 exhibit, I guess it's called, that describes this

08:35 20 license as being negotiated as part of a transfer of the

08:35 21 Dashboard business from HP to Borland on the same date.

08:36 22    Q.   Does that tell you anything about what Xerox

08:36 23 knew about the relationship between HP and Borland?

08:36 24    A.   Yes.  Well, Xerox was, obviously.  Because they

08:36 25 were a party to the license, they knew that

08:36 1    Hewlett-Packard was selling off its business on that

08:36 2    day, and Hewlett-Packard wasn't going to be the party

08:36 3    that was licensed.  It was going to Borland, and Xerox

08:36 4    knew that, because they signed an agreement in which

08:36 5    Hewlett-Packard said we're selling this business to

08:36 6    Borland.

08:36 7        Q.   Now, you know what Borland did with the product

08:36 8    as far as the price goes after it acquired the

08:36 9    company -- or the business?

08:36 10       A.   Yes.  Like any company, they were excited about

08:36 11   the chance to sell this new product, but they had a new

08:36 12   strategy for it.  And their new strategy for it was to

08:36 13   drop the price.

08:36 14            So the first thing they were going to do

08:36 15   was take the price down from $99 to $49.  They thought

08:36 16   they could make more money doing that, I guess.

08:36 17       Q.   I think in your first report, you indicated a

08:37 18   price of $99 attributable to HP but nothing about

08:37 19   Borland.

08:37 20            Why nothing about Borland?

08:37 21       A.   Well, at the time, the transfer to Borland

08:37 22   wasn't relevant when Mr. Gemini was developing his first

08:37 23   set of theories, the ones he subsequently discarded, and

08:37 24   we were talking about the price of an entire system and

08:37 25   the revenue from a system, that was his method of

08:37 1    calculating this.

08:37 2                As part of calculating the revenue for the

08:37 3    system, we used the 99-dollar figure, because that's

08:37 4    what we had for HP.  When Mr. Gemini changed his mind

08:37 5    and said let's move to a per-unit royalty and let's take

08:37 6    it at 1 percent, it became important to actually find

08:37 7    out how much this product was sold for in the real world

08:37 8    under the license.  And so we did further research and

08:37 9    looked that up.

08:37 10   Q.   Now, we had talked about the SGI license, which

08:37 11   was -- which kind, a lump sum or a running royalty?

08:37 12   A.   The SGI license was an operating system

08:37 13   license, and it was a lump sum, one 95,000-dollar

08:37 14   payment.

08:37 15   Q.   Okay.  Apple, lump sum or running royalty?

08:37 16   A.   Also lump sum.

08:38 17   Q.   Okay.  Now, how would you qualify -- given all

08:38 18   the information we just discussed, how would you quality

08:38 19   the HP license, lump sum or running royalty?

08:38 20   A.   It's a lump-sum license.  There's no evidence

08:38 21   that the running portion of the license was ever

08:38 22   operable.

08:38 23   Q.   Okay.  And the Central Point, lump sum or

08:38 24   running royalty?

08:38 25   A.   That's a running royalty.

08:38 1      Q.   Okay.  Now, having gone through the licenses

08:38 2  that Xerox or the Plaintiffs executed with respect to

08:38 3  these patents, did you look at any other licenses that

08:38 4  maybe applicable in doing your analysis?

08:38 5      A.   Yes.  Remember, what you're trying to do -- the

08:38 6  whole context of this is just how would these parties on

08:38 7  both sides of the courtroom behave, if they were sitting

08:38 8  down at a bargaining table.

08:38 9           And so we know that the Plaintiffs, or the

08:38 10 people before them -- Xerox before them, we know that

08:38 11 they negotiated primarily lump-sum licenses.  And so now

08:38 12 the question is, what will the Defendants do, if they

08:38 13 were negotiating a license.  And the answer is, there's

08:38 14 one license that Red Hat entered into that covers the

08:38 15 accused products, and that's also a lump-sum license.

08:39 16          So both parties, either exclusively or

08:39 17 primarily, negotiate lump-sum licenses.

08:39 18     Q.   There was some testimony about a license that

08:39 19 Novell executed.  Do you recall that?

08:39 20     A.   Yes.

08:39 21     Q.   Was that a lump sum or a running royalty based

08:39 22 on the deposition testimony that you heard?

08:39 23     A.   Based on the deposition testimony -- so, first

08:39 24 of all, my understanding is it's not for the accused

08:39 25 products, but the structure of that license was the

08:39 1   following:  Novell paid on a running basis -- in other

08:39 2   words, pay as you go -- up to a certain amount per year,

08:39 3   okay?  And that amount was in the 200,000s, something

08:39 4   like that.

08:39 5                   So once you sold enough units to the point

08:39 6   where you were going to pay $200,000 in that year, but

08:39 7   you stopped keeping track.  And since they sold many

08:39 8   more units than that, then every year they just wrote a

08:39 9   check for $200,000, or whatever it was.  So, in effect,

08:39 10  it was a lump-sum payment that you paid every year and

08:40 11  not a pay-as-you-go license.  You just pay your check on

08:40 12  January 1st, or whatever, and you're done for the year.

08:40 13  You don't have to keep track of the number of units.

08:40 14      Q.   Are you saying Novell keeps track of their

08:40 15  units?

08:40 16      A.   No, they don't.  The point is, you just write

08:40 17  the check once, and you don't have to worry about

08:40 18  keeping track of anything.

08:40 19      Q.   Okay.  There was also some correspondence

08:40 20  between the Plaintiffs and the Defendants at the

08:40 21  beginning of the lawsuit.

08:40 22                   Do you recall that?

08:40 23      A.   Yes.

08:40 24                   MR. REITER:  Maybe if we could put up

08:40 25  DX739, please.

08:40 1    Q.    (By Mr. Reiter) Do you know what this is,

08:40 2  Dr. Putnam?

08:40 3    A.    Yes.  This is a letter from -- it's on the

08:40 4  stationery of the Niro firm, which is the folks who are

08:40 5  representing the Plaintiffs in this case, and this is a

08:40 6  letter addressed to Mr. Cunningham, who is actually here

08:40 7  in the courtroom.  And it's a description of the patents

08:40 8  and basically an offer to settle the litigation if -- on

08:41 9  certain terms.

08:41 10   Q.    And what kind of terms did Plaintiffs offer?

08:41 11   A.    I think you see at the top -- the jury has

08:41 12  probably seen this, but worth highlighting again.  It

08:41 13  says:  Settlement proposal -- and I'll just read that --

08:41 14  IPI and TLC, who are the Plaintiffs in this case,

08:41 15  propose a settlement that will fully release Red Hat

08:41 16  from liability under the PARC patents -- that's the

08:41 17  Xerox patents -- through the expiration -- which occurs

08:41 18  later in 2008 -- and also will grant a covenant not to

08:41 19  sue and a paid-up license.

08:41 20             And the important part for our purposes is

08:41 21  for a single lump-sum payment.

08:41 22   Q.    Now, I think you prepared a lump-sum summary to

08:41 23  kind of take us through what your conclusion was or why

08:41 24  there should be a lump-sum license?

08:41 25   A.    Yes.  Yes.  This is actually one of the

08:41 1  important things.  So remember, there was a prior chart

08:41 2  that I did with a nine-part test, and it was all the

08:41 3  tests that you would apply to the facts to see if you

08:42 4  would -- the parties would negotiate a running royalty.

08:42 5           Each one of those tests indicated that you

08:42 6  wouldn't negotiate a running royalty.  And so then the

08:42 7  question becomes, well, is there evidence in favor of

08:42 8  negotiating a lump-sum royalty?

08:42 9           The answer is yes.  As we see on this

08:42 10 chart, these are licenses to operating system vendors

08:42 11 and also offers to license.  And so in every case, the

08:42 12 person either is the Defendants or is someone like the

08:42 13 Defendants, because they sell operating systems.

08:42 14          So we have the SGI license from Xerox.

08:42 15 That's a lump-sum payment.  The cross-license with

08:42 16 Microsoft is a lump-sum payment.  The IPI license with

08:42 17 Apple is a lump-sum payment.  IPI's licenses to -- or

08:42 18 IPI's -- the Plaintiffs' offer to license to Plaintiffs

08:42 19 (sic), both Red Hat and Novell, were for lump-sum

08:42 20 payments.

08:42 21          And finally, when Red Hat negotiated a

08:42 22 license with DataTern, that was not for these patents,

08:42 23 but it was a lump-sum payment.  And so all of the

08:42 24 operating system licenses that we are able to examine

08:43 25 are structured as a lump sum.

08:43 1    Q.    That DataTern license that you just mentioned,

08:43 2  is that the license you were talking about a moment ago

08:43 3  when you said one of the Defendants had a-lump sum

08:43 4  license?

08:43 5    A.    Yes; that's right.

08:43 6    Q.    Okay.  Now, let's turn to valuation or I think

08:43 7  how much the parties would have paid in the hypothetical

08:43 8  negotiation.

08:43 9          How do you do that?  What do you look at

08:43 10 to determine what the value of the patent is?

08:43 11   A.    Well, this is -- you know, mostly common sense,

08:43 12 and we've actually gone through most of it.  The

08:43 13 question is, what do other people pay for these patents

08:43 14 when they're being traded in the marketplace.

08:43 15         What you want to get is, what's their fair

08:43 16 market value.  And like with patents or cars or houses,

08:43 17 the way you determine the fair market value is what do

08:43 18 people pay for either the same thing or for things that

08:43 19 are similar.

08:43 20         So we go back to the licenses and look at

08:43 21 the actual -- instead of just focusing on the structure,

08:43 22 it's the payment terms.  So remember, I told you at the

08:43 23 beginning it's not just what you pay but how you pay it.

08:43 24 We've talked about how you pay it; you pay it as a lump

08:44 25 sum.  Now we're going to talk about what you pay.

08:44  1      Q.    So did you break up your analysis between

08:44  2  operating systems and add-on licenses in determining

08:44  3  valuation?

08:44  4      A.    Yes.

08:44  5      Q.    Okay.  So the two operating system licenses, I

08:44  6  think, are Apple and SGI?

08:44  7      A.    That's right.

08:44  8      Q.    So let's talk about the SGI license first.  How

08:44  9  much did they pay again?

08:44 10      A.    $95,000, lump sum.

08:44 11      Q.    Okay.  And how long did that license last?

08:44 12      A.    That was for 13 years, from 1995 through 2008,

08:44 13  when the patents ended.

08:44 14      Q.    Okay.  So from when they started a license

08:44 15  until the patents died?

08:44 16      A.    That's right.

08:44 17      Q.    Okay.  And how about Apple, how much did they

08:44 18  pay?

08:44 19      A.    $1.25 million.

08:44 20      Q.    Okay.  And what did that cover?

08:44 21      A.    Time period you mean?

08:44 22      Q.    No.  Actually, I was thinking product-wise.

08:44 23      A.    Oh, product-wise, it covered all of Apple's

08:44 24  products that they might sell anywhere.

08:44 25      Q.    Everything?

08:44  1       A.    Everything.

08:44  2       Q.    Okay.  And now how long did that last?

08:44  3       A.    And that was for -- it was in 2007.  You could

08:44  4  go back as much as six years.

08:44  5              MR. VICKREY:  Your Honor, we object to

08:45  6  this for the same reasons we discussed last night,

08:45  7  trying to suggest that it goes back for sales six years

08:45  8  prior.

08:45  9              THE COURT:  I think you can clarify this

08:45 10  when you get a chance to inquire, Mr. Vickrey.

08:45 11              MR. VICKREY:  Thank you, Your Honor.

08:45 12              THE COURT:  Please proceed.

08:45 13       Q.    (By Mr. Reiter) How long was the Apple license?

08:45 14       A.    Well, certainly, this is -- this is a legal

08:45 15  question.  My understanding of the law is that you could

08:45 16  go back six years from the time of filing of a lawsuit

08:45 17  and then forward another year and a half until the

08:45 18  patents ended.  So in total, about seven and a half

08:45 19  years it covered.

08:45 20       Q.    How does Apple sales or revenue compare to the

08:45 21  revenue of the Defendants?

08:45 22       A.    Oh, it's much, much larger.  Apple sells in the

08:45 23  tens of billions.

08:45 24              MR. VICKREY:  Objection, Your Honor, 403.

08:45 25  We're getting into sales that have nothing --

08:45 1          THE COURT:  Mr. Vickrey, this is something

08:45 2  you can deal with on cross.

08:45 3          MR. VICKREY:  All right.

08:45 4          THE COURT:  Thank you.  Please proceed.

08:45 5      Q.   (By Mr. Reiter) Okay.  So that was the

08:46 6  two-operating system licenses, the two add-on licenses,

08:46 7  Central Point, HP, how much did they pay.

08:46 8      A.   Yes, so now we've been through this.  For the

08:46 9  operating system add-ons, the HP license was $110,000

08:46 10 lump sum, and the Central Point license was 25 cents per

08:46 11 copy.

08:46 12     Q.   Is there any evidence that Central Point paid

08:46 13 anything to Xerox?

08:46 14     A.   No.

08:46 15     Q.   How long did the HP license last?

08:46 16     A.   That license was negotiated in 1994 and, again,

08:46 17 through the end of the patent's life, so about 14 years.

08:46 18     Q.   What about Central Point?

08:46 19     A.   Also negotiated in 1994, so also 14 years.

08:46 20     Q.   So can you summarize your conclusions about

08:46 21 what the value one might appraise these patents at based

08:46 22 on these prior patents?

08:46 23     A.   Sure.

08:46 24     Q.   Or prior licenses?  Excuse me.

08:46 25     A.   Yeah, the best evidence is from the operating

08:47  1    system licenses and because the Defendants sell

08:47  2    operating systems.

08:47  3                And so my conclusion, based on all of the

08:47  4    evidence, is that the parties would have agreed to a

08:47  5    payment of about -- or the value of the license --

08:47  6    comparable value for the parties is about $100,000.

08:47  7        Q.   So is that it, we're done?  Is it $100,000?

08:47  8        A.   Well, no.  You've got to adjust for the -- for

08:47  9    various factors in order to make the license that the

08:47 10    Defendants would have negotiated comparable to the

08:47 11    licenses that we actually observe in the marketplace.

08:47 12                So, for example, if I'm trading in my

08:47 13    Jeep, there's a certain value for Jeeps, but you would

08:47 14    adjust for various factors.  For example, I don't drive

08:47 15    my Jeep very much and so it's got low miles.  And so

08:47 16    that means that the price of my particular Jeep would go

08:47 17    up relative to the average Jeep.

08:47 18                And so we have to look at those things

08:47 19    that would cause you to adjust the license one way or

08:47 20    the other.

08:47 21        Q.   Is one of those factors usage, like you talked

08:47 22    about with respect to your Jeep?  How much the

08:48 23    Defendants would use the technology in their products?

08:48 24        A.   Exactly.  And that's one of the issues -- you

08:48 25    know, that I know is a bone of contention in this case.

08:48 1          Remember, not every copy of the software

08:48 2  is capable of infringing, because not every copy has a

08:48 3  display associated with it or has a user interface

08:48 4  installed on it.  So you would -- like if -- in my case

08:48 5  or in the case of my Jeep, you would discount the price

08:48 6  if something was not used as much -- well, I guess it's

08:48 7  backwards now.

08:48 8          The point of it is, you need to adjust for

08:48 9  the number of units that are actually using the

08:48 10 invention.  In this case, because fewer units use the

08:48 11 invention, that would mean a lower price.

08:48 12    Q.   What about demand for the product; does that

08:48 13 come into play?

      14    A.   Sure.  You want to see whether the invention is

08:48 15 actually the basis for customer demand, so you want to

08:48 16 look at things like do customers buy the product, or in

08:48 17 this case, do they choose to download the Red Hat or

08:48 18 Novell products because of the enhanced workspace

08:49 19 switching feature.

08:49 20         And there's no evidence that I've seen

08:49 21 that anybody chose the Red Hat products because of this

08:49 22 feature.  Even if they use it, it wasn't the basis of

08:49 23 their demand.  It's just something, you know, that they

08:49 24 use.

08:49 25    Q.   What about the Novell products, same

08:49 1    conclusion?

08:49 2        A.   And the same conclusion, yes, exactly.

08:49 3        Q.   Okay.  Anything -- does marketing materials

08:49 4    come into play?  Do you look at those?

08:49 5        A.   Yes, I looked at all the marketing materials.

08:49 6    You know, you have sales reps and things like that and

08:49 7    they say, okay, when you go out in the marketplace, we

08:49 8    want you to explain why our product is better than

08:49 9    everybody else's product, and here's the 25 things we

08:49 10   want you to keep in mind about why our product is the

08:49 11   best.

08:49 12             And so I went through those datasheets to

08:49 13   see what they told their sales reps to tell their

08:49 14   customers.  And there's no place in those datasheets

08:49 15   where it says anything about make sure you mention the

08:49 16   enhanced workspace feature.  So the sales reps aren't

08:49 17   talking that up, and so it can't be the reason why

08:49 18   people actually choose to consume a Red Hat or a Novell

08:49 19   product.

08:49 20       Q.   Now, is there any kind of objective evidence or

08:49 21   information that you looked at about the relative

08:50 22   importance or quantity of the feature in the product?

08:50 23       A.   Sure.  One of the things that people sometimes

08:50 24   do is -- and this is just sort of a back-of-the-envelope

08:50 25   calculation, but it's worth examining -- is you look at

08:50  1   all the lines of code in the entire system.  There's

08:50  2   millions of lines of code.

08:50  3          As I understand it, Fedora has 204 million

08:50  4   lines of code.  I can't imagine how much writing that

08:50  5   is, but it's thousands of software engineers working to

08:50  6   write various parts of the system.

08:50  7          Then you're asked the question, well, the

08:50  8   enhanced workspace switching feature, how many lines of

08:50  9   code is that relative to the total?  Dr. Zimmerman said

08:50 10   he identified about 6,300 lines, as I recall, that were

08:50 11   lines of code that pertained to the enhanced workspace

08:50 12   switching feature.  So you've got 6,300 lines that are

08:50 13   the feature and 204 million that are the entire package.

08:51 14   So you might ask the question, well, what share of the

08:51 15   total is the feature?

08:51 16      Q.   Was that Dr. Zimmerman or Mr. Gray, Defendants'

08:51 17   expert?

08:51 18      A.   I'm sorry.  It may have been Mr. Gray.  I may

08:51 19   have misspoken.

08:51 20      Q.   Okay.  Did you prepare a slide to kind of give

08:51 21   this -- give us all a perspective of the quantity?

08:51 22      A.   Sure.  Yes, I did actually.

08:51 23          It's hard to understand with computer

08:51 24   code.  It's easier with things you can touch.

08:51 25          MR. REITER:  If we could put the car slide

08:51 1    up.

08:51 2        A.    So let's do the math with the car.  So 6,300

08:51 3    lines out of 204 million lines is 0.003 percent of the

08:51 4    total number of lines.  And so if you were applying that

08:51 5    to a car, that's a very tiny number.  If you're applying

08:51 6    that to a car, suppose your car cost $30,000, what is

08:51 7    0.003 percent of a 30,000-dollar car?

08:51 8                    Well, that's something that's worth about

08:51 9    90 cents.  That's the share of the total that's

08:52 10   represented by this feature.

08:52 11                   THE COURT:  Mr. Vickrey?

08:52 12                   MR. VICKREY:  May we have a sidebar

08:52 13   conference?

08:52 14                   THE COURT:  Yes.

08:52 15                   (Bench conference.)

08:52 16                   MR. VICKREY:  This is like a reverse

08:52 17   entire market value thing.  They're trying to jam the

08:52 18   reverse argument down our throats.  That's not the

08:52 19   theory of the case.  It's prejudicial.  You saw a piece

08:52 20   of the car.  We're not asking for a piece of the car.

08:52 21                   MR. REITER:  This is a very small part of

08:52 22   the overall system.  In the SGI license, for example,

08:52 23   SGI was willing to take it out.  They paid $95,000 which

08:52 24   shows a de minimis value of the --

08:52 25                   MR. VICKREY:  Then let him focus on that.

08:52  1          THE COURT:  Okay.  Well, I think the way

08:52  2   to do to deal with this is to allow you to clarify

08:52  3   the -- how this should be applied on cross-examination,

08:53  4   and then we'll proceed that way.

08:53  5          Thank you.

08:53  6          (Bench conference concluded.)

08:53  7          THE COURT:  Mr. Reiter, you were

08:53  8   inquiring.

08:53  9          MR. REITER:  Right, yes.  Thank you, Your

08:53  10  Honor.  Just looking to see where I was.

08:53  11     Q.   (By Mr. Reiter) So have you seen any evidence

08:53  12  that demonstrates that the accused feature is -- or this

08:53  13  enhanced workspace, switching as you call it, is the

08:53  14  basis of consumer demand?

08:53  15     A.   No.  As we discussed, I haven't found any

08:53  16  reason to believe that any consumer actually makes a

08:53  17  decision to purchase this product or to acquire this

08:53  18  product -- they don't purchase it.  They acquire it.

08:53  19  They don't download it.

08:53  20          Nobody makes their decision to do that

08:53  21  based on whether it's got enhanced workspace switching

08:53  22  or not.

08:53  23     Q.   How does that play into how you value the

08:53  24  patents?

08:53  25     A.   Well, again, all the things equal, that would

08:53 1    mean that you would reduce the price you would pay,

08:54 2    particularly relative to situations where an -- if

08:54 3    you're pricing it relative to add-on product.

08:54 4             If somebody buys this as an add-on, it's

08:54 5    because they want it.  But the vast majority of

08:54 6    consumers don't consider this to be an important

08:54 7    determinant of why you actually buy the product.

08:54 8    They're not trying to add it onto their system.  It just

08:54 9    comes automatically, and they don't think about it.

08:54 10   Q.   So did you prepare a chart that kind of shows

08:54 11   the different factors you might look at to value the

08:54 12   intellectual property or the patent?

08:54 13   A.   Yes.

08:54 14             MR. REITER:  If we could put up the

08:54 15   adjustments chart, please.

08:54 16   Q.   (By Mr. Reiter) Is this that chart?

08:54 17   A.   Yes.  So -- I'm sorry.  Go ahead.

08:54 18   Q.   Okay.  I was going to say, if you could explain

08:54 19   it.

08:54 20   A.   Sure.  So -- so remember we talked about -- so

08:54 21   we have -- this is not rocket science.  People pay about

08:54 22   $100,000 when they license these patents.  The question

08:54 23   is, is that the right number, or would you make some

08:54 24   adjustments.

08:54 25             And so we just talked about some of these

08:54 1  adjustments that we would make, and you'll see there's

08:55 2  eight of them that I put up here.  And the first seven

08:55 3  of them have one thing in common.  And that is that if

08:55 4  you were taking that adjustment into account, you would

08:55 5  reduce that $100,000 because of that factor.

08:55 6           So, for example, the first one on use,

08:55 7  many of the Defendants' units can't infringe the patent

08:55 8  because they don't have a display.  Similarly, it's a

08:55 9  tiny share of the total features in code in the entire

08:55 10 product, so it can't be the basis of consumer demand.

08:55 11      Q.   What about the passage of time, how does that

08:55 12 play in?

08:55 13      A.   That's, I guess, the fifth one down there.

08:55 14           THE WITNESS:  Do I have a pointer?

08:55 15      A.   There we go, passage of time right there.

08:55 16           Okay.  So three of the four licenses were

08:55 17 negotiated in the 1990s, and so as we all know from

08:55 18 being consumers, prices change over time.  Some prices

08:55 19 go up over time; other prices go down over time, okay?

08:55 20           Software is one of those things whose

08:55 21 price decreases over time.  It's sort of like big TVs.

08:56 22 I was looking at trying to figure out how much a

08:56 23 big-screen plasma TV cost back in 2002, which is only

08:56 24 eight years ago.  It turns out that the average price of

08:56 25 a big screen TV eight years ago was about $6,000.

08:56 1            So then I went to the Wal-Mart website and
08:56 2    said, well, what do you buy a big-screen TV for today?
08:56 3    Well, it's about $700.  So when you've got a long period
08:56 4    of time since the licenses were negotiated, in this case
08:56 5    about 15 years since the mid-1990s, you need to take
08:56 6    that passage of time into account.
08:56 7            And so what I did was go to the government
08:56 8    website.  It's called the Bureau of Labor Statistics.
08:56 9    They track prices of everything that you could possibly
08:56 10   want to buy, including the prices of software, and
08:56 11   prices have gone down since the mid-1990s.  And so if
08:56 12   you were adjusting for that, for when the Defendants
08:56 13   were actually negotiating ten years later, you would
08:56 14   reduce the price.
08:56 15   Q.    I see the last one is removal of uncertainty.
08:56 16   What does that mean?
08:56 17   A.    Well, this is something that came up a little
08:56 18   bit with Mr. Gemini's testimony.  One of the things that
08:57 19   makes these licenses different from what's happening in
08:57 20   the hypothetical negotiation -- remember, the
08:57 21   hypothetical negotiation is just something we're
08:57 22   imagining in our minds.  It never actually happened.
08:57 23            Or imagining these two parties, instead of
08:57 24   fighting in the courtroom, we're imagining them
08:57 25   bargaining at a bargaining table.  The Plaintiffs have

08:57 1  already bargained at the bargaining table over these

08:57 2  patents, but when they were bargaining in the past for

08:57 3  real, they were bargaining over a patent that hadn't

08:57 4  actually been fought out in court.  Nobody knew whether

08:57 5  it was invalid; nobody knew whether it was infringed.

08:57 6          If you folks decide that this patent is

08:57 7  invalid and infringed, then that gives it sort of your

08:57 8  seal of approval.  It's more valuable to have a patent

08:57 9  that's been found to be invalid and infringed than to

08:57 10 have one that might be valid and infringed or might not

08:57 11 be.

08:57 12         So in the past when we look at these

08:57 13 licenses, they may have been discounted in price,

08:57 14 because nobody knew whether a jury was going to find

08:58 15 them valid and infringed or not.

08:58 16         If the Defendants are supposed to pay for

08:58 17 a valid and infringed patent, they should pay more than

08:58 18 people in the past have paid, because they're buying

08:58 19 something that's more valuable.

08:58 20    Q.   Now, let me interrupt you there, Dr. Putnam.

08:58 21         In the licenses that we've looked at,

08:58 22 Central Point, HP, SGI, and Apple, was there litigation

08:58 23 associated with any of those licenses?

08:58 24    A.   There was litigation associated with the Apple

08:58 25 license and with Central Point.

08:58  1      Q.    Okay.  And with respect to Central Point, was

08:58  2  there this uncertainty about infringement?

08:58  3      A.    Well, apparently not, because -- or if

08:58  4  anything, it was reduced, because in Central Point,

08:58  5  remember the agreement says we, Central Point, agree

08:58  6  that we infringe these patents.  And so they're not

08:58  7  arguing anymore about whether they infringe, because

08:58  8  that was their product; that's not Red Hat's product but

08:58  9  a Novell product.  But that was their product.

08:58 10              We agree that we infringe these patents,

08:59 11  and so the question is, was the price they paid

08:59 12  discounted?  If you've already agreed that you

08:59 13  infringed, then there's no longer any uncertainty about

08:59 14  whether you infringe.

08:59 15              And that's actually something that the

08:59 16  Court is enforcing.  It's a consent judgment, not just

08:59 17  an agreement.  And so the Court and both parties agree

08:59 18  that Central Point infringed.  And in that case, you

08:59 19  wouldn't discount the price for uncertainty about

08:59 20  infringement.

08:59 21      Q.    In your analysis, did you take this uncertainty

08:59 22  into account?

08:59 23      A.    Yes.

08:59 24      Q.    How did you do that?

08:59 25      A.    Well, I used a study by a woman named Kimberly

08:59  1   Moore, who was at the time a professor at George Mason

08:59  2   University, is now actually a colleague of Judge Rader's

08:59  3   on the federal circuit bench.

08:59  4              And she did a study of all the patent

08:59  5   litigation in the United States, and she looked at the

08:59  6   rate at which a patentee succeeds at trial, how often do

09:00  7   patentees win.

09:00  8              And so one of the ways you might think

09:00  9   about this discount is that the parties are sitting down

09:00 10   and trying to bargain over a license, and they don't

09:00 11   know whether a patent is -- who's going to win at trial.

09:00 12              They might say, well, how often does the

09:00 13   plaintiff win.  It turns out the plaintiff wins about 58

09:00 14   percent of the time.  Averaged over the entire country,

09:00 15   averaged all patent trials, that's just the number.

09:00 16       Q.   Now, we've heard some other numbers, I think,

09:00 17   from the Plaintiffs' from other studies.  Are you aware

09:00 18   of those?

09:00 19       A.   Yes.  That's her study.  I used that one.

09:00 20   There are other studies that are generally in the

09:00 21   similar range.

09:00 22       Q.   Okay.  There was some particular talk, I think,

09:00 23   about a study by Mr. Janake?

09:00 24       A.   Yes.

09:00 25       Q.   What does that study say?

09:00 1      A.   So Mr. Janake is -- now we're getting into

09:00 2  academics here.  But Mr. Janake is a professor of law,

09:00 3  and he did another study, like Professor Moore's, and he

09:00 4  looked at cases that only went up on appeal to the

09:00 5  federal circuit.  That's the highest sort of patent

09:01 6  court in the land.

09:01 7           And he studied that particular subset of

09:01 8  cases to see what the success rate was for the

09:01 9  Plaintiffs in those cases.

09:01 10     Q.   What did he find?

09:01 11     A.   He found a success rate of about 25 percent.

09:01 12     Q.   Do you think that study was appropriate or is

09:01 13  meaningful?

09:01 14     A.   Well, Professor Janake is a lawyer; he's not an

09:01 15  economist; he's not a statistician.  He's a very smart

09:01 16  man, actually, but he made sort of a rookie mistake.

09:01 17           The rookie mistake is this:  A lawyer

09:01 18  would think, well, the important thing to do is to look

09:01 19  at all the cases that are actually filed on appeal,

09:01 20  because that way we have a final judgment.  We have the

09:01 21  highest court in the land determining whether these

09:01 22  patents are valid or invalid, so let's look at these

09:01 23  cases, because we can be certain about the results of

09:01 24  these cases.

09:01 25           The problem is that when you look only at

09:01  1   the cases that get appealed, there are also the cases

09:01  2   where the defendants have the best arguments.  And so in

09:01  3   cases where the defendants have the best arguments, the

09:02  4   plaintiffs, the patentees, are also the most likely to

09:02  5   lose.

09:02  6              And so all of this to say that the cases

09:02  7   that Professor Janake looked at was not representative

09:02  8   of the entire population.

09:02  9       Q.   I'm sorry.  I didn't mean to interrupt.

09:02 10       A.   All I was going to say is it's sort of like

09:02 11   this:  Suppose you were the repair shop down at the Ford

09:02 12   dealer, okay, and you looked at cars that came in for

09:02 13   service, okay, and people brought their cars in, and

09:02 14   they need spark plugs, and they've got flat tires, all

09:02 15   kinds of adjustments, and there's all kinds of problems

09:02 16   with the cars, okay?

09:02 17              You'd look at these cars and you'd say,

09:02 18   man, the cars on the road today are in terrible shape.

09:02 19   Transmissions are broken, headlights are out.  All the

09:02 20   cars are broken.

09:02 21              Well, if you thought that, that would be

09:02 22   the wrong conclusion, because the only cars that are

09:02 23   brought in for service are the ones that have something

09:02 24   wrong with them.  They don't represent all the cars on

09:02 25   the road.  They represent what an economist calls a

09:02  1  selected sample; it's a biased sample.

09:02  2              And Professor Janake used a biased sample,

09:02  3  so that's why I didn't use his numbers.

09:03  4      Q.   So if I understand correctly, you used a

09:03  5  multiplier of, I think, 1.72, the 58 percent; is that

09:03  6  right?

09:03  7      A.   Yes.  And so if you want to undo the

09:03  8  discount -- remember we talked about the 59 percent --

09:03  9  if you want to undo that discount, you just divide by

09:03 10  .58, which means multiplying by 1.72.  I'm sure there's

09:03 11  no chart here to show you how this is done.

09:03 12              The thing you need to bear in mind is that

09:03 13  on the last line here where you're trying to remove the

09:03 14  effects of uncertainty and make sure that we compensate

09:03 15  the Defendants adequately, we're going to take that

09:03 16  100,000-dollar number, and we're going to multiply it by

09:03 17  1.72 to increase damages up to $172,000 so that we're

09:03 18  sure that the Defendants (sic) are fully compensated.

09:03 19              They're going to pay -- the Plaintiffs are

09:03 20  fully compensated.  We're going to make sure the

09:03 21  Defendants pay more than what other people have paid,

09:03 22  because the Defendants are using a valid and infringed

09:03 23  patent, if you folks find that.

09:03 24      Q.   If you take all of the studies that were done

09:04 25  or that you're aware of and you kind of average the

09:04 1   probabilities, what do you get?

09:04 2       A.   You would get -- instead of 1.72, you'd get

09:04 3   about 2.08, I think.  I did the math, yeah.

09:04 4       Q.   Is that substantially higher?

09:04 5       A.   No.  It would mean, instead of increasing the

09:04 6   number up to $172,000, you'd increase it up to about

09:04 7   208,000, and so it's still very close.

09:04 8       Q.   So did you prepare a chart that took into

09:04 9   account or showed what you did with these adjustments?

09:04 10      A.   Yes.

09:04 11              MR. REITER:  Put up the next chart,

09:04 12  please.

09:04 13              No, not that one.

09:04 14      A.   Right.  So here's what we did.

09:04 15      Q.   (By MR. Reiter) Just quickly go through that.

09:04 16      A.   Okay.  So we're not going to go through each

09:04 17  line of this, because you can divide all these lines

09:04 18  into two groups.  There's what I did and what I didn't

09:04 19  do, okay?

09:04 20              The first seven things are reasons why you

09:05 21  would reduce the damages.  They don't use all the units;

09:05 22  it's a tiny feature; you only need a license in the

09:05 23  U.S.; it's a short period of time.

09:05 24              And what I decided to do was disregard all

09:05 25  of those reasons for reducing the damages.  So you have

09:05 1   that 100,000-dollar number.  You could take that down.

09:05 2   You could take each one of these seven reasons and you

09:05 3   could nickel-and-dime your way down to some smaller

09:05 4   number.  I didn't do that.

5   Q.   What did you do?

09:05 6   A.   I just kept it at $100,000.

09:05 7   Q.   Then what did you do?

09:05 8   A.   The one thing I did do is the bar in the

09:05 9   yellow, and that's increase it.  There's one factor that

09:05 10  would cause you to increase the damages, and that's

09:05 11  eliminating this uncertainty.

09:05 12         And I did do that, so we kept it at

09:05 13  $100,000.  We didn't chisel away at that, and then we

09:05 14  increased it up to 172,000 to remove the effects of any

09:05 15  litigation discount.

09:05 16  Q.   And you did that even though there was only one

09:05 17  case, the Apple case, in which that litigation discount

09:05 18  really seemed to apply?

09:05 19  A.   That's right.

09:05 20  Q.   Now, would you say that this is a conservative

09:06 21  approach or more of an aggressive approach?

09:06 22  A.   No, I would say it's conservative.  We're

09:06 23  trying to do everything we can -- you'll hear about the

09:06 24  law -- but the statute says the damages have to be

09:06 25  adequate to compensate the patentee.

09:06  1          So I wanted to make sure that if I made

09:06  2  any mistakes, I made them in favor of the patentee.  And

09:06  3  so I ignored all the reasons for reducing damages and I

09:06  4  included the one reason for increasing the damages.

09:06  5      Q.   Now, what was your final conclusion?  If the

09:06  6  patents were valid and infringed, what do you think that

09:06  7  the damages should be that Red Hat would pay?

09:06  8      A.   The final conclusion is $172,000 in a lump-sum

09:06  9  payment all in.

09:06 10      Q.   Okay.  And what about Novell?

09:06 11      A.   And so for Novell, Novell is actually much

09:06 12  smaller than Red Hat measured by revenue.  We know that

09:06 13  revenue plays a role in the size of the overall payment.

09:06 14  Since Novell is about a tenth of the size, they'd pay

09:06 15  about a tenth less, if you were adjusting for revenue,

09:07 16  then that would be one-tenth of 172,000, which is

09:07 17  17,200.

09:07 18      Q.   So $172,000 for Red Hat; is that right?

09:07 19      A.   Yes.

09:07 20      Q.   And $17,200 for Novell?

09:07 21      A.   If you were adjusting based on revenue; that's

09:07 22  right.

09:07 23      Q.   Okay.  And that's your opinion of damages?

09:07 24      A.   Yes.

09:07 25      Q.   Okay.  Now, let's finish up.  I think you had

09:07 1   some things you wanted to talk about with respect to

09:07 2   Mr. Gemini's analysis; is that right?

09:07 3       A.   That is right.

09:07 4       Q.   Okay.  Do you agree with his analysis?

09:07 5       A.   No.

09:07 6       Q.   What's wrong with it?

09:07 7       A.   Well, I think there's four things.  Mr. Gemini

09:07 8   remember -- it's going to be sort of the opposite of

09:07 9   what we just heard.

09:07 10           Mr. Gemini says that the agreement

09:07 11  shouldn't be a lump sum; it should be a running royalty;

09:07 12  it should be pay as you go.  I disagree with that.

09:07 13           If it's a pay-as-you-go license, then

09:07 14  Mr. Gemini has to compute both the royalty rate and the

09:07 15  royalty base.  I think his royalty rate is inflated.

09:07 16  The ticket price is too high.  And I think the royalty

09:07 17  base is inflated, the number of rides that he goes on.

09:08 18      Q.   Okay.  So let's talk about the rate first.

09:08 19      A.   Sure --

09:08 20      Q.   -- all right?

09:08 21           Do you recall what Mr. Gemini was saying

09:08 22  was the per-unit rate?

09:08 23      A.   62 cents.

09:08 24      Q.   Okay.  And do you recall briefly how he got

09:08 25  there?

09:08 1      A.    Yeah.   Mr. Gemini took the -- he ignored the

09:08 2 two operating system licenses, even though the

09:08 3 Defendants sell operating systems, and he focused on the

09:08 4 two add-on licenses; that's the HP and Central Point.

09:08 5           HP, he said, was a 99-cent royalty per

09:08 6 unit, and Central Point is 25 cents per unit, and he

09:08 7 just averaged those, added them up together and divided

09:08 8 by two and came up with 62 cents.

09:08 9      Q.    Okay.   Now, where did he get the 99 cents from?

09:08 10     A.    Well, Mr. Gemini got 99 cents, because,

09:08 11 remember, in the HP license, there was this kicker at

09:08 12 the end that said if you ever get to $10 million in

09:08 13 sales, then you pay at a 1-percent royalty rate.   That

09:08 14 never happened.   He's using that 1-percent number.

09:09 15           And then he's saying, well, okay, let's --

09:09 16 that's something that would have happened in the future,

09:09 17 if it ever happened at all.   Then he says, let's look

09:09 18 back in the past at what HP actually charged.   They

09:09 19 actually charged 99 cents.

09:09 20           So he takes the past price from HP, and he

09:09 21 takes the future 1 percent that Borland might charge

09:09 22 some day, and he multiplies them together and gets

09:09 23 1 percent of $99, and that's 99 cents.

09:09 24     Q.    If you just look at the period of the 12.5

09:09 25 million and the $10 million in that license on the

09:09  1  $110,000, is there some percentage that you can

09:09  2  calculate?

09:09  3      A.   Right.  So -- in the real world, what actually

09:09  4  happened was that HP sold 12 million dollars' worth of

09:09  5  stuff, and Borland was licensed to sell another 10

09:09  6  million dollars' worth of stuff, 22 million.

09:09  7           They paid $110,000 for those rights.  If

09:09  8  you ask yourself, what percentage is that, what

09:10  9  percentage of the total sales is that payment, it's

09:10  10  one-half of 1 percent.

09:10  11      Q.   And what would you apply that one-half of 1

09:10  12  percent to?

09:10  13      A.   Well, if you were looking at the one-half of

09:10  14  1 percent to the licenses going forward from the day it

09:10  15  was actually signed to the product -- remember, on the

09:10  16  day that the license is signed, the Dashboard product,

09:10  17  the HP product, transfers from HP to Borland.  And

09:10  18  Borland says, we thought HP was selling it for too much

09:10  19  money; we're going to drop the price.

09:10  20           So Borland is going to sell it for $49.

09:10  21  If you take a half percent of $49, that would be 25

09:10  22  cents.

09:10  23      Q.   Did you actually look at some of the prices

09:10  24  that Borland published?  Was it only $49?

09:10  25      A.   No.  That was what they wanted to charge the

09:10  1    day they got the product.  Of course, they had trouble

09:10  2    selling it, too, and so they cut the price down to $39,

09:10  3    and then it eventually it became one of these things

09:10  4    they just gave away, like buy some other product and

09:10  5    we'll give you Dashboard free.

09:10  6                 So it went from 49 to 39 and eventually,

09:11  7    at least at times, we know it was given away for

09:11  8    nothing.

09:11  9        Q.   So did you try and calculate a per-unit rate of

09:11  10   the HP license based on the information in evidence that

09:11  11   you had?

09:11  12       A.   Well, if you were going to assume an average

09:11  13   price, knowing that it was never any more than 50 and it

09:11  14   could be as low as 0, and they actually did sell it for

09:11  15   40, for the purposes of figuring out what Mr. Gemini

09:11  16   ought to have done, I said, let's use $40 as the average

09:11  17   price.

09:11  18       Q.   And then did you come up with a per-unit rate?

09:11  19       A.   Yes.  And so if you took a half a percent,

09:11  20   which we agreed was the actual effective royalty rate in

09:11  21   the real world, times this 40-dollar price, a half a

09:11  22   percent of $40 is 20 cents per unit.

09:11  23       Q.   So you think that if you're looking at the HP

09:11  24   license, it would be 20 cents per unit, not 99 cents per

09:11  25   unit; is that right?

09:11  1        A.    Well, no, because then you've got all the

09:11  2   adjustments that you've got to make, which is what

09:11  3   Mr. Gemini also didn't do.

09:11  4        Q.    Okay.   What kind of adjustments?

09:12  5        A.    Well, this was the list of seven things that I

09:12  6   disregarded, because I wanted to make sure that I

09:12  7   compensated the patentees fairly, but Mr. Gemini should

09:12  8   have looked at at least some of these and tried to

09:12  9   adjust his rate; otherwise, I think he's overreaching.

09:12 10              So, for example, Mr. Gemini didn't take

09:12 11   into account the fact that prices have fallen over time.

09:12 12        Q.    Did you look at any statistics to determine how

09:12 13   much software prices had fallen?

09:12 14        A.    Yes.   Software prices fell about 26 percent

09:12 15   from the time that HP negotiated their license to the

09:12 16   time that these parties would have sat down to bargain.

09:12 17   And so if you reduce that 20 cents by the same amount,

09:12 18   it would take it down to about 15 cents.

09:12 19        Q.    Do you recall I asked Mr. Gemini some questions

09:12 20   about usage and a survey, 38 percent?  Remember that?

09:12 21        A.    Yes.

09:12 22        Q.    Did Mr. Gemini take that into account?

09:12 23        A.    Well, no, he disregarded that.   Mr. Gemini had

09:12 24   a survey which the -- it was a survey about something

09:12 25   called virtualization.   Virtualization has nothing to do

09:13  1   actually with the workspace switching feature, but that

09:13  2   survey used a figure of 38-percent usage.

09:13  3            I think it's wrong.  It has nothing to do

09:13  4   with anything.  But if you were going to use that

09:13  5   figure, then you should adjust your royalty rate by the

09:13  6   share of people that actually use the invention.  And so

09:13  7   you should take that royalty rate down by 38 percent.

09:13  8   That would take it from 15 cents down to about 5 cents.

09:13  9        Q.   Okay.  And what do you do?  You're at 5 cents.

09:13 10   Do you stop?

09:13 11        A.   Well, no.  Then we still have the fact that the

09:13 12   HP -- we wanted to adjusts for any uncertainty about

09:13 13   litigation.  I'm going to give the benefit to the

09:13 14   Plaintiffs, the benefit of every doubt.  And so we're

09:13 15   going to multiply that number back up to 1.72 again.

09:13 16            So when all is said and done and you make

09:13 17   all these adjustments, you get a figure of about 9.6

09:13 18   cents per unit.

09:13 19        Q.   So that's what you think the effective per-unit

09:13 20   royalty would be for HP, 9.6 cents per unit?

09:13 21        A.   Again, if you were doing it Mr. Gemini's way,

09:13 22   okay?  It's not just what you pay; it's how you pay it.

09:14 23            And so you shouldn't be paying it on a

09:14 24   per-unit basis, but if you were doing it that way, 9.6

09:14 25   cents is the number you'd come up with.

09:14 1     Q.    Now, what about the Central Point license very

09:14 2 briefly?

09:14 3     A.    Yeah.  And so if you did the same thing with

09:14 4 Central Point and go through all the adjustments we just

09:14 5 talked about, that would be a little bit larger number,

09:14 6 and that would be about 12 cents.

09:14 7     Q.    Okay.  What about Apple, did you take a look at

09:14 8 Apple at all?

09:14 9     A.    Yes.

09:14 10     Q.    Okay.  What did you look at?

09:14 11     A.    Well, remember, Apple is structured as a

09:14 12 lump-sum license.  And so what you want to do is make

09:14 13 sure that -- you want to -- again, if you're going to

09:14 14 think about per-unit terms, if you're going to try to

09:14 15 convert that lump sum into a pay-as-you-go license, you

09:14 16 need to figure out how many units Apple actually paid

09:14 17 for.

09:14 18     Q.    Okay.  And did you do an analysis?

09:14 19     A.    Yeah.  I think we've got the illustration of

09:14 20 the numbers for the jury to follow.  You can see the

09:14 21 math here.

09:14 22                 THE COURT:  Mr. Vickrey?

09:14 23                 MR. VICKREY:  Same objection.  Perhaps a

09:14 24 sidebar, Your Honor?

09:14 25                 (Bench conference.)

09:15  1             MR. VICKREY:  This is back six years, that

09:15  2  they can't get -- Your Honor told us -- said yesterday

09:15  3  that if they do this, you were going to say it doesn't

09:15  4  include sales, in the jury instructions.  They just did

09:15  5  it.

09:15  6             MR. REITER:  I disagree.  No, we talked

09:15  7  about closing and I disagree.  Mr. Gemini was able to

09:15  8  present his evidence his way.  If he wants to

09:15  9  cross-examine Dr. Putnam on this issue, I think he

09:15 10  should be permitted.  We are not going to argue sales to

09:15 11  the jury.

09:15 12             MR. VICKREY:  It's on that chart.

09:15 13             THE COURT:  I think in our discussion I

09:15 14  said that if that was argued in closing, I would make an

09:15 15  addition to my jury instructions, and I will.

09:15 16             MR. VICKREY:  Then it's 403.

09:15 17             THE COURT:  But in terms of what they can

09:15 18  present, I think I'm allowing both parties to present

09:15 19  their theories pretty openly.  I don't think I

09:16 20  restricted Mr. Gemini, and I'm not going to restrict

09:16 21  Mr. Putnam either.

09:16 22             Thank you.

09:16 23             (Bench conference concluded.)

09:16 24             MR. REITER:  If we could get the chart

09:16 25  back up.

09:16 1    Q.   (By Mr. Reiter) Now, what does this show,

09:16 2 briefly?

09:16 3    A.   Everybody loves math as much as I do, and so I

09:16 4 thought I'd just give you a chance to all go through it

09:16 5 with me.

09:16 6         And so what we have is, we're trying to

09:16 7 figure out what did Apple pay on a per-unit basis, okay?

09:16 8 So we can all do it together.  Apple paid 1.25 million

09:16 9 in their license, okay?  I went back and I looked at

09:16 10 Apple's annual reports from 2001 to 2008 to see how many

09:16 11 units worldwide of Macintosh computers they actually

09:16 12 sold.  And that's about 39 million units.

09:16 13    Q.   Why worldwide?

09:16 14    A.   Because the Apple license agreement is a

09:16 15 worldwide license agreement.

09:16 16    Q.   Okay.  Go on.

09:17 17    A.   And so on a per-unit basis, that works out to

09:17 18 3.2 cents.  That's what the third line is, the effective

09:17 19 royalty rate per unit.

09:17 20         Now, remember, there was litigation

09:17 21 involved in the Apple case, and so we want to remove the

09:17 22 effects of -- any litigation discount that the parties

09:17 23 might have agreed to.  So that's going to multiply by

09:17 24 1.72.  That's takes it up to about 5-1/2 cents adjusted

09:17 25 per unit from the Apple agreement.

09:17 1      Q.   I think we're getting ahead of ourselves, but

09:17 2  you went ahead and multiplied it out times the base to

09:17 3  get a damages number; is that right?

09:17 4      A.   Sure.  We were talking about the rate, and

09:17 5  so -- but just -- because this chart shows the whole

09:17 6  thing, I might as well just get to the bottom line.

09:17 7           So if you actually look at the data that

09:17 8  Red Hat -- I just did it for Red Hat here -- that Red

09:17 9  Hat's provided on what's called the GNOME package, which

09:17 10 is the package that contains the workspace switching

09:18 11 feature we've been talking about, there was about 1 --

09:18 12 almost 1.4 million units that are in the United States

09:18 13 that contain that feature.

09:18 14           1.4 million units at 5-1/2 cents per unit

09:18 15 works out to about $76,000.

09:18 16     Q.   Did you also kind of just look at -- I don't

09:18 17 think we have a chart for this -- Apple, if you only

09:18 18 talked about from the time the license was executed?

09:18 19     A.   Sure.  So let's suppose that you couldn't go

09:18 20 back in time six years, okay?  And Apple was only paying

09:18 21 for the right to sell its product going forward, okay?

09:18 22           In that case, it would be many fewer

09:18 23 units.  And so the chart would look exactly the same

09:18 24 except the second line, instead of being licensed units

09:18 25 for 2001 through 2008, it would be licensed units for

09:18  1    2007 to 2008, the date of the license forward.

09:18  2        Q.   What did that number, adjusted royalty rate,

09:19  3    turn out to be?

09:19  4        A.   It works out to, I think, 14 -- you get the

09:19  5    bottom line, it's about 14 cents.  And the very bottom

09:19  6    line, the payment is about $218,000.  So it could be as

09:19  7    high as that, if that's how you interpreted the Apple

09:19  8    license.

09:19  9        Q.   Okay.  Let's go on to the SGI license.

09:19 10        A.   Okay.

09:19 11        Q.   Now, did Mr. Gemini use that license?

09:19 12        A.   No.

09:19 13        Q.   Is it possible or did you have enough

09:19 14    information to compute a per-unit royalty on the SGI

09:19 15    license?

09:19 16        A.   No, there's just not enough information to

09:19 17    figure out the number of units that SGI actually sold.

09:19 18        Q.   Okay.  So what did you do with the SGI license?

09:19 19        A.   Well, the SGI license -- it's sort of is what

09:19 20    it is.  They paid $95,000 and they got to sell as many

09:19 21    units as they wanted.  That was the deal.

09:19 22        Q.   Now, let's turn to the royalty base, and that's

09:19 23    the number of units that need to be paid for; is that

09:19 24    right?

09:19 25        A.   Yes.

09:19 1      Q.    Okay.  Do you agree with the way Mr. Gemini

09:20 2  calculated the base?

09:20 3      A.    No.

09:20 4      Q.    Okay.  Why not?

09:20 5      A.    Well, the jury's already heard at length that

09:20 6  the first problem is that the number of IP addresses,

09:20 7  which is the number of addresses of computers in the

09:20 8  world, bears no relationship to the number of users or

09:20 9  units that are actually using the software, which is

09:20 10 something that the -- neither Red Hat nor Novell

09:20 11 actually tracks.

09:20 12     Q.    So let's start with Novell.  Okay.  What did

09:20 13 Mr. Gemini use?

09:20 14     A.    Well, for Novell, Novell actually produced

09:20 15 their unique IP addresses, and so whatever this means,

09:20 16 they counted the number of addresses in the United

09:20 17 States, and they counted the number of addresses

09:20 18 worldwide.

09:20 19            And then Mr. Gemini used the number of

09:20 20 U.S. addresses as his royalty base; that's the number of

09:20 21 units that he says should be paid for on this

09:20 22 pay-as-you-go basis.

09:20 23     Q.    Do you recall what that number was?

09:20 24     A.    About 1.1 million.

09:21 25     Q.    1.8 million?

09:21 1     A.    1.8 million.  I'm sorry.  1.8 million.  Yes.

09:21 2     Q.    Okay.  And that's of openSUSE?

09:21 3     A.    Yes.  That's for the -- for the R&D project,

09:21 4  the non-revenue-generating part of Novell.

09:21 5     Q.    Okay.  Now, let's turn to Red Hat.  What did

09:21 6  Mr. Gemini do?

09:21 7     A.    Well, for Red Hat, Red Hat produced the same

09:21 8  information.  They produced the worldwide number of IP

09:21 9  addresses, and then they produced the share of those

09:21 10  addresses that are in the U.S. or the exact number, not

09:21 11  the --

09:21 12            MR. REITER:  Can we pull up DX904, please?

      13     Q.    (By Mr. Reiter) What are you talking

09:21 14  about here?

09:21 15     A.    Yes.  If you look at the bottom line, that's

09:21 16  the number we actually care about.  So this is for the

09:21 17  14-month period covered by the patent.  It's not a very

09:21 18  friendly -- easy-to-read number, but the number on the

09:21 19  left is the number of IP addresses, whatever that means,

09:22 20  in the United States.  And the number on the right is

09:22 21  the number of IP addresses outside the United States.

09:22 22            So if you add them together, that's

09:22 23  worldwide.  So just to read the numbers so everyone

09:22 24  knows them, it's 1,537,441 in the United States and

09:22 25  8,253,509 million outside the United States.

09:22  1      Q.    What did Mr. Gemini do?

09:22  2                  MR. REITER:  If we could put up PX321,

09:22  3  Schedule 1, please.

09:22  4      A.    So Mr. Gemini ignored all that.  He didn't do

09:22  5  the same thing that he did with Novell.  He went back

09:22  6  and computed the number of IP addresses, not from what

09:22  7  Red Hat actually said but from an article that he

09:23  8  got in -- that he found on the internet somewhere.

09:23  9                  MR. REITER:  The last page, Schedule 1,

09:23 10  not Paragraph 1.  I'm sorry.  There we go.

09:21 11      Q.    (By Mr. Reiter) So he had the Fedora units at

09:23 12  6.7 million.  Is that a worldwide number?

09:23 13      A.    Yes.

09:23 14      Q.    Okay.  And he had the RHEL units at 570,000?

09:23 15      A.    Yes.

09:23 16      Q.    That's a worldwide number?

09:23 17      A.    Yes.

09:23 18      Q.    And he added those up, and then what did he do

09:23 19  to account for just the U.S.?

09:23 20      A.    Well, you can see there his adjustments.  He's

09:23 21  got about 7.2 million, and then he -- of course, these

09:23 22  are U.S. patents, and so we have to get the U.S. share,

09:23 23  and he multiplies it by 55 percent.

09:23 24                  But instead of using the actual U.S.

09:23 25  numbers, which Red Hat provided, he just said, well,

09:23  1    let's take RHEL, which is the part of Red Hat that

09:23  2    actually makes money, and let's look at the share of

09:23  3    RHEL revenues that are attributable to the U.S. and

09:24  4    let's multiply that.  And that's 55 percent, because

09:24  5    most of the money you make -- because the U.S. is a

09:24  6    wealthy country, most of the money you make on this

09:24  7    comes from the U.S. and so let's apply that to the

09:24  8    worldwide share of all the IP addresses, and that gives

09:24  9    him about 4 million.

09:24 10        Q.   Does that revenue number have anything to do

09:24 11    with Fedora?

09:24 12        A.   No.  Fedora doesn't make revenue.  There's no

09:24 13    revenue associated with it, and it has nothing to do

09:24 14    with the IP addresses associated with Fedora.  The two

09:24 15    concepts are completely unrelated.

09:24 16        Q.   Do you believe that it's appropriate to take

09:24 17    the revenue -- the revenue information or percentage and

09:24 18    apply it to Fedora?

09:24 19        A.   Well, it's not appropriate in general, and it's

09:24 20    particularly not appropriate when you know the true

09:24 21    number.  Red Hat has provided the true number.  If you

09:24 22    actually look at what the number is based on the figures

09:24 23    that Red Hat provided, the true number is about 15

09:24 24    percent, not 55 percent.

09:24 25                   So you know for certain -- you know for

09:24  1    certain -- and this is actually important -- that if you

09:25  2    were to use Mr. Gemini's numbers, you're going to be

09:25  3    bringing in IP addresses from outside the United States

09:25  4    and asking the Defendants to pay damages on them as

09:25  5    though they were inside the United States.  And that's

09:25  6    just flat wrong.

09:25  7        Q.    Okay.  Let's talk about what you did when you

09:25  8    borrowed Mr. Gemini's analysis.

09:25  9                MR. REITER:  If we could put up DX936,

09:25 10    please, Page 45.

09:25 11        Q.    (By Mr. Reiter) And do you know what this is?

09:25 12        A.    Yes.  This is one of the -- this is the second

09:25 13    of the two reports that I filed in this case.

09:25 14        Q.    Okay.

09:25 15                MR. REITER:  So if we could highlight or

09:25 16    zoom in on the 106(a) paragraph.

09:25 17        Q.    (By Mr. Reiter) So could you explain what this

09:25 18    is?

09:25 19        A.    Yes.  So unlike Mr. Gemini, I took the actual

09:25 20    numbers that Red Hat used.  There's -- remember those

09:25 21    two numbers we talked about earlier, the 1.5 million and

09:26 22    the 8.2 million, if you add those together, it comes out

09:26 23    to about 9.79 million units of Fedora, or it's called

09:26 24    downloads, but what we really mean is these are the IP

09:26 25    addresses for Fedora.

09:26 1            And so what that means is that the U.S.

09:26 2 portion is about 15.7 percent.  That's for Fedora.  And

09:26 3 then for RHEL, I just -- since we're trying to correct

09:26 4 Mr. Gemini and get to a number that he ought to have

09:26 5 gotten to, he said there were 570,000 worldwide RHEL

09:26 6 units.  And for RHEL, I did follow his procedure and

09:26 7 multiplied by 55 percent.

09:26 8      Q.   And why did you do that for the RHEL?

09:26 9      A.   Because in this case if you got -- the only --

09:26 10 they don't track IP addresses for RHEL, and so the only

09:26 11 thing you've got is revenues.  And so you're trying to

09:26 12 figure out -- you've got worldwide units and you want to

09:26 13 figure out the U.S. portion, and the only way to

09:26 14 allocate the U.S. portion is based on the U.S. money.

09:27 15            And so for RHEL, which generates money, it

09:27 16 makes more sense at least to look at the share of those

09:27 17 units that are proportional to U.S. revenue.

09:27 18      Q.   So RHEL generates revenue; Fedora does not; is

09:27 19 that right?

09:27 20      A.   That's exactly right.

09:27 21      Q.   So that's why it's okay to use the 55 percent

09:27 22 for RHEL?

09:27 23      A.   It's the best you can -- I mean, frankly, we're

09:27 24 in Alice in Wonderland here, but if you're going to do

09:27 25 that, this is the best you can do.

09:27 1     Q.   Okay.  Let's get to your conclusion.

09:27 2          MR. REITER:  If we could go to Page 46,

09:27 3     please, and zoom in on Paragraph 110.

09:27 4     Q.   (By Mr. Reiter) Now, did you do anything else

09:27 5     to account for the base?

09:27 6     A.   Yes, a lot of adjustments in this case.  The

09:27 7     only other adjustment is that -- remember, we talked

09:27 8     about this earlier.  The -- there's a particular package

09:27 9     that has the accused feature in it.  It's called GNOME.

09:28 10         And so for Red Hat, about 75 percent --

09:28 11    the best evidence is about 75 percent of these units had

09:28 12    GNOME installed.  For Novell, it's about 37 percent.

09:28 13    And so you've got to take those numbers down from about

09:28 14    1.8 million down, in the case of Red Hat, to about 1.4

09:28 15    million; and in the case of Novell, a little

09:28 16    less 500,000.

09:28 17    Q.   Do you recall if there was a typo in

09:28 18    Paragraph B?

09:28 19    A.   Oh, actually, yes.  I didn't catch that.  I'm

09:28 20    sorry.  I said 37 percent, and it should have been --

09:28 21    the math is right, as I recall.  It should be 27

09:28 22    percent, .27 for Novell.

09:28 23    Q.   Okay.  Now, is that what you think the

09:28 24    appropriate royalty base would be for Red Hat and

09:28 25    Novell -- 1.4 million units and 484,000 for Novell?

09:28  1      A.   If you're going to follow Mr. Gemini's

09:28  2  procedures, then this is the best -- this would have

09:28  3  been the way you should have done it.

09:28  4      Q.   Okay.  Do you agree with that process, that

09:29  5  methodology?

09:29  6      A.   No.  As I've said, we have now made -- you

09:29  7  know, it's not what you pay; it's how you pay it.  We

09:29  8  should be paying on a lump-sum basis.  This is only if

09:29  9  you believed that you were going to pay on a running

09:29 10  royalty.

09:29 11      Q.   Okay.  So now you have to take this base and

09:29 12  multiply it by a rate?

09:29 13      A.   Yes; that's right.

09:29 14           MR. REITER:  If we could go to the next

09:29 15  paragraph, 111.

09:29 16      Q.   (By Mr. Reiter) Did you do that?

09:29 17      A.   Yes.

09:29 18      Q.   So what did you come up with?

09:29 19      A.   So remember, we said that we had various sort

09:29 20  of per-unit rates that you could have come up with in

09:29 21  this case.  We had about 5-1/2 cents from the Apple

09:29 22  agreement, 9-1/2 cents from the HP agreement, 12 cents

09:29 23  from the Central Point agreement.

09:29 24           So we can all do the math.  I picked the

09:29 25  middle one, which is 9-1/2 cents.  If you do this, if

09:29 1    you follow Mr. Gemini's logic and use the right numbers

09:29 2    and correct all the mistakes, you'd get to the bottom

09:29 3    line.  If you were doing it that way, you would get a

09:30 4    number of about 133,000 for Red Hat and about 46,000 for

09:30 5    Novell.

09:30 6        Q.    So this would be what you think, using

09:30 7    Mr. Gemini's analysis, the appropriate measure of

09:30 8    damages for Red Hat and Novell?

09:30 9        A.    Yes.  In Mr. Gemini's world, using the right

09:30 10   numbers, this is what you'd get to as a bottom line.

09:30 11       Q.    Okay.  So wrapping everything up, Dr. Putnam,

09:30 12   what is your ultimate opinion here, if the patents were

09:30 13   to be found valid and infringed?

09:30 14       A.    If the folks on the jury find the patents valid

09:30 15   and infringed, in my opinion, the number should be a

09:30 16   lump-sum payment, one lump-sum payment of $172,000 for

09:30 17   Red Hat and $17,200 for Novell.

09:30 18       Q.    And I just want to be clear.  You're not saying

09:30 19   that you have an opinion about whether the patents are

09:30 20   valid or infringed, do you?

09:30 21       A.    No.  This is only if the car is for sale is the

09:30 22   appraiser's opinion relevant.

09:30 23              MR. REITER:  Pass the witness, Your Honor.

09:30 24              MR. VICKREY:  Your Honor, I have a few

09:31 25   questions.

09:31  1          THE COURT:  Thank you, Mr. Vickrey.  You

09:31  2  may proceed.

09:31  3                    CROSS-EXAMINATION

09:31  4  BY MR. VICKREY:

09:31  5      Q.   Good morning, Dr. Putnam.

09:31  6      A.   Good morning, Mr. Vickrey.

09:31  7      Q.   We met last week?

09:31  8      A.   Yes.

09:31  9      Q.   Sir, did I hear you say that there's a

09:31 10  correlation between revenue and how you calculate

09:31 11  damages in this case, like between Red Hat and Novell?

09:31 12      A.   There's some evidence that you would scale the

09:31 13  size of the payment based on revenue.  For example, the

09:31 14  Apple agreement is larger than other agreements that the

09:32 15  parties -- that the Plaintiffs have negotiated.

09:32 16      Q.   I'm not talking about Apple.  Let's just talk

09:32 17  about Red Hat and Novell.

09:32 18          Did I hear you tell the jury that what you

09:32 19  do to figure out the relative size of the damage awards

09:32 20  is you look at revenue of Red Hat against revenue of

09:32 21  Novell?  And that's what you did?

09:32 22      A.   Frankly, it's an open question about whether

09:32 23  you should adjust for revenue.

09:32 24          What we've seen is that if you do look at

09:32 25  revenue, which we know is important since that's how

09:32  1  companies make money, you would adjust based on revenue.

09:32  2  And if you did that, the factor would be about 10

09:32  3  percent for Novell, yes.

09:32  4      Q.   I'm not talking about make-believe.  That's

09:32  5  what you actually told the jury you did?

09:32  6      A.   Yes, that is right.

09:32  7      Q.   So you used the relative revenue base to

09:32  8  calculate the damages between Red Hat and Novell,

09:32  9  correct?

09:32 10      A.   Once you've gotten to a lump-sum figure, yes.

09:32 11      Q.   Okay.  Did I hear you say that Red Hat and

09:32 12  Novell had actually produced usage figures in this case?

09:33 13      A.   I don't think you did, because they haven't.

09:33 14      Q.   Well, I think I heard you say, well, if you

09:33 15  look at what Red Hat produced about use and what Novell

09:33 16  produced about use, this is what you get.

09:33 17      A.   Well, if by use you mean IP addresses, then

09:33 18  they both produced information about IP addresses;

09:33 19  that's true.

09:33 20      Q.   What did Novell produce?  You heard Mr. Gemini

09:33 21  say they didn't produce anything, so he had to go out

09:33 22  and find it on the internet, right?

09:33 23      A.   Well, if I -- if I understand the genesis

09:33 24  correctly, he downloaded it from Novell's website.

09:33 25      Q.   But Novell didn't produce a thing, right?

09:33 1      A.   Well, if you're talking about as a matter of

09:33 2 legal procedure, I'm not sure exactly how Mr. Gemini got

09:33 3 the numbers.  They're Novell's numbers and Novell stands

09:33 4 by them.

09:33 5      Q.   To this day, have you seen anything that Novell

09:33 6 has produced about the number of users of even its

09:34 7 commercial product, its enterprise product, SLED, not

09:34 8 openSUSE?  Have you seen a single document produced by

09:34 9 Novell?

09:34 10      A.   I think the testimony is clear that they don't

09:34 11 track those numbers.  The answer to your question is,

09:34 12 no, I haven't seen them, because they don't exist.

09:34 13      Q.   Not even internet addresses, right?

09:34 14      A.   I don't know what Novell -- how they use them

09:34 15 internally.

09:34 16      Q.   Well, you haven't seen any even IP addresses

09:34 17 for the use of its commercial product, correct?

09:34 18      A.   That is true, yes.

09:34 19      Q.   They didn't give it to you?

09:34 20      A.   Yes.  The addresses I've seen are for openSUSE

09:34 21 only; that's right.

09:34 22      Q.   And you didn't ask for them, right?

09:34 23      A.   I don't think they exist.

09:34 24      Q.   Did you ask?

09:34 25      A.   I was told they did not exist.

09:34 1      Q.    Who told you that?

09:34 2      A.    I'm sure it was counsel for Novell or -- yeah.

09:34 3      Q.    Does it strike you as odd that they would --

09:35 4 they would keep IP addresses for the free stuff they

09:35 5 give away but not keep it for the stuff -- their

09:35 6 enterprise product that they actually make money from?

09:35 7      A.    No.

09:35 8      Q.    That's perfectly normal to you?

09:35 9      A.    They don't track -- IP addresses are not users;

09:35 10 they aren't customers; they don't have anything to do

09:35 11 with the actual number of copies of the software.  We're

09:35 12 using something we know is irrelevant, because it's the

09:35 13 only thing available to count.

09:35 14     Q.    Sir, you've heard sworn testimony in this case

09:35 15 by deposition that Novell has two different per-unit

09:35 16 licenses:  One's Via and one's for MPEG, right?

09:35 17     A.    Yes.

09:35 18     Q.    And how in the world could they keep track of

09:35 19 the royalties for those running royalty licenses,

09:35 20 including the MPEG license, not the one with the cap,

09:35 21 the other one, if they don't track it?  Strike you as

09:35 22 odd?

09:35 23     A.    Well, I -- first of all, I haven't seen the

09:36 24 terms of the license, so I don't know exactly the number

09:36 25 that's being tracked.  Obviously, they're able to

09:36  1   perform under the agreement, and obviously the agreement

09:36  2   has got a cap on it, and so functionally, what happens

09:36  3   is that they don't track.  They just write a check every

09:36  4   year for the same amount of money, because they hit the

09:36  5   cap.

09:36  6       Q.   All right.  I want to briefly revisit your

09:36  7   background, sir.  Courts have rejected your opinions in

09:36  8   the past?

09:36  9       A.   I've had a judge disagree with me; that's true.

09:36 10       Q.   All right.  It's more than one, though?

09:36 11       A.   No.  That's not true.

09:36 12       Q.   Let's talk about the Beidleman case.  Now, in

09:36 13   the Beidleman case, the judge in -- the federal judge in

09:36 14   the Denver court excluded your opinions, refused to let

09:36 15   you testify, correct?

09:36 16       A.   Yes, that is true.  But that's based on

09:36 17   exclusion of the damages theory offered by the

09:37 18   defendants.

09:37 19                 MR. VICKREY:  Your Honor --

09:37 20       Q.   (By Mr. Vickrey) Dr. Putnam, the judge excluded

09:37 21   your testimony because it would lead to an incorrect

09:37 22   assessment of allowable damages, correct?

09:37 23       A.   It's true by definition, sure.

09:37 24       Q.   All right.  Now, let's look at what you said

09:37 25   yesterday when Red Hat's lawyers questioned you about

09:37  1    it.

09:37  2              And you knew that I was going to ask you

09:37  3    about this, because last week I took your deposition,

09:37  4    and I asked you about it, right?

09:37  5        A.    That's true.

09:37  6        Q.    And so you and Red Hat's lawyers discussed how

09:37  7    you were going to respond to it yesterday, correct?

09:37  8        A.    We certainly did discuss that.

09:37  9        Q.    Yeah.  And this is what you came up with:  I

09:37 10    worked on a copyright case once where the lawyers

09:37 11    actually wanted to offer a particular theory of defense,

09:37 12    and I authored a report for them.  So the lawyers wanted

09:37 13    to put something in front of the Court and the jury and

09:38 14    you decided that, okay, I'll author it for you, right?

09:38 15              Right?

09:38 16        A.    They asked me to write a report and I did, yes.

09:38 17        Q.    No, but they said that they wanted to offer a

09:38 18    particular theory, so that's what you did.  That's the

09:38 19    theory that you offered?

09:38 20        A.    It's a question of whether the theory is

09:38 21    allowable as a matter of law, Mr. Vickrey.

09:38 22        Q.    Sir, the lawyers wanted to offer a particular

09:38 23    theory, so you came up with an expert opinion adopting

09:38 24    that theory, correct?

09:38 25        A.    Under the assumption that the theory was

09:38 1    admissible, yes.

09:38 2        Q.   And it wasn't admissible?

09:38 3        A.   Yes; that's right.

09:38 4        Q.   Now, let's talk about the -- another case.  The

09:38 5    Paragon Trade Brands case.  Remember that case, sir?

09:38 6        A.   Yes.

09:38 7        Q.   And in that case, the federal court in Atlanta

09:38 8    rejected your opinions after a trial, right?

09:39 9        A.   Yes.  That was the bankruptcy court actually,

09:39 10   not the district court but the bankruptcy court.

09:39 11       Q.   Well, it's a federal court in Atlanta?

09:39 12       A.   Yes, that's right.

09:39 13       Q.   It was after the trial, the Court heard your

09:39 14   testimony, right?

09:39 15       A.   Yes.

09:39 16       Q.   And the Court rejected your testimony?

09:39 17       A.   The bankruptcy court did reject it; that's

09:39 18   true.

09:39 19       Q.   And let's -- and you knew I was going to ask

09:39 20   you about that, and you talked about that with Red Hat's

09:39 21   lawyers, right?

09:39 22       A.   Of course.

09:39 23       Q.   Let's look at what you said yesterday about

09:39 24   that.  Here you're suggesting that the bankruptcy court

09:39 25   was reversed about the findings she made about your

09:39 1    testimony, right?

09:39 2         A.   I'm sure you know as a lawyer, Mr. Vickrey,

09:40 3    that the case was appealed on the merits, and the

09:40 4    judgment was reversed on the merits without -- and so

09:40 5    that rendered the whole opinion about -- the whole trial

09:40 6    about damages completely moot.

09:40 7         Q.   In other words, on the appeal, there was

09:40 8    nothing said about whether the judge was right or wrong

09:40 9    about how your testimony was -- let me find a quote --

09:40 10   contradicted by the evidence and unpersuasive.  There

09:40 11   was nothing in the appeal about that, correct?

09:40 12        A.   Yes, of course the Court of Appeal didn't have

09:40 13   to reach that question.

09:40 14        Q.   And now I want to talk about your methodology

09:40 15   in this case.  What you did was to set out, at the

09:41 16   direction of Red Hat's lawyers, to come up with the

09:41 17   lowest possible damages in this case, correct?

09:41 18        A.   That statement is completely false.

09:41 19        Q.   All right.  It's your opinion that the damages

09:41 20   for Red Hat would be $172,000, right?

09:41 21        A.   Yes.

09:41 22        Q.   Fair to say that that's less than what your

09:41 23   firm stands to be paid in this case?

09:41 24        A.   I think when all is said and done, my firm will

09:41 25   probably collect more than 172,000; that's true.

09:41 1    Q.   And your hourly rate alone is $699?

09:41 2    A.   675.

09:41 3    Q.   If someone is setting out to come up with the

09:41 4  lower possible damages, you're going to cherry-pick from

09:41 5  the evidence, seize on something that helps you, and

09:41 6  reject or discount everything else, right?

09:41 7    A.   Well, the premise is false; the conclusion is

09:41 8  false, also.  I didn't set out to find the lowest

09:42 9  number, and I didn't cherry-pick.

10    Q.   Sir, that's not what I asked you?

09:42 11            THE COURT:  I think his answer was fair.

09:42 12  You may proceed, Mr. Vickrey.

09:42 13            MR. VICKREY:  Okay.

09:42 14    Q.   (By Mr. Vickrey) Let's look at some of the

09:42 15  things you actually did in coming up with your opinion

09:42 16  that this patented feature is trivial.

09:42 17            By the way, those are your words, not

09:42 18  mine, trivial?

09:42 19    A.   We were talking about as a share of the total

09:42 20  lines of code in the product, and I think that most

09:42 21  people would agree that 3/1000 of a percent is a trivial

09:42 22  number.

09:42 23    Q.   You and the Defendants' lawyers have shown the

09:42 24  jury a lot of slides with new statements and opinions

09:42 25  which can't be found in the two expert reports you

09:42  1    submitted in this case, correct?

09:42  2        A.    No, with one exception, and that's the Apple

09:42  3    agreement.  And we put that in, because you asked me

09:42  4    about it in my deposition.

09:42  5        Q.    All right.  One of your -- you submitted two

09:42  6    reports in this case, sir?

09:42  7        A.    That's right.

09:42  8        Q.    And when was the second report?

09:42  9        A.    I don't recall -- I don't recall the date.

09:43 10        Q.    April 13?

09:43 11        A.    That sounds right, yes.

09:43 12        Q.    Okay.  Now, one of the first things you

09:43 13    addressed in direct testimony, you applied something

09:43 14    called the nine-part test for running royalty, correct?

09:43 15        A.    Yes.

09:43 16              MR. VICKREY:  Kindly flash that up.

09:43 17        Q.    (By Mr. Vickrey) The nine-part test for running

09:43 18    royalty, that's not found in any of your reports,

09:43 19    correct?

09:43 20        A.    That's false.  It should be -- it's in my

09:43 21    second report.

09:43 22        Q.    The nine-part test?

09:43 23        A.    Yes.

09:43 24              MR. VICKREY:  May I approach, Your Honor?

09:44 25              THE COURT:  Yes.  Is there.

09:44 1      Q.   (By Mr. Vickrey) Dr. Putnam, kindly direct me

09:44 2  to where I could find the nine-part test.

09:44 3      A.   Mr. Vickrey, if you turn to Exhibit 16, which I

09:44 4  believe is seven pages from the end, this is essentially

09:44 5  a verbatim copy.

09:44 6      Q.   Okay.

09:44 7              THE COURT:   Could you hold that up for the

09:44 8  jury to see?

09:44 9              THE WITNESS:   I'm sorry.   This is -- you

09:45 10  can't read it probably, but you can see maybe on the

09:45 11  right-hand side here all of the -- all the -- no, sir.

09:45 12              MR. VICKREY:   I agree with Dr. Putnam that

09:45 13  it is in Exhibit 16.

09:45 14      Q.   (By Mr. Vickrey) But this is something that --

09:45 15  this test, can you find it in a case or an article or

09:45 16  anything like that?

09:45 17      A.   No.   It's not -- I mean -- no, I would say it's

09:45 18  not derived from a legal test.   It's derived from the

09:45 19  facts in this case and underlying economics.

09:45 20      Q.   In other words, this is a test you created for

09:45 21  this case?

09:45 22      A.   It's true I've never applied this test before.

09:45 23  These -- I've never applied -- collected these nine

09:45 24  questions into one spot and asked them about -- applied

09:45 25  them to the facts of a particular case; that's true.

09:45  1        Q.    Dr. Putnam, on direct examination, you

09:45  2   mentioned a license that Red Hat took that covered the

09:45  3   same products.

09:46  4        A.    The accused products, yes.

09:46  5        Q.    Including Fedora even though it was a free

09:46  6   product?

09:46  7        A.    I believe -- I believe Fedora is also licensed

09:46  8   under the license, yes.

09:46  9        Q.    And it was for U.S. patents, correct?

09:46 10        A.    Yes.

09:46 11        Q.    And what was the amount?

09:46 12        A.    Around 4 million, I think.

09:46 13        Q.    4.25 million?

09:46 14        A.    That sounds right.

09:46 15        Q.    You mentioned on direct you had made a

09:46 16   statement not every copy infringes.  You're aware that

09:46 17   one of the claims in the case is directed to every

09:46 18   single copy of the software that's distributed?

09:46 19        A.    This is a liability question, Mr. Vickrey, and

09:46 20   my understanding is that a -- in order to infringe, you

09:46 21   have to have a display and a graphical user interface.

09:46 22   And my understanding is that's not characteristic of

09:47 23   every unit.

09:47 24        Q.    Are you talking about the units that apply to

09:47 25   the servers?

09:47 1    A.    Well, servers -- in general, not every server,

09:47 2 but servers in general don't have displays.  Of those

09:47 3 that have displays, not every one has a graphical user

09:47 4 interface.

09:47 5    Q.    Would you agree with me all the Fedora and

09:47 6 openSUSE products and the RHEL software products and the

09:47 7 SLED software products are accused of infringement?

09:47 8    A.    I think that's a liability question.  I

09:47 9 think --

09:47 10    Q.    You don't know?

09:47 11    A.    I don't get into liability.

09:47 12    Q.    All right.  And you sat here through the trial,

09:47 13 correct?

09:47 14    A.    Good parts of it, yes.

09:47 15    Q.    And you've heard the testimony that GNOME is

09:47 16 the default application?

09:47 17    A.    For Red Hat, not Novell.

09:47 18    Q.    All right.  Now, it's your belief, is it not,

09:48 19 that a reasonable royalty calculation should be adjusted

09:48 20 to account for the probability that a patent is found

09:48 21 valid and infringed at trial, correct?

09:48 22    A.    You should adjust the licenses that you find,

09:48 23 if there's evidence that those licenses were negotiated

09:48 24 over a patent that hasn't been found valid and

09:48 25 infringed; that's true.

09:48 1      Q.   And you make that adjustment routinely, because

09:48 2  it's the right thing to do and because it's consistent

09:48 3  with the law, correct?

09:48 4      A.   Yes.

09:48 5      Q.   Now, according to your report and according to

09:48 6  your testimony, a good estimate of the parties'

09:48 7  expectations regarding probability of finding validity

09:48 8  and infringement is 57 percent?

09:48 9      A.   I think I used 58, but yes.

09:48 10     Q.   Okay, 58 percent.  And the statistical

09:48 11 foundation for that 58-percent risk percentage was a

09:48 12 2000 article and a study by Judge Moore, correct?

09:48 13     A.   Yes.

09:48 14     Q.   And there have been more recent studies and

09:48 15 articles, correct?

09:49 16     A.   Yes.

09:49 17     Q.   There was the Sherry and Teece study showing

09:49 18 that the percentage would actually be 45 percent?

09:49 19     A.   They said if you were summarizing the

09:49 20 literature that they found, they summarized it as 45 to

09:49 21 55 percent.

09:49 22     Q.   All right.  So if you took the mid-range,

09:49 23 that's 50 percent, which results in a two times

09:49 24 multiplier?

09:49 25     A.   Your math is right, yes.

09:49 1  Q. Okay.  And that study came out in 2004,

09:49 2 correct?

09:49 3  A. Yes.

09:49 4  Q. You didn't cite it in your reports?

09:49 5  A. I didn't cite the Sherry and Teece article, no,

09:49 6 that's right.

09:49 7  Q. And then there was the 2006 study in the AIPLA

09:49 8 Quarterly Journal, correct?

09:49 9  A. Yes.  That's Janake's.

09:49 10  Q. That's the Janake article, and you were aware

09:49 11 of the article, correct?

09:49 12  A. Yes.

09:49 13  Q. And you didn't cite it in either of your

09:49 14 reports, correct?

09:49 15  A. I think Professor Janake's numbers are not

09:49 16 correct.  He tried to do the right thing, and ended up

09:49 17 making a mistake along the way, and I think we need more

09:50 18 data before we can actually use that method.

09:50 19  Q. But my question was, you didn't cite it in

09:50 20 either of your reports?

09:50 21  A. I did not cite it for that reason, yes; that's

09:50 22 right.

09:50 23  Q. That study was peer-reviewed, was it not?

09:50 24  A. I actually don't know.

09:50 25  Q. All right.

| | | |
|---|---|---|
| 09:50 | 1 | MR. VICKREY:  May I approach, Your Honor? |
| 09:50 | 2 | THE COURT:  Yes. |
| 09:50 | 3 | THE WITNESS:  Thank you. |
| 09:50 | 4 | MR. VICKREY:  Your Honor may have one |
| 09:50 | 5 | already, but do you want one? |
| 09:50 | 6 | THE COURT:  Go ahead.  I've read it. |
| 09:50 | 7 | MR. VICKREY:  All right. |
| 09:50 | 8 | Q.   (By Mr. Vickrey) Here's the study, correct? |
| 09:51 | 9 | A.   This is a copy of the study; that's right. |
| 09:51 | 10 | Q.   Yeah.  And just looking at the first page, does |
| 09:51 | 11 | that refresh your recollection that it was, in fact, |
| 09:51 | 12 | peer-reviewed? |
| 09:51 | 13 | A.   I don't mean to dispute with you, Mr. Vickrey. |
| 09:51 | 14 | I just don't know what evidence you're pointing to. |
| 09:51 | 15 | Q.   The footnote. |
| 09:51 | 16 | A.   Well, if you mean that they think colleagues |
| 09:51 | 17 | who made comments on the manuscript, then that's true. |
| 09:51 | 18 | I interpret peer-reviewed to be a formal process by |
| 09:51 | 19 | which anonymous referees review the manuscript and pass |
| 09:51 | 20 | judgment on it.  I don't know that that happened. |
| 09:51 | 21 | Q.   All right.  As far as you know, this is the |
| 09:51 | 22 | most recent study which sought to quantify litigation on |
| 09:51 | 23 | uncertainty, correct? |
| 09:51 | 24 | A.   No. |
| 09:51 | 25 | Q.   Is there another one? |

09:51 1      A.   Yes.  I found one by PricewaterhouseCoopers,

09:51 2  which is an accounting firm.

09:52 3      Q.   And in that PricewaterhouseCoopers study, they

09:52 4  found that a non-producing entity had a 29-percent rate,

09:52 5  correct?

09:52 6      A.   That was their number for -- I recall that was

09:52 7  their number, yes.

09:52 8      Q.   All right.  But the AIPLA study actually

09:52 9  factored in summary judgment, correct?

09:52 10     A.   Yeah.  And that was one of the things I thought

09:52 11  actually Professor Janake deserved credit for trying to

09:52 12  do, and I wished that he had constructed his sample

09:52 13  differently.  It's an important question.

09:52 14     Q.   All right.  And the prior study by Judge Moore

09:52 15  wasn't looking at summary judgment, correct?  It was

09:52 16  just looking at wins at trial, correct?

09:52 17     A.   I believe it restricted the sample to cases

09:52 18  that were disposed of at trial or on appeal; that's

09:52 19  right.

09:52 20     Q.   And one of the reasons why the AIPLA study

09:52 21  comes to a different percentage is because the win rate

09:53 22  for defendants in summary judgment is higher, correct?

09:53 23     A.   That is one of the reasons, yes.

09:53 24     Q.   All right.  And you yourself have explained

09:53 25  that an arm's length royalty agreed to in the course of

09:53 1  licensing negotiation is often insufficient to

09:53 2  compensate for infringement, correct?

09:53 3      A.   Well, if you're referring to the article that I

09:53 4  published, then the answer is yes, because it doesn't

09:53 5  take into account the removal of uncertainty.  But

09:53 6  obviously here, that's what I did.

09:53 7      Q.   And you also made the comment that -- correct

09:53 8  me if I'm wrong -- that because of uncertainty, no

09:53 9  potential licensee would be willing to pay the full

09:53 10 economic value for the patented technology in the form

09:53 11 of a royalty, correct?

09:53 12     A.   It's a reasonable assumption, sure.

09:54 13     Q.   And -- but once the judge or a jury awards

09:54 14 damages, uncertainty regarding validity and infringement

09:54 15 have been resolved, right?

09:54 16     A.   For the purposes of calculating damages, yes.

09:54 17     Q.   All right.  Now -- and that's because there's

09:54 18 actually been a finding by a court as opposed to the

09:54 19 parties voluntarily agreeing to something in a

09:54 20 settlement agreement, correct?

09:54 21     A.   Yes.

09:54 22     Q.   I want to talk a little bit about use, because

09:54 23 that's a factor in calculating a reasonable royalty,

09:54 24 correct?

09:54 25     A.   Yes.

09:54 1      Q.    Did you hear the testimony of Mr. Riveros about

09:54 2  how Red Hat keeps and archives surveys of their

09:54 3  customers about the use of features of its software?

09:54 4      A.    I wasn't here, but that's consistent with my

09:55 5  understanding.

09:55 6            MR. VICKREY:  Could I please have that?

09:55 7      Q.    (By Mr. Vickrey) Did Red Hat produce to you the

09:55 8  surveys that it keeps?

09:55 9      A.    No.

09:55 10     Q.    Did you ask for them?

09:55 11     A.    My understanding was, these are surveys for our

09:55 12 new features or features they're testing out.  They want

09:55 13 to see whether to adopt them in their enterprise

09:55 14 product.

09:55 15           And so since the feature in question has

09:55 16 already been in the product since 1997, I don't think

09:55 17 that these features existed at that time -- I'm sorry --

09:55 18 these surveys existed at that time.

09:55 19     Q.    All right.  Do you know that for a fact, sir?

09:55 20     A.    I don't know it for a fact, no, but I know for

09:55 21 a fact that Fedora didn't exist at that time.

09:55 22     Q.    Well, Mr. Riveros doesn't work on Fedora.  He

09:55 23 works on the enterprise product.  He's talking about

09:56 24 features that Red Hat's customers talk about, not the

09:56 25 free Fedora software, right?

09:56 1      A.   Well, without knowing the context, I'm not

09:56 2 really sure what these surveys refer to, so I don't want

09:56 3 to --

09:56 4      Q.   All right.

09:56 5      A.   I've never seen them, and so I don't want to

09:56 6 pretend that I know.

09:56 7      Q.   All right.  You heard Mr. Gemini testify that

09:56 8 because he didn't have surveys, he looked for evidence

09:56 9 of what industry analysts and actual users of the

09:56 10 infringing features said about it, correct?

09:56 11      A.   He did say that.

09:56 12      Q.   And I just want to briefly touch on some of the

09:56 13 things that he relied on.

09:56 14           MR. VICKREY:  285.

09:56 15      Q.   (By Mr. Vickrey) The Mozilla article, you've

09:56 16 seen this, correct, sir?

09:56 17      A.   Sure.  This is -- the problem is, this is all

09:57 18 anecdotal evidence; it's one person's opinion.  It's not

09:57 19 actually an industry survey.  It's one guy thinks this

09:57 20 is useful.

09:57 21      Q.   I agree with you that this is not a survey, but

09:57 22 this is one of the things Mr. Gemini found about what

09:57 23 people in the industry were saying about the feature,

09:57 24 correct?

09:57 25      A.   He did find this, yes.

09:57 1      Q.   Kindly turn to 278.

09:57 2               This was the article in PC World

09:57 3   identifying virtual workspaces as the top feature out of

09:57 4   20 that Windows ought to have?

09:57 5      A.   You only read half of the title.  And how to

09:57 6   get them.

09:57 7      Q.   And how to get them.

09:57 8      A.   The next page actually tells you how to get

09:57 9   them for free.  We talked about this yesterday.  I

09:57 10  downloaded it from the Microsoft website.

09:57 11     Q.   Right.  And you're aware Microsoft is licensed

09:57 12  under these very patents, correct?

09:57 13     A.   That's my understanding, yes.

09:57 14     Q.   All right.  Kindly turn to page -- PX279.

09:58 15              This was another thing that Mr. Gemini --

09:58 16  another assessment of this feature that Mr. Gemini

09:58 17  relied on?

09:58 18     A.   He did rely on this, yes.

09:58 19     Q.   And there were others.  I won't go through

09:58 20  them, but you saw all of them, correct?

09:58 21     A.   I think he had one other article that referred

09:58 22  to it as a secret; that's right.

09:58 23     Q.   But none of those are quoted in your reports?

09:58 24     A.   Well, because they went -- what we're looking

09:58 25  for is some sort of quantitative estimate of -- for an

09:58 1  economist, what you care about is what's the economic

09:58 2  impact of this, and not the fact that some people think

09:58 3  it's valuable.

09:58 4          Anybody would conceive that some people

09:58 5  think it's valuable, but you're trying to figure out

09:58 6  what share of the total is that and how important is it

09:58 7  to their decision.  And nothing Mr. Gemini cited tells

09:58 8  me about that.

09:58 9          MR. VICKREY:  Kindly put up 936, Page 45.

09:59 10 Highlight that, please.

09:59 11     Q.   (By Mr. Vickrey) Here -- this is from your

09:59 12 second report, correct?

09:59 13     A.   Yes.

09:59 14     Q.   Here you say that Red Hat determined there

09:59 15 existed about 9.8 million downloads during the period,

09:59 16 correct, the damages period?

09:59 17     A.   Yes.  And the word downloads there, I think, as

09:59 18 I explained, is meant to be unique IP addresses.  But

09:59 19 with that qualification, yes.

09:59 20     Q.   And let's -- and then you also address the RHEL

09:59 21 product, which is the commercial one?

09:59 22     A.   Yes, the enterprise version.

09:59 23     Q.   Now, you sat through at least part of the

09:59 24 trial, and you heard the evidence about IP addresses and

10:00 25 their accuracy in terms of using them for a barometer of

10:00 1   use, correct?

10:00 2       A.    Well, I've heard about their accuracy and the

10:00 3   count of IP addresses is accurate.  I've also heard the

10:00 4   testimony about how they are used as a barometer and

10:00 5   that they don't represent users.

10:00 6             So it's important to distinguish between

10:00 7   those two concepts of accuracy.

10:00 8       Q.    That's because -- well, Red Hat has determined

10:00 9   two things, right?  Its IP addresses could result in

10:00 10  overcounting and actually do, because the number of

10:00 11  unique IP addresses can be dynamic, so you can count a

10:00 12  single user multiple times.

10:00 13      A.    That's one possible source of error, yes.

10:00 14      Q.    But the other error in the methodology that

10:00 15  overcompensates for that is the fact that for corporate

10:01 16  and net users, the software can hit a unique IP address

10:01 17  and then fan out to multiple users, correct?

10:01 18      A.    That's another source of error, yes; that's

10:01 19  true.

10:01 20      Q.    But Red Hat said that when you measure those

10:01 21  two together, the second flaw significantly outweighs

10:01 22  the first, correct?

10:01 23      A.    Well, if you're referring to the Frields

10:01 24  document, then that's what Mr. Frields said.  I think

10:01 25  the testimony in court from Mr. Tiemann was Mr. Frields

10:01  1    was incorrect.

10:01  2        Q.   All right.  But -- and you also heard

10:01  3    Mr. Riveros say for the software they sell -- and they

10:01  4    have a lot of large companies, corporate companies in

10:01  5    the United States, correct?

10:01  6        A.   They have a range of clients; that's true.

10:01  7        Q.   And one of the packages they sell is the

10:01  8    so-called proxy system?

10:01  9        A.   Okay.

10:02 10        Q.   And were you here when Mr. Riveros explained

10:02 11    what would happen if that software hit, for example, my

10:02 12    law firm?  You'd have a single IP address and it would

10:02 13    fan out to multiple users, and they wouldn't capture the

10:02 14    IP addresses, correct?

10:02 15        A.   I wasn't here for Mr. Riveros' testimony.

10:02 16        Q.   I apologize.

10:02 17             THE COURT:  Mr. Vickrey, how much longer

10:02 18    do you think we'll go?

10:02 19             MR. VICKREY:  Probably 20 minutes.

10:02 20             THE COURT:  Then let's take a break.

10:02 21             MR. VICKREY:  Thank you, Your Honor.

10:03 22             (Jury out.)

10:03 23             THE COURT:  Would the attorneys

10:03 24    coordinating the lunch speak to Peggy?  Jan can make

10:03 25    that connection, if you'd like.

| | | |
|---|---|---|
| 10:03 | 1 | (Recess.) |
| 10:03 | 2 | (Jury out.) |
| 10:14 | 3 | THE COURT:  Gentlemen, I'm a little |
| 10:14 | 4 | worried about time here.  It's not my job to tell you |
| 10:14 | 5 | how to do your question, but it's my judgment the jury |
| 10:14 | 6 | has heard of a lot of these things five and six times. |
| 10:14 | 7 | Let's see if we can focus on trying to finish rather |
| 10:14 | 8 | than trying to get in the last punch, all right? |
| 10:14 | 9 | MR. VICKREY:  Yes, Your Honor. |
| 10:14 | 10 | MR. REITER:  Yes, Your Honor. |
| 10:14 | 11 | THE COURT:  Okay.  Bring in the jury. |
| 10:16 | 12 | (Jury in.) |
| 10:16 | 13 | THE COURT:  Please be seated. |
| 10:16 | 14 | Dr. Putnam, you remain under oath. |
| 10:16 | 15 | THE WITNESS:  Yes, Your Honor. |
| 10:16 | 16 | THE COURT:  Mr. Vickrey, you were |
| 10:16 | 17 | inquiring. |
| 10:16 | 18 | MR. VICKREY:  Yes. |
| 10:16 | 19 | CROSS-EXAMINATION |
| 10:16 | 20 | BY MR. VICKREY: |
| 10:16 | 21 | Q.  Dr. Putnam, I'm going to move this along as |
| 10:16 | 22 | quickly as possible.  Kindly turn back to the PX936, |
| 10:16 | 23 | Page 45. |
| 10:16 | 24 | I want to turn briefly to Novell.  The 1.8 |
| 10:16 | 25 | million, would you agree with me that the 1.8 million |

10:16  1    doesn't even take into account the -- the enterprise

10:16  2    users, in other words, the users of the commercial

10:16  3    product that Novell makes money off of in the U.S.?

10:16  4        A.   That's my understanding.

10:16  5        Q.   And would you agree with me that Novell's

10:16  6    revenue, since you've looked at the annual reports, is

10:16  7    roughly 50 -- 50 percent derived from U.S. sales?

10:17  8        A.   For what products?

10:17  9        Q.   For all of its products.

10:17 10        A.   You mean as a company?

10:17 11        Q.   Yes.

10:17 12        A.   That would be surprising.

10:17 13        Q.   All right.

10:17 14             MR. VICKREY:   Tristan, kindly turn to

10:17 15    Exhibit 17 from the -- of the same report.

10:17 16        Q.   (By Mr. Vickrey)  Now, here's -- here we have

10:17 17    the culmination of your analysis of the lic -- license

10:17 18    agreements, correct?

10:17 19        A.   Well, I wouldn't call it the culmination.  It's

10:17 20    actually a comparison of the agreements of

10:17 21    Mr. Gemini's opinions, but okay.

10:17 22        Q.   But, I mean, these are agreements that not just

10:17 23    Gemini analyzed, you analyzed them, as well, correct?

10:17 24        A.   Yes.

10:17 25        Q.   And that's because these agreements are

10:18 1    something important to look to in determining a

10:18 2    reasonable royalty, correct?

10:18 3        A.   One should look at licenses to the

10:18 4    patents-in-suit, yes.

10:18 5        Q.   All right.  Let's -- let's just focus on HP.

10:18 6    Here you called this license a fixed license, correct?

10:18 7        A.   Yes.

10:18 8        Q.   In other words, lump sum?

10:18 9        A.   That's right.

10:18 10       Q.   And even though there is a running royalty

10:18 11   component in the license, you've taken that off the

10:18 12   table, right?

10:18 13       A.   There's a contingency that evidently was never

10:18 14   fulfilled, that's true.

10:18 15       Q.   You don't know one way or the other because we

10:18 16   have no sales information, correct?

10:18 17       A.   I have no information -- I have not seen any

10:18 18   information that anybody paid under that contingency.

10:18 19       Q.   But just so we're all clear, there's -- there's

10:18 20   actually a written -- something written in the license

10:18 21   agreement that calls out a one percent running royalty,

10:18 22   right?

10:18 23       A.   The word one percent does appear in the license

10:18 24   agreement, that's true.

10:18 25       Q.   And you understand that to be a running

10:19 1  royalty?

10:19 2      A.   A contingent running royalty, yes, that's

10:19 3  right.

10:19 4      Q.   All right.  But let's take your assumption that

10:19 5  it's just $110,000 lump sum payment to HP.

10:19 6      A.   Okay.

10:19 7      Q.   Because that's what you're saying here,

10:19 8  correct?

10:19 9      A.   Yes.

10:19 10     Q.   We know, do we not, from a later press release

10:19 11 from Borland that there was an estimate of 125,000 units

10:19 12 sold by HP?

10:19 13     A.   Yes.

10:19 14     Q.   And if we calculate -- if we apply the 110,000

10:19 15 to the 125,000 units, you get 88 -- 88 cents per unit

10:19 16 royalty?

10:19 17     A.   I haven't done the math, but that sounds right.

10:19 18     Q.   Okay.  Now, let's take a look at the two lump

10:19 19 sum -- no -- Silicon Graphics and Apple, if we could

10:20 20 focus on those two, because these are the really meat

10:20 21 and potatoes of your analysis of the lump -- what you

10:20 22 consider to be the appropriate lump sum, correct?

10:20 23     A.   Well, they're operating system licenses, and so

10:20 24 they're more comparable than the add-on utility licenses

10:20 25 for the reasons I've already said.

10:20 1       Q.   All right.  I'm going to address what you have

10:20 2  for sales down here in a minute and the accuracy of

10:20 3  that.  But let's just assume that this is true.  We're

10:20 4  looking at -- forgive the pun, but an apples-to-apples

10:20 5  comparison, correct?

10:20 6       A.   I'm sorry.  What are we comparing?

10:20 7       Q.   Well, if we compare the SGI license to the

10:20 8  Apple license, you're considering both sales to be

10:20 9  equal, billion apiece, and they're both operating

10:20 10 systems, and they're both lump sum, right?

10:20 11      A.   Well, they're both operating system, they're

10:20 12 both lump sum, and we did some back-of-the-envelope

10:21 13 calculation to try to figure out what portion of the

10:21 14 total sales of Silicon Graphics and Apple, which sell

10:21 15 hardware as well as software, what portion of those

10:21 16 sales was attributable to an operating system.  And, you

10:21 17 know, back-of-the-envelope, a billion dollars is, you

10:21 18 know, as good a guess as any.

10:21 19      Q.   But you've identified five characteristics,

10:21 20 five different characteristics for these licenses,

10:21 21 correct?

10:21 22      A.   Yes.

10:21 23      Q.   And four of the five are precisely identical

10:21 24 for SGI and Apple, correct, four of the five?

10:21 25      A.   Well, if you accept the calculation of software

10:21 1   sales.  And so with that qualification, sure.

10:21 2       Q.   The difference is in what was paid for them,

10:21 3   correct?

10:21 4       A.   Yes.

10:21 5       Q.   And would you agree with me that $96,000 -- or,

10:21 6   I'm sorry, 1.2 million -- it's not really 1.2 million,

10:21 7   it's actually 1.25 million, right?

10:22 8       A.   I think we adjusted for present value in that

10:22 9   calculation.  It is 1.25 million, yes, that's right.

10:22 10      Q.   Would you agree with me that 1.25 million is

10:22 11  roughly 13 times $96,000?

10:22 12      A.   I think your math is right.

10:22 13      Q.   So even though you've testified that software

10:22 14  prices went down over time, correct?

10:22 15      A.   Yes.

10:22 16      Q.   At least in this instance, Apple was valuing

10:22 17  the technology much greater than SGI?

10:22 18      A.   Well, you know, it's-- I don't know how much

10:22 19  you want to get into this.  Remember all of Apple's

10:22 20  products were licensed, so not just their computers, but

10:22 21  also their iPhones and iPods and any -- anything that

10:22 22  uses their operating system.

10:22 23           And so if you were trying to do a, quote,

10:22 24  unquote, apples-to-apples comparison, you'd have to

10:23 25  adjust for that in the Silicon Graphics license, and I

10:23  1  can't think of any good way to  do that.

10:23  2     Q.   You're not telling this jury that these patents

10:23  3  apply to all of Apple's products, correct?

10:23  4     A.   I -- my understanding is that's -- that

10:23  5  language is taken directly from the Apple license

10:23  6  agreement.

10:23  7     Q.   But do you have any understanding that the iPod

10:23  8  or iPad would have infringed these patents?

10:23  9     A.   My understanding as an economist, we'll take it

10:23 10  for what it's worth, is that the iPad and the iPhone and

10:23 11  the iPod all run scaled-down versions of a Macintosh

10:23 12  operating system, and so they very well could have

10:23 13  multiple workspaces if you wanted them to.

10:23 14     Q.   Okay.  You understand that -- that my clients

10:23 15  sued Apple over the Tiger Operating System, correct?

10:23 16     A.   Well, I think that they gave the Tiger

10:24 17  Operating System as an example of infringement, yes.

10:24 18     Q.   That's -- that's the operating system that they

10:24 19  identified in the complaint that was filed, correct?

10:24 20     A.   I think that's right, yes.

10:24 21     Q.   All right.  And then the Tiger Operating System

10:24 22  was supplanted and replaced by the Leopard Operating

10:24 23  System, correct?

10:24 24     A.   That's also my understanding, yes.

10:24 25     Q.   Now, here you've assumed a billion in sales for

10:24 1   SGI?

10:24 2       A.   As I recall, the only information we had was

10:24 3   there was 23 billion dollars in sales of systems, and so

10:24 4   for the purposes of trying to get a number, we said,

10:24 5   well, let's assume that 5 percent of those sales are

10:24 6   attributable to the operating system, but that was an

10:24 7   assumption, not based on anything, so --

10:24 8       Q.   In fact, you mention in your report that you

10:24 9   couldn't find any sales information for the SGI product,

10:25 10  correct?

10:25 11      A.   Other than the aggregate level of sales, which

10:25 12  was 23 billion, that's right.

10:25 13      Q.   Which -- which didn't specifically address the

10:25 14  product being licensed, correct?

10:25 15      A.   It incorporated the product being licensed,

10:25 16  which is the operating system, but other than that, yes.

10:25 17      Q.   Just so we're clear, you didn't have any

10:25 18  information to measure the sales of the product that was

10:25 19  being licensed, correct?

10:25 20      A.   That's true.

10:25 21      Q.   And that's one of the things -- the expected

10:25 22  demand that somebody would look at in a lump -- in

10:25 23  negotiating a lump sum payment, correct?

10:25 24      A.   As a matter of principle, sure.

10:25 25      Q.   But you didn't have that and -- and neither do

10:25  1    we, correct?

10:25  2        A.   Yes.

10:25  3        Q.   But we did have indications in the record that

10:25  4    SGI was prepared to dismantle, disable, or otherwise not

10:25  5    use the feature?

10:25  6        A.   They indicated that they were prepared to do

10:25  7    that, that's true.

10:25  8        Q.   And one of the things that you've -- that

10:25  9    you've cited in the past is the Sherry and Teece study?

10:26 10        A.   You mean in other expert reports or other

10:26 11    cases?

10:26 12        Q.   Or didn't you mention in this case, 45 to 5

10:26 13    percent range?

10:26 14        A.   Yeah, I think we established that I didn't cite

10:26 15    it in this case.

10:26 16        Q.   Okay.

10:26 17        A.   I'm aware of it.

10:26 18        Q.   And one of the things that they identified was

10:26 19    in some instances, the value of an invention just

10:26 20    because of other circumstances actually can increase

10:26 21    over time, correct?

10:26 22        A.   That can happen.

10:26 23        Q.   And you're not ruling that out in this case,

10:26 24    are you?

10:26 25        A.   I actually am ruling it out in this case.

10:26 1     Q.   Just one more thing on HP.  I think you said on

10:26 2  direct examination that the day they got the product,

10:26 3  they wanted to decrease the price?

10:26 4     A.   Yes.

10:26 5     Q.   Is there any evidence that -- that Xerox was

10:26 6  aware of any intention to decrease the price of the $99

10:27 7  unit?

10:27 8     A.   Xerox knew that HP was selling the business to

10:27 9  Borland.  So they knew Borland was a -- going to be the

10:27 10  person actually operating under the license, and I don't

10:27 11  know -- I don't know what Xerox knew about Borland's

10:27 12  marketing plans at the time of that negotiation.

10:27 13     Q.   All right.  I want to go to HP real quick.

10:27 14  Here you said the rate is not applicable, correct?

10:27 15     A.   Because there is no -- there is no rate, that's

10:27 16  right, yes.

10:27 17     Q.   And you've ridiculed Mr. Gemini in the past

10:27 18  about using a 99 percent -- 99 cent per unit rate,

10:27 19  correct?

10:27 20     A.   I object to the characterization.  I wouldn't

10:27 21  say I ridiculed him.  I said it was factually incorrect.

10:27 22     Q.   Wait.  I think you told me in your deposition

10:28 23  you ridiculed him.

10:28 24               MR. VICKREY:  Kindly turn to 997, I think

10:28 25  schedule 10.  Let's focus on Hewlett Packard, please.

10:28 1     Q.   (By Mr. Vickrey)   This is your report, please?

10:28 2     A.   Yes.

10:28 3     Q.   And kindly --

10:28 4          MR. VICKREY:   Put the whole thing up.

10:28 5     Q.   (By Mr. Vickrey)   We -- we have different

10:28 6  columns.   One is what you've called the observed

10:28 7  royalty?

10:28 8     A.   Yes.

10:28 9     Q.   And tell us what you've used as your observed

10:28 10 royalty for the HP license?

10:28 11    A.   Well, we -- we calculated using Mr. Gemini's

10:28 12 method one percent of $99, and if you do the math, then

10:28 13 that's 99 cents.

10:28 14    Q.   Well, that's not what you said in your report.

10:28 15 You didn't say this is Mr. Gemini's analysis.   This is

10:28 16 your analysis, correct?

10:28 17    A.   Well, but this is an analysis based on the

10:28 18 percentage of revenue which at the time was

10:28 19 Mr. Gemini's theory.   It no longer is.   So I was trying

10:28 20 to conform my criticism of Mr. Gemini to what he

10:28 21 actually said.

10:29 22    Q.   All right.   I want to wrap this up.   I think I

10:29 23 heard you testify yesterday, and I'm sorry to do this,

10:29 24 but I think you said the Apple license reached back six

10:29 25 years, something like that?

10:29   1          A.    That's my understanding of the way it was --

10:29   2     the Plaintiffs -- these Plaintiffs pled that case.

10:29   3          Q.    All right.  But you're not a lawyer, correct?

10:29   4          A.    That's certainly true.

10:29   5          Q.    But, nonetheless, you try to keep up with the

10:29   6     case law in patent infringement -- in the patent

10:29   7     infringement arena, correct?

10:29   8          A.    As much as an economist can.  I rely on lawyers

10:29   9     for legal advice.

10:29  10          Q.    All right.  You're aware my clients sued Apple

10:29  11     on the '412 patent on a method claim?

10:29  12          A.    Yes.

10:29  13          Q.    And are you aware of any court opinions or

10:30  14     statutes that would have allowed IPI to obtain past

10:30  15     damages on a method claim on Apple sales prior to

10:30  16     receiving notice of the patent?

10:30  17          A.    My understanding is that when you plead a

10:30  18     method claim, you can go back six years for damages.

10:30  19     That's my understanding.

10:30  20          Q.    Well, I'm talking about two different things.

10:30  21     I'm -- I'm distinguishing Apple's internal use from

10:30  22     Apple's sales to third parties.  Let's take the latter

10:30  23     situation.

10:30  24                Are you -- can you tell us any court

10:30  25     opinion or statute that would have allowed my clients to

10:30 1   reach back six years for damages against Apple on sales

10:30 2   on a method claim?

10:30 3       A.   Well, Mr. Vickrey, for the purposes of

10:30 4   this -- this case, I think I would say that's the advice

10:30 5   I've been given, and that's the interpretation of the

10:30 6   law.  So I'm not going to cite case law to you because I

10:31 7   think it would be improper.

10:31 8       Q.   Well -- I'll move on.

10:31 9            You heard evidence as to the how --

10:31 10  talking about Apple again.  You heard evidence as to how

10:31 11  the system that IPI sued on, the Tiger system required

10:31 12  separate users to log in and log off before they could

10:31 13  switch, correct?

10:31 14      A.   I did hear that discussion, yes, uh-huh.

10:31 15      Q.   And have you -- and have you heard any evidence

10:31 16  or any testimony from the Defendants' experts that the

10:31 17  Tiger method would infringe any of the patents-in-suit?

10:31 18      A.   My understanding from the complaint was that it

10:31 19  did -- they did specifically accuse instances in which

10:31 20  there were multiple users, but, obviously, this is

10:32 21  beyond both my legal expertise and my technical

10:32 22  expertise.  But my -- my understanding was that they

10:32 23  contemplated the multiple user log-in scenario.

10:32 24      Q.   Okay.  My question was something a little

10:32 25  different.

10:32 1          Did you hear any testimony from the

10:32 2   Defendants' experts that the Tiger method would infringe

10:32 3   any of the patents-in-suit?

10:32 4      A.   Well, the Defendants' experts are -- were hired

10:32 5   to analyze the Red Hat and Novell systems, and so I

10:32 6   don't -- I don't recall any testimony about the Apple

10:32 7   operating system.

10:32 8      Q.   But, now, if the patents just covered Leopard,

10:32 9   assume with me just that fact, we're talking roughly 4

10:32 10  million units sold in the U.S., correct?

10:32 11     A.   If you're talking -- I don't have the numbers

10:32 12  off the top of my head.

10:32 13          MR. VICKREY:  Kindly flash up PX316.  Next

10:33 14  page.  Yeah, highlight the Mac sales, U.S.

10:33 15     Q.   (By Mr. Vickrey)  This is Apple's annual

10:33 16  report, and this shows, does it not, for 2008 that the

10:33 17  total sales were less than 4 million units?

10:33 18     A.   For -- for the Americas, that's true, but it's

10:33 19  a worldwide license.

10:33 20     Q.   Right.  But these -- these were the same

10:33 21  patents, the same U.S. patents, correct, that we're

10:33 22  talking about, the Apple license?

10:33 23     A.   The Apple license is a worldwide license under

10:33 24  the U.S. patents, that's true.

10:33 25     Q.   For the same patents-in-suit in this case, same

10:33  1    U.S. patents?

10:33  2        A.   The Apple license covers the same

10:33  3    patents-in-suit in this case, yes, that's right.

10:33  4        Q.   All right.  You also heard testimony that Apple

10:33  5    threatened to delay the release of the Leopard system

10:34  6    until after the patents expired, correct?

10:34  7        A.   I think that actually mischaracterizes the

10:34  8    testimony.  I think that was at most what Mr. Cooper

10:34  9    said that an Apple lawyer told him that Apple might have

10:34 10    been thinking.  But --

10:34 11        Q.   But you heard Mr. Riveros testify that -- that

10:34 12    it would have been difficult for Red Hat to remove this

10:34 13    feature from its products?

10:34 14        A.   I actually wasn't here, as I said, for Mr.

10:34 15    Riveros' testimony.

10:34 16                 MR. VICKREY:  That's all I have, sir.

10:34 17    Thank you.

10:34 18                 THE COURT :  Thank you, Mr. Vickrey.

10:34 19                 Mr. Reiter?

10:34 20                 MR. REITER:  I will try and be very brief,

10:34 21    Your Honor.

10:34 22                 THE COURT:  Thank you.

10:34 23                     REDIRECT EXAMINATION

10:34 24    BY MR. REITER:

10:34 25        Q.   Just very quickly, Dr. Putnam.  I wanted to

10:34 1   review the SGI license and the Apple license.

10:35 2               MR. REITER:  If, Mr. Barns, you could put

10:35 3   up DX773, please, and go to Article 1.1 on the second

10:35 4   page.  1.1, please.  Oh, I need to switch.

10:35 5               COURT ROOM DEPUTY:  You need to switch.

10:35 6               MR. REITER:  Okay.  Thank you.

10:35 7       Q.   (By Mr. Reiter)  What is the licensed product

10:35 8   here under the SGI license?

10:35 9       A.   The licensed product is the desks and desk

10:35 10  overview application which is their -- I understand is

10:35 11  their -- component of that graphical user interface

10:35 12  within the IRIX operating system, which is what SGI

10:35 13  called its operating system.

10:35 14      Q.   Does that license that SGI provi -- or received

10:35 15  cover all of their products?

10:35 16      A.   Yes.

10:35 17      Q.   All products at SGI are covered by this

10:35 18  license?

10:35 19      A.   Well, in other words, anything that -- anything

10:36 20  that incorporates the desks and desk overview

10:36 21  application within the operating system, yes.

10:36 22      Q.   Okay.

10:36 23              MR. REITER:  If we can turn to DX740,

10:36 24  please, and also put up Section 1.1, licensed product.

10:36 25      Q.   (By Mr. Reiter)  This is from the Apple

10:36 1   agreement.  And what does this cover in contrast to the

10:36 2   SGI license?

10:36 3       A.   Well, this is obviously broader.  It means any

10:36 4   product, service, devices, system, hardware, software,

10:36 5   or offering made, used, sold, offered for sale, leased,

10:36 6   purchased, licensed or imported by or for Apple or an

10:36 7   Apple affiliate.

10:36 8       Q.   So how do the SGI and Apple license grants

10:36 9   compare?

10:36 10      A.   Well, this -- this covers the entire operating

10:36 11  system and hardware and software.  The SGI license

10:36 12  covered the, it says, the desks and desk overview

10:36 13  application within the operating system, and so this is

10:36 14  going to -- the grant -- I think what's being granted

10:36 15  here is much broader.

10:37 16      Q.   Now, I want to turn briefly to the HP license.

10:37 17  Recall Mr. Vickrey asked you some questions about the

10:37 18  $110,000 applied to 125,000 units?

10:37 19      A.   Yes.

10:37 20      Q.   And tried to come up with some kind of a rate

10:37 21  for that?

10:37 22      A.   Yes.

10:37 23      Q.   Is there something missing in that calculation?

10:37 24      A.   Yes.

10:37 25      Q.   What's missing?

10:37 1    A.   Well, as you recall from the HP license,

10:37 2  there's -- remember, what's happening at the HP license

10:37 3  is that there's sales going backwards and there's sales

10:37 4  going forwards, because we're -- HP is transferring the

10:37 5  business to Dashboard.  So this is you're cleaning out

10:37 6  your house and you're trying to get your house in order,

10:37 7  and so you're paying for the sales that you made in the

10:37 8  past, and you're paying for the sales that Borland is

10:37 9  going to make going forward.

10:37 10          Mr. Vickrey applied the $110,000 payment

10:37 11  only to the sales going past but didn't apply it to the

10:37 12  sales going forward.  If you were going to compute the

10:37 13  rate effectively, you would say this $110,000 payment

10:37 14  needs to apply both to HP sales that it's already made

10:37 15  and to all the sales, at least up to 10 million, that

10:38 16  Borland is going to make in the future.

10:38 17          So you can't just take $110,000 and divide

10:38 18  it by the 125,000 units because you're forgetting about

10:38 19  the future.  That's not what the license says.

10:38 20    Q.   Another subject, we've all heard about it a

10:38 21  lot, and I'm not -- I'm just going to have one or two

10:38 22  questions.

10:38 23          IP addresses.  In the hypothetical

10:38 24  negotiations, would the parties here in your opinion

10:38 25  have used that as a way of counting rev -- or counting

10:38 1    the base?

10:38 2        A.    No.

10:38 3        Q.    Why not?

10:38 4        A.    Well, so first of all, we can't find any

10:38 5    licenses where they actually do do that.  And so I'm an

10:38 6    economist.  I look at what people do.  And the common

10:38 7    sense thing is to see if people actually use IP

10:38 8    addresses to negotiate licenses.  Nobody does that.

10:38 9            If you can't find a license where people

10:38 10   actually do this, it doesn't make any sense to propose a

10:38 11   license and say the parties would have agreed to it

10:38 12   based on IP addresses.

10:38 13           And then for all the reasons I'm sure

10:38 14   we're now -- will be relieved not to hear from anymore,

10:38 15   IP addresses don't correspond to users.  And so, you

10:39 16   know, Albert Einstein said that not everything that

10:39 17   counts can be counted and not everything that can be

10:39 18   counted counts.  Okay.  Just because you can find a

10:39 19   number doesn't mean it means anything.  IP addresses

10:39 20   have nothing to do with how many people actually use the

10:39 21   Plaintiffs' product.

22         Q.    Next subject.  Mr. Vickrey showed you something

10:39 23   he called anecdotal evidence.  We've been using that.

10:39 24   What does that mean, anecdotal evidence?

10:39 25       A.    That's a -- that's a $5 word for a five cent

10:39 1    concept.  It just means that it's stories.  If I tell

10:39 2    you an anecdote, it means that I went over to the Ford

10:39 3    dealer yesterday and tried to buy a part for my car.

10:39 4              That's a story.  It doesn't tell you

10:39 5    anything about how many parts Ford sells or how many

10:39 6    Ford dealers there are in the country.  It doesn't tell

10:39 7    you any systematic information.  It's just a story about

10:39 8    me.

10:39 9              And Mr. Gemini told stories about how

10:39 10   people had used this feature and how it was important to

10:39 11   them.

10:39 12      Q.   Well, I just want to clarify -- strike that.

10:39 13             Have you seen anything from Red Hat or

10:39 14   Novell that talks about people using this feature or

10:40 15   this product or demand for this product?

10:40 16      A.   No.

10:40 17      Q.   This feature?  So the only thing we've seen is

10:40 18   this anecdotal evidence; is that right?

10:40 19      A.   Yes, there was something from Ubuntu, which is

10:40 20   a competitor, actually, and a couple blogs or -- or

10:40 21   reviews.

10:40 22      Q.   Now the next subject, the Janake article, you

10:40 23   talked about that a little bit this morning with me and

10:40 24   also with Mr. Vickrey, recall that?

10:40 25      A.   Yes.

10:40 1    Q.   You said you didn't use it, and you had an

10:40 2    explanation, and I just want to make sure that we all

10:40 3    understand.  Why do you think that it is not the best

10:40 4    article to use?

10:40 5    A.   Professor Janake picked a certain sample of

10:40 6    cases to analyze.  He picked the cases that go up to

10:40 7    Washington to -- on appeal where Judge Rader's court

10:40 8    actually is.  And those cases are not a random sample of

10:40 9    the entire population.  They're a particular set of

10:41 10   cases.

10:41 11          It's sort of like the car example.  The

10:41 12   cars that you see in the shop at the dealer are not a

10:41 13   random sample of all the cars on the road; they're the

10:41 14   ones that need fixing.  And so it's in the same -- it's

10:41 15   sort of the same thing, when cases go up on appeal to

10:41 16   Judge Rader's court, they're the ones that need fixing.

10:41 17          And so you can't draw an inference from

10:41 18   that sub-sample of cases about all the cases as a whole.

10:41 19   And so you wouldn't use that as the basis for trying to

10:41 20   figure out how much the license should be discounted in

10:41 21   a negotiation, because in the real world, parties

10:41 22   wouldn't use -- wouldn't do what Mr. Janake did to try

10:41 23   to figure out the odds of winning at trial.  It's not

10:41 24   the right way to think about it.

10:41 25   Q.   Let me be clear, though, but in your analysis,

10:41 1   you did account for this risk, did you not?

10:41 2       A.   I just used a different number because

10:41 3   Mr. Janake's number -- he tried to do the right thing,

10:41 4   he just didn't get it right.

10:41 5       Q.   Okay.  But you -- you acted for it?

10:41 6       A.   I did, yes.

10:41 7       Q.   Okay.  Last thing.

10:41 8               MR. REITER:  I want to put up DX936,

10:42 9   Exhibit 16 please.  I don't think everybody was able to

10:42 10  see that.

10:42 11      Q.   (By Mr. Reiter)  And this is a chart from your

10:42 12  expert report; is that right?

10:42 13      A.   Yes.

10:42 14      Q.   So what -- what was this?

10:42 15      A.   Well, now, I've seen this three or four times.

10:42 16  This is just -- so in -- the way this works is I have to

10:42 17  tell everybody what my opinions are going to be before I

10:42 18  come to court.  And so I have to give a report.

10:42 19              And one of my opinions is the nine-part

10:42 20  test for why it is you wouldn't pick a running royalty.

10:42 21  And so I put this exhibit into my report, and I copied

10:42 22  it to show to the jury, and it's basic -- it's

10:42 23  essentially identical.  I can't see any differences.

10:42 24      Q.   Now, in creating this -- this chart and the

10:42 25  factors in the chart, did you use things such as the

10:42 1    Georgia-Pacific factors and your training as an

10:42 2    economist to determine what was appropriate?

10:42 3        A.    Of course.

10:42 4        Q.    You didn't just pick them out of the air, did

10:43 5    you?

10:43 6        A.    Well, no.  So, for example, we talked about the

10:43 7    incidence of use, and so that's Factor 11 under

10:43 8    Georgia-Pacific.

10:43 9               And the question is, did each unit

10:43 10   generate revenue?  And that's one of the factors under

10:43 11   Georgia-Pacific.  How do you -- does the sale of the

10:43 12   product allow you to make money by selling other

10:43 13   products.

10:43 14               And, you know, what I call the input

10:43 15   market and the output market, just what do competitors

10:43 16   pay for this in this market?  So it's all completely

10:43 17   within Georgia-Pacific.

10:43 18               MR. REITER:  I have no further questions.

10:43 19               THE COURT:  Thank you, Mr. Reiter.

10:43 20               Mr. Vickrey?

10:43 21               MR. VICKREY:  Nothing further, Your Honor.

10:43 22               THE COURT:  Thank you.

10:43 23               Thank you, Dr. Putnam, you may step down.

10:43 24               THE WITNESS:  Thank you, Your Honor.

10:43 25               THE COURT:  Mr. Reiter?

10:43  1              MR. REITER:  At this point, Your Honor, we

10:43  2  -- the Defendants rest.

10:43  3              MR. HILL:  Your Honor, at this time, the

10:43  4  Plaintiffs close.

10:43  5              THE COURT:  Then thank you, gentlemen.

10:43  6  We've come to the close of the presentation of evidence,

10:44  7  ladies and gentlemen.  We will now proceed to the next

10:44  8  and important part of this case, the instructions.

10:44  9              Mr. Gasey, do you have some comments

10:44 10  before that?

10:44 11              MR. GASEY:  Your Honor, just to save time

10:44 12  for the jury, I'm assuming that we have the same

10:44 13  arrangement to preserve our Rule 50 motion, so we --

10:44 14              THE COURT:  Absolutely.  Excuse me.

10:44 15              MR. HILL:  Would you like to do that here,

10:44 16  Your Honor, or at the sidebar?

10:44 17              THE COURT:  Yeah, come up to the sidebar.

10:44 18  We can do that very quickly here.

10:44 19              (Bench conference.)

10:44 20              MR. GASEY:  Sorry, Your Honor.

10:44 21              THE COURT:  No, no, no, I was the one that

10:44 22  was trying to rush along.

10:44 23              Mr. Gasey?

10:44 24              MR. GASEY:  Yes, Your Honor, we'd like to,

10:44 25  if it's agreeable with the Defendants, make our JMOL

10:44  1    record on paper but have the Defendants agree that we

10:44  2    would have our rights preserved as if they were timely

10:44  3    made in Court at this time.

10:44  4                    MR. REITER:  Okay.  And we will be

10:45  5    renewing our JMOL, as well, not that we've been fully

10:45  6    heard, and --

10:45  7                    THE COURT:  That will be fine.

10:45  8                    MR. REITER:  Okay.

10:45  9                    THE COURT:  And we will acknowledge all of

10:45 10    this as happening in open court.

10:45 11                    MR. REITER:  Okay.  Then everything is

10:45 12    preserved.

10:45 13                    THE COURT:  And then you can do it all in

10:45 14    paper to preserve every last word.

      15                    MR. REITER:  Okay.  Thank you, Your Honor.

      16                    MR. GASEY:  Thank you.

      17                    THE COURT:  Now I'll go right into an

      18    instruction.

      19                    MR. GASEY:  Okay.

10:45 20                    (Bench conference concluded.)

10:45 21                    THE COURT:  Mr. Gasey, Mr. Reiter, as the

10:45 22    Court goes through its instructions.  I was thinking I

10:45 23    might put them on the screen.  Is that --

10:45 24                    MR. GASEY:  That's fine, Your Honor.

10:45 25                    MR. REITER:  Yeah.

10:45  1                    THE COURT:  Does that work for you?

10:45  2                    MR. REITER:  Yes, Your Honor.

10:45  3                    THE COURT:  It sometimes helps to -- this

10:46  4      is a little dangerous.  You're going to see where I'm

10:46  5      ad-libbing because you'll see what is written down as

10:46  6      instructions.

10:46  7                    Ladies and gentlemen, just to make sure

10:46  8      you understand what we're going to do, I will now give

10:46  9      you your instructions on the law.  They will reference

10:46 10      the verdict form which you will have when you go into

10:46 11      the deliberation room, and they will reference also the

10:46 12      claim construction defining the terms of the claim.

10:46 13                    Following that, each of the parties has

10:47 14      about an hour to argue to you the -- their view of how

10:47 15      the case should be decided.  Let's go through my jury

10:47 16      instructions, and then let's talk about the timing.  The

10:47 17      parties have jointly agreed to provide you with a lunch,

10:47 18      and that's being brought in in a timely fashion.  What

10:47 19      we'll decide together is when to have that lunch, and --

10:47 20      but let's first dispose of the -- this important part of

10:47 21      the law.

10:47 22                    The reason we're slowing down just a

10:48 23      little is I realized the copy you have up there is not

10:48 24      the final copy.  You're hurting my feelings.  I think I

10:48 25      have a very profound voice.  She's making me use the

10:48  1    microphone.

10:49  2                 Members of the jury, I will now provide

10:49  3    you with the final instructions on the law.  As you're

10:49  4    aware from the presentation of evidence, we must address

10:50  5    several -- several areas of the law.  I will identify

10:50  6    each issue, the parties' contentions as to that issue

10:50  7    and the particular questions you will answer during your

10:50  8    deliberations and the law you must follow.  You will

10:50  9    have a copy of these final instructions for your

10:50  10   reference here to follow along.  I ask you to read

10:50  11   along.

10:50  12                Please listen carefully to everything I'm

10:50  13   telling you now.  You'll be provided with copies of a

10:50  14   verdict form.  You must answer each and every one of the

10:50  15   questions on the verdict form unless it instructs you to

10:50  16   skip a question.  Your foreperson must sign and date the

10:50  17   form.

10:50  18                Now let's talk about your duties first.

10:50  19   You have two main duties as a juror.  First, you must

10:50  20   decide what the facts are from the evidence you saw and

10:51  21   heard here in Court.  Second, you must take the law that

10:51  22   I give you, apply it to the facts, and answer the

10:51  23   questions in the verdict form.

10:51  24                It's my job to instruct you about the law.

10:51  25   You are bound by the oath that you took at the beginning

10:51   1   of the trial to follow those instructions.  My

10:51   2   instructions include an instruction on the meaning of

10:51   3   the patent claims.  You'll take that with you into the

10:51   4   room.

10:51   5               Let me start by defining evidence.  We

10:51   6   talked about this a bit, but you must make your decision

10:51   7   based only on evidence you saw and heard here in court.

10:51   8   The evidence in this case includes only what the

10:51   9   witnesses said while they were testifying under oath,

10:51  10   the exhibits admitted into evidence, and the

10:51  11   stipulations that the lawyers may have agreed to, and

10:51  12   the facts I will instruct you to take as true.

10:51  13               Nothing else is evidence.  The lawyers'

10:51  14   arguments, questions, objections, and statements are not

10:51  15   evidence.  My legal rulings aren't evidence.  Any of my

10:52  16   comments and questions are not evidence.

10:52  17               Certain physical exhibits have been

10:52  18   admitted into evidence.  You may rely upon such exhibits

10:52  19   that have been admitted into evidence, even if the

10:52  20   underlying materials are not here.  However, the

10:52  21   authenticity of those exhibits has in some cases been

10:52  22   challenged.  It's for you to decide how much if any

10:52  23   weight you give to them.  In making that decision you

10:52  24   should consider all the testimony you heard about the

10:52  25   way the exhibits were prepared and other indicia of

10:52  1  reliability.

10:52  2          There are two types of evidence you must

10:52  3  consider.  One is direct evidence, such as testimony of

10:52  4  an eyewitness.  The other is circumstantial evidence,

10:52  5  the proof of circumstances that tend to prove or

10:52  6  disprove the existence or nonexistence of certain other

10:52  7  facts.  The law makes no distinction between direct and

10:52  8  circumstantial evidence.

10:52  9          You should use your common sense in

10:52 10  weighing the evidence.  Consider it in light of your

10:53 11  everyday experience and give it whatever weight you

10:53 12  think it deserves.

10:53 13          Witnesses.  In determining the weight you

10:53 14  give to the testimony of a witness, you should ask

10:53 15  yourself whether the evidence tended to show that the

10:53 16  witness testified falsely about some fact or whether the

10:53 17  evidence showed that at some other time the witness said

10:53 18  or did something or failed to say or do something that

10:53 19  was different from the testimony at trial.

10:53 20          When specialized knowledge or experience

10:53 21  about a particular matter may be helpful a person who

10:53 22  has special training or experience in that technical

10:53 23  field -- we'll call those the expert witnesses -- may

10:53 24  state his or her opinions on those matters.  You need

10:53 25  not accept the opinion of any of these expert witnesses.

| | | |
|---|---|---|
| 10:53 | 1 | As with any other witness, you're free to decide what |
| 10:53 | 2 | you rely on. |
| 10:53 | 3 | Summary of contentions.  To help you |
| 10:53 | 4 | follow the evidence, I'm going to summarize the |
| 10:53 | 5 | positions of the parties.  The Plaintiffs in this case |
| 10:54 | 6 | are IP Innovation, LLC, and Technology Licensing |
| 10:54 | 7 | Corporation.  Those are the Plaintiffs.  Mr. Gasey, |
| 10:54 | 8 | Mr. Hill, and you're familiar with that. |
| 10:54 | 9 | The Defendants are Red Hat and Novell. |
| 10:54 | 10 | Collectively called the Defendants, and that's Mr. |
| 10:54 | 11 | Krevitt, Mr. Reiter, Ms. LaValle, and the others. |
| 10:54 | 12 | This case involves three U.S. patents, |
| 10:54 | 13 | U.S. Patent '412, '521, and '183, each entitled user |
| 10:54 | 14 | interface with multiple workspaces for sharing display |
| 10:54 | 15 | system objects, and was originally assigned to Xerox |
| 10:54 | 16 | Corporation.  The patents were later transferred from |
| 10:54 | 17 | Xerox to the Plaintiffs.  For convenience, the parties |
| 10:54 | 18 | and I will often refer to these three patents as the |
| 10:54 | 19 | patents-in-suit or by using their last three numbers. |
| 10:54 | 20 | Plaintiffs filed suit in this Court |
| 10:54 | 21 | seeking money damages from Defendants for allegedly |
| 10:55 | 22 | infringing the patents-in-suit by using, selling, and |
| 10:55 | 23 | offering for sale in the United States products and |
| 10:55 | 24 | processes that the Plaintiffs argue are covered by |
| 10:55 | 25 | Claims 1 and 21 of the '412 patent, Claim 8 of the '521 |

10:55 1   patent, and Claim 1 of the '184.  You're dealing with

10:55 2   four claims.  Remember that.  Plaintiffs also argue that

10:55 3   Defendants actively induced their customers to infringe

10:55 4   the patents-in-suit.

10:55 5         Defendants deny that they have infringed

10:55 6   or actively induced infringement of the asserted claims.

10:55 7   Defendants also argue that the claims are invalid.

10:55 8         Your job will be to decide whether or not

10:55 9   Defendants have infringed any asserted claims of the

10:55 10  patents-in-suit and whether or not those claims are

10:55 11  invalid.  If you decide they have infringed any valid

10:56 12  asserted claim of the patents-in-suit, you will then

10:56 13  need to decide any money damages to be awarded to

10:56 14  Plaintiffs.

10:56 15        Let's talk about the claim interpretation.

10:56 16  Because only the claims of a patent can be infringed you

10:56 17  must understand the scope and meaning of the claims

10:56 18  before undertaking any infringement analysis.

10:56 19        It's my duty to interpret those claims for

10:56 20  you.  It is your duty to apply my interpretation of the

10:56 21  meanings of the claims to the accused products and the

10:56 22  use of the accused products.

10:56 23        I'm going to send with you into the

10:56 24  deliberation room a handout that explains the meanings

10:56 25  of some of the words of the claims in this case.  As

10:56  1    I've previously instructed you, you must accept my

10:56  2    definition of those words as correct.  Any words in the

10:56  3    claim which I have not provided a definition for, you

10:56  4    should apply their plain English meaning to those.

10:56  5         You should not take my definition of the

10:57  6    language of the claims as an indication that I have a

10:57  7    view regarding how you should decide those issues that

10:57  8    you are being asked to decide, such as infringement and

10:57  9    validity.  Those issues are yours to decide.

10:57 10         Talk about burdens of proof.  Plaintiffs

10:57 11    have the burden of proving infringement and damages by

10:57 12    what is called a preponderance of the evidence.  That

10:57 13    means the Plaintiffs have to produce evidence, which

10:57 14    when considered in light of all the facts, leads you to

10:57 15    believe that Plaintiffs' claim is more likely true than

10:57 16    not.

10:57 17         To put it differently, if you were to put

10:57 18    Plaintiffs' and Defendants' evidence on opposite sides

10:57 19    of a scale, the evidence supporting Plaintiffs' claims

10:57 20    would have to make the scale tip on their side.

10:57 21         If you believe that Plaintiffs have met

10:57 22    their burden of proving patent infringement and damages

10:57 23    by a preponderance of evidence, you must find in favor

10:57 24    of Plaintiffs.  If you believe that Plaintiffs have not

10:58 25    met their burden of proof for the patents-in-suit, you

10:58 1   must find in favor of Defendants.

10:58 2              A patent and its claims are presumed to be

10:58 3   valid.  In this case, Defendants claim that the asserted

10:58 4   claims are invalid.  Accordingly, Defendants have the

10:58 5   burden of proving that each of the claims is invalid by

10:58 6   a clear and convincing evidence standard.

10:58 7              Clear and convincing evidence is evidence

10:58 8   that produces in your mind an abiding conviction that

10:58 9   the claims are invalid.  Therefore, for Defendants to

10:58 10  prevail on the invalidity issue, you must be persuaded

10:58 11  that it is highly probable that what Defendants seek to

10:58 12  prove is true.

10:58 13             If you believe that Defendants have met

10:58 14  their burden of proving invalidity by clear and

10:58 15  convincing evidence, you must find in favor of

10:58 16  Defendants.  If you believe they have not met their

10:58 17  burden, you must find in favor of Plaintiffs on the

10:59 18  issue of validity.

10:59 19             Those of you who are familiar with

10:59 20  criminal cases will have heard the term beyond a

10:59 21  reasonable doubt.  That burden does not apply in any

10:59 22  civil case, and, therefore, you should put it out of

10:59 23  your mind in considering whether Defendants or

10:59 24  Plaintiffs have met their burden of proof in this case.

10:59 25             Let's talk about the issues you're going

10:59  1   to decide now.  Those are infringement, validity, and

10:59  2   damages.

10:59  3            When you get your verdict form, you'll see

10:59  4   23 questions.  It's really just those three questions

10:59  5   for each of the Plaintiffs, for each of the Defendants,

10:59  6   and for each of the claims.  I'll explain that as we go

10:59  7   along.

10:59  8            Infringement, that's assessed on a

10:59  9   claim-by-claim basis.  Therefore, there may be

11:00 10   infringement as to one claim but not infringement on

11:00 11   another.  In this case, there are two possible ways to

11:00 12   find that a claim may be infringed, direct infringement

11:00 13   and active inducement.

11:00 14            Let's talk about the first one, direct

11:00 15   infringement.

11:00 16            Plaintiffs contend that Defendants

11:00 17   directly infringed Claims 1 and 21 of the '412 patent

11:00 18   through the manufacture, use, sale, or offer for sale

11:00 19   within the U.S. or its territories of server and

11:00 20   desktop-based operating systems.

11:00 21            Plaintiffs contend that Defendants

11:00 22   directly infringe Claim 8 of the '521 patent through the

11:00 23   manufacture, use, sale, or offer to sale within the

11:00 24   United States of server and desktop-based operating

11:00 25   system.

11:00  1          They contend that Defendants directly

11:00  2     infringe Claim 1 of the '183 patent through the

11:01  3     manufacture, use, sale, or offer for sale within the

11:01  4     United States of server and desktop-based operating

11:01  5     systems.

11:01  6          Defendants deny that they have infringed

11:01  7     any of the asserted claims of the patents-in-suit

11:01  8     through the manufacture, use, sales, or offer for sale

11:01  9     within the United States or its territories of their

11:01 10     server and desktop-based operating systems.

11:01 11          The law.  Only the claims of a patent can

11:01 12     be infringed.  Neither the specification, which is the

11:01 13     written description of the invention, nor the drawings

11:01 14     of a patent can be infringed.  Infringe -- infringement

11:01 15     is assessed on a claim-by-claim basis.  Therefore, as I

11:01 16     said before, you can have infringement of one claim but

11:01 17     not another.

11:01 18          To prove infringement of each of the

11:01 19     patents-in-suit, Plaintiffs have the burden of proving

11:01 20     by a preponderance of the evidence that during the

11:01 21     lifetime of the patents-in-suit, the Defendants made,

11:02 22     used, sold, or offered to sell within the United States

11:02 23     a product or process that meets all of the requirements

11:02 24     of a claim of each of the patents-in-suit.

11:02 25          In your analysis of whether the Plaintiffs

11:02  1  meet their burden of proof, you must compare the accused

11:02  2  products or one's use of the accused products with each

11:02  3  and every one of the requirements of a claim to

11:02  4  determine whether all of the requirements of that claim

11:02  5  are met.  If they have not met their burden of proof,

11:02  6  you must find for Defendants.

11:02  7          Claims 1 and 21 of the '412 patent use the

11:02  8  phrases display object means for generating, control

11:02  9  means for accessing and input means for receiving.

11:02 10  These means for phrases are special phrases in patent

11:02 11  law.  They're called means-plus-function requirements.

11:02 12          Each of these claims cover the structure

11:03 13  described in the patent that performs that function.

11:03 14  The claims also cover equivalents to the structure found

11:03 15  in the patent for that function.

11:03 16          You should apply my definitions of the

11:03 17  functions and the structures for these

11:03 18  means-plus-function clauses as you would my definition

11:03 19  of any other claim term.

11:03 20          A product meets the means-plus-function

11:03 21  requirements of the claims if two conditions are met:

11:03 22  It has a structure or set of structures that perform the

11:03 23  identical function in the claim, and -- and that

11:03 24  structure or set of structures is either identical to

11:03 25  or equivalent to the structure that I defined earlier as

```
11:03  1   performing the function.

11:03  2              A structure is a set of -- or a set of

11:03  3   structures is equivalent to the structure I have defined

11:03  4   if a person having ordinary level of skill in the field

11:04  5   of technology of the patents-in-suit would have

11:04  6   considered the differences between them to be

11:04  7   insubstantial at the time the alleged infringement

11:04  8   occurred.

11:04  9              If you find that the Plaintiffs have met

11:04 10   their burden of proof, you must find for the Plaintiffs.

11:04 11   If you find that Plaintiffs have not met their burden of

11:04 12   proof, you must find for Defendants.

11:04 13              And you will have on your verdict form

11:04 14   direct infringement.  Then you will have for each

11:04 15   claim -- there are four, remember, a question of whether

11:04 16   Red Hat directly infringes and whether Novell correctly

11:04 17   -- directly infringes.  Therefore, you will have eight

11:04 18   questions on direct infringement, one for each claim,

11:04 19   one for each of the Defendants.

11:04 20              On to indirect.  Plaintiffs allege that

11:05 21   defendants are liable for infringement by actively

11:05 22   inducing their customers to directly infringe the

11:05 23   patents-in-suit.  Defendants deny that they have

11:05 24   actively induced their customers to directly infringe

11:05 25   any of the asserted claims of the patents-in-suit.
```

11:05  1                Let's talk about the law there.  As with

11:05  2  direct infringement, you must decide whether there's

11:05  3  been active inducement, and you're to do that on a

11:05  4  claim-by-claim basis.

11:05  5                In your active inducement analysis, you

11:05  6  will consider the following factors:  Whether the

11:05  7  Defendants took action during the time of the patent

11:05  8  which was in force which encourages acts by someone

11:05  9  else, and the encouraged acts constituted direct

11:05 10  infringement of that claim, and Defendants were aware of

11:06 11  the patent and knew or should have known that the

11:06 12  encouraged acts constitute infringement of that patent,

11:06 13  and Defendants had an intent to cause those encouraged

11:06 14  acts, and the encouraged acts were actually carried out

11:06 15  by someone else.

11:06 16                To prove active inducement of

11:06 17  infringement, Plaintiffs must prove that each of those

11:06 18  requirements is met.  Further, proof of each element

11:06 19  must be by preponderance of the evidence.

11:06 20                It's not sufficient that the person or

11:06 21  company that's allegedly induced to infringe itself

11:06 22  directly infringed the claims.  Nor is it sufficient

11:06 23  that Defendants were aware of the acts that allegedly

11:06 24  constitute the direct infringement.

11:06 25                Rather, you must find that Defendants

11:06  1    specifically intended another person or company to

11:07  2    infringe the patent-in-suit and that such other person

11:07  3    or company actually engaged in the acts that constitute

11:07  4    direct infringement to find inducement of infringement.

11:07  5             If you do not find that Defendants

11:07  6    specifically intended another person or company to

11:07  7    infringe or if there's no direct infringement by anyone,

11:07  8    then you must find that Defendants have not actively

11:07  9    induced the alleged infringement.

11:07 10             Now, you'll have, again, the next eight

11:07 11    questions will be on inducement.  There will be one

11:07 12    question for each claim and each Defendant.  Does Red

11:07 13    Hat induce?  Does Novell induce for each of the claims?

11:07 14    So there's another eight questions.  There's 16 of the

11:07 15    23 questions already.

11:08 16             Next question.  Validity.  You'll have one

11:08 17    question on this.  The Inventorship issue.  First, the

11:08 18    parties' contentions.  In this case, Defendants contend

11:08 19    that each of the patents-in-suit is invalid because of

11:08 20    improper Inventorship.

11:08 21             A patent is invalid if it fails to meet

11:08 22    the requirement that all of the actual inventors, and

11:08 23    only the actual inventors, be named as inventors in the

11:08 24    patent.  This is known as the Inventorship requirement.

11:08 25    The inventors named in an issued patent are presumed

11:08 1    correct, and the Defendants must show improper

11:08 2    Inventorship by clear and convincing evidence.

11:08 3              Let me tell you the law there.  A joint

11:08 4    invention is the product of collaboration of the

11:08 5    inventive endeavors of two or more persons working

11:08 6    towards the same end and producing an invention by their

11:09 7    aggregate efforts.

11:09 8              To constitute a joint invention, it's

11:09 9    necessary that each of the inventors work on the same

11:09 10   subject matter and make some contribution to the

11:09 11   inventive thought and the final result.  Persons may be

11:09 12   joint or co-inventors even though they do not physically

11:09 13   work together, do not make the same type or amount of

11:09 14   contribution, or do not contribute to the subject matter

11:09 15   of every claim of the patent.

11:09 16             However, individuals cannot be joint

11:09 17   inventors if they are completely ignorant of what each

11:09 18   other has done until after their independent efforts.

11:09 19   They must have directly collaborated through some open

11:09 20   line of communication during or at approximately the

11:09 21   time of their inventive effort.

11:09 22             For persons to be joint inventors, there

11:09 23   must be some element of joint behavior such as

11:09 24   collaboration or working under common direction, one

11:09 25   inventor seeking -- seeing a relevant report and

11:09 1    building upon it or hearing another's suggestions at a

11:10 2    meeting.

11:10 3                    In some cases, the interplay between

11:10 4    conception and collaboration requires that each

11:10 5    co-inventor engage with the other co-inventors to

11:10 6    contribute to a joint conception.

11:10 7                    That's your instruction on the

11:10 8    Inventorship.

11:10 9                    Now, there's another set of four questions

11:10 10   dealing with invalidity of each of the four claims by

11:10 11   anticipation.  So you've got 17 so far and another

11:10 12   four -- math isn't my strong suit, but I think we're up

11:10 13   to 21.

11:10 14                    We're now going to talk about the law

11:10 15   governing anticipation, the next four questions.

11:10 16                    Defendants allege that all asserted claims

11:10 17   of the patents-in-suit are invalid because they are

11:11 18   anticipated by certain prior art references, products,

11:11 19   or systems.

11:11 20                    Under the patent laws, a person is

11:11 21   entitled to a patent only if the invention claimed in

11:11 22   the patent is new in light of what came before.  That

11:11 23   which came before is referred to as the prior art.

11:11 24                    In this case, the following systems are

11:11 25   prior art, the Chan Room system, the Macintosh Switcher,

11:11  1   and the Amiga Workbench.  Defendants allege that the

11:11  2   listed prior art contains all of the elements of each of

11:11  3   the claims, all four claims in this suit.

11:11  4           Defendants have the burden of establishing

11:11  5   by clear and convincing evidence that those claims are

11:11  6   not new.  To prove that the inventions are not new,

11:11  7   Defend -- Defendants must show that all of the

11:11  8   requirements of each patent claim are present in a

11:12  9   single document or system that qualifies as prior art.

11:12 10           The Chan Room system, the Macintosh

11:12 11   Switcher, and the Amiga Workbench are prior art.  So you

11:12 12   must consider this question for the Chan Room system,

11:12 13   Macintosh Switcher and Amiga Workbench.

11:12 14           If you find that Defendants established by

11:12 15   clear and convincing evidence that all of the elements

11:12 16   are contained in at least one of these documents or

11:12 17   systems, then you must find that the '412, '521 and '183

11:12 18   patents are invalid.

11:12 19           If you find the Defendants have not

11:12 20   carried their burden of proof, then you will find for

11:12 21   the Plaintiffs.

11:12 22           Something is inherent in an item of prior

11:12 23   art if it is necessarily present in that prior art or

11:12 24   necessarily results from the practice of the prior art.

11:12 25   Inherency may not be established by probabilities or

11:12  1  possibilities.  The mere fact that a certain thing may

11:13  2  coincidentally result from a given set of circumstances

11:13  3  is not sufficient.  A party claiming anticipation by

11:13  4  inherency must show that the elements of the claim are

11:13  5  necessarily present in the prior art or necessarily

11:13  6  result from the practice of the prior art.

11:13  7          Defendants must prove by clear and

11:13  8  convincing evidence that the inventions recited in these

11:13  9  claims of the patents-in-suit are inherently present in

11:13 10  the prior art.

11:13 11          I told you there were 23 questions.  We're

11:13 12  up to 21.  That means there are two left.  You can guess

11:13 13  what those are.  Damages on each of the -- for each of

11:13 14  the Defendants.  Let's talk about damages generally.

11:13 15          Plaintiffs argue they're entitled to

11:13 16  damages in the form of a reasonable royalty based on

11:13 17  Defendants' infringement of the patents-in-suit.  If you

11:14 18  find that Defendants infringed any valid claim of the

11:14 19  patents-in-suit, then you must determine the amount of

11:14 20  money damages, if any, to be awarded to the Plaintiffs.

11:14 21          The amount of those damages, if any, must

11:14 22  be adequate to compensate Plaintiffs for the

11:14 23  infringement, but in no event less than a reasonable

11:14 24  royalty for the use made of the invention by the

11:14 25  Defendants.

11:14  1          You may decide that the parties would have

11:14  2    agreed to a lump sum, paid-in-full royalty, or a running

11:14  3    royalty.  The damages you award are meant to compensate

11:14  4    the patentholder.  You may not include in your award any

11:14  5    additional amount as a fine or penalty in order to

11:14  6    punish Defendants.

11:14  7          Your damages award, if you even reach that

11:14  8    issue, should put Plaintiffs in approximately the same

11:14  9    financial position it would have been in had the

11:14 10    infringement not occurred, but in no event may the

11:15 11    damages be less than a reasonable royalty for the use

11:15 12    made of the invention.

11:15 13          Plaintiffs have the burden to establish

11:15 14    the amount of their damages by a preponderance of the

11:15 15    evidence.  While Plaintiffs may not establish the amount

11:15 16    of damages by mere speculation or guess, they satisfy

11:15 17    their burden by showing the extent of damages as a

11:15 18    matter of just and reasonable inference, even if the

11:15 19    damages are established as an approximation.

11:15 20          Now, the time period.  The damages period

11:15 21    in this case is from October 2007 through December 10th,

11:15 22    2008, October 9th to December 10th.

11:15 23          Plaintiffs cannot recover damages for any

11:15 24    activities of Red Hat or Novell that are alleged to

11:15 25    infringe the patents-in-suit that occurred before the

11:15  1    Plaintiffs filed this lawsuit, and the patents-in-suit

11:15  2    expired on December 10, 2008.

11:15  3                Now, let's talk about reasonable royalty.

11:16  4    A royalty is a payment made to a patentholder in

11:16  5    exchange for the right to make, use, or sell the claimed

11:16  6    invention.  A reasonable royalty is the amount of

11:16  7    royalty payment that a patentholder and the infringer

11:16  8    would have agreed to in a hypothetical negotiation

11:16  9    taking place at a time when the infringement first

11:16 10    began.

11:16 11                In considering this hypothetical

11:16 12    negotiation, you should focus on what the expectations

11:16 13    of the patentholder and the infringer would have been

11:16 14    had they entered into an agreement at that time and had

11:16 15    they acted reasonably in their negotiations.

11:16 16                You must also assume that both parties

11:16 17    believed the patent was valid and infringed.  In

11:16 18    addition, you must assume that the patentholder and

11:16 19    infringer were willing to enter into an agreement.  Your

11:16 20    role is to determine what that agreement would have

11:16 21    been.

11:16 22                The measure of damages is what royalty

11:16 23    would have resulted from the hypothetical negotiation

11:17 24    and not simply what royalty either party would have

11:17 25    preferred.  It's negotiation, remember.

11:17  1          In this trial, you have heard evidence of

11:17  2  things that happened after the infringement began.  That

11:17  3  evidence can be considered only to the extent that the

11:17  4  evidence aids you in assessing what royalty would have

11:17  5  resulted from a hypothetical negotiation.

11:17  6          With respect to the license agreement

11:17  7  entered into between Apple and Plaintiffs, you should

11:17  8  keep in mind that when Plaintiffs sued Apple, the law

11:17  9  allowed Plaintiffs to receive damages for at least

11:17 10  Apple's internal use that predated the filing of the

11:17 11  lawsuit by six years in addition to the 1.5 years that

11:17 12  were left on the life of the patents.

11:17 13          If you find any claim of the

11:17 14  patents-in-suit to be infringed and valid, you must

11:18 15  decide the amount of damages in the form of a reasonable

11:18 16  royalty you find Plaintiffs have proven by a

11:18 17  preponderance of the evidence.  You may decide that

11:18 18  Plaintiffs and Defendants would have agreed to a lump

11:18 19  sum, paid-in-full royalty at the -- at the hypothetical

11:18 20  negotiation.  Alternatively, you may decide that they

11:18 21  would have agreed to a running royalty.

11:18 22          To decide an amount based on a running

11:18 23  royalty, you must first decide the approximate (sic)

11:18 24  royalty base.  If you decide to apply a royalty on a per

11:18 25  unit base, the royalty base can be the number of

11:18 1   infringing units distributed.  Where a patent

11:18 2   contributes only part of the value of a larger product,

11:18 3   a patentee's damages are generally limited to the part

11:18 4   of the value created by the patent.

11:18 5          In determining the reasonable royalty, you

11:18 6   should consider all of the facts known and available to

11:18 7   the parties at the time the infringement began.

11:18 8          Some of the factors you may consider in

11:19 9   making your determination are:  The royalties received

11:19 10  by the patentholder for the licensing of the

11:19 11  patents-in-suit tending to prove an established royalty

11:19 12  at the time, the nature and scope of those existing

11:19 13  licenses as exclusive or nonexclusive or as restricted

11:19 14  or nonrestricted in terms of territory if -- or with

11:19 15  respect to whom the manufactured product may be sold;

11:19 16  the effect of selling the patented specialty in

11:19 17  promoting sales of other products of the licensee, the

11:19 18  existing value of the invention to the licensor as a

11:19 19  generator of sales of nonpatented items and the extent

11:19 20  of such derivative or convoyed sales; the duration of

11:19 21  the patent and the term of the license; the nature of

11:19 22  the patented invention and the benefits to those who

11:19 23  would have used the invention; the extent to which the

11:20 24  invention -- the infringer has made use of the invention

11:20 25  and any evidence probative of the value of that use; the

11:20 1 opinion and testimony of qualified experts; or any other

11:20 2 factors which in your mind would have increased or

11:20 3 decreased the royalty the infringer would have been

11:20 4 willing to pay and the patentholder would have been

11:20 5 willing to accept, acting as normally prudent business

11:20 6 people.

11:20 7 All right.  That covers damages.

11:20 8 Now I have a few instructions for how you

11:20 9 reach your verdict.  That concludes the part of my

11:20 10 instructions explaining the rules for considering the

11:20 11 testimony and the evidence.  Now let me tell you how you

11:20 12 conduct your deliberations and your possible verdicts.

11:20 13 Counsel for Plaintiffs and Defendants will

11:20 14 now make their closing statements.  Once they complete

11:20 15 their statements, that's your time to start deliberating

11:21 16 in the jury room.  In fact, it's your duty to talk with

11:21 17 each other about the evidence and make every reasonable

11:21 18 effort you can to reach unanimous agreement.

11:21 19 Each of you must decide the case for

11:21 20 yourself, but do so only after an impartial

11:21 21 consideration of the evidence with your fellow jurors.

11:21 22 Your verdict, after all, however, must be unanimous.

11:21 23 After you are released to the jury room,

11:21 24 you shall select one of your member of the jury as the

11:21 25 foreperson.  The foreperson will preside over the

11:21 1   deliberations and speak for you when you return here to

11:21 2   Court.  After that, you should begin your deliberations.

11:21 3              Once you start deliberating, do not talk

11:21 4   to the jury officer or to me or to anyone except each

11:21 5   other about the case.  If you have any questions or

11:21 6   messages, you must write them down on a piece of paper,

11:22 7   sign them, and give them to the Marshal.

11:22 8              Jan, who will that be?  There will be a

11:22 9   Marshal outside the door.  Knock on the door, he will

11:22 10  answer, you will give him the written question, and he

11:22 11  will give them to me, and I will respond as soon as I

11:22 12  can.  I may want to speak to counsel about what you've

11:22 13  asked, so it may take a little time to get back to you.

11:22 14  You can continue your deliberations while you're

11:22 15  waiting.

11:22 16             Any questions or messages normally should

11:22 17  be sent to me through your foreperson.  Do not ever

11:22 18  write down or tell anyone how you stand on your votes.

11:22 19  For example, do not write down or tell anyone that you

11:22 20  are split 8 to 3 or 6 to 5 or whatever your vote happens

11:22 21  to be.  That should stay secret until you are finished.

11:22 22             A verdict form has been prepared for you.

11:23 23  I told you that.  The verdict form contains all the

11:23 24  questions that we've gone over.  After you've reached

11:23 25  the unanimous agreement on a verdict, your foreperson

11:23  1    will fill in the verdict form, sign it, date it, and

11:23  2    advise the Court you've reached a verdict.

11:23  3              Let me finish by repeating something I

11:23  4    said earlier.  Nothing I've said or done during this

11:23  5    trial was meant to influence your decision in any way.

11:23  6    You must decide this case yourselves based on the

11:23  7    evidence presented.  Once the lawyers have finished

11:23  8    their closing statements, I will release you to the jury

11:23  9    room.

11:23 10              The exhibits are already there for your

11:23 11    consultation.  Before you stop your deliberations this

11:23 12    evening, you should request my permission to leave.  If

11:23 13    you've not reached a verdict this evening, you should be

11:23 14    here tomorrow morning promptly at 9:00 a.m. to begin

11:23 15    your deliberation for a second day, if that is

11:24 16    necessary, and so on until your verdict is reached.

11:24 17              That final sentence just says thank you,

11:24 18    and that's not enough.  You should feel proud of

11:24 19    yourselves.  This is your duty, but you've done it very

11:24 20    well.

11:24 21              Counsel?

11:24 22              MR. REITER:  Your Honor, may I approach?

11:24 23              THE COURT:  Yes, you may.

11:24 24              (Bench conference.)

11:24 25              MR. REITER:  Your Honor, I'm sorry, there

11:24  1  was just one statement, you read, you must first decide

11:24  2  the approximate royalty basis.  It reads appropriate.

11:24  3  Given all the issues --

11:24  4            THE COURT:  I'll reread it.

11:24  5            MR. REITER:  Okay.

11:24  6            THE COURT:  What page?

11:24  7            MR. REITER:  Page 14.  You said,

11:24  8  approximate.  It should be appropriate.

11:24  9            THE COURT:  Okay.

11:25 10            (Bench conference concluded.)

11:25 11            THE COURT:  I need to re-read a sentence

11:25 12  because I made a mistake.

11:25 13            To decide on an amount based on a running

11:25 14  royalty, you must first decide the approximate royalty

11:25 15  base.  I think I said appropriate.

11:25 16            MR. REITER:  No, it's appropriate.

11:25 17            THE COURT:  Oh, excuse me.  Let me say

11:25 18  that again.

11:25 19            To decide on an amount based on a running

11:25 20  royalty, you must first decide the appropriate royalty

11:25 21  base, the appropriate royalty base.

11:25 22            I misread it because -- it was my mistake.

11:25 23  Appropriate is what you're deciding.

11:26 24            MR. GASEY:  Your Honor, one other issue.

11:26 25  May I approach?

11:26  1                    THE COURT:  Yes, you certainly may.

11:26  2                    (Bench conference.)

11:26  3                    MR. GASEY:  This is a matter of mechanics

11:26  4  or fairness.  I just wonder if -- if we're going to all

11:26  5  do our closing before lunch -- before breaking for

11:26  6  lunch, that's fine.  I just don't want to have it where

11:26  7  I'm doing my closing and then they get lunch.

11:26  8                    THE COURT:  No, it's a fair point.  Do

11:26  9  both or let's decide that right now.

11:26 10                    MR. GASEY:  Right.  Right.

11:26 11                    THE COURT:  So let's decide that right

11:26 12  now.  I'd -- I'd propose to just kind of ask the jury

11:26 13  what they want to do.  If they want to go two hours now

11:26 14  or --

11:26 15                    MR. KREVITT:  We -- we should take a

11:26 16  break.

11:26 17                    THE COURT:  Do they want to go two hours

11:26 18  now before lunch?  Let's ask them.

11:26 19                    MR. GASEY:  Sure.

11:26 20                    THE COURT:  Okay.

11:26 21                    (Bench conference concluded.)

11:26 22                    THE COURT:  This is that point where we're

11:26 23  going to make some decisions, and I'm going to do an

11:26 24  unusual thing, and that is, consult my jury.

11:26 25                    Now, you're not allowed to speak in Court,

| | | |
|---|---|---|
| 11:26 | 1 | but you can nod your heads or shake your heads.  And |
| 11:27 | 2 | what I'm inquiring is each Counsel has an hour.  We have |
| 11:27 | 3 | two alternatives.  We can take a break, ten minutes, |
| 11:27 | 4 | return and do two hours of their closing statements, |
| 11:27 | 5 | with a slight break in between each one, and then you |
| 11:27 | 6 | would retire to begin your deliberations and eat lunch. |
| 11:27 | 7 | Or the alternative is we could have lunch |
| 11:27 | 8 | now, return, do our two hours, and then I will release |
| 11:27 | 9 | you to begin your deliberations.  The question is do you |
| 11:27 | 10 | want lunch now or at 1:30, approximately? |
| 11:27 | 11 | How many are -- how many by the nod system |
| 11:27 | 12 | are for eating lunch now?  How many want to eat lunch at |
| 11:28 | 13 | 1:30?  I think I saw a preponderance of nods in favor of |
| 11:28 | 14 | 1:30.  But I promised you a break.  Let's take a break |
| 11:28 | 15 | now, we'll come back, and we'll hear from counsel. |
| 11:29 | 16 | Five, ten minutes. |
| 11:29 | 17 | (Jury out.) |
| 11:29 | 18 | MR. GASEY:  I wasn't sure if Your Honor |
| 11:29 | 19 | wanted to go through the remaining exhibits now. |
| 11:29 | 20 | THE COURT:  Yeah, let's do that.  We might |
| 11:29 | 21 | as well do it now.  We need them on the record. |
| 11:29 | 22 | Mr. Stewart? |
| 11:30 | 23 | All right, Ms. Dickman, you're going to |
| 11:30 | 24 | talk to me. |
| 11:30 | 25 | MS. DICKMAN:  Plaintiffs would like to |

11:30  1   offer the following exhibits to be admitted into

11:30  2   evidence, PX317.

11:30  3               MR. STEWART:  We have an objection.

11:30  4               THE COURT:  317, just a second.  I've got

11:30  5   to write down.  Okay.  Go ahead.

11:30  6               MS. DICKMAN:  PX285, PX278.

11:30  7               MR. STEWART:  I'm sorry.  Was that 278?

11:30  8               MS. DICKMAN:  Yep.  PX279.

11:30  9               MR. STEWART:  We have an objection with

11:30 10   that one.

11:30 11               THE COURT:  Got it.

11:30 12               MS. DICKMAN:  Mr. Vickrey said DX997, but

11:30 13   what was actually put up was DX809.  So we'd like to

11:30 14   offer 809.

11:31 15               THE COURT:  Okay.  809.

11:31 16               MR. STEWART:  Your Honor, if I may real

11:31 17   quick, I didn't have 278 on there, and I believe we

11:31 18   would have an objection with that, as well.

11:31 19               THE COURT:  I'm not clear, Mr. Stewart.

11:31 20   Which one do you have an objection to?

11:31 21               MR. STEWART:  278, 279, and 317 thus far.

11:31 22               THE COURT:  Okay.  Good.  But not 809?

11:31 23               MR. STEWART:  Correct.

11:31 24               THE COURT:  Thank you.

11:31 25               MS. DICKMAN:  One other we'd like to offer

11:31 1   PX316.

11:31 2                       MR. STEWART:  We'll have an objection to

11:31 3   that.

11:31 4                       MS. DICKMAN:  It was already admitted.

11:31 5                       THE COURT:  I need to hear your objections

11:31 6   on 317, 278 and 9.

11:31 7                       MR. REITER:  These are articles that came

11:31 8   up with Mr. Gemini.  We had raised objections already on

11:31 9   hearsay grounds.  You sustained the objections.  I think

11:31 10  they just came up again with Dr. Putnam.

11:31 11                      THE COURT:  They were used for

11:31 12  impeachment, and they were appropriate in that context.

11:31 13                      MR. REITER:  I don't know if it was

11:31 14  impeachment, but just to talk about -- like a Ubuntu

11:31 15  article, that kind of thing.

11:31 16                      THE COURT:  I think I had earlier --

11:32 17                      MR. REITER:  Sustained.

11:32 18                      THE COURT:  -- not admitted those.  Which

11:32 19  ones were those?

11:32 20                      MR. STEWART:  279 -- 278, 279 and 317.

11:32 21                      THE COURT :  Okay.  Good.  Then those are

11:32 22  not admitted.

11:32 23                      Mr. Stewart, do you have something for me?

11:32 24                      MR. STEWART:  Yes.  The Defendants would

11:32 25  like to offer DX739, DX740, DX770, DX773, DX904, and

```
11:32  1   DX936.
11:32  2                 MS. DICKMAN:  We object to DX936.
11:32  3                 THE COURT:  936.  Mr. Gibbons, is that
11:32  4   you?
11:32  5                 MR. GIBBONS:  Dr. Putnam's report.
11:32  6                 THE COURT:  That's what?
11:32  7                 MR. GIBBONS:  That's Dr. Putnam's report.
11:32  8                 MR. REITER:  That's the whole report?
11:32  9                 MS. DICKMAN:  Yeah.
11:32 10                 MR. REITER:  Okay.  We're not going to
11:32 11   offer it.
11:32 12                 THE COURT:  Okay.  Then 936 is not
11:32 13   permitted.
11:32 14                 MS. DICKMAN:  Thank you, Your Honor.
11:32 15                 THE COURT:  And we now have a complete
11:32 16   record, right?
11:32 17                 MS. DICKMAN:  Yes, Your Honor.
11:32 18                 THE COURT:  And Ms. Dickman and Mr.
11:33 19   Stewart will go into the hall, extract from the boxes
11:33 20   everything which has not been admitted, they'll check
11:33 21   each other, and then the boxes will be in the jury room
11:33 22   when they go back in.
11:33 23                 COURT ROOM DEPUTY:  Will I get a complete
11:33 24   list of the exhibits?
11:33 25                 MS. DICKMAN:  As they're being admitted?
```

11:33  1                    COURT ROOM DEPUTY:  Yes.  I need --

11:33  2                    MS. DICKMAN:  I think ours is complete

11:33  3    already because the things that were not permitted were

11:33  4    not on our list, and the things that were permitted were

11:33  5    already admitted for us.

11:33  6                    COURT ROOM DEPUTY:  So everything from

11:33  7    yesterday is correct that I have.

11:33  8                    MS. DICKMAN:  Yes.  Yes, ma'am.

11:33  9                    MR. STEWART:  I'll have to check on it.

11:33 10                    MR. GIBBONS:  Your Honor, should we start

11:33 11    pulling these boxes out of the courtroom right now?

11:33 12                    THE COURT:  Yes, please do.

11:33 13                    MS. DICKMAN:  Would you like us to leave

11:33 14    the exhibits that are going back there in the boxes,

11:33 15    because I think the larger --

11:33 16                    THE COURT:  Yes.

11:33 17                    MS. DICKMAN:  -- volume is what's not

11:33 18    going back --

11:33 19                    MR. REITER:  It's not going to be much.

11:33 20                    MS. DICKMAN:  Yeah.

11:33 21                    MR. REITER:  How many exhibits do we have

11:33 22    total?

11:33 23                    MS. DICKMAN:  I think you guys have maybe

11:33 24    30, and we have maybe 70.

11:33 25                    THE COURT:  I'll trust -- I'll trust your

| | | |
|---|---|---|
| 11:33 | 1 | judgment, Mr. Stewart and Ms. Dickman about -- maybe you |
| 11:34 | 2 | can put them all in a box or two and send them back. |
| 11:34 | 3 | MR. GIBBONS:  You know, once -- once the |
| 11:34 | 4 | jury is dismissed to begin deliberation, we can pull the |
| 11:34 | 5 | boxes in here and then bring them in -- |
| 11:34 | 6 | THE COURT:  It would be nice if they were |
| 11:34 | 7 | in there already. |
| 11:34 | 8 | MR. GIBBONS:  We can do that, too. |
| 11:34 | 9 | THE COURT:  Yeah, do that.  Just have them |
| 11:34 | 10 | in there. |
| 11:34 | 11 | MR. GIBBONS:  Fair enough. |
| 11:34 | 12 | THE COURT:  And -- |
| 11:34 | 13 | MR. GASEY:  One exception, Your Honor, |
| 11:34 | 14 | because I'd like to reference them in the close, would |
| 11:34 | 15 | be the original diskettes. |
| 11:34 | 16 | THE COURT:  Oh, yeah, yeah, anything |
| 11:34 | 17 | that's going to be used, absolutely. |
| 11:34 | 18 | MR. GASEY:  Thank you. |
| 11:34 | 19 | THE COURT:  By either one.  Okay.  Give me |
| 11:34 | 20 | a minute and then we'll start. |
| 11:34 | 21 | (Recess.) |
| 11:34 | 22 | (Jury in.) |
| | 23 | THE COURT:  Please be seated. |
| 11:42 | 24 | Mr. Gasey? |
| 11:42 | 25 | MR. GASEY:  Yes, Your Honor.  I'm going to |

11:42  1    do the closing.  I promise I'll take less than 40

11:42  2    minutes.  I promise.  I promise.  And then my co-counsel

11:42  3    will go ahead and do the rebuttal with the remainder of

11:42  4    the time.

11:42  5              THE COURT:  That will be fine.

11:42  6              MR. GASEY:  Thank you, Your Honor.

11:43  7              Good morning again.  This is a case about

11:43  8    the fundamental clash between the Defendants, leaders of

11:43  9    the open-source community, and my clients, the patent

11:43 10    owners.  This clash, of course, is over whether they

11:43 11    have the right to use and distribute --

11:43 12              THE COURT:  Excuse me, Mr. Gasey.  Just a

11:43 13    matter of record, you can stand wherever you want, but

11:43 14    could I put a mic in your hand?

11:43 15              MR. GASEY:  Too soft?

11:43 16              THE COURT:  Well, no, you sound just

11:43 17    great, but we record everything, and believe it or not,

11:43 18    what you say is important.

11:43 19              MR. GASEY:  Can I have Your Honor talk to

11:43 20    my wife?

11:43 21              THE COURT:  I'm not going that far.

11:43 22              MR. GASEY:  This clash -- this case is

11:43 23    over whether or not the Defendants have the right to use

11:43 24    and distribute what is provided for, what is protected

11:43 25    in other people's patents, my clients' property, without

11:44  1    paying for it.

11:44  2                    Now, this is the part of the case where

11:44  3    you're going to have to decide a lot of different

11:44  4    questions.  The Judge has pointed out that there's 23

11:44  5    different questions that you're going have to answer.

11:44  6                    Now, there's going to be four basic

11:44  7    issues -- Ms. Harper, go ahead and put up Slide 2?

11:44  8                    Four basic issues that you're going to

11:44  9    have to decide, the first of which is infringement; the

11:44 10    second of which deals with validity, and part of that is

11:44 11    the issue of Inventorship; and then finally is the issue

11:44 12    of damages.

11:44 13                    Now, I'm going to go ahead and try and

11:44 14    walk through the actual verdict form that you're going

11:44 15    to be sent back to go ahead and deliberate with.  And

11:44 16    part of the -- part of the purpose of this is to go

11:44 17    ahead and organize my thoughts in summary that I'd like

11:44 18    you to keep in mind as you're going through deciding the

11:45 19    questions that it is your duty to figure out.  You are

11:45 20    the judges of those issues.

11:45 21                    Now, the first issue that you're going to

11:45 22    be deciding on your verdict form is the issue of

11:45 23    damages -- excuse me -- the issues of infringement.  I'm

11:45 24    sorry.

11:45 25                    As the Judge mentioned, there is going to

11:45 1    be a series of a total of 16 questions.  The first eight

11:45 2    questions are broken down on a claim-by-claim basis, one

11:45 3    claim for each Defendant.  So Claim 1 for the '412

11:45 4    patent, the question is whether or not it's infringed by

11:45 5    the Plaintiffs -- excuse me -- by Novell, whether or not

11:45 6    it's infringed by Red Hat.

11:45 7              And then it goes through Claim 21 for the

11:46 8    same question.  Then it goes through Claim 8 of the '521

11:46 9    patent, and finally it goes through Claim 1 of the '183

11:46 10   patent.  All the same question, whether or not by a

11:46 11   preponderance of the evidence, 50/50 plus one tiny bit

11:46 12   favors my clients.

11:46 13             If that's the case, if that burden is met,

11:46 14   then there's infringement.  And the reason why there are

11:46 15   separate questions is because each claim, remember, is

11:46 16   its own separate piece of property.  It's got its own

11:46 17   separate boundaries, its own separate rights.

11:46 18             You can find infringement of some claims

11:46 19   or not others, and the same holds true for validity as

11:46 20   well.  There's a different scope, a different fence

11:46 21   around the yard.

11:46 22             Now, direct infringement can be shown a

11:46 23   number of different ways.  The evidence that we have

11:46 24   presented and that shows direct infringement by the

11:47 25   Defendants is use of the software in an infringing

11:47 1   method or in an infringing system.

11:47 2                   What does that mean?

11:47 3                   What that means is, the Novell and Red Hat

11:47 4   software has been used by the Defendants in such a

11:47 5   matter to go ahead and infringe each of the different

11:47 6   claims.  They've been used in computers with displays

11:47 7   and with keyboards and have been used in the switching

11:47 8   feature that goes ahead and reads on the asserted

11:47 9   claims.

11:47 10                  And there's going to be several different

11:47 11  types of evidence on this, and obviously because I

11:47 12  really do want to try and move along, there's only going

11:47 13  to be a few different points I'm going to show.  But the

11:47 14  jury instructions that the Judge showed you and read to

11:47 15  you indicated that there's two different types of

11:47 16  evidence.

11:47 17                  And there's direct evidence, such as shown

11:47 18  by testimony of an eyewitness, and the other type of

11:48 19  evidence is what's called circumstantial evidence, the

11:48 20  proof of circumstances that tend to prove or disprove

11:48 21  the existence or non-existence of certain other facts.

11:48 22                  I think an easy way to go ahead and give

11:48 23  an example of what that sort of circumstantial evidence

11:48 24  means is an example of, if you were to go to some kind

11:48 25  of tropical island, you felt you discovered it first,

11:48  1   and you wanted to see if there had been any humans there

11:48  2   before.  Now, you might see a human; you might see a

11:48  3   person walking around on the beach, and you would know

11:48  4   that's direct evidence.  You are the eyewitness to that

11:48  5   fact.

11:48  6           But there's also a possibility that you

11:48  7   might not see anybody.  There might not be any direct

11:48  8   evidence, but you might see a footprint in the sand.

11:48  9   And using your common sense, you're going to realize

11:48 10   that there's a person that's there or at least that has

11:48 11   been there.  That's that kind of circumstantial

11:48 12   evidence.

11:48 13           The direct evidence and the circumstantial

11:48 14   evidence supports the infringement of the claims

11:49 15   asserted in this case.

11:49 16           Now, first the direct evidence.  On

11:49 17   Tuesday afternoon, I think it was, my co-counsel,

11:49 18   Mr. Gibbons, went ahead and read in some deposition

11:49 19   testimony.  We tried to be brief, and I know that it has

11:49 20   a different effect versus seeing somebody live, but it

11:49 21   is direct evidence.  It is direct commentary by the

11:49 22   Defendants' witnesses.

11:49 23           Now, one of the witnesses you heard

11:49 24   from -- I'll put it up on the ELMO.

11:49 25           Now, one of the witnesses that you heard

11:49  1  from was a gentleman by the name of Markus Rex.  Mr. Rex

11:50  2  testified in his deposition as follows -- well, there's

11:50  3  testimony from Mr. Rex where he testified he used -- do

11:50  4  you remember the spinning cube examples that were shown?

11:50  5          He testified that he used the spinning

11:50  6  cube.  If you recall from notes that you took during his

11:50  7  deposition that was read in on Tuesday, he testified

11:50  8  that he used the spinning cube, and he used a keyboard

11:51  9  to go ahead and switch from face to face.

11:51  10          In other words, he directly infringed --

11:51  11  here we go, Slide 20.  Thank you.

11:51  12          Mr. Rex testified:  When I've used the

11:51  13  cube as an individual user, I switched one of two ways.

11:51  14  Control alt -- and that's a keyboard command -- right

11:51  15  arrow, slash, left arrow.  In other words, he went ahead

11:51  16  and clicked on the cube itself on the screen.  So in

11:51  17  other words, he used it on a system that had a screen,

11:51  18  that had a keyboard, an input means, and he went ahead

11:51  19  and used it in an infringing manner, switching from one

11:51  20  workspace to another.

11:51  21          He's not the only person, though.  We have

11:51  22  testimony from Matthias Clasen.  Now he is a senior

11:51  23  engineering representative of Defendant Red Hat, but Red

11:51  24  Hat, for whatever reason, decided to call him here

11:51  25  today.  So we went ahead and read his testimony in as

11:51 1   well on Tuesday afternoon.

11:52 2                   What he testified to, you may recall, is

11:52 3   testing that he performed as work on behalf of Red Hat.

11:52 4   And he tested the graphical user interface, the GUI, to

11:52 5   start the computer and check that the graphical user

11:52 6   interface is in front of him.

11:52 7                   What he further testified to is that he

11:52 8   tested each and every user function on the screen.  That

11:52 9   includes the switching function.  He is another example

11:52 10  of direct infringement by the Defendants.

11:52 11                  There's a third example of infringement

11:52 12  that was read in in that testimony by a marketing

11:52 13  representative, a gentleman by the name of Mr. Justin

11:52 14  Steinman.  You heard him live on Thursday, but you also

11:52 15  heard his deposition testimony on Tuesday afternoon.

11:52 16                  And he testified as follows:  When you use

11:52 17  the Novell product and you're clicking from desktop to

11:52 18  desktop with your mouse, do you click on the icons?

11:53 19                  Answer:  I actually use the keyboard

11:53 20  personally.

11:53 21                  You're clicking on the icons, right?

11:53 22                  Yes.  Sometimes I click on the icons, yes.

11:53 23                  He's another user.  We have evidence from

11:53 24  the users themselves, from the Defendants themselves an

11:53 25  admission that they go ahead and use the product in the

11:53  1   infringing manner.

11:53  2              We also have circumstantial evidence

11:53  3   showing the use of the product by the Defendants, and

11:53  4   we'll get into that in a little bit, because that also

11:53  5   applies to the other legal standard for infringement,

11:53  6   inducement of infringement.

11:53  7              What does that evidence include?

11:53  8              It includes things like product

11:53  9   literature, training materials, instructions.  And

11:53 10   you'll see from the actual instruction manuals, the user

11:53 11   guides and other materials that you'll be able to take

11:53 12   back with you to the jury room, they show things like

11:53 13   screen shots showing the actual product in use.

11:53 14              The only way that they created those kinds

11:54 15   of screen shots, those kinds of things with a switching

11:54 16   windows, was for somebody to go ahead and use the

11:54 17   product in an infringing manner.  It's circumstantial

11:54 18   evidence showing that somebody at Novell, somebody at

11:54 19   Red Hat went ahead and used the product in an infringing

11:54 20   manner to help create the product literature that

11:54 21   encourages their customers to go ahead and infringe.

11:54 22              Here's an example.  You've got

11:54 23   descriptions of the Novell rotating cube.  It talks

11:54 24   about the ability and walking through the steps of how

11:54 25   to go ahead and move around the cube and go switch from

11:54 1  desktop to desktop, to switch from workspace to

11:54 2  workspace.

11:54 3          Now, we also have the issue of inducement.

11:54 4  Inducement, as the Court pointed out to you, involves a

11:54 5  series of steps.  I'll read them from the Judge's jury

11:55 6  instructions.  Inducement involves five different

11:55 7  points.  That the Defendants took action during the time

11:55 8  period when the patent was in force that encouraged acts

11:55 9  by somebody else;

11:55 10         Second, that they encouraged acts that

11:55 11 constituted direct infringement.  In other words, they

11:55 12 encouraged people to go ahead and use their products in

11:55 13 an infringing manner;

11:55 14         That -- third, that the Defendants knew or

11:55 15 were aware of the patent and knew or should have known

11:55 16 that what they encouraged their customers -- what they

11:55 17 encouraged the people that received their software to

11:55 18 do, that those acts would constitute infringement.

11:55 19         And that the Defendants had an intent to

11:55 20 cause the encouraged acts.  In other words, they wanted

11:55 21 to cause their customers, the people that received their

11:55 22 software to use that software in that way.

11:56 23         And that finally that their encouraged

11:56 24 acts were actually carried out by somebody else.

11:56 25         Now, some of the evidence you need to keep

11:56  1    in mind as we go through these points.  These -- by the

11:56  2    way, these questions are Questions 9 through 16 on your

11:56  3    verdict form.  They deal with inducement as opposed to

11:56  4    direct infringement, but otherwise they track the same

11:56  5    claims that are found on Questions 1 through 8 of your

11:56  6    verdict form.

11:56  7            Some of the evidence that you need to

11:56  8    consider when you're looking at what constitutes

11:56  9    inducement, I think, frankly, a good example, a very

11:56 10    good example of that is you remember when we heard

11:56 11    evidence about Novell and their efforts.  They spent

11:56 12    1500 hours of video time studying and looking at and

11:57 13    encouraging their users to figure out ways for their

11:57 14    users to better use their products, to take the features

11:57 15    that they wanted to work well and incorporate them into

11:57 16    their products and fix what didn't work as well.

11:57 17            One of the things that they went ahead and

11:57 18    would promote that encouragement through was through

11:57 19    videotaping users, monitoring their use, creating tests

11:57 20    analyzing their use, and posting the results so people

11:57 21    could go ahead and see the dozens of different features

11:57 22    in their accused products and their accused software and

11:57 23    see how people would use it, see how people could figure

11:57 24    out how to better take advantage of each of those

11:57 25    features.  And one of those features was the ability to

11:57  1 | go ahead and switch desktops.

11:57  2 |                  Would you go ahead and play that video?

11:57  3 |                  (Video played.)

09:11  4 |                  QUESTION:  Can you move this picture to

09:11  5 | the part of the cube that has the other insets.

09:11  6 |                  ANSWER:  Let's first see where it is.

09:11  7 | Control alt.

09:11  8 |                  Uh-huh, there maybe it's this.  I wonder

09:11  9 | what would happen if I just kind of drag this window to

09:11 10 | the right.

09:11 11 |                  Aha.  There we go.  Wow.

11:58 12 |                  (End of video clip.)

11:58 13 |                  MR. GASEY:  There's an example.  There's a

11:58 14 | website, videotape on that website, reports about that

11:58 15 | videotape on that website, all sponsored by Novell to go

11:58 16 | ahead and physically have somebody sitting there and

11:58 17 | instructing somebody how to use the accused device, how

11:58 18 | to go ahead and take advantage of the switching feature.

11:58 19 |                  That is the kind of evidence that supports

11:58 20 | inducement of infringement of these claims.

11:59 21 |                  Now, it's not just looking at pictures.

11:59 22 | The words of the claims matter.

11:59 23 |                  If you could go ahead and go to Slide 15.

11:59 24 |                  We won't go through the element-by-element

11:59 25 | process, because we want to make good use of time.

11:59  1           But you'll recall when Dr. Zimmerman was

11:59  2  up on the stand and went through the claims in an

11:59  3  element-by-element analysis.  And that's going to be

11:59  4  part of your duty.  Part of your job today is to go

11:59  5  ahead and look at each element of each asserted claim

11:59  6  and compare that with what is in Red Hat's and Novell's

11:59  7  systems.

11:59  8           And for those claim elements for which

11:59  9  Novell and Red Hat do not distribute themselves, you

11:59 10  need to consider two questions.

11:59 11           For direct infringement, do they use their

11:59 12  software and systems that include displays, systems that

11:59 13  include user input devices, things like mouses and

12:00 14  keyboards, or do they go ahead and encourage their

12:00 15  customers to go ahead and use their software in such

12:00 16  systems?

12:00 17           Now, the Defendants are going to point out

12:00 18  a bunch of defenses.  I think they boil down to about

12:00 19  three big issues.  The first one -- go to Slide 39 -- is

12:00 20  they say, you know what, we don't use any displays.  We

12:00 21  have all sorts of servers, and those servers are just

12:00 22  big boxes, and nobody can go ahead and see an image on

12:00 23  those big boxes.  You've got big corporate data centers.

12:00 24           You heard evidence from one of the

12:00 25  witnesses, testimony from them that there was a server

12:00 1   center that was as big as Texas Stadium.

12:00 2               The question you need to ask yourself is,

12:00 3   who do you think puts that material on their servers?

12:00 4               The people that put that kind of material

12:01 5   on their servers are folks that are known generally as

12:01 6   system administrators.  And what they need to do in

12:01 7   order to put that material on -- go to Slide 41 -- is

12:01 8   they need to have a computer interface.

12:01 9               Now, sometimes it may be remote; sometimes

12:01 10  it may be local, but the point is, the thing that's

12:01 11  relevant is they need to have a display to go ahead and

12:01 12  see how things are getting installed.

12:01 13              And that display, when it's provided using

12:01 14  the Defendants' software, includes a switching feature

12:01 15  such as what infringes the claims of these

12:01 16  patents-in-suit.

12:01 17              Now, you remember also hearing a lot of

12:01 18  testimony about the fact that Fedora and openSUSE are

12:01 19  training grounds.  I think they're even referred to by

12:01 20  the Defendants or their lawyers as a training camp to go

12:01 21  ahead and see who makes the cut.

12:01 22              The question you need to ask is, if this

12:01 23  is a feature that made the cut -- remember, there are

12:01 24  separate products for the desktop software and the

12:02 25  server software.  It was a feature that they didn't

12:02  1    really need.  In other words, if the GNOME, the

12:02  2    graphical user interface that provides the windows

12:02  3    environment for operating in this fashion wasn't

12:02  4    necessary, why would they offer it in a server software

12:02  5    package?

12:02  6              Second defense the Defendants have --

12:02  7    really, they're related defenses.  You heard a lot of

12:02  8    talk about flexibility and continuity.  They had a

12:02  9    series of demonstrations and PowerPoints going ahead and

12:02 10    showing how there was no continuity between different

12:02 11    workspaces, that things weren't perceptible as the same

12:02 12    tool.

12:02 13              And the thing you need to keep in mind,

12:02 14    the thing that's contained within your jury instructions

12:02 15    is words.  In patent law and patent claims words count.

12:02 16    There's two sources of words you need to consider in

12:02 17    this case.

12:02 18              One is the patent claim language itself.

12:03 19              If we could go to -- let's go back to the

12:03 20    Slide 15.

12:03 21              You've got claim language that's unique to

12:03 22    each of the claims.  There's some overlapping terms, but

12:03 23    each of them are unique on their own.  And you heard

12:03 24    testimony from Dr. Gray during his -- I think it's

12:03 25    Mr. Gray actually -- during his cross-examination where

12:03   1   he admitted that when you look at all the claims

12:03   2   asserted in all the patents, there isn't one of them

12:03   3   that uses the word flexibility or the word continuous --

12:03   4   or continuity.

12:03   5           It's something that is outside the

12:03   6   boundaries of the claims.  Again, if you think about

12:03   7   each claim as a fence defining a piece of property,

12:03   8   they're going ahead and trying to take something that's

12:03   9   outside the fence and put it in to differentiate what

12:03  10   the claims call for, what the scope of the property is.

12:03  11           A second source of evidence that -- or a

12:04  12   second source that you need to consider when you're

12:04  13   looking at this language to consider what words matter,

12:04  14   and that's the Court's claim construction.  You're going

12:04  15   to get a schedule along with your jury instructions that

12:04  16   lay out the interpretations of the terms.

12:04  17           And nowhere in those interpretations are

12:04  18   you going to find any reference to flexibility and

12:04  19   continuity.  You need to use the language of the claims,

12:04  20   and you need to use the Court's instruction, the Court's

12:04  21   interpretation of those claims that's been given to you.

12:04  22           And none of that matters at all with

12:04  23   respect to flexibility and continuity.

12:04  24           Now, when it comes to the issue of

12:04  25   infringement and comparing on an element-by-element

12:04 1    basis, you also need to consider some of the evidence

12:04 2    that was presented by Dr. Zimmerman.

12:04 3             For instance, things like the -- remember

12:04 4    the calendar example that Dr. Zimmerman talked about?

12:05 5    Dr. Zimmerman went ahead and showed an example like

12:05 6    what's up on the screen there that showed two different

12:05 7    workspaces, two different desktops.

12:05 8             Now, the Defendants' technical expert made

12:05 9    a big deal to say, look, it's really just one object;

12:05 10   there's just a series of switches that things turn on

12:05 11   and off; things don't really change.

12:05 12            If they don't really change, how is it

12:05 13   that you can go ahead and have one item, one window, one

12:05 14   calendar tool like this in two different workspaces and

12:05 15   change the location of the workspace and have it go

12:05 16   ahead and record the same data; for instance, that

12:05 17   you're taking your son from school or to practice.

12:05 18            Go ahead and compare that.  Compare that

12:05 19   versus what's shown in the patent.  And you'll see

12:05 20   there's a one-to-one correlation with what Dr. Henderson

12:05 21   invented and what's called for in the claims of the

12:05 22   patent.

12:06 23            At the end, when you go ahead and look at

12:06 24   all the evidence, all the notes -- because I've seen you

12:06 25   taking a lot of notes -- there's that balancing process.

12:06   1                    Slide 51.

12:06   2                    Consider their arguments, consider their

12:06   3   evidence.  I'm not saying don't do it.  What does it

12:06   4   boil down to?

12:06   5                    They say no displays.  They say no

12:06   6   flexibility.  They say no continuity.

12:06   7                    What's the evidence that goes ahead and

12:06   8   supports that there is infringement?

12:06   9                    We know that openSUSE and Fedora is used

12:06  10   on desktops.  You heard testimony from Mr. Gray that the

12:06  11   only example he could ever name where something was --

12:06  12   where something in Fedora was used on a server -- in

12:06  13   other words, something related to their no display

12:06  14   argument -- that that was an experiment that he

12:06  15   conducted at home.

12:06  16                    Those are not products which are used with

12:06  17   servers.  They're used with desktops.

12:07  18                    You've seen the examples of customer use.

12:07  19   You've seen direct testimony from both Defendants.  And

12:07  20   most important of all, you've seen the claim language,

12:07  21   and you've seen the Court's claim construction.  You're

12:07  22   going to get to study it in more detail.  And you see

12:07  23   how there is a disconnect, a fundamental difference

12:07  24   between the terms that they're relying upon to show that

12:07  25   they don't infringe versus what the actual boundaries of

12:07  1    what the property is.

12:07  2                    As a result, you're going to see, at least

12:07  3    under the preponderance of the evidence standard, at

12:07  4    least under that 50-yard line plus just a touch, that

12:07  5    that evidentiary standard has been met by the

12:07  6    Plaintiffs, that there's infringement.

12:07  7                    Now, that brings us to our second issue.

12:07  8                    If you'd go to Slide 52, Inventorship.

12:07  9                    Inventorship comes up just once, one

12:07 10    question.  That's Question 17 on your verdict form.  And

12:08 11    the issue in this case is one for which the Defendants

12:08 12    bear the burden of proof.  They bear the burden of proof

12:08 13    by clear and convincing evidence, because it's presumed

12:08 14    that Xerox named the correct inventors when they filed

12:08 15    for their patent application.

12:08 16                    Think about this for a second.  If we had

12:08 17    gone ahead -- let's imagine some alternative universe

12:08 18    where you had filed the same invention with just one

12:08 19    inventor or just two inventors, all of them from the

12:08 20    same company; it's all Xerox PARC's property.

12:08 21                    What do you think the Defendants would be

12:08 22    saying?

12:08 23                    They'd saying you left an inventor out;

12:08 24    you screwed up.

12:08 25                    The evidence is that all three of the

12:08   1    inventors came up with this invention.  The evidence is

12:08   2    all three of the inventors talked to one another.  And

12:08   3    the evidence is that they worked together.

12:08   4              You saw Mr. Maxwell talking about the

12:08   5    merging of the process, and you heard live from

12:09   6    Dr. Henderson -- by the way, nobody forced him to stay

12:09   7    down here the whole trial.  He's still out there in the

12:09   8    gallery as a matter of fact, because it's his invention;

12:09   9    it's his baby.  And he worked with the co-inventors.

12:09  10              There was a period of time of three months

12:09  11    where they talked to each other in the summer of '86;

12:09  12    then Dr. Henderson and Dr. Card further went ahead and

12:09  13    came up with additional features.

12:09  14              You remember the catalogue feature that

12:09  15    Dr. Henderson talked about, that was part of their Rooms

12:09  16    Project that they came up with in the fall of '86.  They

12:09  17    added to that feature, after they had the benefit of

12:09  18    talking to Mr. Maxwell.

12:09  19              And then in the beginning of 1987, they

12:09  20    all worked together further adding features that were

12:09  21    beyond Rooms and Desk Tops, because remember these

12:09  22    patents are not limited just to Rooms and Desk Tops.

12:09  23    They're limited only by what's in the scope of the

12:09  24    claims.

12:09  25              The examples that are included in there

12:09  1    include Desk Tops and Rooms.  But it's not just

12:09  2    something that's in one commercial product or another.

12:10  3    There's a lot more to it than what's set forth the

12:10  4    claims.

12:10  5              And as a result of a three-month period of

12:10  6    collaboration, they file the patent application that

12:10  7    resulted in three different patents:  The '412 patent,

12:10  8    which was issued in 1991; the '521 patent, which issued

12:10  9    in 1995; and the '183 patent, which was issued in 1996.

12:10 10              You don't have to rely just on live

12:10 11    testimony either to support this Inventorship.  Remember

12:10 12    the articles that Dr. Henderson talked about?  July of

12:10 13    1986, we know that the inventive process had started

12:10 14    because Dr. Henderson and Dr. Card had created a paper

12:11 15    to go ahead and describe some of their ongoing work with

12:11 16    Rooms.

12:11 17              And in that paper, we know that they were

12:11 18    aware of Mr. Maxwell's work.  They commented upon it.

12:11 19    They were continuing their work and commenting upon the

12:11 20    work of their co-inventor, Mr. Maxwell.  They talked

12:11 21    about their discussions with Mr. Maxwell.  They

12:11 22    acknowledged that they had talked with him in

12:11 23    discussions with the Cedar Windows Project.

12:11 24              Now, let's compare that with the jury

12:11 25    instructions.  In the jury instructions, the Judge went

12:11 1    ahead and provided an example of what it means to be

12:11 2    joint inventors.

12:11 3              Can we you switch over to that briefly?

12:11 4              An example of that kind of effort is

12:12 5    collaboration or working under common direction, one

12:12 6    inventor seeing a relevant report and building upon it

12:12 7    or hearing another's suggestions at a meeting.

12:12 8              And that's exactly what happened back in

12:12 9    1986.

12:12 10             The third issue that you're going to have

12:12 11   to decide is the issue of validity.  Anticipation.  In

12:12 12   other words, is there one system that discloses each and

12:12 13   every element of a given claim.

12:12 14             And, again, remember this is something

12:12 15   that the Defendants bear the burden of proving.  They

12:12 16   bear the burden of proving by a lot more than just this

12:12 17   51-percent standard that we have.  They have to go ahead

12:12 18   and show clear and convincing evidence.

12:12 19             And the three references that they're

12:12 20   relying upon are the Amiga system, the Chan system or

12:12 21   the Chan rooms model, and the Apple Switcher.  You've

12:13 22   heard testimony from their expert, Dr. Wilson, and

12:13 23   you've heard also testimony from Dr. Zimmerman

12:13 24   contradicting his conclusions.

12:13 25             You also need to consider, though, a

12:13  1    couple other sources.  One person you didn't get to hear

12:13  2    from today about the relationship between things like

12:13  3    the Apple Switcher or the Chan rooms model is the Patent

12:13  4    Examiner.

12:13  5           We know that the Patent Examiner had the

12:13  6    Switcher in front of them.  We know that the Patent

12:13  7    Office had the Chan rooms model in front of them.  More

12:13  8    importantly, we know that there wasn't any issue about

12:13  9    confusion, because the inventors had gone ahead and

12:13 10    sifted through and explained each of those references to

12:13 11    the Patent Office.

12:13 12           For instance -- switch to Slide 74,

12:13 13    please.

12:13 14           You saw evidence earlier that there was

12:14 15    what's called an information disclosure statement.

12:14 16    There was a need for the inventors and for their

12:14 17    attorneys to be forthright, to go ahead and disclose

12:14 18    everything they know to the Patent Office.

12:14 19           They talked about the Macintosh Switcher.

12:14 20    The Macintosh Switcher was considered and became part of

12:14 21    the official record of the patent.  The same thing with

12:14 22    respect to the Chan room model.

12:14 23           Now, there's a question at one point in

12:14 24    terms of distinctions between a workspace and an

12:14 25    application.  And -- which the Court is going to provide

12:14  1    instructions on terms that were construed, but you'll

12:14  2    read from your instructions that where there's a lack of

12:14  3    a specific instruction from the Court, you're going to

12:14  4    go ahead and draw on your experiences.

12:14  5            I think the specific language is:  For any

12:14  6    words in the claim for which I have not provided you

12:15  7    with a definition, you should apply the plain English

12:15  8    meaning.

12:15  9            Take a look at what's in these patents.

12:15 10    Look, for instance, at Figure 1.

12:15 11            Go to Slide 79, please.

12:15 12            There's a perfect example in there.

12:15 13    Workspaces and applications.  A workspace is the whole

12:15 14    screen.  The application is something that's as simple

12:15 15    as those boxes.  And what did the patent call those

12:15 16    boxes?

12:15 17            If you go to the specification, you're

12:15 18    going to see they talk about them as display objects --

12:15 19    in this instance, they're called windows -- are provided

12:15 20    by the same display system object, which calls it a text

12:15 21    editing application.  That's an application.

12:15 22            Now, you go ahead and compare that to the

12:15 23    Macintosh Switcher.  What do they call that?  They call

12:15 24    that --

12:15 25            Switch to 577, please.  If you could focus

12:16 1   in on the text.

12:16 2            Remember looking at that in the

12:16 3   cross-examination of Dr. Wilson?  They called that an

12:16 4   application switcher.  It's not a workspace switcher;

12:16 5   it's an application switcher.

12:16 6            Let's talk about the Amiga reference.  The

12:16 7   Amiga reference --

12:16 8            If you switch to Slide 81, please.

12:16 9            The Amiga reference, this is quoting from

12:16 10  the exhibit they're relying upon.  It's a tool.  Again,

12:16 11  a tool is like an application.  It's not a workspace.

12:16 12  The words that were added by Dr. Wilson to try and show

12:16 13  that it was a workspace, that was added in.  That was

12:16 14  his characterization, not what the evidence actually

12:17 15  showed, not what the prior art actually includes.

12:17 16           They haven't met their burden of proof.

12:17 17  They haven't shown a firm conviction that each and every

12:17 18  element of these claims is met.

12:17 19           Finally, let's go to the issue of damages.

12:17 20  The Defendants, I suspect, will spend a lot of time -- a

12:17 21  lot of your time over the hour-plus focusing on

12:17 22  something that is frankly not an issue.  They're going

12:17 23  to go ahead and focus as part of the apparent merits of

12:17 24  the case about how Mr. Cooper, Technology Licensing

12:17 25  Corporation's representative, is a bad guy.

12:17 1                    They lied; that the Judge called them on

12:17 2    that lie; and that as a result, some of his patents were

12:17 3    taken away.  Again, when you start hearing comments like

12:17 4    this, you've got to ask yourself, what does this have to

12:18 5    do with infringement?

12:18 6                    What does this have to do with

12:18 7    Inventorship?

12:18 8                    What does this have to do with validity?

12:18 9                    Did Mr. Cooper testify about any of these

12:18 10   things?

12:18 11                   No, no, no.

12:18 12                   The one issue that Mr. Cooper testified

12:18 13   about, besides the ownership of the patents, which is

12:18 14   not something that we're discussing here today -- it's

12:18 15   not an issue that you have to decide who owns the

12:18 16   patents -- is the negotiations that he conducted with

12:18 17   Apple.

12:18 18                   Remember, the one license that TLC and IP

12:18 19   Innovation got in 2007 was with Apple.  In June of 2007,

12:18 20   they settled an ongoing lawsuit, very shortly after the

12:18 21   lawsuit was file.  They settled it for $1.25 million.

12:18 22                   Mr. Cooper's testimony was that they were

12:18 23   sued on Tiger software, which we know is true, because

12:18 24   that's what's in the complaint.  And that one of the

12:18 25   things that influenced why IP Innovation and TLC took a

12:18   1   license for as low a figure as they did was because of

12:19   2   the delay with the Leopard software, the upcoming

12:19   3   Leopard software product.

12:19   4              You know what, whether Mr. Cooper -- even

12:19   5   if he hadn't told the truth on that, even if you didn't

12:19   6   believe him, the evidence shows that Apple did come out

12:19   7   with the Leopard product four months after this feature.

12:19   8   In other words, that Apple added the concept of virtual

12:19   9   workspaces with the launch of Leopard in October of

12:19  10   2007.  In other words, they added to the concept

12:19  11   something that didn't exist before in October of 2007.

12:19  12              This issue of going and looking at prior

12:19  13   use, prior use of the workspace switcher feature is

12:19  14   completely unsupported by the evidence.  The Defendants

12:19  15   haven't shown that there was any prior use by Apple of

12:19  16   the workspace switcher.

12:19  17              And the evidence does show that workspace

12:19  18   switcher came online with Apple in their Leopard product

12:20  19   in October 2007, which is exactly the same timeframe of

12:20  20   the infringement that is the subject of this case here

12:20  21   today.

12:20  22              Now, there is one point I should bring --

12:20  23   that we do agree on one thing with Dr. Putnam.

12:20  24   Dr. Putnam recognized that when it comes to damages, you

12:20  25   have to adjust for risk, when it comes to settlements.

12:20  1                    Settlements recognize that you could lose,

12:20  2        so you're going to settle for less than what you would

12:20  3        if you have to go in front of a jury like today.  Early

12:20  4        on, when there were all sorts of risks against Apple,

12:20  5        TLC and IP Innovation decided to go ahead and take a

12:20  6        license for $1.25 million.

12:20  7                    Now, there are four licenses that are

12:20  8        involved in this lawsuit:  Silicon Graphics, Central

12:20  9        Point Data, Hewlett-Packard, and Apple.  Three of the

12:20 10        four licenses were done by Xerox 15 years ago.

12:21 11                    Dr. Putnam is relying upon a lump-sum

12:21 12        license for $95,000.  What do we know about that?

12:21 13                    We know that Silicon Graphics offered to

12:21 14        go ahead and take the feature out of their product.  And

12:21 15        we know that back then, when that license was done in

12:21 16        1994, two of the three patents that we're talking about

12:21 17        today weren't even issued.  There weren't even property

12:21 18        rights on the '521 and '183 patents.  There was only one

12:21 19        issued patent as of that date.

12:21 20                    The important thing is, is that we have no

12:21 21        idea of the use.  Everybody admits we have no idea how

12:21 22        much the Silicon Graphics agreement was used.  All we

12:21 23        know is the lump sum that was paid.  We know the lump

12:21 24        sum that was paid, 95,000 back then, and we know the

12:21 25        lump sum that was paid by Apple, $1.25 million, last

12:21 1   year -- excuse me -- three years ago.

12:21 2                   Which one do you think the Defendants want

12:21 3   you to rely upon?

12:21 4                   We think a much more fair metric is how

12:21 5   much use there is, how many copies were downloaded.

12:22 6                   Now, there's been a lot of testimony about

12:22 7   use and how IP addresses don't relate to the number of

12:22 8   users.  Again, let's look at the evidence, the

12:22 9   statements that Red Hat's employees have made to the

12:22 10  public about the number of users.

12:22 11                  Can you put on 283, Slide 91?

12:22 12                  What they're telling the public -- in

12:22 13  other words, what they're not saying in the courtroom

12:22 14  here is there is accuracy in metrics.  In other words,

12:22 15  that the number of units in the field are higher than

12:22 16  the number of units that are shown on that page.

12:22 17                  In other words, that for Mr. Gemini to

12:22 18  rely upon those figures, those totals, is a low -- is

12:22 19  actually lower than the actual number of units in the

12:22 20  field.

12:22 21                  We also know that the same gentleman that

12:22 22  went ahead and created this entry went ahead and told

12:23 23  the public that the number of users was 9.5 million

12:23 24  users of the Fedora 7, 8, and 9, and another 2.5 million

12:23 25  users of the proprietary RHEL product.

12:23 1          Now, the other key point that you need to

12:23 2  consider is the disconnect between what the Defendants

12:23 3  did with their infringing software once they were sued

12:23 4  versus what Silicon Graphics did when Xerox came

12:23 5  knocking on their door.

12:23 6          Silicon Graphics said, you know what, we

12:23 7  don't need this feature.  We're willing to take it out.

12:23 8          You also heard testimony from Mr. Riveros

12:23 9  yesterday.  He was asked the following question.  He was

12:23 10 asked whether or not there was any way to eliminate this

12:23 11 feature or disable it.  He said it could be done; it was

12:24 12 possible, but it's not something we would do, because,

12:24 13 first of all, it's a huge hassle.  We would basically

12:24 14 have to redo the whole package.

12:24 15          You need to consider at the end of the day

12:24 16 that there's a choice -- there is a result of that

12:24 17 choice.  There is a result of their conduct in choosing

12:24 18 not to eliminate the infringing feature, to take a

12:24 19 different path from what Silicon Graphics did.

12:24 20          Whether you go ahead and reach a damages

12:24 21 figure using a reasonable royalty based upon a number of

12:24 22 units or a lump-sum figure, I think at the end of the

12:24 23 day, when you consider the evidence that's applicable, I

12:24 24 think you end up in the same damage figure.

12:24 25          We think you should go ahead and use the

12:24  1    degree of use, because we think that's a more accurate

12:24  2    metric than simply a lump sum.  But that's your choice.

12:24  3                In the end, your choices are to go ahead

12:24  4    and consider infringement, consider the value of the

12:24  5    invention of my clients' property, and consider that

12:24  6    they've taken it, and they haven't paid for it.

12:25  7                Thank you.

12:25  8                And I apologize.  I went five minutes

12:25  9    over, I'm told by co-counsel, so I did 45 minutes

12:25 10    instead of 40, but part of that was just getting set up

12:25 11    here.

12:25 12                So thank you for your time.

12:25 13                THE COURT:  Let's take a

12:25 14    five-to-ten-minute break, and then we'll come back in

12:25 15    here with the Defendant.

12:25 16                (Recess.)

12:25 17                (Jury in.)

12:25 18                THE COURT:  Please be seated.

12:40 19                Mr. Krevitt.

12:40 20                MR. KREVITT:  Thank you, Your Honor.

12:41 21                Ladies and gentlemen of the jury, Josh

12:41 22    Krevitt.  I'm going to now speak to you about Red Hat

12:41 23    and Novell.

12:41 24                I do want to say at the outset, though,

12:41 25    that I had had no intention at all of bringing up the

12:41 1   fact Mr. Cooper testified that he had lied to the patent

12:41 2   office and lied to the Court, and that before I even got

12:41 3   a question in on cross-examination, it was necessary for

12:41 4   Judge Rader to give a special instruction that some of

12:41 5   his testimony was not accurate.

12:41 6              My -- I'm very confident and comfortable

12:41 7   with your all (sic) recollection with what happened with

12:41 8   Mr. Cooper's testimony.

12:41 9              I want to focus on the substance, and Mr.

12:41 10  Gasey's remarks, to my mind, capture all that's wrong

12:41 11  with this case, all that's wrong with the Plaintiffs'

12:41 12  presentation.

12:41 13             You saw a lot of scales, you saw some

12:41 14  magnifying glasses, and you saw an awful lot of checks.

12:41 15  But what you didn't see is substance.  That's what we

12:41 16  want to focus on, the substance.

12:41 17             The very first words that Mr. Gasey said

12:42 18  after, good morning, the very first words were, this is

12:42 19  a clash, a fundamental clash between the open-source

12:42 20  community on the one hand and patent owners on the other

12:42 21  hand.  This is a fundamental clash of policy

12:42 22  considerations.

12:42 23             That's not how we see the case.  My

12:42 24  clients have been sued, and they're asking for millions

12:42 25  of dollars, and there's no merit at all to the case, and

12:42 1   there never has been, not since they wrote the letter

12:42 2   saying that they wanted us to take 20 days to look at

12:42 3   the issues, not since they told us to do our own

12:42 4   evaluation, not since they said, we don't want a

12:42 5   lawsuit, and went ahead and filed the lawsuit the very

12:42 6   next day.

12:42 7            There's no merit to the lawsuit, and I'm

12:42 8   going to walk you through that, and I think it will be

12:42 9   clear.  It's not our burden.  You've seen a lot about

12:42 10  scales.  The Plaintiffs like to talk about scales, and

12:42 11  you know it's not our burden to prove noninfringement.

12:42 12  We don't have to do anything.  But the Plaintiffs do.

12:42 13           The Plaintiffs talk a lot about football

12:42 14  lines.  And we just have to -- I think Mr. Gasey put it,

12:42 15  50 percent plus a tiny little bit, because they want --

12:43 16  they want -- they want to lower what they need to show

12:43 17  to prove infringement because they can't prove

12:43 18  infringement.

12:43 19           It's their burden.  They have to come

12:43 20  forward.  And it's true, you can think about it as

12:43 21  scales, but when they put nothing at all in front of the

12:43 22  scales, they don't win, they haven't met their burden.

12:43 23  Putting checkmarks in a scale is not proving your

12:43 24  burden.  Putting a magnifying glass up on a screen, it's

12:43 25  just not meeting your burden.

12:43  1          Looking at the claims, looking at the

12:43  2  language, our products, that's meeting your burden, and

12:43  3  that hasn't happened in this case, and we're going to

12:43  4  talk about it.

12:43  5          I just -- I want to say at the outset,

12:43  6  though, about how we got here and what we think this

12:43  7  case is about.  What we think this case is about and

12:43  8  what the evidence has already shown and what I hope is

12:43  9  clear to you-all is that IPI and TLC were given patents

12:43 10  by Xerox.  Those companies exist, this is in the record,

12:43 11  to get money for patents they acquire by suing folks.

12:43 12          So IPI and TLC went ahead and sued some

12:44 13  people, and as part of that settlement, they were given

12:44 14  these patents.

12:44 15          You remember during Mr. Cooper's testimony

12:44 16  he said several times, and Mr. Gasey kept using this

12:44 17  language, that they bought the patents, IPI and TLC

12:44 18  bought the patents.  Remember that?  They didn't buy the

12:44 19  patents.  They didn't pay any money for the patents.

12:44 20  They brought a lawsuit, and as part of that settlement,

12:44 21  they were given the patents.

12:44 22          Remember I showed you the agreement, and

12:44 23  Mr. Gasey objected to you seeing the agreement.  I

12:44 24  showed the agreement in which Xerox gave the patents

12:44 25  away.  How do you have a case where you represent to the

12:44  1    jury that somebody bought patents without showing the

12:44  2    agreement that gave them the patents in the first place?

12:44  3    That's the Plaintiffs' case.

12:44  4            Because what happened here is IPI and TLC,

12:44  5    when they sue people, they expect them to roll over, to

12:44  6    pay some money, to go away.  That's the game plan.

12:44  7    That's the program.

12:44  8            Remember Mr. Cooper testified about the

12:45  9    TLC licensing programs for these patents?  It was -- it

12:45 10    was a question I asked him.  He said first thing we did

12:45 11    is we had a licensing program when we got the patents.

12:45 12    We -- we developed a licensing program.

12:45 13            The licensing program was suing three

12:45 14    companies, waiting three years, and filing three

12:45 15    lawsuits.  Welcome to the TLC licensing program.

12:45 16    You-all are a part of it.  That's what's going on here.

12:45 17            And why didn't my clients roll over?  Why

12:45 18    is it Michael Tiemann from a Red Hat has been here all

12:45 19    week and Markus Rex from Novell and Justin Steinman with

12:45 20    premature twins flying down?  Why didn't we?

12:45 21            Mr. Vickrey asked Dr. Putnam today, how

12:45 22    can it be that your clients, that your clients would

12:45 23    pursue this case when they're paying you more money than

12:45 24    it would cost to make us go away, just to pay us off?

12:45 25    How could that possibly be?  Because it's wrong.

12:45   1          When somebody sues you and there's no

12:45   2   basis to the lawsuit at all, it's wrong.  You don't pay

12:45   3   to make them go away, because what you don't want to

12:46   4   fuel, you don't want to fund that litigation machine.

12:46   5   It's going to steamroll over someone else and it's going

12:46   6   to steamroll over you another time.  It's wrong.

12:46   7          So what did my clients do?  They said, no,

12:46   8   we're not going to pay to make IPI and TLC go away.  No,

12:46   9   we're not.  We're not going to give them money just

12:46  10   because it would be easier.  We are going to take this

12:46  11   case and we are going to submit this case to 11,

12:46  12   originally 12, 11 strangers in Marshall, Texas.  That's

12:46  13   how comfortable we are in the merits.  That's how

12:46  14   comfortable we are that when the evidence comes out, the

12:46  15   jury will agree with us.

12:46  16          And one thing I can assure you right from

12:46  17   the start every day in every way, we tried to make this

12:46  18   clear for you-all.  And I'm certain we didn't always

12:46  19   succeed, but that was our goal.  Every single day when

12:46  20   we went to bed, how can we make this clear for the jury?

12:46  21   How can we explain this evidence?  How can they

12:46  22   understand what the patent means?  Because when you do,

12:46  23   as I said at the outset, when you understand what the

12:47  24   patents actually cover and what our products actually

12:47  25   do, we don't infringe.

12:47  1          So very quickly, let's talk about what

12:47  2   evidence the Plaintiffs put on about our products.  Did

12:47  3   you see a demo of our products?  You heard a lot of

12:47  4   testimony that you could download it for free.  You can

12:47  5   go on the lunch break and download it -- not until

12:47  6   you're done with your deliberations.  But after, you can

12:47  7   go and download it for free.  It's available.

12:47  8          They had no problem showing you Microsoft

12:47  9   Windows the other day when Mr. Hill was cross examining

12:47 10   Dr. Wilson.  I think that was yesterday.  It seems like

12:47 11   forever ago.  They had no problem doing a demonstration.

12:47 12          Isn't it strange to you that somebody

12:47 13   would accuse somebody of infringement and ask you-all to

12:47 14   award millions of dollars and not show the product?

12:47 15   Doesn't that seem a little weird to you?  The reason

12:47 16   they didn't show the product is because we don't

12:47 17   infringe.

12:47 18          What else did they do?  At the outset, I

12:47 19   explained to you that what the patent was about is

12:47 20   flexibility and continuity.  Remember that?  Flexibility

12:47 21   and continuity.  And I explained why.  I didn't ask you

12:48 22   to take my word for it.  I walked through the figures,

12:48 23   right, and Mr. Gray did the same thing, and Dr. Wilson

12:48 24   did the same thing.

12:48 25          And so what is the response you've heard.

12:48  1   The Plaintiffs know that our products can't do

12:48  2   flexibility and continuity.  They know that.  No dispute

12:48  3   about that.  Mr. Gasey didn't tell you otherwise.  Our

12:48  4   products can't do it.  So what do they do?  They've got

12:48  5   to get rid of that.  Flexibility and continuity won't

12:48  6   work.  They've got to get rid of that.

12:48  7            So the way they do that is slight of hand.

12:48  8   They tell you, are those words in the claims?  Are those

12:48  9   exact words in the claims?  That's what they do.  Even

12:48 10   though Dr. Henderson, the inventor of the patents who

12:48 11   came here and testified, who is still here, as Mr. Gasey

12:48 12   pointed out, testified using exactly those words.  So

12:48 13   Dr. -- it's good enough for Dr. Henderson to understand

12:48 14   his own invention, it's good enough for

12:48 15   Dr. Henderson to explain it to the jury.  But when

12:48 16   you-all go back to the jury room and you try to sort

12:49 17   this out, the only words you can use, and I challenge

12:49 18   you to do this for three minutes, the only words you can

12:49 19   use are the words in the claims.

12:49 20            I want you to have a conversation about

12:49 21   display system objects and display objects and whether

12:49 22   or not data structures are common.  It's -- the reason

12:49 23   people use words is the same reason Judge Rader, the

12:49 24   Court, construes the claims.  It's so that people in

12:49 25   your position can understand what the claims mean.  It's

12:49  1    about clarity.

12:49  2                    We are the party of clarity.  We are the

12:49  3    party that wants you to understand.  We want to make it

12:49  4    clear because clarity is our friend.  We win with

12:49  5    clarity.  The Plaintiffs are the party of confusion, of

12:49  6    distraction.

12:49  7                    So even though Mr. Henderson --

12:49  8    Dr. Henderson, excuse me, used exactly those words, they

12:49  9    were good enough for him, they're not good enough for

12:49 10    you.  But here's an interesting thing, not a single

12:49 11    witness that testified over four days, not one said that

12:49 12    flexibility and continuity does not accurately describe

12:49 13    the patents.  Think about that.

12:50 14                    Dr. Zimmerman was here, the Plaintiffs'

12:50 15    expert.  He was asked one question about this.  One

12:50 16    question, the very first question of his examination.

12:50 17    Is that accessible?  No.  Take my work for it, the one

12:50 18    question he was asked is the one question you were told.

12:50 19    Are those words -- and you hear -- you heard the

12:50 20    Defendants' lawyer, right out of the box, Mr. Krevitt,

12:50 21    talk about flexibility and continuity, correct?  Yes, I

12:50 22    did.  Are those words anywhere in the claims of

12:50 23    Dr. Henderson's patents?  No, they not.

12:50 24                    Well, he needn't have asked that question.

12:50 25    We know that.  But did he ask the next question?  Are

12:50 1    they inaccurate?  In any way, do you disagree with that

12:50 2    characterization?  It's his own expert.  Do you think

12:50 3    that's not an appropriate way to characterize the

12:50 4    patents?  He didn't ask the question.  He didn't ask the

12:50 5    question because we know the answer.  Dr. Henderson gave

12:50 6    the answer.  The answer is flexibility and continuity

12:50 7    are accurate.

12:50 8              Don't you ask your own expert, if the

12:50 9    answer is no, wouldn't that be helpful?  Wouldn't it be

12:51 10   nice for Mr. Gasey to have been able to stand up here

12:51 11   and say, and as Dr. Zimmerman said, flexibility and

12:51 12   continuity is inaccurate.

12:51 13             You don't ask a question -- this is basic

12:51 14   101 stuff, when you know the answer is a bad one.  So he

12:51 15   didn't ask Dr. Zimmerman.

12:51 16             Dr. Wilson testified that flexibility and

12:51 17   continuity accurately describes the patents.

12:51 18   Dr. Gray testified to flexibility and continuity

12:51 19   accurately describes the patents.  Dr. Henderson

12:51 20   described that flexibility and continuity accurately

12:51 21   described the patents.  And Dr. Zimmerman said, the

12:51 22   words aren't in the claims.  That's all you got.  Every

12:51 23   witness consistent, flexibility and continuity.

12:51 24             But I want you to understand something

12:51 25   else.  That's not the reason that we're saying we don't

12:51 1    infringe, meaning we're not -- it's not that we are not

12:51 2    relying on the claim language.  I want you to understand

12:51 3    that.  We are relying on the claim language.  So I will

12:51 4    walk you through a claim.  I will do, with respect to

12:52 5    infringement, what the Plaintiffs didn't.  And I will

12:52 6    explain to you where those concepts come from and why it

12:52 7    is that we do not have those in our product.

12:52 8            So Claim 1 says:  A first display object

12:52 9    and a second display object.  Do you see those?  And it

12:52 10   goes on to require that those are in different sets of

12:52 11   workspaces, that the first display object, A, B, C, D

12:52 12   can be located one place and the second display object

12:52 13   in a different place.  And you've seen this figure an

12:52 14   awful lot, right?  And you see right out of the

12:52 15   specification that they can be presented in different

12:52 16   locations on the screen and with different dimensions.

12:52 17   That's the flexibility.  That's all we're talking about.

12:52 18           But when you're in the jury room, focus on

12:52 19   the claim language.  We're not telling you flexibility

12:52 20   is in the claim.  We could have eliminated that

12:52 21   confusion a long time ago.  That word is not in the

12:52 22   claim.  That concept is required by the claims.  Dr.

12:52 23   Henderson told you that.

12:52 24           Now, let's move on, and we look at

12:52 25   continuity.  The claims require that they be perceived

12:53 1   the same, that you can continue your work.  You look

12:53 2   right in the specification.  It maintains continuity.

12:53 3   Next line in the specification.  You continue your

12:53 4   working.  You perceive these things as the same tool so

12:53 5   you can continue your work.  That was the invention.

12:53 6   The title of the invention is shared display objects,

12:53 7   display system objects.  Excuse me.

12:53 8               What that means is you have two display

12:53 9   objects in two workspaces.  But so that you can have the

12:53 10  flexibility to arrange them any way you want and the

12:53 11  continuity to continue your work, they share the same

12:53 12  data structure.  They share -- they come from the same

12:53 13  place.  That's the title of the patent.  They share a

12:53 14  system object.  And by sharing the system object, what

12:53 15  that means is, but not being the same, it means they can

12:53 16  be arranged differently.  That's the flexibility right

12:53 17  out of the claims in terms of talking about the first

12:53 18  display object and the second and different sets, and

12:53 19  also you can continue your work.

12:53 20              Dr. Henderson told you that, you heard

12:54 21  deposition testimony from other inventors to that

12:54 22  effect, and it's right out of the claim language.  So I

12:54 23  want to make sure you understand that this is a red

12:54 24  herring that flexibility and continuity are not in the

12:54 25  claims.

12:54 1          Now, let's move on and talk about

12:54 2 infringement quickly.  The first thing I want to talk

12:54 3 about is direct infringement.  These are concepts that

12:54 4 are not concepts with which you deal with every day, I

12:54 5 assume, and they are -- they are tough concepts for us

12:54 6 to keep straight.  So I want to make sure you understand

12:54 7 that there are two theories on which the Plaintiffs are

12:54 8 seeking damages under infringement.

12:54 9          The first is what's called direct

12:54 10 infringement.  What that means is that we infringe,

12:54 11 meaning Red Hat and Novell do all the things in the

12:54 12 claim.  One actor, Red Hat, or one actor, Novell, does

12:54 13 all the things in the claim.  All the claims require a

12:54 14 display.  Remember that?  So the only way we can be a

12:54 15 direct infringer -- there is no dispute on this

12:54 16 question -- the only way we can be a direct infringer is

12:55 17 for our internal use.  Direct infringement is just when

12:55 18 -- when Michael Tiemann at Red Hat or Markus Rex at

12:55 19 Novell are using the computers themselves, when Red Hat

12:55 20 and Novell are using the computers themselves.  That's

12:55 21 very important.  That's direct infringement.

12:55 22          And the reason it's important is it's

12:55 23 another red herring.  The Plaintiffs don't want you to

12:55 24 find direct infringement, or stated differently, they

12:55 25 don't care about that.  Red Hat has some 3,200

12:55  1  employees.  I think Novell has 3,900 worldwide.  Let's

12:55  2  round both up to 4,000.  They have 4,000 employees.

12:55  3            They're asking for 62 cents a copy.

12:55  4  That's $2,400.  If you find direct infringement because

12:55  5  the only direct infringement can be the use by my

12:55  6  clients, the use of the employees of my clients, direct

12:55  7  infringement results in damages of 24, 25, 2,000,

12:55  8  hundred dollars.  I want to make sure that's clear.

12:55  9  That's direct infringement.  Use by my clients

12:56 10  internally.

12:56 11            So what's inducement?  That's what the

12:56 12  case is about.  Inducement is that my clients sell

12:56 13  software, and it causes other people to infringe.  It

12:56 14  causes you to infringe or some company to infringe.

12:56 15  That's inducement.  It induces, it causes you to

12:56 16  infringe.

12:56 17            Now, here is the important thing.  There

12:56 18  is no evidence, no evidence in this record -- and I

12:56 19  welcome Mr. Hill on his rebuttal to point to a single

12:56 20  shred of evidence on the following point.  That even a

12:56 21  single customer, even one, has ever used the server

12:56 22  software with a display running Linux, running Red Hat

12:56 23  software, or running Novell software.

12:56 24            So let me make sure you understand what

12:56 25  I'm saying because it's very important.

12:56  1              They can only prove inducement -- can we

12:56  2    pull up the jury instructions on inducement?  They can

12:57  3    only prove inducement, this is what Judge Rader told

12:57  4    you, they can only prove inducement if they have these

12:57  5    five things.

12:57  6              So the first is Defendants took actions

12:57  7    that caused somebody to infringe.  Let's leave that

12:57  8    aside.  Let's give them the benefit of the doubt on that

12:57  9    one.  We think they're wrong, but for the moment we'll

12:57  10   give them the benefit of the doubt.  By providing

12:57  11   software or Mr. Gasey talked about literature, we're

12:57  12   causing people to do -- to use our software.  Let's

12:57  13   leave that one aside.

12:57  14             The next is that they encouraged acts, so

12:57  15   what that means is our customers' use, we're encouraging

12:57  16   our customers to do something, our customers' use

12:57  17   infringes.

12:57  18             Now, we proved, I hope, even though it's

12:57  19   not our burden, that nobody infringes.  That's the

12:57  20   flexibility and continuity we talked about, that nobody

12:57  21   infringes.  Hopefully we proved that.  But even if you

12:57  22   accept the encouraged acts constituted direct

12:57  23   infringement -- let's move to the next thing --

12:57  24   Defendants were aware of the patent and knew or should

12:57  25   have known that the acts constitute infringement.

```
12:58  1              Let's make sure we understand what that
12:58  2  means.  You cannot find inducement unless you find that
12:58  3  we knew there was infringement, unless you find that my
12:58  4  clients not only caused the customer to use the
12:58  5  software, but knew that when the customer used the
12:58  6  software, it would be infringing.
12:58  7              So if my clients believed that there was
12:58  8  no infringement, if my clients believed genuinely that
12:58  9  the software does not infringe, you cannot find
12:58 10  inducement.  That's what this means.  You must find, to
12:58 11  find inducement, the Plaintiffs must prove that my
12:58 12  clients knew that the acts of our customers would
12:58 13  infringe.
12:58 14              Michael Tiemann testified unequivocally,
12:58 15  Red Hat does not believe there's infringement.  Red Hat
12:58 16  does not believe there's infringement.  He had an
12:58 17  opportunity -- he was cross examined very aggressively
12:59 18  and ably by Mr. Hill, nothing on this question.
12:59 19              Markus Rex, same thing, does Novell
12:59 20  infringe?  No, we don't.  Has it been Novell's belief
12:59 21  that it doesn't infringe throughout this case?  Yes, it
12:59 22  has been.
12:59 23              If they -- if you believe their testimony,
12:59 24  if you do not believe that Markus Rex and Michael
12:59 25  Tiemann lied when they testified under oath, there can
```

12:59 1    be no inducement under the instructions that Judge Rader

12:59 2    gave you.

12:59 3              There's another reason there can be no

12:59 4    inducements, and I'm sorry for spending so much time,

12:59 5    but this is the substance that I was talking about.

12:59 6    This is what you have to look at.

12:59 7              The other reason there can be no

12:59 8    inducement is this:  The Plaintiffs must prove that

12:59 9    somebody actually did it, that somebody used our server

12:59 10   software with a display running our software.  The

12:59 11   Plaintiffs must prove that someone did it.

12:59 12             It's not enough for Mr. Gasey to say --

12:59 13   and I wrote it down -- it's not enough for Mr. Gasey to

01:00 14   say:  Who do you think put the material on the servers?

01:00 15   I don't know who put the materials on the servers.

01:00 16   They're suing my clients for millions of dollars.  Who

01:00 17   do you think put the materials on the servers isn't good

01:00 18   enough.  They need evidence.  They need evidence that

01:00 19   somebody did it.

01:00 20             Mr. Hill will not be able to stand up here

01:00 21   and identify a single customer for which there is

01:00 22   evidence in the record that uses either of my clients'

01:00 23   server software with a display that runs Red Hat or

01:00 24   Novell's software.  If he does, it will be the first

01:00 25   time we hear it.  There is no evidence in the record of

01:00  1  somebody doing that.

01:00  2              It may seem like a technicality.  He's

01:00  3  going to stand up and talk about all our customers.

01:00  4  Mr. Krevitt bragged time and again.  We do.  We have

01:00  5  lots of customers, lots of customers, the White House,

01:00  6  Department of Defense, Justice Department, NASA, lots of

01:00  7  big companies, too.  That's not enough.

01:01  8              The Plaintiffs had the burden to come

01:01  9  forward with evidence that somebody did it.  And they

01:01 10  had to come forward with the evidence of who did it and

01:01 11  prove that to you.  And that -- the record is completely

01:01 12  absent of any such evidence.  The issue was simply not

01:01 13  addressed at any time in this case.

01:01 14              So now let's talk about the two examples

01:01 15  that Dr. Zimmerman gave for infringement.  He gave one

01:01 16  example of a trash icon, I believe, and one example of

01:01 17  the calendar.  I want to note something, for what it's

01:01 18  worth, Mr. Gasey said that Mr. -- that Dr. Zimmerman had

01:01 19  been shown something that wasn't right.  I assume it was

01:01 20  not deliberate.

01:01 21              The demonstrative that Mr. Gasey put on

01:01 22  the screen was used to cross-examine Mr. Gray.

01:01 23  Dr. Zimmerman was never shown that demonstrative,

01:01 24  because had Dr. Zimmerman been shown that demonstrative,

01:02 25  Mr. Lyon would have cross-examined him and demonstrated

01:02  1   that his opinions were wrong.  So the demonstrative --

01:02  2   demonstrate wasn't shown to Dr. Zimmerman.  It was only

01:02  3   shown on cross-examination to our witness.

01:02  4              And a funny thing about that.  You know

01:02  5   I'm being tag-teamed today by Mr. Hill and Mr. Gasey.

01:02  6   Mr. Hill is going to stand up and speak yet.  And that's

01:02  7   how it works.  The Plaintiffs go first.  They get to put

01:02  8   on their evidence.  We've got to sit there and wait, and

01:02  9   then we get to go.  We put on our evidence.  And then

01:02 10   the Plaintiffs get another shot.  They get to come back

01:02 11   up and put on their evidence.  And that's how it happens

01:02 12   at trial, too.

01:02 13              It didn't in this case, but that's how it

01:02 14   happens in trial, also.  Keep this in mind.

01:02 15              Dr. Zimmerman, who's still here with us,

01:02 16   could have testified in response to Mr. Gray's testimony

01:02 17   and could have explained why that was wrong.  He could

01:02 18   have testified in response to Dr. Wilson's

01:02 19   demonstrations and explained why those are wrong.

01:02 20              The Plaintiffs could have put him up

01:02 21   and -- asked Dr. Zimmerman, why was Dr. Wilson's

01:03 22   demonstrations wrong?  What was wrong with those?  Walk

01:03 23   us through that.  Where did -- where did Dr. Wilson go

01:03 24   wrong?  Why should the jury not believe their own eyes

01:03 25   when they watched the demonstration that proved that

01:03  1   these patents are invalid.  But they didn't put him on,

01:03  2   and they didn't put him on for the same reason they

01:03  3   didn't ask him the question about flexibility and

01:03  4   continuity.

01:03  5             It's not helpful.  You don't put a witness

01:03  6   on who's going to say things that aren't helpful.

01:03  7   Mr. Gemini, too -- keep this in mind.  Mr. Gemini

01:03  8   testified, and then Dr. Putnam testified.  One of the

01:03  9   things Mr. Gemini also testified is:  I don't have all

01:03 10   the information I need.  Mr. Tiemann has some of it.

01:03 11             So then Mr. Tiemann testified.  Remember

01:03 12   that?  And Mr. Gemini was here when that happened.  And

01:03 13   then what happened?  I haven't seen Mr. Gemini since.  I

01:03 14   don't know if he left town or just left the courthouse.

01:03 15   He -- he has not been around since.  He could have

01:03 16   testified in response to what Mr. Tiemann said at any

01:04 17   time.  He could have testified in response to what

01:04 18   Dr. Putnam said at any time.  They chose not to put him

01:04 19   on.

01:04 20             Now, the two issues that were raised

01:04 21   here -- I want to make sure you understand.  There is a

01:04 22   trash icon -- there are two kinds of windows -- forgive

01:04 23   me, I know you've heard so much about this, but there

01:04 24   are sticky windows and there are ordinary windows.  On

01:04 25   that, there's no question, two kinds of windows, sticky,

01:04  1   ordinary.

01:04  2              The sticky windows, which -- of which this

01:04  3   is one, are one single display object.  That's claim

01:04  4   language.  I didn't say flexibility.  That's claim

01:04  5   language.  There is only one display object.  It's

01:04  6   slapped on.  It doesn't move.  You go from workspace to

01:04  7   workspace.  It is the same display object.  It doesn't

01:04  8   share a display on -- system object with another display

01:04  9   object.  It doesn't do the things that the claims

01:04 10   require, the claims require.  It also has no

01:04 11   flexibility.  That doesn't infringe.

01:04 12              The only other example was this, the

01:05 13   calendar.  Now, the way our calendars work, and

01:05 14   Mr. Gray explained this, and I know this is technical,

01:05 15   and I -- and I'm doing the Plaintiffs' job.  They're the

01:05 16   ones that should be explaining why this falls in the

01:05 17   scope of the claims.  So I'm up here trying to explain

01:05 18   to you why they can't do that.

01:05 19              The way our calendar works, as you see

01:05 20   here, is you have one system object or data structure.

01:05 21   That's what generates that calendar, that's what

01:05 22   generates it, and you have another.  The patent should

01:05 23   have done this.  The patents share this.  That's what

01:05 24   the patent title is about, sharing a system object.

01:05 25              In the patents, this and that would be

01:05  1  one.  And that's what I was trying to do with my hands

01:05  2  earlier.  Those two connect up to two different display

01:05  3  objects, but they control two different display objects.

01:05  4  And that's why you have continuity, because when you

01:05  5  share the display object, the data that you do to this

01:05  6  display object goes down to the system object and is

01:06  7  reflected in the other display object.  So

01:06  8  that -- that does not -- that's the title.  Thank you.

01:06  9          User interface with multiple work --

01:06 10  workspaces for sharing displace system objects, for

01:06 11  sharing display system objects.  And if you go back,

01:06 12  these are not shared.  That's right out of the claim.

01:06 13  When you-all go back, you can look at the claims.

01:06 14  That's in the claims.  That's claim language, and we

01:06 15  don't infringe.

01:06 16          So on infringement, here's what

01:06 17  Dr. Zimmerman did.  Dr. Zimmerman testified.

01:06 18  Mr. Gibbons stood here and said:  So, Dr. Zimmerman, I'm

01:06 19  going to read you a claim element.  He read a claim

01:06 20  element, and he said, is that claim element met?  Yep.

01:06 21          And then Mr. Gasey stood up, you remember

01:06 22  that, and he went over and he -- he checked some things

01:06 23  on the board, that was the infringement analysis.

01:06 24  That's not meeting your burden.  That's not enough.

01:06 25  That's an empty scale.  So when they tell you about the

01:06  1   tiny amount, that's not enough.  We don't infringe, and

01:06  2   we have presented evidence to that effect.

01:07  3             And we just put up on the screen, because

01:07  4   everyone likes graphics, when you get to the jury

01:07  5   question.  This is what I want you to keep in mind, this

01:07  6   is both direct infringement, of course, and inducement,

01:07  7   because both require infringement.  We don't do the

01:07  8   second and the third claim elements for sticky windows,

01:07  9   and for ordinary windows, we also don't do the second

01:07 10   and third claim elements.  We are missing those

01:07 11   elements.

01:07 12             And as you know, as you've heard many

01:07 13   times, you miss one element, there's no infringement.

01:07 14   You miss two, three, doesn't matter.  There's no

01:07 15   infringement.  We are missing many elements.  The

01:07 16   Plaintiffs have not proven infringement, and while we

01:07 17   didn't have to, we have proven no infringement.

01:07 18             Now, let's talk quickly about validity.

01:07 19   The -- I want to do the Inventorship issue first.  I'm

01:07 20   going to try to make this one quick, okay?

01:07 21             Okay.  So the Inventorship issue.  There's

01:08 22   three inventors.  You-all have heard that.  There's John

01:08 23   Maxwell, on the one hand, and there's Card and Henderson

01:08 24   on the other.  Dr. Henderson, excuse me.  There's Card

01:08 25   and Dr. Henderson on the other.

01:08  1          There is no question, no dispute in this

01:08  2    case that Maxwell worked on one project and Card and

01:08  3    Henderson worked on another.  The only question is at

01:08  4    some point did they collaborate.  There's no dispute,

01:08  5    you heard it from all the deposition testimony that was

01:08  6    read, Dr. Henderson was very candid about this, they

01:08  7    worked on different projects.  You got Card and

01:08  8    Henderson on the one hand.  You've got Maxwell on the

01:08  9    other hand.

01:08 10          And let's just look quickly -- we'll tick

01:08 11    through this quickly.  What did Card say:  What about

01:08 12    John Maxwell?  Did you work with him at all, not

01:08 13    directly, indirectly?  Well, it turned out he had a

01:08 14    somewhat similar idea.  And his work was done

01:08 15    independent of what you and Dr. Henderson did?  More or

01:08 16    less, yes.

01:08 17          And I think we have Maxwell who says:  Did

01:08 18    you work with Mr. Henderson or Dr. Card in developing a

01:09 19    multiple workspace environment?  Answer:  No.  Did you

01:09 20    work on Rooms at all?  Answer:  No.  Did you -- do you

01:09 21    consider Rooms -- that was Dr. Henderson and card's

01:09 22    project -- do you consider Rooms and Desktops, that's

01:09 23    Maxwell's project -- to be the same thing?  No.  I mean,

01:09 24    they are completely invented and implemented completely

01:09 25    independently of each other.

01:09 1          Hard to imagine, more unequivocal

01:09 2 testimony.  So they invent the ideas separately.

01:09 3          Now, here's what the jury instruction

01:09 4 says.  Again, let's just look at it very quickly.  The

01:09 5 jury instruction, first line out of the jury

01:09 6 instruction.  A joint invention, that's what they have

01:09 7 to prove -- excuse me -- we have to prove there's not a

01:09 8 joint invention, but for the patent to be valid, you

01:09 9 need a joint invention.

01:09 10          A joint invention is the product of

01:09 11 collaboration of the inventive endeavors, the ideas, the

01:09 12 ideas behind the invention -- That's what you have to

01:09 13 collaborate on -- of two or more persons working toward

01:10 14 the same end and producing an invention by their

01:10 15 aggregate efforts.  You're collaborating on the

01:10 16 inventive ideas of two or more persons to the same end.

01:10 17 That didn't happen here.

01:10 18          You saw the testimony of Card, and you saw

01:10 19 the testimony of Maxwell.  Here's what

01:10 20 Dr. Henderson explained.  Dr. Henderson candidly

01:10 21 admitted that he and Card worked on one project and

01:10 22 Maxwell worked on another project.  And then at some

01:10 23 point, a patent attorney shows up.  At some point, a

01:10 24 patent attorney gets involved.  The patent attorney gets

01:10 25 involved when there's already been an invention.  You

01:10 1   don't just have patent attorneys laying around waiting

01:10 2   for something to happen.  You have an invention, and

01:10 3   Patent attorneys show up.

01:10 4         And they start talking about the patent

01:10 5   process.  Not coming up with the invention.  Patent

01:10 6   attorneys don't come up with inventions.  They

01:10 7   memorialize those in a patent.  And so the patent

01:10 8   attorney comes around, and Card and Henderson start

01:10 9   talking with him, and he starts thinking about doing a

01:10 10  patent and in his research at Xerox discovers the work

01:11 11  of Maxwell and decides, hey, that's similar.  Let's pull

01:11 12  that together.

01:11 13        If you look at Maxwell, he says:  How did

01:11 14  it come to being that you and Mr. Henderson and

01:11 15  Dr. Card were put together on this one patent.  The

01:11 16  patent attorney, the very first three words in response

01:11 17  to that question prove it all.  The patent attorney, Jim

01:11 18  Beran, came to my office, and he said, we found your

01:11 19  name on some software in the CSL system on a system

01:11 20  called Desk Tops.  Did you write that software?  And I

01:11 21  said, yes.  And he said, we'd like to file a patent on

01:11 22  that.  And I said, sounds good to me.

01:11 23        Then they come together, and they do a

01:11 24  patent.  So inventing separately but patenting together

01:11 25  is not enough.  That's not joint Inventorship.  And if

01:11  1  you'll indulge me just for a minute because -- so I was

01:11  2  talking to my daughter, and I was thinking about how to

01:11  3  explain this.  And here's the -- here's how it occurred

01:11  4  to me.

01:11  5          So in her class, she's in fourth grade,

01:11  6  Mrs. Smith brought them all together.  They all came

01:12  7  together, and they wrote a story.  And Ms. Smith said,

01:12  8  you'll come up with the characters, and you come up with

01:12  9  where it will be, and you come up with the story line,

01:12 10  and you can come up with some crime action fun stuff,

01:12 11  and we'll all sit around a table, and we'll all write a

01:12 12  story together.  We'll all collaborate on a story.

01:12 13  We'll have one story that we all collaborate on.  All 11

01:12 14  of you are going to work on a story.

01:12 15          So you sit around a table, and you work

01:12 16  together, and then Mrs. Smith slaps it together, and now

01:12 17  you've got Mrs. Smith's fourth grade story.  It's one

01:12 18  story on which you collaborated.

01:12 19          The difference is what happened here.

01:12 20  What happened here is if Mrs. Smith had said, okay, you

01:12 21  go out and write a story, and you go out and write a

01:12 22  story, everyone go write out and write their own story.

01:12 23  Don't talk to each other and don't collaborate.  You all

01:12 24  go out and write your own stories and come back in a

01:12 25  week with your stories.  And what we'll do, it will be

01:12  1  really cool, we'll slap all those stories together, and

01:12  2  we'll call those Mrs. Smith's 11 different stories from

01:12  3  fourth grade, 2010.

01:12  4            That is not collaborating on the stories.

01:12  5  That is not collaborating on the inventive endeavors.

01:13  6  You have to prove that they collaborated on the

01:13  7  inventions, not the writing of a patent.

01:13  8            They didn't.  The evidence is unequivocal.

01:13  9  The evidence is clear and convincing, and you should

01:13  10 find the patent invalid.  There is not a joint

01:13  11 Inventorship.

01:13  12           So now we'll move on.  Let's talk about

01:13  13 anticipation.

01:13  14           You saw Dr. Wilson demo those machines,

01:13  15 and he was very excited about those machines, very

01:13  16 excited about computers, loves his computers.  And he

01:13  17 demoed the Apple machine, and he demoed the Amiga

01:13  18 machine, and you saw it with your own eyes.

01:13  19           Now, Mr. Gasey told you not to believe

01:13  20 those eyes, and Mr. Hill will probably echo that, but

01:13  21 you saw it with your own eyes.  Those machines

01:13  22 invalidated every single thing that the patents do.

01:13  23           And Dr. Wilson didn't just say, take my

01:13  24 word for it.  He didn't do a demo and talk fancy about

01:13  25 his son, Steve, and then sat down.  Mark Lyon brought

01:14  1    him through every single claim element for each one of

01:14  2    those machines, every single claim element,

01:14  3    element-by-element-by-element, and they were satisfied.

01:14  4              And so what did you hear today?  What is

01:14  5    the response?  What's plaintiffs' response to all of Dr.

01:14  6    Wilson's evidence?  Here it was.  With respect to Chan,

01:14  7    the only thing Mr. Gasey said is that there was another

01:14  8    article before the patent office.  Stipulated, no

01:14  9    argument.  There was another article before the patent

01:14 10    office.  That's true.

01:14 11              There was an article, however, that was

01:14 12    not before the patent office that provided critical

01:14 13    details about the Chan system that had it been before

01:14 14    the patent office, the patent would not have been

01:14 15    allowed.  That's what Dr. Wilson testified.  The patent

01:14 16    would not have been allowed.

01:14 17              The information in the second article was

01:14 18    so important, was so different and Dr. Wilson explained

01:14 19    why the patent would not have been allowed.

01:14 20              Now, Mr. Gasey told you, you don't have to

01:15 21    worry about the article, but Dr. Zimmerman didn't tell

01:15 22    you that.  Dr. Zimmerman could have come and explain why

01:15 23    the second article was really nothing.  It didn't add

01:15 24    much, not a big deal.  That didn't happen.  So we have

01:15 25    to take Mr. Gasey's word for it.

01:15 1          So you have Dr. Wilson telling you it's

01:15 2 critical, and you have Mr. Gasey telling you it's not a

01:15 3 big deal.

01:15 4          Next, let's look at -- and that's it on

01:15 5 that.  That's it on Chan.  No argument, no argument,

01:15 6 keep this in mind.  This is very important, no argument

01:15 7 that the Chan system does not disclose every element.

01:15 8 No argument that the Chan system doesn't invalidate the

01:15 9 claims as a reference.  The only argument is one paper

01:15 10 was already before the patent office so we should assume

01:15 11 the patent office knew about it, and then we shouldn't

01:15 12 worry about it.  No harm, no foul.

01:15 13          The second reference, also not -- second

01:15 14 system, also not before the patent office, which we seem

01:15 15 to be having technical difficulties, was the Amiga

01:15 16 Workbench.  The Amiga Workbench was also not shown to

01:16 17 the patent office.  And Dr. Wilson testified at length,

01:16 18 showed the system, worked on the system and explained to

01:16 19 you on a claim-by-claim basis, Dr. Wilson did for

01:16 20 invalidity what Dr. Zimmerman did not do for

01:16 21 infringement.

01:16 22          Dr. Wilson did not just say, take my work

01:16 23 or word for it.  I didn't go over to a whiteboard and

01:16 24 just do checks.  Dr. Wilson walked through item-by-item,

01:16 25 element-by-element, system-by-system why they are

01:16  1    invalidated.   The Amiga Workbench is an example.

01:16  2              The Apple Macintosh is another example.

01:16  3    And this -- the Apple Macintosh, to my mind, and

01:16  4    Mr. Gasey's presentation, with all due respect, is a

01:16  5    perfect example of the confusion, of the distraction, of

01:16  6    the red herrings, of the don't look over here when

01:16  7    Mr. Hill was cross examining Dr. Wilson and could ask

01:16  8    any questions at all, any questions at all, and devotes

01:16  9    a large portion of it to bullying the witness about his

01:17 10    hourly rate, about how many hours he spent on this.

01:17 11              You have Dr. Wilson, one of the leading

01:17 12    experts and professional computer programmers in the

01:17 13    world, been in the business for 45 years, he's on the

01:17 14    stand under oath and telling the Court -- telling the

01:17 15    jury that the patents are invalid, and you spend your

01:17 16    time bullying him about his hourly rate.

01:17 17              So what did Mr. Gasey just say about the

01:17 18    Apple Macintosh?   Mr. Gasey -- go back, please.

01:17 19    Mr. Gasey said that the Apple Macintosh does not

01:17 20    invalidate -- and it was a big windup -- he said, you've

01:17 21    got to look at the words of the claim.   You've got to

01:17 22    focus on the words of the claim.   Remember he said that?

01:17 23    And then he said the Apple Macintosh uses applications,

01:17 24    and an application is not a workspace.

01:17 25              But here's the interesting thing, he said,

01:17 1   you've got to look at the words of the claim.  That's

01:17 2   really important.  Judge Rader is telling you what that

01:18 3   means.  You've got to look at that.  And then he put up

01:18 4   on a screen Figure 1A and 1B.  There wasn't a word on

01:18 5   the screen.  There were words, because the words of the

01:18 6   claim construction prove they're wrong.  If you show the

01:18 7   words and let you-all look at them and understand the

01:18 8   issue, it's clear.  The patents' invalid.

01:18 9           Let's look at the words.  The issue is,

01:18 10  Mr. Gasey raised one issue with respect to this.  No

01:18 11  question about all the other elements.  He raised one

01:18 12  issue.  An application is not a workspace.  So let's

01:18 13  look at the words, on the left, is out of the Court's

01:18 14  claim construction.

01:18 15          As Judge Rader said, you have to accept

01:18 16  these.  These words are gospel for purposes of

01:18 17  understanding what this claim means.  So the first is

01:18 18  display object.  And Dr. Wilson ran through all this, so

01:18 19  forgive me for being repetitive, but I want this to be

01:18 20  clear because there was no other response with respect

01:18 21  to this system.

01:18 22          A display object is just a display

01:19 23  feature.  It's just something on the screen.

01:19 24  Dr. Wilson testified to that.  That went un rebutted.

01:19 25  There is no dispute.  Dr. Zimmerman never said a single

01:19  1    thing different than that.  It is something on the

01:19  2    screen.  So we look, we've got a lot of things on the

01:19  3    screen, a lot of display objects.  So we can check that

01:19  4    off.  We've got display objects.

01:19  5              Now, what is a workspace?  A workspace is

01:19  6    a collection of display objects.  This is the Court's

01:19  7    claim construction.  This is not Josh Krevitt's

01:19  8    explanation, Mr. Gasey's explanation.  This is the

01:19  9    Court's claim construction.  You have display objects,

01:19 10    and you have a collection of them.  You've got a

01:19 11    workspace.  You've got to accept that.

01:19 12              Whatever preconceived notions Mr. Gasey

01:19 13    wants to create or sense that a workspace is different

01:19 14    than an application is irrelevant.  The Court tells you

01:19 15    what a workspace is.  Its' a collection of display

01:19 16    objects.  Use your own eyes.  Don't listen to me.  Don't

01:19 17    listen to Mr. Gasey.  Use your own eyes.

01:19 18              There are display objects on that screen,

01:19 19    and there is a collection of display objects on that

01:20 20    screen.  We've circled a bunch of the different display

01:20 21    objects.  When you've got a bunch, you've got a

01:20 22    collection, and when you've got a collection, you've got

01:20 23    a workspace, and when you've got a workspace, you've got

01:20 24    an invalidating piece of prior art.  There is no other

01:20 25    response the Plaintiffs have offered on this piece of

01:20  1   prior art.

01:20  2              Now, that's anticipation.  So you never

01:20  3   will never need to get to the issues of damages, so I'm

01:20  4   reluctant to even raise it.  But since the Plaintiffs

01:20  5   raised it and Mr. Hill is likely to raise it, I'll raise

01:20  6   it briefly.  I want it to be clear, though, this is a

01:20  7   waste of all of our time.  You'll never -- you never

01:20  8   need to get to damages.

01:20  9              So what about damages?  Speaking

01:20  10  seriously, our view on damages in this case is use your

01:20  11  common sense.  Use your common sense.  Dr. Putnam

01:20  12  testified he's got a Ph.D. from Yale and a master's from

01:20  13  Yale, too, maybe.  He's got more degrees.  And we joke

01:21  14  around with him that I have never seen a case in which a

01:21  15  Ph.D. from Yale was less necessary.

01:21  16             Use your common sense.  You have patents

01:21  17  that were given from Xerox to the Plaintiffs.  You have

01:21  18  patents that Xerox licensed.  We don't have to guess

01:21  19  what the marketplace would value these patents.  We

01:21  20  know.  It's the same thing I said.  How much would you

01:21  21  pay for a cup of coffee?  If you knew somebody else paid

01:21  22  for a cup of coffee, You want to pay the same thing.

01:21  23  You want to -- want to pay the same thing to rent a car

01:21  24  for the same period of time.  This is just common sense.

01:21  25  We all know this.

01:21  1                    Actually, we don't all know this.  You may

01:21  2  recall I asked Mr. Cooper if he and I went and bought a

01:21  3  cup of coffee at the same time and they charged him

01:21  4  more.  Whether that would be unreasonable, and

01:21  5  Mr. Cooper said, well, that might be reasonable.  And

01:21  6  then I said, what if they charged you 40 times more?

01:21  7  Neither one of us had ever been in the store, we order

01:21  8  the same coffee, same size, little milk, and they charge

01:22  9  you 40 times more?  Would that be reasonable?  And

01:22 10  Mr. Cooper said, yeah, I can see circumstances where

01:22 11  that would be reasonable.

01:22 12                    It's not reasonable.  Anyone who says it

01:22 13  is has a credibility problem.  It's not reasonable.

01:22 14  That's what the plaintiffs are asking for here.  They're

01:22 15  asking you to focus on IP addresses.  And they're asking

01:22 16  you to mix and match from Fedora and RHEL, and we need

01:22 17  only look at the licenses.  That's what we need to look

01:22 18  at.  What did Xerox license these patents for?

01:22 19                    To HP, $110,000.  There's been a lot of

01:22 20  confusion about HP because Mr. Gasey said in his

01:22 21  opening, you may recall, you will see, Mr. Gasey said,

01:22 22  you will see a license in this case for 99 cents a copy.

01:22 23  Do you remember that?  I do.  It surprised me.  I wasn't

01:22 24  aware of that license.

01:22 25                    It doesn't exist.  There is no license in

01:22  1    this case for 99 cents a copy.  He was talking about the

01:23  2    HP license.  In the HP license, there was a payment of

01:23  3    $110,000 that covered, by the way, approximately $24

01:23  4    million in sales.  110,000.  That's it.  That's the HP

01:23  5    license.

01:23  6              Now, at some point, it's true if they hit

01:23  7    $10 million, there was a kicker, and then you started

01:23  8    paying some money.  Never hit the money, never hit the

01:23  9    10 million, excuse me.  HP, you-all may be familiar with

01:23 10    HP.  They are a very large company.  Paid $110,000 for a

01:23 11    license for 14 years for these patents.

01:23 12              Silicon Graphics, how much did Silicon

01:23 13    Graphics pay?  They had a license for 13 years, totally

01:23 14    paid up all in, $95,000, $95,000.  That's what they

01:23 15    paid.  And the Plaintiffs' emphasize, they say all the

01:23 16    time -- it's one of those issues that's funny because I

01:23 17    think it cuts against them.  They say all the time, the

01:23 18    Plaintiffs -- excuse me, Silicon Graphics would have

01:24 19    taken it out.  They would have taken that out, and

01:24 20    that's relevant.  Of course, that's relevant.  That

01:24 21    tells you how valuable this is.

01:24 22              It's so not valuable that they would have

01:24 23    been prepared to take it out.  And how much are they

01:24 24    willing to pay to have this feature?  How much are they

01:24 25    will to pay to keep this feature in their product?

01:24  1  About a hundred grand.  That's what we'll pay, not a

01:24  2  dime more.  $95,000, all in, up front.

01:24  3              Central Point, 14-year license, 14-year

01:24  4  license also.  We have no evidence, nobody has come

01:24  5  forward with any evidence that a single penny was ever

01:24  6  paid on that license.  Now, it did provide on the

01:24  7  license for a 25 cent price per unit.  It did provide

01:24  8  for that.  There is no evidence.  Dr. Putnam told you

01:24  9  this.  Mr. Gemini told you this.  No evidence at all

01:24 10  that even a single dime was ever paid.

01:24 11              So what do you have?  You have $110,000

01:24 12  paid.  You've got zeroish, I don't know what that is,

01:24 13  paid.  And you've got 95,000 paid.  That's it from

01:24 14  Xerox.  Three licenses.  They had the patents for 13

01:25 15  years, were out trying to get money for these patents,

01:25 16  and in 13 years got $205,000, licensing each one for 14

01:25 17  years, or in the case of Silicon Graphics -- excuse me

01:25 18  for 13 years.  And then there's one other license

01:25 19  you-all have heard about, the Apple license.

01:25 20              And there's been -- you've heard some

01:25 21  discussion about the Apple license and how you should

01:25 22  understand the Apple license.  So let's keep -- let's

01:25 23  stick to the things we can all agree on.  The Apple

01:25 24  license covered all of Apple's products, every single

01:25 25  product, from the Macintosh to the iPads to the iTouch

01:25 1   to the iPhone to iTunes to everything.  Every one of

01:25 2   Apple's products was covered by this license.

01:25 3             Another thing, Apple is a very, very big

01:25 4   company.  And with all due respect to my clients, they

01:25 5   are tiny when it comes to a comparison with Apple.

01:25 6   Another thing, and Judge Rader instructed you on this,

01:25 7   the Apple license covered a period of seven years,

01:26 8   covered a period of seven years.  The damages period in

01:26 9   this case is 14 months.  That's one-sixth -- one-sixth

01:26 10  of the time.

01:26 11            We just -- even if you ignore how big

01:26 12  Apple is, even if you ignore all of that, you're left

01:26 13  with give or take $200,000 just if we were to look only

01:26 14  at the time.

01:26 15            And so what did we hear today?  We heard

01:26 16  from Mr. Gasey that, well, you should ignore all the

01:26 17  parts before they sign the license because the older

01:26 18  version of the Apple didn't have this feature.  Two

01:26 19  problems with that.  One, false.  The feature that the

01:26 20  Apple product had was the same as the feature that the

01:26 21  Plaintiffs accused us of infringement in their letter,

01:26 22  which they didn't mean when they sued us the next day,

01:26 23  in their original claim charts that they provided and in

01:26 24  claim charts submitted in this case reviewed by

01:26 25  Mr. Cooper and Dr. Zimmerman, same thing.

01:27 1          Number two, in terms of it not being

01:27 2  covered, there is no evidence.  The only thing we have

01:27 3  is Mr. Cooper telling us that somebody at Apple said

01:27 4  that maybe this feature was done differently.  That's

01:27 5  not evidence.  That's Cooper-talk telling you that this

01:27 6  feature may have been different.  We don't know, that's

01:27 7  not sufficient evidence.  What we do know, what we do

01:27 8  know as a matter of indisputable fact is that the

01:27 9  license was for seven years, seven-year license covering

01:27 10 all of their products.

01:27 11          That's the Apple license.

01:27 12          Now, I want to say one word about usage

01:27 13 and IP addresses.  I don't want to lose you-all.  This

01:27 14 is very important.  Do you remember there was a question

01:27 15 with Judge Rader, and Judge Rader read the word

01:27 16 approximately or approximate number when it should have

01:28 17 been appropriate number?  The jury instruction said you

01:28 18 have to find the appropriate number of uses, and Judge

01:28 19 Rader said, you have to find the approximate number of

01:28 20 uses.  Remember that?  And that's a huge difference.

01:28 21 And here's why.

01:28 22          Approximate number of usage -- uses

01:28 23 doesn't work.  For a damages calculation, you need to

01:28 24 know with precision, you need to know exactly the number

01:28 25 of uses.  That's why that change in the jury instruction

01:28 1  is so important.  That's a big difference, approximate

01:28 2  doesn't work.  And what we know is the following:

01:28 3          The plaintiffs are relying on IP

01:28 4  addresses.  Do you remember that?  IP addresses hit the

01:28 5  servers.  And there were millions of IP addresses.  I

01:28 6  think for Red Hat, there's 60 -- 6.5 million IP

01:28 7  addresses, remember?

01:28 8          So what the Plaintiffs do is they take

01:28 9  that number, and they say, that's the number of units,

01:28 10 that's the number of units, 6.5 million.  Here's what we

01:28 11 know, though, as a matter of fact.  That's not the

01:29 12 number of units.  The best the Plaintiffs will tell you

01:29 13 is it might be higher than that.  It might be lower than

01:29 14 that.  There is no evidence -- more than no evidence.

01:29 15 All the evidence is to the contrary that in any way IP

01:29 16 addresses approximates usage let alone demonstrates it.

01:29 17         Michael Tiemann testified unequivocally:

01:29 18 Okay.  Thank you.  So let's take RHEL first.  Does Red

01:29 19 Hat count the number of RHEL users?  No.  Ever?  No.

01:29 20 Does Red Hat count the number of Fedora users?  No.

01:29 21 Ever?  No.

01:29 22         Markus Rex:  So just to be clear, is it

01:29 23 possible to determine the number of users of OpenSUSE

01:29 24 products?  No, it is not.  Is it possible to do that

01:29 25 using IP addresses?  No, it is not.

01:29  1          Remember all the discussion of IP address?

01:29  2  You cannot look at IP addresses as the number of users.

01:29  3  They're just is a disconnect there.  There is no

01:29  4  evidence to the contrary.  But here's what they do.  It

01:29  5  gets worse.  So they start with the number of IP

01:29  6  address, right, 6.5 million IP addresses, something like

01:30  7  that.  That's worldwide.  Everyone knows that.  That's

01:30  8  worldwide.  So the first thing, and I won't keep

01:30  9  reminding you, but I want you to keep in your mind that

01:30 10  even if you talk about IP addresses as users -- as users

01:30 11  is wrong.  That's wrong.  All the evidence in this case

01:30 12  says that.  You can't do that.  But let's say we're

01:30 13  going to just for a moment and we'll follow the

01:30 14  Plaintiffs' lead on that.

01:30 15          So IP addresses are users just for

01:30 16  purposes of this discussion.  But the Plaintiffs are

01:30 17  only entitled to the number of uses in the United

01:30 18  States.  That's the law.  They can't get uses outside

01:30 19  the United States.  That's just how it works.  So

01:30 20  they've got to figure out a way to go from 6.5 million

01:30 21  to -- which is worldwide -- to the number in the United

01:30 22  States, okay?  There actually is one thing, and on this

01:30 23  subject, Michael Tiemann, Markus Rex, were unequivocal

01:30 24  and in agreement, there's one thing that you know with

01:30 25  certainty from IP addresses, the country of origin.

01:30 1          The IP addresses are set by the United

01:30 2 States Department of Commerce.  The IP address to a 99.8

01:31 3 percent certainty tells you the country of origin.  So

01:31 4 they start with the IP address, which is wrong, and they

01:31 5 say that's 6.5 million.

01:31 6          Now, they need to get to the number of

01:31 7 U.S.  We know that number.  We actually know that number

01:31 8 with certainty.  We know the number of IP addresses that

01:31 9 are within the United States.  It is 16 percent of the

01:31 10 total, slightly less than 16 percent.  That's what

01:31 11 Michael Tiemann testified.  That we know with certainty,

01:31 12 99.8 percent certainty.  But that's a bad number for the

01:31 13 Plaintiffs.

01:31 14          Because if you start at 6.5 million and

01:31 15 you've got to only take 16 percent of that, that's

01:31 16 not -- that's not a good number.  They're not happy with

01:31 17 that number.  So they've got to ignore -- keep this in

01:31 18 mind, they start with IP addresses, the only thing we

01:31 19 know with certainty about IP addresses is the country of

01:31 20 origin, and they ignore that.  They throw the 16 percent

01:31 21 away.  Don't think about that 16 percent.

01:31 22          But they're stuck still, remember?

01:32 23 They've got to come up with a number in the United

01:32 24 States.  That they have to do.

01:32 25          So how do we do that?  The way they do

01:32  1   that is by mixing apples and oranges, taking something

01:32  2   totally irrelevant.  They say, okay, IP addresses relate

01:32  3   to Fedora, but why don't we look at the revenue

01:32  4   associated with the Red Hat Enterprise Linux products?

01:32  5   Totally different products, totally different

01:32  6   distributions.  Why don't we look at the revenue?

01:32  7           And it turns out, and you heard Michael

01:32  8   Tiemann explain why, it turns out that Red Hat gets

01:32  9   55ish percent of its revenue from the United States,

01:32 10   different products, nothing to do with IP addresses,

01:32 11   nothing to do with Fedora.  They get 55 percent of their

01:32 12   revenue for these other products in the United States.

01:32 13           Well, so, what do the Plaintiffs do?  They

01:32 14   say, let's ignore the number we know with certainty, the

01:32 15   16 percent of IP addresses, that we know absolutely with

01:32 16   certainty.  Let's ignore that.  Let's take 55 percent

01:32 17   instead from the revenue numbers and let's use that

01:33 18   because that will give us a better number.

01:33 19           Not only is that funny math, not only is

01:33 20   that no possible way to conceive of a damages award, but

01:33 21   it captures perfectly what this case is about.  This

01:33 22   case has had no merit from the start.  We don't infringe

01:33 23   these patents.  We never have.  The patents are invalid,

01:33 24   those machines invalidate the patents.  The patents are

01:33 25   invalid because of the joint Inventorship issues.  The

01:33  1    patents should never have been allowed out of the patent

01:33  2    office and they shouldn't have been asserted against my

01:33  3    clients.

01:33  4              And we -- if there are damages, it's a

01:33  5    very, very low number.  When you think about all the

01:33  6    other licenses out there, 100,000, 95,000, zero, all the

01:33  7    other licenses out there, it's a very low number.  And

01:33  8    so you have -- you have red herrings on the

01:33  9    infringement, you have slight of hand on the invalidity,

01:33 10    and you have funny voodoo math on the damages, all

01:34 11    hoping that with confusion and distraction and throwing

01:34 12    up enough concepts and enough red checks on the board,

01:34 13    there's just the possibility, a hope, maybe, you-all

01:34 14    will go back, be confused, throw up your hands, and give

01:34 15    the Plaintiffs some money.

01:34 16              That's not how it works.  That's not how

01:34 17    it should work.  That's why every day in every way we

01:34 18    have tried to make this clear for you.  We know that

01:34 19    when you get it, when you understand the issues, when

01:34 20    you see what our products do, when you see what the

01:34 21    prior art does, when you understand what the patent

01:34 22    means, when you get what they're doing with the math, it

01:34 23    will be very clear that the case has no merit and that

01:34 24    they should be awarded no damages.

01:34 25              Thank you very much.

01:34  1                THE COURT:  Mr. Hill, how long will you
01:34  2  be?
01:34  3                MR. HILL:  Probably 15 minutes at a
01:34  4  maximum.
01:34  5                THE COURT:  As we've discussed, the party
01:35  6  with the burden has the last word.
01:35  7                Mr. Hill.
01:35  8                MR. HILL:  Thank you, Your Honor.
01:35  9                Ladies and Gentlemen, thank you for your
01:35 10  attention throughout this trial.
01:35 11                I want to talk to you a little bit about a
01:35 12  couple things.  I want to ask you to do something for
01:35 13  me.  There's a reason, Ladies and Gentlemen, that we've
01:35 14  been here for a week.  And it wasn't so that we could
01:35 15  try to cram everything in your throat in the last hour.
01:35 16                We do this for a week because we have to
01:35 17  present evidence to you.  And as the Judge told you and
01:35 18  as in the written instructions you'll take back to the
01:35 19  jury room, what the lawyers stand up and tell you, isn't
01:35 20  evidence.  What I'm standing here telling you right now
01:35 21  can't be the basis for your decision.
01:36 22                So I want to ask you to do something for
01:36 23  me.  I want to ask you to just focus in your mind on
01:36 24  where you were two hours ago.  Think about it.  What
01:36 25  were your thoughts of the evidence before you heard a

01:36 1  bunch of argument, before you heard a bunch of things

01:36 2  that couldn't be the basis for a decision, what were

01:36 3  your thoughts of the evidence that you had heard over

01:36 4  the past week.

01:36 5           You heard the Judge read you the legal

01:36 6  instructions.  At the end of those legal discussions --

01:36 7  or the legal instructions where he gave you the law,

01:36 8  right there fix your mind.  Fix your mind because that's

01:37 9  the point at which you've got to make a decision.  At

01:37 10 that point in time, you had everything that Judge Rader

01:37 11 has told you you can and should rely upon to decide the

01:37 12 questions that he has put in front of you on that

01:37 13 verdict form, right then.

01:37 14          Now, I will give it to Mr. Krevitt, he is

01:37 15 a very skilled advocate.  He presented to you a very

01:37 16 robust presentation of what they say the world looks

01:37 17 like of what they say went on in this courtroom over the

01:37 18 last five days.

01:38 19          But with all due respect to Mr. Krevitt,

01:38 20 the way he sees the world ain't why we're here.  Why

01:38 21 we're here is to find out how you folks see the world,

01:38 22 to find out what was in your mind once you had heard the

01:38 23 evidence and once you had heard the law from Judge

01:38 24 Rader.

01:38 25          That's the reason we're here.  And I want

01:38  1    to make one point to you about something that

01:38  2    Mr. Krevitt had to say.  He told you that clarity is our

01:38  3    friend.  His friend.  That's what he said.  He told you

01:38  4    clarity is his friend.  I want you to think back on the

01:38  5    evidence in this case.  I want you to think about

01:39  6    whether the things he just told you were matched with

01:39  7    what you remember to be so.

01:39  8                You folks have taken extensive notes

01:39  9    through this trial.  Look back at your notes.  Look

01:39 10    at your notes and remember some of the statements that

01:39 11    Mr. Krevitt just gave you.  See if they jive with your

01:39 12    recollection of these witnesses, with your recollection

01:39 13    of the evidence you had presented to you.

01:39 14                I want to show you one thing.  I want to

01:39 15    look at the document camera to do it.  Mr. Krevitt made

01:39 16    a big point about a comment that Judge Rader reread out

01:39 17    of the jury instructions on the issue of damages.  He

01:39 18    said to you that damages have to be determined -- this

01:39 19    was his word -- with precision.  Precision.  That

01:39 20    conveys a definite meaning.  Precision.  Let's look at

01:40 21    the jury instruction.  Let's look right there at the

01:40 22    bottom of the last page of what the Judge just told you

01:40 23    was the law.

01:40 24                Plaintiffs satisfy their burden by showing

01:40 25    the extent of damages as a matter of just reasonable

01:40  1    inference, even if the damages are established by an

01:40  2    approximation.  Does that say even if the damages are

01:40  3    established with precision or they must be established

01:40  4    with precision?  No, it doesn't.

01:40  5            I don't show you that because I don't

01:40  6    believe that we've proven damages in this case.  I

01:40  7    believe we have.  You folks saw the evidence.  I believe

01:40  8    we've proven every element of each cause of action.

01:40  9            You folks got to hear Dr. Zimmerman on day

01:40  10   one, I believe it was, testify about infringement in

01:40  11   this case and walk you through the claim language and

01:40  12   show you screen shots from the accused products so that

01:40  13   you could decide in your mind whether we had met each of

01:41  14   those claim limitations, whether these accused products

01:41  15   practice, tread on our property.

01:41  16           But Mr. Krevitt, to hear him talk, that

01:41  17   didn't happen.  The reason I show you that, folks, is

01:41  18   that this is like all lawsuits, it comes down to

01:41  19   deciding who you believe.  It comes down to credibility.

01:41  20   Credibility.

01:41  21           If you look at the evidence that's

01:41  22   presented to you and then you see that evidence get

01:41  23   tested on cross-examination, and you have to decide,

01:41  24   we've got two people saying different things, and each

01:41  25   person's story is being tested.  It's being tested in

01:41 1   what we, in this American system of justice, call the

01:42 2   crucible of trial.  That's what we do here.

01:42 3            We lay the evidence out before you so that

01:42 4   you folks can decide what is the truth, not who's got

01:42 5   the best lawyer, not who can put the best spin on it,

01:42 6   but who can tell you and is telling you the truth.

01:42 7            You've had a chance for a week to look at

01:42 8   the claim language out of these patents.  You've had a

01:42 9   chance for a week to see pictures of their products and

01:42 10  how they operate.  You've had a chance for a week to see

01:42 11  the source code from those products to show that they

01:42 12  function as described in these patents.  And you've had

01:42 13  a week to hear people tell you, didn't do it, can't do

01:42 14  it, but if we do do it, somebody did it before us.  And

01:42 15  if we do do it, maybe they were too generous in giving

01:43 16  credit for the invention.  And if we do do it and the

01:43 17  patents are valid, well, we really can't figure out how

01:43 18  many of these things we sell.  And if we do do it and

01:43 19  the patents are valid and we can't figure out how many

01:43 20  of these things they sell, the attempts they make to

01:43 21  figure out how many we sold, those aren't any good.

01:43 22            Where does it stop?  Where does the

01:43 23  cafeteria line stop?  They want to lay it out there for

01:43 24  you and ask you to pick off their cafeteria-line

01:43 25  defense.

01:43   1          But all you folks have to do is focus on

01:43   2   the evidence.  And if you focus on the evidence and you

01:43   3   focus on what you see in this courtroom, a Plaintiff who

01:43   4   decided they wanted to stand up for their property

01:43   5   rights, knowing when they stood up for the property

01:44   6   rights that they were going against the behemoths of the

01:44   7   industry, knowing that they were going against people

01:44   8   who openly say they hate software patents, knowing that

01:44   9   they were going to have to sue those folks, and they

01:44  10   were going to be put through three years of hell just to

01:44  11   get here to try to get a fair shake to try to hope that

01:44  12   a jury would look at the situation and judge it on the

01:44  13   facts, judge it by what they believe is the truth, not

01:44  14   by what the best experts you can buy, that you can

01:44  15   purchase, and the best lawyers you can hire.  Not

01:44  16   depending on how they can spin it.

01:44  17          My clients took that on.  And they knew it

01:44  18   would be -- they'd have to weather the storm to get

01:44  19   here, and they have.  They've weathered the storm.  And

01:45  20   now they want you folks to find the truth.  And they

01:45  21   want you folks to look at their invention, look at the

01:45  22   products that they believe practice their invention and

01:45  23   award them what is fair and just compensation for

01:45  24   somebody trading on other people's property.

01:45  25          Thank you for your time.  I appreciate

01:45  1   your hard work this week.  I appreciate the hard work

01:45  2   you're fixing to have to go do.  And I thank you for

01:45  3   your verdict.  Thank you, Your Honor.

01:45  4              THE COURT:  Ladies and gentlemen, we've

01:45  5   reached the point where you will deliberate, you will

01:45  6   deliberate according to the instructions I've given you,

01:45  7   you will follow the law I've given you.  You will bring

01:45  8   us a verdict.  If you need to communicate, follow the

01:45  9   instructions I've given you on that.

01:45 10              Thank you very much for your service.

01:45 11   We'll hear from you again when you have a verdict.

01:46 12   Thank you.

01:46 13              All rise for the jury.

01:46 14              (Jury out.)

01:46 15              THE COURT:  Gentlemen, I'll have access to

01:46 16   you if I need you?  That means I need somebody here at

01:46 17   the -- I need somebody here at the courthouse at all

01:47 18   times so that, if necessary, I get a question or

01:47 19   something, I can have access to all of you within

01:47 20   minutes, please.  Thank you very much.

01:47 21              MR. LYON:  One minute, Your Honor, just

01:47 22   these disks need to be taken into the jury room, I

01:47 23   understand.

01:47 24              THE COURT:  That is correct.

01:47 25              Will you take care of that, Mr. Stewart

01:47  1  and Ms. Dickman.

01:47  2                    (Recess.)

01:47  3                    (Jury out.)

       4                    THE COURT:  We've received a communication

02:58  5  from the jurors, and I'll read it.  It says simply:

02:58  6  Copy of Judge's instructions.

02:58  7                    MR. GASEY:  I think there was an agreement

02:59  8  between the parties last night that we weren't going to

02:59  9  supply the instructions, and in the absence of getting

02:59 10  Defendants' lawyers crossways with their partners, I

02:59 11  think we should probably stick with that agreement for

02:59 12  the moment, Your Honor.

02:59 13                    MS. LAVALLE:  That's correct.  We did

02:59 14  agree.

02:59 15                    THE COURT:  Then I will draft a response,

02:59 16  which I'll read to both of you.

02:59 17                    MR. GASEY:  All right.

02:59 18                    MR. GIBBONS:  Just so it's clear, the

02:59 19  instructions Your Honor read to the jury, right?

03:00 20                    DEPUTY CLERK:  Right.

03:00 21                    (Pause in the proceedings.)

03:00 22                    THE COURT:  Ms. LaValle, Mr. Hill,

03:00 23  Mr. Gasey:  Because you've both heard and read along

03:00 24  with the Court's legal instructions, you've received all

03:00 25  you need to receive to proceed for a verdict, Judge

```
03:00  1  Rader.
03:00  2              Will that be fine?
03:00  3              MR. GASEY:  It's agreeable with us, Your
03:00  4  Honor.
03:00  5              MS. LAVALLE:  Yes.
03:01  6              THE COURT:  Thanks.  If you'd stay
03:01  7  available.  We never know what they may want to hear
03:01  8  from us.
03:01  9              (Further jury deliberations.)
03:54 10              (Jury out.)
03:54 11              THE COURT:  I understand we have a
04:00 12  verdict.  We're all professionals and we've probably
04:00 13  done this plenty of times, but it's never inappropriate
04:00 14  to remind ourselves that we don't react whatsoever to
04:00 15  whatever they say.  There are times for reaction outside
04:00 16  of the courtroom later.
04:00 17              I'm going to call them in; we'll hear that
04:00 18  verdict.
04:00 19              Do you wish to have the jury polled?
04:00 20              MR. HILL:  No, Your Honor, not from the
04:00 21  Plaintiffs.
04:00 22              THE COURT:  Mr. Krevitt, do you wish to
04:00 23  have the jury polled?
04:00 24              MR. KREVITT:  No, Your Honor.
04:00 25              THE COURT:  Then we'll take their verdict,
```

04:00  1   and then I'm going to go back and talk to them for a few

04:01  2   minutes.  I'll tell them a couple of things.  I'll tell

04:01  3   them that under Eastern District rules, you're not to

04:01  4   contact them, but they could contact you and that you'd

04:01  5   probably all like to talk to them, if they do.

04:01  6                And I'll also listen to them a little bit.

04:01  7   It's always important for them to feel like they've had

04:01  8   a chance to air their views a little bit to me.  So I'll

04:01  9   do that.

04:01 10                Then I'll return here, and I would like to

04:01 11   have just a minute to tie up loose ends, see what we may

04:01 12   need to do from here or not do from here.

04:01 13                All ready?

04:01 14                MR. GASEY:  Yes, Your Honor.

04:03 15                (Jury in.)

04:03 16                THE COURT:  Please be seated.

04:03 17                May I inquire who is the Foreperson?

04:03 18                Ms. Bates?

04:03 19                FOREPERSON:  Yes.

04:03 20                THE COURT:  Would you get from Ms. Bates

04:03 21   the verdict form.  I'll return that to you in just one

04:03 22   moment.  I'm just checking to make sure it's completed

04:04 23   at this point.

04:04 24                FOREPERSON:  Yes, sir.

04:04 25                (Pause in the proceedings.)

04:04  1                      THE COURT:  It does appear complete.

04:04  2                      Would you take that back to Ms. Bates.

04:04  3                      Ms. Bates, would you stay standing, and

04:04  4    I'm going to ask you -- there are 23 questions there.

04:04  5    I'm going to ask you just in numerical order.  I think

04:04  6    we all know what the questions are.  I'll ask you

04:04  7    Question No. 1, 2, 3, 4 --

04:04  8                      FOREPERSON:  Okay.

04:04  9                      THE COURT:  -- all through the 23, and

04:04 10    you'll just give me the unanimous verdict of your jury.

04:05 11                      Question 1 is a yes or no on infringement.

04:05 12                      FOREPERSON:  No.

04:05 13                      THE COURT:  Question 2?

04:05 14                      FOREPERSON:  No.

04:05 15                      THE COURT:  Question 3?

04:05 16                      FOREPERSON:  No.

04:05 17                      THE COURT:  Question 4?

04:05 18                      FOREPERSON:  No.

04:05 19                      THE COURT:  Question 5?

04:05 20                      FOREPERSON:  No.

04:05 21                      THE COURT:  Question 6?

04:05 22                      FOREPERSON:  No.

04:05 23                      THE COURT:  Question 7?

04:05 24                      FOREPERSON:  No.

04:05 25                      THE COURT:  Question 8?

04:05  1                    FOREPERSON:  No.

04:05  2                    THE COURT:  Question 9?

04:05  3                    FOREPERSON:  No.

04:05  4                    THE COURT:  Question 10?

04:05  5                    FOREPERSON:  No.

04:05  6                    THE COURT:  Question 11?

04:05  7                    FOREPERSON:  No.

04:05  8                    THE COURT:  Question 12?

04:05  9                    FOREPERSON:  No.

04:05 10                    THE COURT:  Question 13?

04:05 11                    FOREPERSON:  No.

04:05 12                    THE COURT:  Question 14?

04:05 13                    FOREPERSON:  No.

04:05 14                    THE COURT:  Question 15?

04:05 15                    FOREPERSON:  No.

04:05 16                    THE COURT:  Question 16?

04:05 17                    FOREPERSON:  No.

04:05 18                    THE COURT:  Question 17?

04:05 19                    FOREPERSON:  Yes.

04:05 20                    THE COURT:  Question 18?

04:05 21                    FOREPERSON:  Yes.

04:05 22                    THE COURT:  Question 19?

04:06 23                    FOREPERSON:  Yes.

04:06 24                    THE COURT:  Question 20?

04:06 25                    FOREPERSON:  Yes.

04:06  1            THE COURT:  Question 21?

04:06  2            FOREPERSON:  Yes.

04:06  3            THE COURT:  Question 22?

04:06  4            FOREPERSON:  Zero.

04:06  5            THE COURT:  Question 23?

04:06  6            FOREPERSON:  Zero.

04:06  7            THE COURT:  Thank you.  Now if you will

04:06  8  return that to the verdict form.

04:06  9            Yes, we'll give that to Jan.

04:06 10            Everything clear, Mr. Krevitt, Mr. Gasey?

04:06 11            MR. GASEY:  Yes, Your Honor.

04:06 12            MR. KREVITT:  Yes, Your Honor.

04:06 13            THE COURT:  Fine.  What I'd like to do at

04:06 14  this point is first, in the presence of everyone who's

04:06 15  participated here, I'd like to express our great thanks

04:06 16  to you for your time and your efforts.  And I'm going to

04:07 17  express even more than that in just a few moments.

04:07 18            I'd like to return with you to the jury

04:07 19  room and just for a few minutes be available to you to

04:07 20  ask me, if I won my last tennis match, or anything else.

04:07 21  I wish to just be available to you for a few minutes.

04:07 22            I have a few things I'd like to say to you

04:07 23  to kind of wrap things up.  And I'll do that, and then

04:07 24  I'll return here for just a few minutes with all of you,

04:07 25  if I may.

04:07  1          So, once again, formally, in front of all

04:07  2  of those who participated, we thank you.  And you're

04:07  3  dismissed from your responsibilities, and I'll join you

04:07  4  for a moment.

04:07  5          (Jury out.)

04:08  6          (Recess.)

04:08  7          THE COURT:  I'm sorry to hold you here for

04:24  8  a little longer.  Could we talk just a little?

04:24  9          One thing I wanted to say that probably is

04:24 10  well understood, but I want to say it anyway, and that

04:24 11  is when this case is appealed, and I expect it will be,

04:24 12  I can absolutely guarantee you that Circuit Judge Rader

04:24 13  will have absolutely no knowledge about when the case is

04:24 14  filed.

04:24 15          Even though at that time, he'll be the

04:24 16  Chief Judge, he will ensure that he does not even know

04:24 17  when it's to be heard.  The Cornell case that I handled

04:24 18  last year was heard last month.  I didn't know that

04:24 19  until one of my colleagues mentioned in the elevator.

04:25 20          They were swiftly upbraided that they

04:25 21  should not have mentioned it in the elevator, but I'm

04:25 22  just mentioning that so you know that I will not have

04:25 23  anything to do with that.

04:25 24          And if we have altogether made some

04:25 25  mistake, we'll come back and we'll do this again, and

04:25  1    I'll come back and do it.

04:25  2                    Now, what remains for us to do, I need

04:25  3    advice from any of you on things that we might need to

04:25  4    follow up with.

04:25  5                    MR. HILL:  Your Honor, at this point --

04:25  6                    MR. REITER:  Do you guys want to -- we

04:25  7    have the Rule 50 after judgment, which obviously this is

04:25  8    a judgment.

04:25  9                    But do you guys want to pick a day, like a

04:25 10    week --

04:25 11                    MR. GASEY:  That's fine.  If we could have

04:26 12    a week to go ahead and to file and get perfected our

04:26 13    Rule 50 motions.

04:26 14                    THE COURT:  That would be just fine.  Is a

04:26 15    week enough?

04:26 16                    MR. REITER:  How about two weeks?

04:26 17                    MR. GASEY:  Two is fine with us.

04:26 18                    THE COURT:  We've all been rushing to get

04:26 19    to this point, and we don't have to rush anymore.  So

04:26 20    two weeks will be fine with me.

04:26 21                    Mr. Gasey and Mr. Reiter, Mr. Krevitt, two

04:26 22    weeks then.

04:26 23                    Anything beyond that?

04:26 24                    MR. GASEY:  Not from the Plaintiffs.

04:26 25                    THE COURT:  I assume that --

04:26  1                    COURT ROOM DEPUTY:  The trial exhibits.

04:26  2                    THE COURT:  Yes, what do we do with the

04:26  3  trial exhibits?

04:26  4                    MR. REITER:  Until judgment is entered, I

04:26  5  think they have to stay with the Court.

04:26  6                    THE COURT:  Well, I will enter judgment

04:26  7  forthwith, if there's no reason for me to slow down.

04:27  8                    MR. GASEY:  No, Your Honor.

04:27  9                    THE COURT:  Then that will happen as soon

04:27 10  as I can find the right form and sign it.  And if

04:27 11  there's nothing further, then I will release you.

04:27 12                    And let me say that regardless of

04:27 13  outcomes, it's kind of sad that there's an outcome in

04:27 14  these sorts of events, but there is.  I've been

04:27 15  absolutely delighted with the character and performance

04:27 16  of counsel.

04:27 17                    I came down here to the Eastern District

04:27 18  for a couple reasons, and I can say I was impressed

04:27 19  enormously with the jury pool.  I've told you that.

04:28 20  I've never had a jury pool where people didn't try to

04:28 21  evade responsibility more than accept it, and you don't

04:28 22  see that here.  And I thought counsel can be enormously

04:28 23  proud of themselves on both sides.

04:28 24                    Thank you, Gentlemen.

04:28 25                    There's an order been filed you're to

04:28 1  follow that you get to take away the exhibits, but

04:28 2  you've agreed to file copies on a DVD that I will

04:28 3  receive, that the Court will receive.

04:28 4                      You understand all that?

04:28 5                  MR. GASEY:  Yes.

04:28 6                  MR. REITER:  That's fine, Your Honor.

04:29 7                  THE COURT:  It's on the record.

04:29 8                  COURT ROOM DEPUTY:  The original patents

04:29 9  are in the jury room.  Do you want to take those?

04:29 10                 MR. GASEY:  Yes.

      11                     (Court adjourned.)

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

1                        <u>CERTIFICATION</u>

2

3

4              I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10   _____        _____

11   DONNA COLLINS, CSR                  Date
     Deputy Official Court Reporter
12   State of Texas No. 1086
     Expiration Date:  12/31/10
13

14

15   _____        _____
     GLENDA FULLER, CSR                  Date
16   Deputy Official Court Reporter
     State of Texas No. 1042
17   Expiration Date:  12/31/10

09:21 18

19

20

21

22

23

24

25